**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

HEWLETT-PACKARD COMPANY        *    4:18-CV-00762
                               *
V.                             *    10:09 A.M. to 5:14 P.M.
                               *
TOSHIBA CORPORATION, ET        *
AL                             *    OCTOBER 21, 2019

**TRIAL**
**BEFORE THE HONORABLE DAVID HITTNER**
**AND A JURY**
**Day 5 of 6 Days**

**APPEARANCES**

**FOR THE PLAINTIFF:**
Mr. Alistair B. Dawson
Mr. Alex Benjamin Roberts
Mr. Garrett Scott Brawley
Beck Redden LLP
1221 McKinney
Suite 4500
Houston, Texas 77010
(713) 951-6225

**FOR THE DEFENDANT, QUANTA STORAGE, INC.:**
Mr. David A. Carman
Wolk & Levine, LLP
535 North Brand Boulevard
Suite 300
Glendale, California 91203
(818) 241-7499

**ALSO IN ATTENDANCE:**
Mr. Brad Hartz
Mr. Russell Hudson
Ms. Liz Poirrier
Mr. Jake Wang

Court Reporter:
Laura Wells, RPR, RMR, CRR
515 Rusk Street, Suite 8004
Houston, Texas 77002

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**DAY 5**
**(Trial)**

Page

OCTOBER 21, 2019

Hearing on Plaintiff's Motion.....................   495
Hearing on Defendant's Motion....................   496
Plaintiff Rests.................................   501
Defendant Rests.................................   501
Jury Charge.....................................   505
Closing Statement by Mr. Roberts................   529
Closing Statement by Mr. Dawson.................   543
Closing Statement by Mr. Carman.................   560
Rebuttal Closing Statement by Mr. Dawson........   562
Jury Deliberations..............................   570
Reporter's Certificate..........................   572

**ALPHABETICAL**

**WITNESSES**                                        **Page**

**DEBRA J. ARON, Ph.D**
    Direct Examination By Mr. Dawson            383
    Cross-Examination By Mr. Carman             488

*Laura Wells, CRR, RDR*

**PROCEEDINGS**

**(Call to order of the Court.)**

THE COURT:  Good morning.  Ready to crank it up?

MR. DAWSON:  We are.

THE COURT:  Let's get the jury in.  Is it warm in here?

MR. DAWSON:  It's a little warm.  It doesn't bother me.  It might bother others.

THE COURT:  Okay.  Bring it down just a bit.

CASE MANAGER:  All rise for the jury.

(Jury entered courtroom at 10:09 a.m.)

THE COURT:  All right.  Be seated, please.  It was an exciting weekend sports-wise.  Now we are going to have an exciting week court-wise.

All right.  Counsel, call your next witness, please.

MR. DAWSON:  Your Honor, HP calls Dr. Debra Aron.

THE COURT:  Raise your right hand to be sworn, please.

(Witness sworn by case manager.)

THE WITNESS:  I do.

THE COURT:  Thank you.  You may have a seat.

**DEBRA J. ARON, Ph.D,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. DAWSON:

**Q.**   Good morning.

**A.**   Good morning.

**Q.**   Can you introduce yourself to Judge Hittner and to the ladies and gentlemen of the jury, please.

**A.**   My name is Debra Aron, and I am an economist from Chicago.

THE COURT:   How do you spell your last name, please?

THE WITNESS:   It's A-r-o-n.

BY MR. DAWSON:

**Q.**   Now, I introduced you or called you as Dr. Debra Aron. Is that because you have a Ph.D?

**A.**   I do.   I have a Ph.D in economics.

THE COURT:   From where?

THE WITNESS:   University of Chicago.

BY MR. DAWSON:

**Q.**   We'll get into that in some detail later.  Tell us about yourself.  Where did you grow up?  Married?  Kids? Things of that nature.

**A.**   I live in Chicago.  I grew up and was born and raised in Los Angeles.  I came to Chicago for graduate school, and I have lived there pretty much my whole adult life.

I'm married to the same man for over 30 years.  I have three grown children.  Let's see.  One is in Brooklyn, one is in San Francisco, and one is in Phoenix.

**Q.** All right. Where are you employed?

**A.** I'm employed by a consulting firm called Charles River Associates or CRA.

**Q.** What is Charles River Associates? What does it do?

**A.** Charles River is a consulting firm. We're primarily economists and some other professionals who engage in economic analysis for policy and for regulatory purposes, for business strategy, and also for litigation like this.

**Q.** And you said that you were an economist. Tell us: What is an economist and what is the study of economics?

**A.** Well, economics is the study of how society allocates resources. And so what that means is it's the study of how business firms make decisions about how much to produce and what to produce and what prices to charge and how consumers make decisions about how to buy and how all of those decisions interact with each other to arrive at competition and arrive at prices in the market and products that companies produce in the marketplace.

**Q.** And does part of economics involve how prices are set?

**A.** Yes. One of the areas of economics is how prices are set, and that's one of my areas of specialty or expertise.

**Q.** Okay. I think we're going to talk about that a little later in your testimony. What are your duties as vice president at Charles River Associates?

**A.** Well, I am a vice president. That's my title. And in

that role I provide my expertise to clients on projects involving, as I said, public policy or regulatory issues, business strategy issues, mergers, antitrust cases like this one.

Q.   Where did you work before Charles River Associates?

A.   I was doing essentially the same work at another consulting firm called Navigant, which last year changed its name to Ankura when they were bought by this company Ankura.

Q.   Okay.  And were you at Navigant when you were originally retained by HP in this case?

A.   I was.  I was originally retained in 2015 in this case; and at that time, I was at Navigant.

Q.   Okay.  So you have been working on this case for four years?

A.   I have.

Q.   Is there an industry or subject matter that you have kind of specialized in over the course of your -- how long have you been doing this?  30 years?

A.   I have.  I have been a professional economist for over 30 years.

Q.   Is there an area of specialty that you have had over the course of your 30 years of experience?

A.   Well, the first ten years of my career I was a full-time academic.  I was teaching at Northwestern

University.

And in the course of that work and then as I transitioned to consulting, I was working quite a lot; and probably most of my work in the last 20 years has been in communications, the communications industry, telecommunications, and technology.

And so my work in the last 20 years has been largely related to policy and regulatory and disputes issues in telecommunications and technology industries.

Q.   All right.  Do you have experience teaching as well?

A.   I do.  As I mentioned, I --

MR. DAWSON:  Hold on a second.  Can we bring up slide one, please, Ms. Poirrier.

THE COURT:  Do you want the light off?

MR. DAWSON:  Whatever.  I think the jury prefers that.  So I think that's preferable.

THE COURT:  Is that screen on there yet?

MR. DAWSON:  It is not, Your Honor.

THE COURT:  Hang on one second.  If not, I'll get Ellen, the expert, in here.  All right.  When you see her come in -- oh, there it goes.  Okay.

MR. DAWSON:  Well done, Your Honor.

THE COURT:  All right.  Go on.

BY MR. DAWSON:

Q.   Tell us about your teaching positions, Dr. Aron.

**A.**   Sure.  When I finished graduate school, I went to Northwestern University where I taught at the Kellogg Graduate School of Management for, as I said, about ten years.  And when I was there, I taught courses in managerial economics.  I taught pricing theory, and I taught a Ph.D course in the -- called the economics of information.

And since that time, when I left Northwestern as full-time faculty and took on my consulting job, I stayed in teaching.  I continued to teach one course a year, most years, still at Northwestern; and at that time, I was teaching a course in competition and strategy in communications markets.  And I did that until about three years ago, when I stepped back from teaching.

**Q.**   Now, my research tells me that you have also taught first graders from time to time.  Tell me about that.

**A.**   Well, I am involved in a project in Chicago where we teach first graders to read in the inner-city schools.

**Q.**   In addition to teaching, tell us about your scholarly research that you have done.

**A.**   Well, as part of my work I do engage in research.  I have published my research in the major peer-reviewed professional journals in my field in economics.  I have also published research articles in book chapters, and I wrote -- I co-wrote the economics chapter of the American

Bar Association's Practice Guide on Telecommunications and Antitrust.

MR. DAWSON:  All right.  Ms. Poirrier, could you bring up Plaintiff's Exhibit Number 245, please.

BY MR. DAWSON:

Q.   This is a copy of your resume that's in evidence in this case.  I just want to go over, briefly, the publications section there.  Is that the publications that you were just referring to, some of them?

A.   Some of them, yes.

Q.   Okay.

A.   I think it goes on.

Q.   And if you turn to the next page, there is another full page of those and another full page or another partial page after that.  By my count, there was 26 different publications that you have authored.  Does that sound about right?

A.   That sounds about right.  Over 20 I know for sure.

Q.   The next section of your resume talks about presentations.  Tell us about your presentations.

A.   As part of my work I am often invited to speak at either other universities, major universities, or before conferences or legislatures, regulators, on my research and my work.  And those are listed -- some of those are listed here on this page that you see.  They are all

listed on my resume.

MR. DAWSON:  Okay.  If you could show the next couple of pages, please, Ms. Poirrier.

BY MR. DAWSON:

Q.    Another page of your presentation and another page and then another one after that.  I counted approximately 80 different presentations that you have made.  Does that sound about right, Dr. Aron?

A.    That sounds about right, yes.

MR. DAWSON:  Okay.  If we could go back to the slide, please, Ms. Poirrier.

BY MR. DAWSON:

Q.    You mentioned -- in your earlier testimony you mentioned telecommunications and antitrust.  What is antitrust?

A.    Antitrust is the area of law that governs the importance of competition among firms.  And so antitrust law -- one of the things that antitrust law talks about is that companies are expected to compete with each other and that if they don't compete with each other by, for example, as in this, the issue in this case, fixing prices or agreeing with each other to set prices, set bids, restrict their output in some way that is not part of their normal competition, that that is against the law. That's the area of law that governs behavior that impedes

competition in ways that can harm consumers and harm the economy.

Q.    Now, have you testified as an expert witness before?

A.    Yes, I have.

Q.    Okay.  Have you won awards for your research and your work as an economist?

A.    I have.  When I was an academic full-time, I won a number of research fellowships, research grants, and other awards, as you see listed here in this demonstrative.

Q.    I'm curious about the IBM chair.  What is the IBM chair?  What do you have to do to get that award?

A.    That was support for my research when I was an academic at Northwestern University, and it's awarded in -- competitively in response to the quality of one's research that one is conducting and that one is working on at the time.

Q.    Okay.  Now, you have been retained by HP in this case. Do you normally work for the plaintiffs, or do you do work for both plaintiffs and defendants?

A.    In my work, I work sometimes for plaintiffs, sometimes for defendants.  I would say, in this case, HP is a plaintiff.  So my client is a plaintiff.  Probably more often I work for defendants, but it's pretty balanced between the two.

Q.    Have you ever worked for HP before this case?

**A.** No, I haven't.

**Q.** Have you ever worked for me or my law firm before this case?

**A.** No.

**Q.** Okay. How is Charles River Associates compensated for the work that you do in this case?

**A.** My company bills for my time and for the time of my team, my staff that works on the cases that I am engaged in, including this one.

**Q.** And we're going to talk about some of the work that you did a little bit later, but you all have calculated you have spent over 8,000 hours working on this case in the four years that you have been working on the case, correct?

**A.** That's right.

**Q.** And how much have you or the company -- not you but the companies you are affiliated with, how much have you been compensated for your work in this case?

**A.** I believe that the total billings came to about $4 million.

**Q.** And just so we all know, does that -- the amount you have been paid have any bearing whatsoever on your testimony in this case?

**A.** No.

MR. DAWSON: Okay. Your Honor, we present

*Laura Wells, CRR, RDR*

Direct Examination of Debra J. Aron, Ph.D                  Day 5 - 393

Dr. Aron to the Court as an expert who is qualified on damages and antitrust price-fixing cases.

THE COURT: I haven't heard any objection. So please proceed.

MR. DAWSON: All right.

BY MR. DAWSON:

Q. All right. Let's talk about your work in this case, Dr. Aron. What was your assignment by HP when you were retained?

A. I was asked to assume that there was a price-fixing conspiracy in this case and to estimate or quantify what -- whether there were damages that HP suffered as a result of that price-fixing conspiracy and, if there were damages, how much were they.

Q. All right. And your slide up here references DVD drives. We have heard testimony in this case that there were both DVD drives and CD drives that make up the optical disc drives that are the subject of the case.

Why did you not include CD drives in your work?

A. So my analysis did focus only on DVD drives and that's because, as we'll talk about I think later, my analysis of damages, which is to assess whether HP was charged more for the products that it purchased than it would have paid had the companies been competing with each other instead of conspiring with each other.

That analysis I conducted is based on data, and it's based on analysis of that data. And when you see the way I approached that problem and conducted that analysis, you'll see that -- why the data that I had wasn't sufficient for me to quantify damages associated with CDs. The data didn't exist for the approach that I took. So I think the jury will see that.

It's not to say that there were no overcharges or damages associated with those products. It's just that I couldn't conduct my analysis with respect to those products.

Q. All right. Now, you say in here that you were asked to assume that a conspiracy to fix prices for optical disc drives occurred. Why were you asked to assume that?

A. That's the standard way that a damages expert, which is what I -- my role in this case, has to conduct a damages analysis. And that's because if your job is to quantify what the damages are, if it turns out that the plaintiff's allegations are true, the only way you can logically go about that is to assume that the allegations are true. Because if the bad acts didn't happen, then there are no damages.

So when I am a damages expert for a plaintiff or for a defendant in the case, you make the same assumption, which is that the allegations are true, the bad acts happened.

And then you try to figure out how much are the damages, if any.

Q.   Well, if you are assuming that there was a price-fixing conspiracy, have you necessarily assumed that there were damages associated with that conspiracy?

A.   Oh, no.  The fact that a price-fixing conspiracy occurred, as I assume, doesn't mean necessarily that it was effective in increasing prices and causing harm to HP. So I didn't assume that the price-fixing conspiracy caused harm.  That's what I analyzed and looked at the data to determine.

Q.   Let's talk about the work that you and your staff did in this case.  If you could give us an overview of these 8,000 hours that you all spent.  Tell us what you did and why it was important for your work.

A.   Sure.  Well, as I said, we began this work in 2015. And in the course of that work we had to analyze a lot of different data sets and a lot of different voluminous data.  So as it turned out, there were over 400 million ODDs purchased, and I had data, as I think we'll talk about, on over 6,000 -- sorry -- 600,000 transactions during the course of the period of data that I had.

Q.   Let me interrupt you a second.

A.   Sure.

Q.   The 600,000 transactions, tell us more.  What kind of

*Laura Wells, CRR, RDR*

transactions are you talking about?

**A.** A transaction is every time HP purchased, made a purchase of optical disc drives, that's considered or that's shown in my data as a transaction.

And so my data would show how many drives were purchased, what kind of drives they were, how much was spent, what the prices were, how many were purchased, what the date was of the purchase, some information about -- sometimes about the address to which they were delivered, the currency in which the transaction was recorded, and other details like that.

**Q.** All right. And then you say next on your slide that you accessed and searched over 250,000 files and documents in this case.

What kind of files and documents are you talking about?

**A.** The parties in the case produced a lot of materials, and that included many files of data but also many files of documents. And I think the jury has seen some of those documents in this case. Those were e-mails, reports, internal strategy documents, documents pertaining to procurement events. There were all sorts of documents that related to the issues in this case.

But then, also, my team and I gathered our own research on the industry, on analyst reports pertaining to

the industry, data pertaining to the industry, and pertaining to the products and a variety of research topics that we had to conduct in order to figure out what the products were, what computers they went into, and when they were transacted.

Q.   All right.  And you say in here that you gathered and analyzed data on the costs of ODDs.  Why did you do that?

A.   Well, I think we'll talk about this in a bit more detail later.  But in order to figure out what prices would arise in a competitive market, that's a question of supply and demand in economic terms, and that means that one of the considerations has to be what was the cost to the suppliers of making those optical disc drives.

And so we had to gather data to figure out what those costs were, and that's what I mean here.  That's not information that HP has on what the supply -- their supplier's costs are.  So that was information that I had to gather and verify from third-party sources.

Q.   All right.  And then reviewed industry reports and research articles.  What was the purpose of that work?

A.   It was important in the course of my work to understand what the products are in the industry, how they differ from each other, how the -- how the industry was thinking about what was going on at each point in time, were there inventory changes that the suppliers were

experiencing, were there factors in the industry that might be affecting the data I had that I should know about in conducting my analysis.

So to do that, I collected and my team and I reviewed many reports from industry observers and analysts on the details of what was going on in the industry throughout the alleged conspiracy period as well as after the alleged conspiracy period when the parties were no longer allegedly conspiring with each other but were competing.

Q.   All right.  Now you say on here you interviewed Mr. Russell Hudson.  The jury has heard from him earlier in the case.  What was the purpose of interviewing Mr. Hudson?

A.   Well, there were a couple of purposes.  One is I interviewed him fairly early on in my process.  And so I wanted to understand from him how the procurement process works, and that was one of his areas of expertise.  So I interviewed him about that.

As it turned out, later there were additional depositions taken in the case from other procurement managers in addition to him.  And so I had additional information from them, as well, that confirmed and reinforced and added to the information that I obtained from him.

But I also learned from him about where the purchased

drives were going when they came into the United States and other factors about the flow of the products.

Q.   And what did you learn from Mr. Hudson about the DVD drives that were shipped directly to the United States? Where were they shipped?

A.   They were shipped to three locations in the United States.  One was Ontario, California.  One was Indianapolis, and the third was El Paso, Texas.  And from there, they were incorporated into computers, and those computers were shipped out to customers around the country.

Q.   Around the United States?

A.   Around the United States, yes.

Q.   Did you also learn from him that some of the computers were shipped from -- they were assembled overseas but shipped into the United States?

A.   Yes.  I also could see that in the data.

Q.   Okay.  And were they shipped to end-user customers located throughout the United States?

A.   Yes.  That's what I understand from Mr. Hudson.

Q.   Okay.  So let me -- before we get to what you did, how come it took you 8,000 hours?  That's a lot.  I can't even do the math on how many years that is in terms of work. How come it took you so long?

A.   Well, I wanted to get it right.  There were a lot of

materials to digest, organize, collate, vet, test, and understand; but then once I -- once we started to digest those materials, we had to incorporate them and develop an analysis to figure out in a reliable way and in a testable way whether there were prices that were charged to HP during the alleged conspiracy period that were greater than the prices that they -- that they would have paid if that conspiracy had not occurred.

So we had to -- we received, I believe, 45 different complex data files that reflected transactions at the transactions level of transactions from different parts of HP, from different geographic areas, different time periods, and different product types.

We had to fully understand what the different product types were.  There wasn't just a few different product types.  There were something like 700 different product codes in the data that we had to figure out what they were and what kinds of computers they went into and so forth.

So as I said before, we had to make sure that we were understanding what was happening in the data in the context of what was happening in the industry.

And in the course of that work, my team and I were continuously testing our work, checking it, making sure it was right at every stage.  So it's not unusual in my experience that it would take this many hours to conduct a

price-fixing analysis in litigation like this, but that is what it took.

Q.   Okay.  With all this work that you did, tell us what you did with it.

A.   Sure.  So I have kind of summarized it here.  One of the things I did is I considered how HP conducts its procurement events, and I understand the jury heard about that from Mr. Hudson.

But I analyzed the way that HP conducts those procurement events to assess whether just as an economic matter what we, as economists, know about how prices are set and how procurement events like that work, is it plausible that those procurement events could give rise to or facilitate or be consistent with a conspiracy or, in the alternative, is it the case that the way that the procurement events were conducted would make it impossible to collude.  So that was one of the analyses, assessments I conducted.

Then I, with my team, designed and conducted and analyzed a test using the data available to assess whether there were, in fact, overcharges; and I did that using what is called multiple regression analyses.  It's a statistical technique that economists and other scientists use to figure out how different factors affect an outcome.

I determined from that what the prices would have been

during the conspiracy had there not been a conspiracy, and I compared those to the prices that were actually paid by HP to see if they were different.

And then I calculated the overcharges, meaning where the prices that were actually paid were higher than the prices that would have been paid without the conspiracy. That's what we call an overcharge. And then I considered how many units were bought to calculate the total overcharges in dollars.

Q.   All right.  Let me see if I can kind of set the stage. So in terms of -- we're going to talk about the procurement process.  But in terms of determining whether there were overcharges, do I understand correctly that you gathered data in a -- for a period of time when there was no alleged conspiracy?  You gathered data on supply and demand for optical disc drives?

And if I don't get it right, you correct me.  I'm a lawyer, not an economist.

A.   Yeah.  So what I did was the concept of this, you know, how do you go about figuring out what prices would have happened in a world that didn't actually exist, meaning the world during the time period of the alleged conspiracy, 2003 to 2009, if there hadn't been a conspiracy.  So we call that the but-for world, the world that would have occurred but for the conspiracy.  How do

you do that?

Well, the logic and the way I approached it and the way this is commonly approached is you say, well, let's look at how the prices came out in the period of time when there was no conspiracy. And that's called the clean period, the period that's clean of conspiracy.

And we analyzed the supply-and-demand factors that affect prices during that time period and say, well, however those factors affected the prices, they should have affected the prices the same way during the conspiracy.

So we analyze the data during the clean period, look at supply and demand, look at what the prices actually were, figure out how those factors affected the prices.

And then we say, okay, they should have affected them in a comparable way during the conspiracy period. And that is what allows me to calculate what the prices would have been in the conspiracy period.

Q. So you determine what I'll call competitive pricing in the conspiracy period and compare that to actual pricing to see if there were any overcharges?

A. Correct.

Q. And that's what you did here?

A. That's what I did.

Q. Okay. We'll get to that in more detail.

*Laura Wells, CRR, RDR*

You mentioned your team.  Tell us about your team, please.

**A.**   Sure.  I would say the four main members of my team are the very handsome individuals shown in this slide.

Dr. Tomlin was the, I call, case manager.  He worked with me on all aspects of the case, including discussing with me the methodology that we would apply, working with the data, understanding the data, supervising with me the research that we conducted.

Dr. Lenzo -- and all of the three doctors there are also Ph.D's in economics.

Dr. Lenzo did a lot of the work with me on the actual statistical analysis and some of the programming on the statistical analysis.

Dr. Corbett worked with me and helped on understanding and organizing and compiling all of those different data sets -- I think I mentioned we had 45 different data sets just from HP on transactions, as well as other data -- to make sure that we didn't have any double counting, that we didn't have any errors in the data or, if we saw things that we thought were problems, we researched them.

And Mr. Khan, who is an MBA, also did a lot of the programming of the analysis, worked with me, helped me on dealing with the data.

And then there were a half a dozen or so other more

junior staff members who worked with our team, helped on creating exhibits, performing research under my supervision and control, doing programming, checking the information, checking the data, verifying the programming and conducting all the quality control that, as part of our process, we always do.

Q.   And have you supplied us with the resumes of these four individuals?

A.   I have.

Q.   And they are, just in case the jury wants to look at them, Plaintiff's Exhibit Numbers 246, 248, 250, and 252, and that would give more information about each of their respective backgrounds and educations?

A.   Yes.  That's right.

Q.   Okay.  So let's talk about the conclusion that ultimately you reached as a result of all this work, and then we're going to kind of unpack it all.  Okay?

A.   Okay.

Q.   So let's see if this works.

         MR. DAWSON:  Can I go to the next slide, please.

BY MR. DAWSON:

Q.   All right.  Why don't you give us a summary of the conclusions and opinions that you reached as a result of the work that you have done in this case.

A.   Sure.  What I found is that there were overcharges.

There were damages.

THE COURT:  Hang on.  We're going to move that, what is it, the flip chart all the way in.  I have that up here on my screen, but sometimes it's clearer up there also.  All right.  Thanks.

You did a good job, Pat.  Thank you very much.

THE CLERK:  Thank you, Judge.

THE COURT:  He is probably saying I could have done it myself, too.

MR. DAWSON:  I promise you, he is not saying that, Judge.

THE COURT:  Well, whatever.  He is not saying that.  Go right ahead.

BY MR. DAWSON:

Q.  All right.  Give us the summary of your opinions as a result of all the work that you did.

A.  Sure.  So as I said, I did conclude that HP suffered damages, and I quantified them.  I found that the damages or the overcharges amounted to $176.3 million, which turned out to be just under 10 percent of the total expenditures that HP made on DVDs, on the drives that I included in my analysis, which HP spent about $1.79 billion on those products during the conspiracy period.

The conspiracy period for damages was of the third

quarter of 2003 through the second quarter of 2009; and just to reiterate the damages, what that means is that overall, that's the amount that HP paid in excess of what they would have paid during the alleged conspiracy as a result of the conspiracy itself.

**Q.** All right. Let me go over a couple of things. So did you only include in your damage analysis the DVDs that were either directly shipped to the United States or were included in PCs that were shipped to the United States?

**A.** Correct.

**Q.** So DVDs that were made for computers sold outside the United States are not included in your damage assessment; is that right?

**A.** Right. If they weren't shipped to the United States or incorporated in computers that were shipped to the United States, they were not included in these numbers.

**Q.** And what -- was it your conclusion that even though they are not included in your damage study that, nevertheless, HP was overcharged for those DVDs during the conspiracy period?

　　　　MR. CARMAN: Objection. Relevance, Your Honor.

　　　　THE COURT: What is the relevance, please?

　　　　MR. DAWSON: It shows the conservative nature of the damage model, Your Honor, because she has not included those damages in her assessment.

THE COURT:  All right.  For that purpose, I'll overrule the objection.

**A.**   Well, let me just say I included those DVDs in my analysis.  I did not include them in these numbers.  I excluded them from these numbers and -- but, since you asked, yes, I did find that there were overcharges on those excluded devices as well, DVDs.

BY MR. DAWSON:

**Q.**   Okay.  Does that -- never mind.  Let me ask a different question.  From the data that you looked at, was it your understanding that the purchases of the DVDs were by the plaintiff HP, Inc.?

MR. CARMAN:  Objection.  Calls for hearsay and no foundation.

THE COURT:  All right.  What is your response?

MR. DAWSON:  Your Honor, she can rely on information that she received as a result of the data that she looked at and all the documents that she looked at in this case.

THE COURT:  May I hear the question one more time.

MR. DAWSON:  Sure.

THE COURT:  No.  She will read it back.

THE REPORTER:  Yes, Your Honor.

"QUESTION:  From the data that you looked at, was it

your understanding the purchases of the DVDs were by the plaintiff HP, Inc.?"

THE COURT:  Overrule the objection.

A.   Yes.  As I mentioned earlier, we did quite a lot of work to understand the data that we received; and it was my understanding, based on that work, that the data was purchases by the plaintiff HP, Inc. formerly known as Hewlett-Packard Company.

BY MR. DAWSON:

Q.   And is your conclusion with respect to the damages, are those damages that were suffered by the plaintiff HP, Inc.?

A.   Correct.

Q.   During the course of your work, did you come to see what I'll call inter-company or I guess intra-company transactions between HP, Inc. and some of its subsidiaries?

A.   Yes.  That's right.

Q.   What did you do with those transactions that were between HP, Inc. and any of its subsidiaries as it relates to your damages calculations?

MR. CARMAN:  Objection.  Vague and ambiguous.

THE COURT:  Overruled.

A.   In the data files that I received, the transactions identified the supplier; and in any cases in which the

supplier was identified as an HP entity, I excluded those because I understood those to be intra-company transactions.

THE COURT:  "Intra" meaning what?  From the same company?  Within the same company?

THE WITNESS:  Correct.  Like, so from HP Korea to HP, Inc.

THE COURT:  All right.

BY MR. DAWSON:

Q.   And when you say you excluded, you didn't exclude those that related to HP, Inc., only from the subsidiary companies, correct?

MR. CARMAN:  Objection.  Vague and ambiguous, Your Honor.

BY MR. DAWSON:

Q.   Tell us what you excluded.

THE COURT:  Okay.  Rephrase it.  He is rephrasing it.

BY MR. DAWSON:

Q.   Go ahead.

A.   What is the question now, please?

Q.   What intra-company HP transactions did you exclude from your damage model?

A.   Any transactions in the data where the supplier was identified as an HP entity.  And so an example I just gave

was HP Korea.  There were a handful of others as well, and they appeared to be HP-related entities.  So I excluded them from the whole analysis.

Q.   Okay.  Let's switch gears, Dr. Aron.  Let's talk about what is a price-fixing conspiracy?

A.   A price-fixing conspiracy is an agreement among companies to set a price, maintain a price.  Sometimes it takes the form of agreeing to restrict output in order to elevate a price or to agree on bids and, for example, in this case, in procurement events or bidding events, as a way to increase the supplier's profits at the expense of the customer.

Q.   And from an economic perspective, why is it illegal to engage in price-fixing?

A.   Well, from an economic perspective it's competition between companies that drives prices down for the benefit of consumers.

So when companies are competing with each other, their incentive, if they are not colluding with each other, is to try to undercut each other so that they could win the business.  And by undercutting each other, that's to their benefit because they can win the business, but it drives the price down.

And as a group, the suppliers would all like it if they could somehow agree that they are not going to do

that, they are not going to compete with each other and instead they would agree that they will just offer some price or they will agree on what prices they are going to charge and not collectively drive the price down.

But it's that collective activity of driving the price down that's the heart of competition, and that's what benefits consumers.

And so that principle, I believe, underlies the very strong principle in the law that that is not allowed. Companies aren't allowed to agree in that way because that harms consumers and it harms the economy.

Q. And can you give us an example of a price-fixing conspiracy that we might be able to relate to?

A. Sure. I mean, you know, because price-fixing conspiracies in the United States are not legal, they generally tend -- to the extent that they are attempted, they are attempted in secret. So we don't know about a lot of them.

But one that the jury may have heard about is OPEC, the Organization of Petroleum Exporting Countries, which is currently an organization of about 14 countries that produce oil. And OPEC is an organization that is what we call a cartel, which is the same thing as a price-fixing conspiracy or collusive organization.

What they do is they agree to restrict their oil

production so as to cause the world price of oil to be higher, and that benefits them collectively.

Q.   All right.  Let me ask you this:  From an economic perspective, do competitors normally share pricing information with each other?

A.   Well --

MR. CARMAN:  Objection.  Foundation, Your Honor.

MR. DAWSON:  Your Honor, I asked --

THE COURT:  What is your response?

MR. DAWSON:  I asked her from an economic perspective.  She is an expert on economics.

THE COURT:  I'll overrule the objection.

A.   Normally, in my experience, companies are very protective of information about, for example, what they are going to bid in a competitive bid situation, and that's for good reason.

As you can imagine, if your competitors know what you are going to bid, it makes it easier for them to beat you because they know what they have to bid to win.  So normally companies would treat that information as highly sensitive if they are competing with each other.

BY MR. DAWSON:

Q.   Okay.  We have had testimony in this case, Dr. Aron, that the ODD suppliers would share information about who would and who would not participate in certain HP

procurement events.

From an economic perspective, what is the significance of that?

**A.**   Well, the way that the procurement events were structured, HP did not disclose to the bidders which companies were invited to bid.

From the bidder's perspective, if they are competing with each other, that makes -- that encourages them to be more aggressive in their bidding because they don't know who they are bidding against.

If you know who you are bidding against, that gives you information as to how aggressive you have to be or don't have to be in order to win the bid.

So it's a way of facilitating -- sharing information about who you are bidding against is a way of facilitating a coordination among you so that you can agree on who is going to win this time and maybe who would win the next time or what order you will come in in the procurement event.

**Q.**   Dr. Aron, we have also had testimony in this case that one of the things that conspirators would do is agree on rankings in procurement events, particularly auctions.

From an economic perspective, what is the significance of having the suppliers -- the ODD suppliers agree on who would get what ranking?

**A.** So I think the jury has heard that the way these procurement events were typically structured, it wasn't winner take all. The -- HP would pre-announce how many winners there would be and what share of the volume they would be allowed to supply. And typically, the lowest price would get the biggest share of the pie. And so there would be a ranking.

Well, HP didn't disclose during the course of an auction or another event, nor did it disclose later, who got what ranking. But if in the course of these events the bidders are sharing that information with each other what rank they currently are in, that helps them in a couple of ways to secure a collusive outcome.

One is they can tell if each other is cheating on their agreement; and second, they know whether they have to bid lower in order to get to the ranking that they want to achieve.

**Q.** All right. And then we have also heard testimony in this case about the ODD suppliers sharing information about inventory levels, shortage information, and road maps for future production.

From an economic perspective -- have you seen these road maps in the course of your work that I'm referring to?

**A.** I have, yes.

**Q.**   From an economic perspective, what is the significance of ODD suppliers sharing information about inventory levels, shortages, and their road maps for future production?

**A.**   Well, again, this is information that in my experience is typically very sensitive information that companies do not share with each other.  What their plans are, for example, for their future, quote-unquote, road map, like what products they are going to invest in, what research they are going to do, which products they want to emphasize, that's competitively sensitive information and it's not information that companies would normally share.

So the fact that we see them sharing that information suggests that they are not competing with each other but rather they are sharing information in order to support and contribute to their ability to reach agreement with each other on prices and outputs.

**Q.**   All right.  Let's talk about the alleged co-conspirators.  Who are the --

MR. DAWSON:  Can we go to the next one, please, Ms. Poirrier.  I don't know why my thing stopped working.

BY MR. DAWSON:

**Q.**   Who are the alleged co-conspirators?

**A.**   Well, there are several, and I think that the jury -- I saw before there was a list of them here on the easel.

And I think I'm giving the same names.

So one is Quanta, the defendants in this case, which is a company headquartered in Taiwan.  Quanta manufactured and sold optical disc drives to HP directly and also through other companies, in particular Sony and Philips, as well as at some point Panasonic.

Then HLDS, which is a joint venture between Hitachi, which is a Japanese company, and LG, a Korean company.

PLDS, another joint venture.  Philips is a Dutch company and Lite-On -- and there has previously been BenQ -- is also a joint venture.  Lite-On is a company in Taiwan.  And I'll explain in a minute why I'm saying where these companies are headquartered.  It matters for another issue in the case in my analysis.

And then TSST, which is a joint venture between the Japanese company Toshiba and the Korean company Samsung.

And then there are other companies:  Sony Optiarc, a joint venture between Sony and NEC, Panasonic, Pioneer, TEAC and NEC, which are Japanese companies, they are all alleged to be part of the conspiracy.

Q.    All right.  We have heard about the ODDs, the CD drives, and the DVD drives.  Were the sale of or the purchase of the CD drives and the DVD drives were they consistent among the different products?

A.    They occurred in different volumes at different times.

**Q.** Did you prepare a chart that shows us the different purchases of the different types of ODDs?

**A.** Yes. So this chart, what it shows from 2003 to 2010 -- thank you -- is how many of these types of products were sold worldwide. This is worldwide sales in the whole industry.

And what you see is, like, the red dotted line that is -- gets really high, that's DVD rewritable drives.

If you'll look at the blue one that's declining, those are CD-ROMs, and what you see is CD-ROMs were declining and DVD rewritables were growing.

The black one, that's another kind of CD, CD rewritable drives.

That pink line along the bottom you can hardly distinguish from the horizontal axis, that's Blu-rays of all types. They were very small during this time period.

And then there is this product called combos. Combos are DVD drives where you can read them. They are readable as a DVD, but you can write to a CD on those drives. So that's called a combo.

And what you see here is that these -- the growth and decline of these products had different patterns over time.

**Q.** What is the significance -- I'm sorry. Did I interrupt you? I didn't mean to.

**A.** Oh, I was going to say one other thing, which is that it's also significant that the CDs here kind of went pretty close to zero by the end of the conspiracy period, which was in 2009.

And as I'll explain in a bit, that's why I wasn't able to calculate overcharges related to CDs because, as I said earlier, the premise of my analysis was I looked at how prices were set in the clean period, which was after the conspiracy, but there weren't enough sales after the conspiracy to analyze that and then apply that analysis to the conspiracy period.

So even though there were a lot of CDs sold during the conspiracy period, my analysis that relies on there being a clean period didn't allow me to do that for CDs.

**Q.** All right. Have you also calculated the market share that is controlled by the alleged participants in the conspiracy?

**A.** Yes. And I have a slide on that.

**Q.** Before we leave this one, this document, by the way, is Plaintiff's Exhibit Number 293, if anyone is interested in it.

And let's look at your slide. Is this the slide that you prepared, Dr. Aron?

**A.** It is. And what this shows is the total share of worldwide sales of DVDs that were sold by those alleged

conspirators.  And again, this is all sales worldwide, not just to HP.

Q.   What is on this axis, if that's the right term?

A.   Yeah.  So the vertical axis is the share.  So it goes from zero to 100 percent.  And what you see is that in every year between 2003 and 2014, which were all the years in which I had data on this, the co-conspirators supplied over 90 percent and, in many years, close to 100 percent of all of the DVDs sold in the world.

Q.   Why does that matter?

A.   It matters because when you are engaging in a conspiracy, if the purchasers can say, you know, these guys are charging me prices that are too high.  We may not know why, but they seem high.  I'm going to go elsewhere.

     Well, if there is nowhere else to go, if there are no other qualified sellers, or if those other sellers are so small that they don't have the capacity to satisfy the needs of your demand, then you don't have an alternative, and that makes it easier to succeed in a -- in creating a cartel price or a collusive price.

Q.   So, I mean, does that suggest that HP didn't have any choice?  They effectively had to purchase from one of the co-conspirators?

A.   Yes.  That's right.  I mean, what it says is there really were not other suppliers that were selling at any

material volume relative to the co-conspirators, and we'll talk in a bit about why that is. But it limited the ability of HP to go anywhere else.

HP is a big -- a big customer. They needed suppliers that could supply a volume that they needed to produce their computers for the world. And what this shows is there really were not -- they weren't out there in any material volume.

And the importance of that, from the conspirators' standpoint, is it limits the threat that they face that their collusive price will be undercut by somebody. So it makes it easier for them to maintain a collusive price.

**Q.** During this timeframe that we're talking about, did any new, I think what you all in economics call new entrants, did any companies enter the market and start offering ODDs during this timeframe that we're talking about?

**A.** No. There were no new entrants. The only new, quote-unquote, companies that came about were combinations of the ones that were already there in the market during the conspiracy period.

**Q.** And is there an explanation for why there were companies not entering the market during this timeframe? I mean, if these companies are at above competitive pricing, why wouldn't someone have an incentive to say let

me come and offer a competitive price and I won't participate in the conspiracy?

**A.**    Right.  And there is a strong incentive for that, and the fact that we don't see it tells us that there were, what we call, barriers to entry.

One of them is that in order to be a supplier to a company like HP, the suppliers had to pass tests.  Their product had to be tested and qualified so that they were sufficiently reliable and met the standards of HP's production.  Not everyone could do that.  In fact, not every product that was tested by the co-conspirators passed the tests.  So that was one.

The other one, though, that's important is that in order to produce these products, these optical disc drives, you had to have access to patents.  And Philips, the dutch company, and the Japanese companies that I named, those were companies that owned patents.  They had developed that patented technology.

They were operating in countries, Japan and The Netherlands, where labor costs were pretty high.  And so that's why they were engaging in joint ventures or arrangements with companies in countries that had lower labor costs like Taiwan, like Korea, so that together those companies in those lower labor cost countries could produce the products but they could do so by using the

Japanese company's intellectual property.

So in order to be a, quote, entrant into this market, you both have to have access to low-cost labor in order to be competitive but you would also have to have access to those patents.  And if you weren't in a joint venture or an agreement with one of those patent-owning companies, you would have to pay to use the patented technology, and that would put you at a competitive disadvantage to the companies that were in these arrangements with the patent-owning companies.

**Q.**   Let's switch gears, Dr. Aron, and let's talk about HP's procurement process.  The jury has heard a little bit about it from Mr. Hudson.

But, first of all, have you determined the quantity of DVDs by dollar volume that HP purchased during the relevant timeframe?

**A.**   Yes, I have.  So this breaks out the dollar volume of purchases that HP made of DVDs, the products that are in my analysis.

$534 million of purchases during the conspiracy period for DVDs that were shipped directly to the United States and $1.26 billion for DVDs that were incorporated into computers that were shipped to the United States.

And I made sure, by the way, there was no double counting here.  DVDs in the first bucket are not the same

as the ones in the second bucket.

THE COURT:  What do you mean by that?

THE WITNESS:  By that I mean, Your Honor, that I made sure that I didn't count a DVD that was directly shipped to the United States as also being a DVD that was incorporated into a computer that was shipped to the United States because that would be double counting the same device.

THE COURT:  All right.

THE WITNESS:  So I made sure there was no double counting.

BY MR. DAWSON:

Q.   All right.  And I think the total you show for the relevant timeframe is $1.793 billion, correct?

A.   That's correct.  That's just the sum of the first two buckets.

Q.   And for the jury's benefit, this document is Plaintiff's Exhibit Number 304.

Let's talk about the HP procurement process.  You said one of the things that you analyzed is whether it was susceptible to price fixing; is that right?

A.   That's right.  I did.

Q.   So you learned, presumably, about the e-auction process?

A.   Yes.  There were three types of procurement events

that HP conducted.  One was called e-auctions or electronic auctions, which were conducted on an internet platform, essentially, so that the suppliers were submitting bids through a computer.

Q.   All right.  And what is the total available market? What is the significance of that?

A.   Well, so the way that these e-auctions worked is that HP would announce what the features of this auction were going to be.  So HP would announce what product they were trying to procure and the characteristics of that product. They would announce what the starting price of the auction was going to be.

And one of the other things that they announced was what is the total volume that they expected to purchase. They didn't commit to that volume, but they gave an estimate of the total volume that they wanted to purchase, and that was called the total available market.

MR. DAWSON:  All right.  Ms. Poirrier, can you also bring up Plaintiff's Exhibit Number 243, please.

BY MR. DAWSON:

Q.   In the course of your work, Dr. Aron, have you seen this document before?

A.   Yes, I have.

Q.   Tell us what this document is.

A.   So this is an announcement to --

**Q.** Would you like to go back to the first page or can you --

**A.** No. This is good.

**Q.** Okay.

**A.** This is an announcement to the suppliers for another form of procurement event which is called e-RFQ or request for quotation. This is also a procurement event that happens electronically. In other words, bids were submitted through a computer.

But in this kind of event, what would happen is the suppliers would submit bids. HP would look at the bids. They may go back and have a negotiation with the bidders, and there might be a subsequent round, or more than one subsequent round, in which there is another set of bids. And then HP would decide who the winners are.

So in an e-RFQ, this is an example of what was announced to the bidders. In this particular one, there was only one round that they were going to hold. They were going to start -- you know, announce a starting price, and the starting price was going to be lower than the last price that they paid, which was common.

And one of the things I think is important to notice here, and this is true of the e-auctions as well, as I said before, the outcome wasn't winner take all. The lowest price didn't get the entire total available market

to supply.  Instead, the lowest price would be awarded something, like in this case, 35 to 40 percent of the amount that HP was going to purchase.  And in this case, HP was going to award some of the volume to the top four, meaning the four lowest-priced bidders.

Q.  All right.  Let's switch gears, Dr. Aron.  Let's talk about Quanta.  The jury has heard a fair amount about Quanta in this trial.  We have heard from Mr. Hudson that Quanta sold $385 million in ODD products to HP and then through Sony and Philips an additional $125 million.

Are you aware of the business relationships between Quanta and Sony and Quanta and Philips?

A.  Yes.  Well, Quanta disclosed in its filings in this case that it sold products through Philips to HP and through Sony to HP; and that's consistent with what I explained earlier about these joint ventures, which is Quanta is a company headquartered in Taiwan and Sony and Philips are companies with patent rights.  So it makes sense that Quanta would supply through these companies because that gave them access to the intellectual property rights or the patent rights.

So what Quanta said in its disclosures in this case is that it sold products through Philips between 2004 and 2007, and then it sold products through Sony between 2006 and then actually 2010, beyond the conspiracy period.

Direct Examination of Debra J. Aron, Ph.D    Day 5 - 428

**Q.**    All right.  Let's switch gears again.  Is it -- knowing what you know about the HP e-auction process, is it possible for suppliers to engage in price-fixing in connection with the e-auction process?

**A.**    It is.  There are a number of features of an action conducted electronically like that that can -- if companies want to conspire with each other -- facilitate that kind of collusion.

**Q.**    Have you prepared a chart that summarizes those reasons why the procurement process used by HP was susceptible to price-fixing?

**A.**    Yes.  I have summarized them here.

**Q.**    Okay.  So tell us about the first one.

**A.**    Well, the way that these auctions were conducted, I said they were conducted electronically.  So through a computer.  And what that means is the bidders were not in the same room with HP.  They were in an office somewhere, and they were submitting their bids.

But while they were submitting their bids during the actual course of the auction, they could communicate with each other, and there is evidence that they did.  So they could be talking to each other on their phones, you know, in the course of this event, which takes a half an hour or an hour, and be telling each other what their bids are. And that allows them to make sure that they are not

Direct Examination of Debra J. Aron, Ph.D    Day 5 - 429

bidding below the price that they agreed on and that each member is following the strategy that they have agreed to.

Q.   All right.  The second item on your list is that HP disclosed to each bidder its rank during the bidding.

Why does that make it more susceptible to price-fixing?

A.   Well, HP didn't disclose what -- during the bidding what each other party was bidding or who the other parties were that had different ranks, but it did disclose to each bidder what its own rank was.

And that allows each bidder to know whether it is -- whether the other guys are undercutting them at a level that they weren't expecting or that they were -- in this case, they weren't telling.  If they weren't telling them the truth, that they could determine, from what their own rank was, whether others were upholding their part of the bargain.

Q.   Yeah.  For example, if the ODD suppliers agreed ahead of time on who was going to get what rank and if they knew their own rank, would they be able to determine whether somebody in the conspiracy didn't abide by the rules?

A.   Right.  So like if they had agreed if I'm a bidder and we agree that I'm going to come in third and what I find out is HP is telling me I'm coming in fifth or fourth, then I know someone else isn't living up to their part of

*Laura Wells, CRR, RDR*

the bargain.

And that when companies are engaged in a conspiracy and they can detect that others are cheating on the agreement, that gives them an opportunity to punish the others by bidding more aggressively.  And when companies do that, that hurts everyone else, too.

And that threat, the possibility that each participant has a threat to hurt everyone else by bidding more aggressively than they agreed to, is part of what maintains the agreement itself.  Everyone has the ability to hurt everyone else if anyone else deviates.  That constrains everyone's incentive to deviate.

**Q.**  All right.  You talk about this repeated game.  What is the repeated game, and how does it lead to more susceptibility to price-fixing?

**A.**  By repeated game, what I mean is that these events happened over and over.  So, typically, an event for a particular ODD would occur about once a quarter for supply in the next, usually, about three months.

But that means that for each ODD there might be a procurement event every three months and then there are all the other ODDs that are having their own procurement events.  So these events are going on repeatedly.

And the suppliers know a couple of things.  One thing they know is that if we don't maintain our discipline and

come out with a good, from our perspective, supplier's high price, then that's going to affect the next events. Because as we saw in that previous slide, the way that HP set its initial starting price for the events is it consulted what the price was that they paid last time; and also, they consulted prices they paid on other devices.

So the bidding outcomes in each event had an effect on subsequent events. And what that means is, from a bidder's perspective, if we lose our discipline and end up with a low price, that's not only going to affect us for this event, it's going to hurt us in future events.

So it is another way that the participants in a conspiracy would be able to punish each other in order to -- if they see that anyone else is deviating, and it's a way that they will be hurt if they deviate beyond the current event.

So it encourages them to maintain their collusive discipline and keep their prices up.

Q.    All right. You say prequalification requirement. Why does that lead to susceptibility to price-fixing?

A.    Well, for the reasons I talked about before, which is that because the suppliers had to pre-qualify, they had -- their devices had to be tested and approved. That limits the number of potential suppliers; and the fewer suppliers there are, the easier it is to maintain a collusive

agreement.

**Q.** And then you talk about split awards. What are split awards? And what is the significance of that to susceptibility to price-fixing?

**A.** Split awards are what I mentioned earlier, that it wasn't a winner-take-all outcome, typically, in these events.

And so in a winner take all, it's very -- it's very tempting for suppliers to want to cheat on an agreement and undercut the other suppliers because you win the whole market. And if you don't win, you lose the whole opportunity. But if the -- if you don't undercut the first-place supplier and you come in second, that's not so bad because you also get a share of the market.

So it's not a win/lose situation. And that tempers or limits the incentive for each participant to cheat on the agreement by undercutting the competitors and deviating from the collusive agreement.

**Q.** If split awards are susceptible to price-fixing, why would HP do that?

**A.** Well, there are good business reasons to do it. One is that you have to -- companies, I think, reasonably assume that their suppliers are not conspiring with each other, but they do have to worry about whether they are going to have adequate supply for their business.

So, first of all, you don't want to put all your eggs in one basket when, you know, you are making computers and you need optical disc drive to sell them. So you want to make sure, typically, you have more than one supplier in case one of them has a production problem or a strike or something that interrupts their ability to supply you. So you have an alternative.

And also, it may be, and we see in the documents this to be true, some of the suppliers really don't have the capacity to supply the entire volume that a company like HP needs. And so if you exclude them entirely, you really even further limit the choices that you have to procure from.

Q.   And you mentioned here the ranking. And if disclosing the ranking makes it more susceptible to price-fixing, why would HP disclose the ranking?

A.   Well, again, if these companies are not conspiring with each other and they are competing with each other, then knowing your ranking encourages you to bid more aggressively in order to win. So if you know that you are fourth in the lineup and you bid a little bit lower you can get to be third, that's information that's valuable to you to be able to compete more aggressively to win.

Q.   Is it kind of consistent with bidding on eBay when you -- when it tells you that you are, what is it, the highest

bidder or you are the winner or you are in the lead or whatever they say on eBay?  Is that the same kind of phenomenon?

A.    I think it's probably the same kind of phenomenon that we have experienced as bidders on eBay.  Of course, on eBay you are bidding to be the highest price to win.  And on these you are bidding to be the lowest price to supply.

Q.    All right.  In the course of your work did you discover various safeguards that HP had put in place to try and prevent or limit the opportunity for the suppliers to engage in price-fixing?

A.    Yes.  And I named some of them earlier.  HP did not disclose who the bidders were that were invited to participate in the event.

HP did not disclose during the event who was bidding what.

HP did not disclose during the course of the event who the other parties were that had the other ranks.

And HP, you know, didn't disclose what the other bids were, if I didn't say that.  That's another characteristic of the process that HP did not disclose because that kind of disclosure would facilitate collusion.

Q.    All right.  And does the economic literature recognize that having auctions and e-RFQs that HP used that they are susceptible to collusive price-fixing?

*Laura Wells, CRR, RDR*

**A.**   Yes.   There is economic literature on this; and some of that literature is summarized in this Handbook of Industrial Organization, which is a compendium of the most widely-cited research and thinking on a topic.

And so as an example, what I am showing here is what the Handbook of Industrial Organization says about this. And what it says is there is evidence of collusion in many auction markets.   There are a number of examples of types of auctions in which collusion has been found and that auction markets may be especially vulnerable to collusion.

**Q.**   And this document is Plaintiff's Exhibit Number 256, if anyone is interested.

MR. DAWSON:   Your Honor, we're going to switch subjects now.   I don't know if you want to keep going.

THE COURT:   That will be fine if you want to do it right now.

MR. DAWSON:   Well, I'm about to switch gears, and I thought it would be an appropriate short break time.

THE COURT:   Let me shut this down.   All right. We'll take our break at this point.   We'll take a 15-minute break and then go on to about 1:00 or 1:05. Something like that.   Okay.   See you back in 15 minutes.

THE CLERK:   All rise.

(Jury exited courtroom at 11:30 a.m.)

(Recess from 11:30 a.m. to 11:51 a.m.)

THE COURT:  All right.  Let's call the jury in, please.

CASE MANAGER:  Please rise for the jury.

(Jury entered courtroom at 11:51 a.m.)

THE COURT:  All right.  Thank you.  Be seated.

MR. DAWSON:  Your Honor, we're going to be using some boards on an easel.  Where would you like us to place the easel so that you can see it?

THE COURT:  Usually down at this end, all the way down here where at least if there is an objection I can look over and see what the objection is.

MR. DAWSON:  Okay.

THE COURT:  So, in other words, just make sure the jury can see it with a slight -- no.  No.  Not even there.  You can move it just where -- no.  Angle it to the jury and make sure that our witness and the judge can at least see it.

MR. DAWSON:  Is that okay?

THE COURT:  Is that okay for the jury?

JURORS:  Yes.

THE COURT:  Can everybody see it or do you want it moved?

JURORS:  It's okay.  I can see it.

THE COURT:  Do you want it moved a little more this way?

JURORS:  That's fine.

THE COURT:  Everybody is fine.  Right in that area will be fine.

MR. DAWSON:  Thank you, Your Honor.  May I proceed?

THE COURT:  Yes, sir.

BY MR. DAWSON:

Q.   Dr. Aron, earlier in your testimony -- and I may not describe this right.  So you make sure I get it right -- you talked about how one of the things you did is you looked at supply characteristics and demand characteristics to determine competitive pricing in the, what you call, clean period.

Do you recall that testimony?

A.   I do.  And I put on -- does it work?

THE COURT:  No.  I don't think so.  I don't think it's on.  Push the central button.  Try it now.

THE WITNESS:  Can you hear me now?

THE COURT:  No.

THE WITNESS:  Now?

THE COURT:  I think is it coming through some?

JURORS:  No.

THE WITNESS:  You can't hear?

JURORS:  I mean, I can hear you.  It's not coming through the microphone.

THE COURT:  It's on.  I'll tell you what.  I'll tell you what.  Move it to the center.  Usually if a guy, what is it, has on a tie on I usually say, you know, move it right on close to the knot on the tie.  That's the best we'll get.

THE WITNESS:  Is that better?

THE COURT:  Oh, yeah.  Much better.

THE WITNESS:  Okay.  Good.  These were not made for women's clothing.

BY MR. DAWSON:

Q.   So back to my question.  You told us earlier that one of the things that you did was you looked at the supply characteristics and the demand characteristics in order to determine what competitive pricing would be in the clean period.  Did I get that mostly right?

A.   That's right.

Q.   Okay.  Help me understand how you go about determining competitive pricing or equilibrium pricing when there is price competition going on.  And if you want to use these boards that you prepared, then why don't you go up to the easel and use the boards, please.

THE WITNESS:  Okay.  Thank you.  May I, Your Honor?

THE COURT:  Yes.  Thank you.

A.   So I did make a few demonstratives to show you this.

And if you ever took an economics class, you might be familiar with this; but if you are not, that's okay.  I'm just going to briefly explain this and what it has to do with our case.

So this is what we call supply and demand in economics.  And what I'm showing you here is on this horizontal axis.  This is the quantity of the product.  And for this example, the product is rewritable DVD 12.7-millimeter optical disc drives.

And on this vertical axis this is -- so this is dollars, and this is quantity.  And the height tells you the price that would be charged in this market for this product.

And this upward slope and curve called supply, which is the line here, it summarizes how much all of the suppliers in the market would produce at different prices.  So what it says in this case is at higher prices the suppliers would be willing to supply more to the market; and this downward sloping line is the demand curve, which says at different prices how much would consumers want to buy or customers want to buy.  And so it's downward sloping because at lower prices, people want to buy more.

So that's the idea of supply and demand.  And in a market where customers are competing with each other -- I mean, where suppliers are competing with each other and

customers are making decisions about how much to buy based on the price, the price that will come out of that market is this one right here.  So it's the price where the supply equals the demand.

And so that's this price right here.  And you read it off the vertical axis.

BY MR. DAWSON:

Q.   Is that considered the competitive or equilibrium price?

A.   Yes.  So that's considered the competitive price or the equilibrium price because, of course, supply and demand are in equilibrium with each other.

The market doesn't have to be perfectly competitive to have this outcome, but this is the characteristic of a market price where the suppliers are competing with each other.  You get a price where supply equals demand.

Q.   How does that compare to a market where you have a conspiracy or a cartel?

A.   Right.  So --

Q.   Do you want me to help you?

A.   Maybe.  Hold on.  Okay.  So what I have shown here is just the same picture, but in a cartel the objective of the colluding suppliers is to increase the price above what the price would be in the competitive market.  So they would agree on some price like this, which is higher

than the market price.

And you see it's not in equilibrium, but that's why they have to agree on it.  That's why they have to conspire to get to that price because if they didn't, their own incentives to undercut each other would drive the price down to the competitive price.

Q.   All right.  Now, suppose that during this timeframe, for example, we know that the cost to manufacture DVDs was dropping over time, correct?

A.   That's right.

Q.   So suppose there was a shift in inputs, costs for DVDs.  How would that affect the price?  And let me come help you.

A.   I've figured out that I have to just move this one first and then I can get that one.

Q.   All right.  I'll trade you.

A.   Thank you.  So, generally speaking, the problem with doing an analysis or the challenge in doing the analysis that I conducted is I'm looking at prices that came out of the market in one time period and I'm using that relationship to determine what the prices would have been in a different time period.

And in that other time period we have to take account of the fact that costs may have been different, demand may have been different.  And so we want to adjust for that.

I need to adjust for those things.

So what we do in the clean period is we notice that, well, supply and demand is shifting around in the clean period, too.  So that's what allows me to determine the relationship between the supply and demand conditions and the prices that come out of the market.  And then I can apply that relationship to the clean period.  So -- I mean, to the conspiracy period.

So what I'm showing you here is:  Well, what happens if the price of the inputs, the costs of supplying the optical disc drives to the suppliers, goes down?  Well -- which is, in fact, what was happening during the whole time period of the conspiracy and the clean period.

Well, what happens when costs go down is that the supply curve shifts down or you could think of it as shifting out, either way.  It's suppliers at lower costs are willing to supply more at any given price; and so that means the supply curve goes to, like, this red one.

And that means that in a competitive market the price would go down because you have a new intersection of supply and demand with this shifted supply curve reflecting the lower input cost to the suppliers.

Q.   Okay.  And have you also looked at what happens in this market if there is a shift in demand?

A.   Yes, I have.

Direct Examination of Debra J. Aron, Ph.D                    Day 5 - 443

**Q.**    Have you got it?  Here you go.

**A.**    Thank you.  So this looks more complicated.  But all I'm trying to show you here is that sometimes supply shifts and demand shifts.  Demand is the demand for optical disc drives, which is ultimately determined by the demand for computers.

And so in any given quarter or any given year sometimes demand may go up and sometimes it may go down, but that's going to affect the price.  Because if the demand increases, which is a shift up in this demand curve, well, that's going to lead to a different intersection of supply and demand and a different price.

And sometimes and typically in any given quarter -- I analyzed the data quarterly -- supply and demand could be shifting.  Costs are changing.  Demand is changing.

So what I'm showing you here is, well, what if in some quarter supply shifts down again because the costs of producing an ODD go down but demand goes up because maybe people are buying more computers that month or that quarter.

Well then what is going to happen to the price is you look at the intersection between the new demand curve and the new supply curve and that's, in this case, going to cause the price to go from P2 to P3.

So what I -- the point of all this is that what I did

in my analysis is looked at the actual prices.  What we see in the data are these prices.  We don't see all these curves.  We just see the prices.

But we also see the -- I have got data on the factors that determine costs, which is what shifts the supply curve around, and demand for computers, which is what shifts the demand curve for optical disc drives around.

And then I can combine that data to calculate how those changes affect the prices and then apply that to the conspiracy period to know what the prices would have been under the supply and demand or cost and computer demand conditions that actually occurred in the conspiracy period to figure out what the prices would have been.  That's the idea.

Q.   Okay.  So let me make sure I have got this.  All the data that you were given in the -- let's start in the clean period, the post-conspiracy period -- were you able to discern from that data the -- kind of the relationship between the supply inputs and the demand inputs and analyze that in the context of what the prices were?

A.   Yes.  So I had price information from HP, and I collected from industry sources the cost information and demand information for each quarter in both the clean period and the conspiracy period.

Q.   And from that were you able to discern how changes in

the supply inputs or the demand inputs affected the competitive price?

**A.**   Yes, I was.

**Q.**   What did you do then with that information?

**A.**   Conceptually what I did with that information is I took the relationship that I calculated between those factors that determine the price, cost, and demand; and I basically plugged them into the actual cost and demand factors that occurred in the conspiracy period to calculate what the prices would have been had that market been competitive in the conspiracy period.

**Q.**   Okay.  And what -- what do you call the -- what the prices would have been in the conspiracy period had there not been collusion?

**A.**   We call those the but-for prices because those are the prices that would have occurred but for the conspiracy.

**Q.**   All right.  And then how did -- what did you do with those but-for prices?

**A.**   I compared them to the actual prices to see if they were higher or lower than the actual prices, and the difference is -- there is positive or negative.  It's the overcharge or the undercharge that is caused by the result of the conspiracy.

**Q.**   Okay.  Why don't you take a seat for just a second, if you want.  We're going to get you back up in a minute.

MR. DAWSON:  Can I have Slide 25, please, Ms. Poirrier.

THE COURT:  Do you need the lights out at this point?

MR. DAWSON:  For just a minute, and I'll move the easel, Your Honor, for a moment.

BY MR. DAWSON:

Q.   All right.  And I think we have covered this, right?

A.   Yes.  I think this is what I just said.

Q.   Okay.  We won't repeat it.  Now, how did you determine the but-for prices?

A.   Applying the conceptual approach that I just described, I used a methodology that is the common methodology in economics and other sciences for this, which is called multiple regression analysis.

Q.   And is this a -- multiple regression analysis, have you used this before?

A.   Yes.  Multiple regression analysis is a central tool that economists use to determine prices in a price-fixing case; but also, I have used it in my academic research.  I have published papers analyzing a variety of economic issues using multiple regression analysis.  It's commonly used in litigation in all kinds of cases, and it's a tool that goes back at least 100 years.

Q.   And is it generally accepted in the economics field to

use multiple regression analysis in a price-fixing case to determine but-for pricing?

**A.** Yes, it is. In my experience, it's the standard tool to use for that purpose.

**Q.** And in your understanding, has regression analysis been used in all these other price-fixing cases that we have on the board?

**A.** Yes. Polyurethane foam is a case that I did and --

THE COURT: Could you pull the mic in, Counsel. Pull the mic in.

THE WITNESS: Then should I turn this one off?

MR. DAWSON: No. You can leave them both on.

THE COURT: No.

THE WITNESS: Okay.

**A.** So polyurethane foam is a case I did. I used multiple regression analysis in that one. Concrete is also a case that I did. And -- but there are a variety of price-fixing cases over all different kinds of products and industries, and this is the standard tool that's used to determine what the but-for prices would have been.

**Q.** So just out of curiosity, what was the price-fixing alleged in the polyurethane foam case that you worked on?

**A.** Polyurethane foam is a product that's like a spongy padding, and it's used underneath carpets. It's used for a variety of padding applications, and one of the uses is

in automotive car seats and underneath automotive carpets. And a variety -- a number of auto manufacturers, as well as mattress companies, were suing the makers of polyurethane foam for price-fixing.

And in my case, I was calculating but-for prices and overcharges for General Motors, which was a plaintiff in that price-fixing case, and used multiple regression analysis for that.

Q.   All right.  Is multiple regression analysis used in many different types of lawsuits?

A.   Yes.  It's used not just in price-fixing.  It's used in -- it's used very commonly whenever an economist is asked to calculate damages or to assess the likelihood of liability in certain kinds of cases, as well.  It's used in a broad spectrum of applications.

Q.   So how might you use regression analysis in a sex and race or race discrimination case?

A.   Regression analysis -- multiple regression analysis is a way to figure out how a variety of factors combine to affect some outcome.  So the multiple refers to the fact that there are multiple variables or multiple factors that may affect an outcome.

So in, for example, a sex discrimination case the claim might be that, let's say, women were systematically paid less by a particular company than men.  Let's say

that's the allegation.

Then what you would want to make sure you have accounted for is perhaps the women in that organization might be in different kinds of jobs that are lower paid or they might be more recently hired and therefore have less tenure than the men.

And so you want to take that into account to make sure that what you are comparing is apples-to-apples, that women in the same job with the same tenure are they or are they not being paid less than men in the same job in the same tenure.

So you have to account for job and tenure and perhaps other factors, and multiple regression analysis is the common way to do that.

**Q.**   And have you prepared some boards to help us kind of better understand multiple regression analysis?

**A.**   I have.

**Q.**   All right.

MR. DAWSON:  Your Honor, can we maybe take -- we'll put the lights on, and I'll move the easel.  Thank you.

THE COURT:  Yeah.

MR. DAWSON:  Is that right?  Did I get that right?

BY MR. DAWSON:

*Laura Wells, CRR, RDR*

**Q.** All right. Dr. Aron, why don't you tell us what you have represented in this board and help us understand your regression analysis.

**A.** Okay. So the way I want to try to explain regression analysis to you is just with a simple example, and the example is:

Suppose you are trying to figure out what a child's height will be as an adult and you look at the literature and biology and you determine that the main things that affect a person's height as an adult is their sex.

THE COURT: Oh, I'm sorry. That light is on. You need that. Go on. Sure. Can you angle that just a little bit this way, just a -- that's it.

THE WITNESS: Is that good?

THE COURT: Yeah. I just need -- if there is an objection or question, I just need to be able to see. Go on.

THE WITNESS: I want you to see, too, Your Honor.

THE COURT: Continue.

THE WITNESS: Thank you.

**A.** So let's say that you figure out that the main determinants of a child's height as an adult are the height of the parents and the sex of the child and how good their nutrition is as a child. Let's say that is what you determined.

So now what you want to do is you get data. So you get observations on people's heights as an adult and you also get observations for each of those people how tall were their parents, how good was their nutrition in childhood, and what is their sex, boy or girl.

Let's say here is your data points. You know, like this one is a person who has a height -- like maybe this is 5'8" and this is the father's height, which looks like it might be 5'7", something like that. So you have got all these data points.

And what regression analysis will do, if this is the only data -- this is the only variable you have got, it will calculate the best line through these points. And it will tell you, based on just this information, what is the best estimate of this child's height based on the father's height. So it calculates the best line relationship.

Now, what you see here is this isn't a very good predictor, right? There is a lot of variability here that this line doesn't explain.

BY MR. DAWSON:

**Q.** Well, and that's because you have only analyzed one variable, right?

**A.** Exactly. So in multiple regression you want to account for the other factors as well. So what you see here in the data is there is really kind of two clusters.

There is this one, and then there is this one.

Why is that?  Well, I mean, you can guess.  It's because these are boys, and these are girls.  And so for any given father's height, the girls are going to tend to be shorter than the boys.

So if you are going try to predict what people's heights are going to be based on, you know, what you know about them as a child, you want to take that into account. You don't want to ignore that.

Q.   All right.  Do you have another chart that uses multiple variables?

A.   Yes.  Yes.  So here is what the regression would look like if you also included in your analysis the variable as to whether they are boys or girls, and the regression is going to calculate the best line through the boys' data -- these are all data points for boys -- and the best line for the girls' data.

And you see that that gives you a much better estimate.  If you are going to predict what someone's height is, you are going to get a much better prediction. When you take account of that variable, that has a big impact on the outcome.

Now, there is still variability here.  It's not perfect.  But there are other variables to take into account, too, when we look at height.  And one of them is,

well, you might have mother's height in there.  That could help.  And you might put in nutritional value as a child, and that will explain some of the variability as well.

So once you have put in the variables that you think are of the most importance and interest, you can calculate through this multiple regression approach what the effect is of each individual component taking into account the other components.  That's the idea of multiple regression.

Q.  And in your explanation did you actually kind of come up with an equation?

A.  Yes.  So if I were going to predict -- if I were going to run a multiple regression analysis to predict a child's height as an adult, this is what the equation would look like.  You would have the predicted height at adulthood is an equation that looks like this.

There is some average, and then you want to put in the nutritional quality as a child.  You have some data on that.

This is the person -- is the observation a boy or girl?

What is the parental height?  Maybe we put father's height here.  Maybe we have two variables, mother and father.

And then there is some what is called the error term, which is just the variability that isn't explained by the

data, and there will always be some variability that's not explained.  In real life there is variability that is never explained by anything we can predict through our data.

So you run this equation using the statistical methods of multiple regression, and you then estimate these effects.  And A, B, C, and D are the effects of how much -- for example, for every additional inch of a father's height, D will tell you how many -- if it's a boy, D will tell you how much additional inches you expect for that child to have as an adult.  If it's a girl, it will tell you how many additional inches you expect to have for that child as a girl.

So that's the idea.  And what we're estimating through the data are these effects or they are called coefficients.  They are just the effects of these important factors in determining the outcome.

In our case, this isn't height.  It's the price.  And these factors are not, you know, parental height and nutrition.  They are what kind of ODD is it?  Is it a boy or girl?  Is it a DVD 12.5 millimeter, you know, rewritable drive or is it a 9.5 rewritable DVD?

So I consider the type of product it is.  I consider supply and demand factors, and I estimate the effects on the price.  And then these coefficients that I estimate

are what allow me to then plug in the actual supply, demand, and product-type factors that occurred during the conspiracy period to predict the prices that would have happened, the but-for prices in the conspiracy period.

Q. So how do you know whether your regression analysis is any good or not?

A. Well, one of the beauties of regression analysis is that it is a statistical analysis, and it provides a lot of diagnostic statistics that allow you to test that, you know, to determine whether you have a good fit or a bad fit.

So if this is your data and this is the regression equation you get, the statistics that you get from the regression -- and I should say, you know, what this means is you put the data into a computer, and you tell it what variables -- you give it the data for what variables to use to calculate the effects. And it runs the program, and it will then tell you what the regression equation is that comes out of it but, also, how good the fit is. It gives you statistics on that.

And if this is what your data looked like, it would say, hey, your fit is not very good. You don't have a good model.

Whereas if it looks like this, the output, the regression statistics will tell you, yeah, you have a good

model.  You have explained the data pretty well.

So this might be what it looks like when you account for, in my other -- in my example if you account for not just father's height but also is it a boy or girl.  Well, then you are going to get a better fit, like this, and the statistics are going to look good.  They are going to say, yeah, you have a good model.

Q.  All right.  You can take your seat, Dr. Aron.  Let me move this.

So I know you have kind of alluded to this a time or two, but I just want to set the stage for what is coming next.  So tell us what you did with the data that you got in this case to run your multiple regression analysis.

A.  So I did exactly what I just described, which is I had data from HP on prices for transactions by product type, by time period, and I also collected and used data on costs, which are my control for supply, and on computer purchases, which are my -- which is my control for demand.

PI also controlled for what I observed in the data was an inventory change, a major inventory change in the data, which I confirmed in the industry reports.  So I knew I had to control for that, as well.

And then I specified my regression equation, which is like what I showed you, and I conducted -- I ran the regression analysis to quantify or what it is called is

Direct Examination of Debra J. Aron, Ph.D    Day 5 - 457

estimate those coefficients, those factors that measure the effect of each component on the price.

Then I plugged those into the data on costs and demand in the conspiracy period, and I calculated the but-for prices.

Q.  All right.  What if -- and I think you said earlier that you analyzed this on a quarter-by-quarter basis; is that right?

A.  Yes.

Q.  What if collusion was more successful or more prominent at one event or in one quarter versus another? Did your analysis take that into consideration?

A.  It did.  Because I ran the analysis quarter by quarter and I calculated but-for prices quarter by quarter, if the conspiracy was not very effective in any particular quarter or was ineffective, my calculated but-for prices would not show an overcharge.

So I allowed the data to tell me whether there was an overcharge in any given quarter.  I didn't, you know, make any assumption about that, the data.  It told me and, in fact, it turned out that there were overcharges in some quarters and not others for some product and by product.

Q.  All right.  What if the collusion was more successful for one particular DVD product versus another?  Would your model account for that, as well?

**A.** It did, yes. So, as I said, I ran the analysis separately -- I mean, I ran it separating the data by product. So I was able to estimate the effects of supply and demand on the price for each product. And then when I calculated the but-for prices, I calculated them for the products, you know, separately. I had six different product types in my analysis.

**Q.** All right. You mentioned the data. Was that the 600,000 pieces of data that you referenced earlier in your testimony?

**A.** The data incorporated the data on the 600,000 transactions. Although my analysis covered only the DVD transactions not, for example, the CD transactions, as I explained earlier.

**Q.** Okay. And was that data provided to you by HP?

**A.** The transactions data, which gave me the price, was provided by HP. The supply and demand controls, that was data provided by industry sources, industry reports that I obtained and determined to be reliable.

**Q.** And the data that you used, was that data equally available to Quanta if they wanted to run the same regression analysis that you ran?

**A.** It was. It was produced to Quanta, as well as to me. And also, my regression analysis was produced. So if Quanta wanted to check it or rerun it, they could do so.

**Q.**   So if somebody wanted to grade your papers, they had the information to grade your papers?

**A.**   They had my papers and all of my underlying programs and data, yes.

**Q.**   Okay.  Did you identify what you call a clean period as part of your work?

**A.**   I did.

**Q.**   What is the clean period?

**A.**   The clean period was the period after the alleged conspiracy.  So I observed that the last HP procurement event on which there was a guilty plea was in the first quarter of 2009.

And procurement events in one quarter determine the prices in the next quarter.  So that means that any conspiracy that may have affected procurement events in the first quarter would have been -- still been seen in the second quarter prices.

So I began the clean period in the third quarter of 2009 and ran it to the end of the data available to me, which was through the third quarter of 2015.

**Q.**   All right.  Did you determine that product characteristics were something that you needed to address in your damage assessment?

**A.**   I did.  By analogy, just like you want to control for whether your children in your sample are boys or girls,

you also -- in my analysis I needed to -- I felt it was important to control for the type of product that was being sold.

Q.   Let me interrupt you a second.

MR. DAWSON:  Your Honor, could you turn the lights out, please.

THE COURT:  Absolutely.

MR. DAWSON:  Thank you.

BY MR. DAWSON:

Q.   So tell us what you did with respect to the various product characteristics that were considered in your regression analysis.

A.   Sure.  So these products have many characteristics, and one of them, as we have talked about, is the type of ODD.  Is it a CD?  Is it a DVD?  Is it a Blu-ray?

For the reasons that we talked about, I considered DVDs only and I didn't include CDs and Blu-rays because I didn't have adequate post-conspiracy data to run a regression analysis and get reliable results.

Another characteristic that differentiates these products is the height of the DVD.  Half-heights typically go into a PC, like a desktop-type computer; whereas slim and ultraslim typically go into a laptop.

THE COURT:  Are they the same size or wide or as in diameter or are they different thicknesses?

Direct Examination of Debra J. Aron, Ph.D      Day 5 - 461

THE WITNESS:  The only difference is in the height.  So the other dimensions are the same.

THE COURT:  When you say "height," you mean, what is it, not the circumference but the -- what is the word I'm looking for?

THE WITNESS:  Diameter?

THE COURT:  Diameter, yeah.  Is it the diameter of a smaller disc, is that it, or is it measured differently?

THE WITNESS:  So the disc that you put into the drive is the same.  It's a common DVD that you are used to seeing.

THE COURT:  All right.

THE WITNESS:  But the drive itself, which is the device we're talking about, if you think of the three dimensions, the length, the width, and the height, it's only the height that is different.  And I'm actually going to show you some pictures in a minute, and that might help.

THE COURT:  All right.  All right.  Okay.

BY MR. DAWSON:

Q.   All right.  So how did you factor in the height of the particular products in the work that you did?

A.   I separated the data by height.

Q.   So you analyzed the data for half-heights versus slims

versus ultraslims?

**A.** Yeah. So, in particular, I calculated -- I separated the data for DVD-ROM half-heights differently from DVD rewritable half-heights, and the writability is the other -- is the next factor we're going to talk about.

But products are differentiated by whether you can only read them, read from them, or whether you can also write or save to those, to the DVDs. And if you can save to them, they are called rewritable. If you save to them multiple times, they are called rewritable.

**Q.** All right. And so you accounted for the writability by segregating the products according to whether they were ROM, rewritable, or combos?

**A.** That's right.

**Q.** All right. Tell us how you accounted for -- first of all, what is internal versus external; and how did you account for that in your damage analysis?

**A.** Internal optical disc drives are when the device is incorporated into the computer itself, and external is when it's a separate device with a separate housing and you might plug it into your computer but it's not built into it.

And in my data, there were not that many external devices, and I excluded them from my analysis. So I only considered internal.

**Q.** Why did you exclude the externals?

**A.** The data were spotty on them. There weren't that many, and I didn't have adequate data to run a separate analysis on them.

**Q.** Okay. And then your last point here is tray drive versus slot drive. Explain that to us and explain how you adjusted for that or took that into consideration in your damage assessment.

**A.** Sure. The jury may be probably familiar with this. A tray drive is when you push a button and the drive -- a tray slides out and you put the DVD on it and then it retracts. That's a tray drive.

And a slot is when there is a slit in the computer and you feed the DVD right into it and a mechanism pulls it in.

So in my analysis I considered only the tray drives because -- like, for the same reason. The slot drives were much less prevalent. There weren't that many of them in the data, and I didn't have adequate data to run a regression analysis to get a reliable but-for price estimate.

MR. DAWSON: All right. Let's look at -- if I could have the next slide, please, Ms. Poirrier.

BY MR. DAWSON:

**Q.** Let's look at the different products that you included

*Laura Wells, CRR, RDR*

in your damage analysis.  What product do we have here?

**A.**  So this -- and, Your Honor, you can see now what these look like.

This is a half-height DVD optical disc drive.

THE COURT:  That's a drive itself, not the disc itself?

THE WITNESS:  That's right.  And the product that we're talking about is the drive, not the disc itself.

THE COURT:  Okay.

**A.**  So what you see on the left is what a half-height optical disc drive looks like, and on the right you see it incorporated into the desktop computer.

The half-height drives, I considered both DVD rewritable and DVD-ROM; and I considered them separately.

**Q.**  Okay.  And then these are the slim products?

**A.**  Right.  And so here you see it's slimmer.  It's flatter.  It's 12.7 millimeters high.  And these devices get incorporated into laptop computers, and you see it on the right.  It's sliding out of the side of the laptop.

I considered in my analysis three kinds of 12.7 or slim optical disc drives:  the ROMs, the rewritables, and the combos.

**Q.**  All right.  And then the final product that you considered was the ultraslim; is that correct?

**A.**  Right.  And these are 9.5 millimeters high, and they

are also typically incorporated into laptops.  And I considered the rewritables.  There were few DVD ultraslim ROM drives.  So that wasn't a device I considered.

THE COURT:  In laptops these days, right now, which ones are you finding most often?  The medium or the ultraslim or that's not -- is that not in your expertise area?

THE WITNESS:  Well, I would have to go back and look at the data, but my recollection is that the 9.5s were becoming more prevalent over the entire -- over the entire period, including the conspiracy and the post-conspiracy period.  The 12.7s were by far the most prevalent drive in the marketplace.

THE COURT:  At that time is it the miniaturization?  Is it a degree of miniaturization?

THE WITNESS:  It is.  That's right.  My recollection of the data in the post-conspiracy period is that the 12.7s were declining, and the 9.5s were growing. But I don't think 9.5s had overtaken the 12.7s.  That's my recollection.  I would have to go back and look at the data for that.

BY MR. DAWSON:

Q.   All right.  So in your damage assessment or damage analysis you considered six different DVD products; is that correct?

**A.**   That's right.

THE COURT:  When you say DVD products, you mean the drives?

MR. DAWSON:  The drives, yes, Your Honor.

THE COURT:  We're all talking about the drives and not the discs.

MR. DAWSON:  Correct.  The drives.  Let me be more specific.

BY MR. DAWSON:

**Q.**   In your damage analysis you considered six different DVD drives; is that correct?

**A.**   That's right.

**Q.**   The rewritable half-height, the ROM half-height, the ROM 12.7, the combo 12.7, the rewritable 12.7, and the rewritable 9.5?

**A.**   You've got it.

**Q.**   Okay.  And we have had testimony from Mr. Hudson in this case that Quanta supplied HP with five of those six products, everything but the ultraslim.

Is that consistent with what you saw in the data that was provided to you?

**A.**   I think his testimony was he wasn't sure about the 9.5s.

**Q.**   Right.

**A.**   And that's consistent with anything I know about the

data, yes.

MR. DAWSON: Okay. All right. Let's look at the next slide, Slide 37, please. Maybe I can do it. Yeah.

BY MR. DAWSON:

Q. Have you looked at and analyzed the pricing for the products that were purchased by -- the products that are the subject of your damage analysis, have you done a study of how the prices that were charged to HP how they changed over time?

A. Yes. So what I'm showing here is simply a plot of the actual transactions prices by drive type during the conspiracy period.

So I don't know if it's easy to see what is on the horizontal axis, but these are quarters. They are time periods. And the furthest to the left is the third quarter of 2003, which is the beginning of the damages period. And then the last one is the second quarter of 2009, which is the end of the conspiracy period.

And what I'm showing you here is what the actual prices looked like. This is just plotting the data. And what you see is two things.

One is the prices for the 12.7s are much higher than the prices for the half-heights, and there is a systematic difference, meaning they are always higher. So this tells me I have to account for that difference. I have to

*Laura Wells, CRR, RDR*

control for that difference.

And then the other thing that you see is that they are declining over time.

**Q.**   What is the significance of the fact that they are declining over time?

**A.**   Well, it turns out that they are declining over time because the costs are declining over time, and that's what you would expect to happen in a market.

As we talked about earlier, when the costs of a product are declining over time, the price will decline. And that's true whether the market is competitive or even if it's a monopolist.  Even a monopolist whose costs are declining will reduce the price because it's profit maximizing, actually, to reduce the price and sell more if your costs are lower.

So what you are seeing here is the actual price declines reflecting cost declines, and we're also seeing that the prices vary by product type.  So I needed to control for costs, certainly, and I needed to control for product type.

And by the way, the other thing, just to notice here, is that you see the combos and the DVD-ROMs for the 12.7s, those prices converge as you get towards the end of the conspiracy period; and they are completely convergent in the clean period.

And that's consistent with the documents that I saw in the industry, as well, that the market basically treated them the same.  So I treated those two products the same in my analysis.

Q.   Now, is the fact that the prices were falling during the conspiracy period is that at all inconsistent with the assertion that there was a price-fixing conspiracy?

I mean, how can you have a price-fixing conspiracy if the prices are falling?  That seems a little odd to me, but maybe you can help us understand that.

A.   Yeah.  So, yes, there can be an effective price-fixing conspiracy in an environment where prices are falling, and that's because when costs are falling, prices are going to fall, as I said, whether you are a monopolist or a competitive industry or anything else.  That's the incentive that the companies have is to lower the price.

But especially when costs are falling and the companies are facing this prospect of lower prices, that's part of the incentive to engage in price-fixing so that the prices don't fall by as much.

And so what it means to have an effective conspiracy in an environment where costs are falling is:  Let's say the price is $45 for the drive and in the next period, if it were a competitive market, the price would be $40.  Well, an effective conspiracy means the price was actually

$43.  The conspiracy was able to constrain the price from falling by as much as it would have in the competitive environment.

So in that case the overcharge would have -- if the competitive price would have been $40 and the actual price turned out to be $43 because of the collusion, then the overcharge would be $3.

Q.   All right.  You mentioned the supply inputs.  How did you account for supply inputs in your regression analysis?

A.   Well, as I said, HP doesn't have data on the costs of its suppliers and making optical disc drives, but what I learned in my study of the industry is that there are two main components of building an optical disc drive, and they are called the optical pickup unit, the OPU, and the LSI chipset.  Those two things together make up most of the cost of building an optical disc drive.

And so I was able to obtain data on those costs, industry data on the costs of those inputs over the entire conspiracy period and the clean period.  And I combined them, added them together to get my estimate of the cost drivers for optical disc drives, and that's how I accounted for costs.

I also accounted for what I described earlier.  There was an inventory shock or abrupt adjustment in inventory that was clear in the data in 2010.  So I accounted for

that in my regression, as well, so that it wouldn't disrupt or mask the true relationships between the supply and demand.

And then I also conducted sensitivity analyses on my model to make sure that it wasn't -- it wasn't inappropriately responsive to changes in my model that shouldn't affect the model materially. And in that sensitivity analysis I included some wage costs from the Philippines and determined that the model was robust to reasonable changes in the inputs.

**Q.** So that I might understand this, is this trying to figure out -- you mentioned earlier when you were doing the economics instruction that you would look at the factors affecting supply and determine their relationship to the price. Is that -- is this how you are analyzing the supply side of that analysis?

**A.** Yes. That's right. These are the factors that would shift the supply curve around.

**Q.** Okay. And then that helps you understand the relationship between supply, demand, and competitive pricing?

**A.** Yes. These are on the supply side.

**Q.** Okay. And here is the costs of the -- you can see it up here -- the optical pickup units. This is one of the component parts of the DVD drives that you studied?

**A.**    That's right.  So this, again, is just a plot of the data that I obtained.  You can see that the cost of the OPUs varies by drive height, and so that allowed me to have separate controls for drives of different heights.

**Q.**    And you can see this is the LSI chipset costs.  That's the other component of the DVD drives?

**A.**    That's right.  And this cost doesn't vary by drive type; but as with the optical pickup units, you can see that the price -- the cost is dropping throughout the period.

**Q.**    Both sets of prices are -- prices for these inputs are dropping during the period that you studied, correct?

**A.**    That's right.  And just in case there is any confusion, the title says prices for the pickup units.  Those are the prices.  They are the prices that the companies like HP pay for these -- I'm sorry.  These are the prices that the companies like Quanta pay for these devices.  And so they are the costs to the ODD manufacturers of manufacturing an optical disc drive.

**Q.**    And the decline in this price, in the price of components of DVDs, that's consistent with what you said earlier about the overall prices of DVDs falling during the period that you studied, right?

**A.**    That's right.  Prices will fall when costs are falling.

**Q.** All right. Now, you have told us about the supply side of your analysis. Let's talk about the demand.

How did you assess demand for DVDs in your regression analysis?

**A.** Well, as I mentioned earlier, the demand for DVDs -- DVD drives is driven by the demand for computers. Remember, all of these drives are incorporated internally into these computers.

And so I controlled for shifts in demand. Like if you think back to that supply and demand picture, I controlled for those shifts by measuring demand as the purchases of personal computers. When purchases of personal computers goes up, well that means there is an increase in the demand for optical disc drives.

So this what I'm showing you here is a depiction of the data that I obtained from, again, a third-party data source called IDC Worldwide, which provides reliable data on personal computer sales, including laptops. And this is what the demand looked like from the beginning of 2003 to the third quarter of 2015.

**Q.** So going back to our economics lesson, you have got the necessary inputs for supply. You have got the necessary inputs for demand. You know the prices at least in both the conspiracy period and the clean period. And all that goes into, I'm guessing, some sophisticated

computer model, and it comes out with a result. Am I right?

**A.** That's right.

**Q.** Am I oversimplify that?

**A.** No. No. That's right. And the equation looks very much like the one that I showed you with the children and their heights. And the result of the regression analysis is the statistics that are estimated for the effects of the supply and demand variables on the price and also those diagnostic statistics that determine whether the model is a good fit and is reliable.

And so what I found is that the model is a good fit. It is reliable. The coefficients, those factors that measure the effect of the variables, supply and demand, on the prices are of the sign they should be. You know, like when prices go down, price should go down. That's what I found. And when demand goes up, prices should go up. And that's what I found.

And there are -- the effects that I found are what is called statistically significant on costs, which means that the statistics are saying that the effect that I found is not the result of just random variation in the data. It is reliable to use that estimated effect as the effect of that variable on prices.

**Q.** So earlier you told us that sometimes when you do

regression analysis you have a bad fit, and sometimes you have a good fit.  What did you get in this case?

**A.**   So I got a good fit in the sense that it's a reliable model.  The effects that I have estimated are reasonable in context of the economic theory.

You know, if I got a good fit from the statistics but the results made no sense economically, I would go back and rethink what was going on in the data and in the model.

But the statistics were very sound and they were consistent with the economic principles of supply and demand.  So I concluded it's a sound model.

**Q.**   Okay.  And by putting in your supply inputs and your demand inputs that you got from all this data, were you able to ascertain the but-for prices, what the prices, the competitive prices should have been for DVDs during the conspiracy period?

**A.**   Yes.  I was able to calculate that the way I have described already.

**Q.**   And is that represented on this chart?

**A.**   Well, this is an example for one product.  This happens to be the chart for DVD-ROM half-heights.  And what I'm showing you here is that --

THE WITNESS:  Is it okay if I stand up?

THE COURT:  Sure.

*Laura Wells, CRR, RDR*

MR. DAWSON:  Do you want to use this thing?

THE WITNESS:  No.  So what --

MR. DAWSON:  You have got to turn it on.  Turn the button on at the top.

THE COURT:  Push the button at the very top. Hold it a bit.  It should turn the power on.  Is it out of -- do you need a new battery?

THE WITNESS:  The red light is on.

THE COURT:  The red light is on?

THE WITNESS:  Yes.

MR. DAWSON:  Let me look over here a second. It's out of battery.

THE COURT:  Hang on.  We've got a backup in there.  Give us a second.

MR. DAWSON:  Thank you.

THE COURT:  Make sure Ellen knows we need a battery in that.

MR. DAWSON:  A technical failure there.

THE WITNESS:  Thank you.

BY MR. DAWSON:

Q.  All right.  So walk us through what we see on this chart.

THE COURT:  Now, do we need -- do you have a laser pointer?

MR. DAWSON:  I do.

THE COURT:  It might help.

MR. DAWSON:  I think she can point using --

THE WITNESS:  I'm good.  I like this better.

THE COURT:  All right.

THE WITNESS:  So what I'm showing you here is that this is the costs.  So these are those material costs.

THE COURT:  What exhibit is this?

MR. DAWSON:  This is -- it's a slide.  It's a demonstrative exhibit.

THE COURT:  It's a demonstrative?

MR. DAWSON:  Yes.

THE COURT:  All right.  Otherwise, we need to state for the record exactly what we're looking at.  But if it's for demonstrative purposes, that means it doesn't go back into the jury later on as evidence, but it's used as a demonstrative only.  Right.  All right.  Go on.

MR. DAWSON:  Go ahead, Dr. Aron.

THE WITNESS:  Okay.  So this is the optical pickup unit and the LSI chipset costs.

These prices in orange, those are the actual prices that were charged.  And the conspiracy period goes to about here.

The but-for prices that I calculated for this drive using my regression analysis are these in the blue dots.

*Laura Wells, CRR, RDR*

And what you see is that they are not always below the actual prices, but they are below the actual prices for much of the conspiracy period.

And the difference, the amount of the overcharge, is the difference, this vertical difference between the actual price and the but-for price in each quarter.

So, for example, over here in 2003 and '04, when the actual prices were really high and there is this very big margin here between the price and the cost, the overcharges are the difference between the price and the cost because the prices that would have occurred in the absence of the conspiracy are more consistent with cost.

Here, I'm not finding for this particular drive an overcharge and then here, as well.

Q. Let me ask you a few questions. So, first of all, the difference between -- the difference between the blue dotted line and the orange line, that's the profits that the ODD suppliers were able to make from selling their DVD drives?

A. It's the margin between the price and these costs. I mean, it doesn't account for every single component of costs, but this is most of the costs.

Q. Okay. And then you have already said that the dotted line is what the prices should have been had there been no collusion or conspiracy, correct?

**A.**   That's right.

**Q.**   And so the difference between the -- this dotted line and the orange line is the amount of the overcharge?

**A.**   The vertical difference is the amount of the overcharge per unit, and then you multiply that by the number of units that were sold in that quarter.

**Q.**   So, first of all, it looks to me like in the beginning you have got what is approximately maybe a $3 overcharge; and then near the end, it's probably a matter of, you know, some amount of cents.  Does that look right to you?

**A.**   That's -- yes.

**Q.**   How do you get -- here is my question:  How do you get to $176 million when this is the -- what the overcharges are?

**A.**   There are a lot of units sold.  You multiply that amount by millions of units, and that's the arithmetic of how you get to $176 million.  This was only one drive, of course.  There are five other drives.

**Q.**   Okay.  And did you analyze the competitive pricing in the but-for world for all the other drives?

**A.**   I did, yes.

**Q.**   Did you find that there were overcharges?  In other words, the competitive price was lower than the actual price during at least some time frames for all the other products that you studied?

**A.**   I did.

**Q.**   Now, I want to talk about one thing.  In the, roughly, 2008 period, it looks to me that the but-for prices somehow went ahead of the actual prices.  How did that happen?

**A.**   That's right.  The but-for prices that I have estimated here are actually above the actual prices, and I think that's -- it's for one of two reasons.

One is you should know that this period right here where you see kind of a dip in the actual prices, that was the big recession.

**Q.**   Of 2008?

**A.**   Of 2008.  This is that time period.  My regression analysis does not include the recession.  And so I did not have a way in my model to really account for the unique effect of the recession.  So it's possible that my but-for prices are overstating what the but-for prices really would have been in a recession, but I don't have a way to control for that.

So what I did was I took these overcharges to be undercharges, and I gave the conspiracy full credit for that.  In other words, I subtracted them from the damages, from my total damages.

The other reason, though, that this might be a real effect is --

THE COURT:  A real what?

THE WITNESS:  Effect.

THE COURT:  Okay.

**A.**  -- is that during the recession it's possible that the conspiracy was going on, but it was in a price-war period. In other words, the participants were punishing each other the way I described it before in the dynamic of collusion.

And so it actually, because there was a lot of economic pressure on companies to, you know, supply in a recession could have -- that could actually have driven down the prices below the competitive price.

So I can't say which one it is.  I think it's important that it happened during the recession.  But for whatever reason it happened, I did give the conspiracy full credit for the negative overcharges and subtracted them from my damages.

BY MR. DAWSON:

**Q.**  Okay.  Did you add up the total amount of overcharges during the conspiracy period?

**A.**  I did.  And -- sorry.  Yes.  So this is the sum of the overcharges by product type.  As I mentioned before, I combined DVD-ROM and combo because their prices converged for the 12.7 product.

And what you see in the purchases column is that is the dollar value of purchases of that product type that HP

made for devices that either were shipped directly to the United States or were incorporated into computers that were shipped to the United States.

The overcharges column, those are the overcharges that I calculated over the entire conspiracy period, and I also calculated the percent just so you could see what that looks like.  It comes to just under 10 percent.

Q.   All right.  And for the jury's benefit, this document has been admitted into evidence as Plaintiff's Exhibit Number 304.

So I take it from this chart that you did not assume that the overcharges or determine that the overcharges were the same for each product?  It varies from product to product?

A.   It does vary from product to product, and that could be because for some events the conspiracy was more effective than for others.

It could also be that -- and it is partially related to the fact that some of these products were sold in different time periods than others and some time periods had higher overcharges than other time periods.

Q.   Yeah.  Why?  Why is that?  We saw that the amount of the overcharge starts out higher and then it kind of gets lower and lower.  Why is it that the overcharges would change over time?

**A.**   One reason could be that the effectiveness of the conspiracy changes over time.  But it's also true that, if you remember the chart that we looked at a moment ago, the margin was really high in the early period and then it declined in later periods.

And so when the margin is highest, there is that much more room to have an overcharge, you know, when that's what we saw in the chart that in those early periods there was just more room between the price and the cost to effectuate an overcharge through a conspiracy.

MR. DAWSON:  Your Honor, I have got probably about ten more minutes.  I don't know if you want to keep going or if you want to take the lunch break.  It's whatever is your pleasure.

THE COURT:  What is the jury?  What do you want to do?  Do you want to take a break?

JURORS:  Ten more minutes is fine.

THE COURT:  What is that?

MR. DAWSON:  I think they want to go.

THE COURT:  All right.  It's now about 1:03.  So let's bank on not going beyond 1:15.  Okay?

MR. DAWSON:  Yes, Your Honor.

BY MR. DAWSON:

**Q.**   Did you do anything to test the validity of your model?

Direct Examination of Debra J. Aron, Ph.D      Day 3 - 484

**A.** I did. As I mentioned earlier, I ran a number of analyses to test the validity of the model. And the first two that are discussed here are I put different variables into the model to make sure that if I control for supply or demand in additional ways it doesn't have a big upsetting effect of my results.

And what I found is that my model is quite stable and robust to modifications in the inputs that I used, which is what you want to happen, and that's what I found. That's what the results showed.

I also changed the end date of the conspiracy to one quarter later in case my assumption that -- of when the conspiracy ended wasn't quite right. And I also found that my results didn't change materially, you know, significantly. The model was still sound in the ways it should be sound, and the results were consistent with the results that I found for my primary model.

And I dropped data from 2014 and 2015, the last two years of my clean period, in case there was some kind of life-cycle effect, meaning those last years where the products were in a later stage of their life in the marketplace, as opposed to the conspiracy period when they were in an earlier stage.

If that was somehow having an effect on my results, I wanted to check that. And so I checked it by dropping

that latter data. And I still was able to estimate the coefficients of my regression analysis. I still had good sound statistics and I could still estimate the but-for prices and I got, you know, comparable results.

**Q.** All right. Did you do anything else to assess whether your conclusions were reasonable?

**A.** I did. I also looked at the results just to see if they were plausible. And one way I did that is I looked at the margins that the conspirators actually earned in the post-conspiracy period, actually earned during the conspiracy period, and would have earned under the but-for prices.

And what you see here is the yellow bar is the actual margins during the conspiracy period; and the green one is the actual margins in the post-conspiracy period, which are lower, you know, as you saw the prices go down. So there is a compression of the price and the costs. This happens -- this chart happens to be for the DVD rewritable 12.7 drive product.

The margins that they would have earned in the conspiracy period had they charged the competitive prices that I estimated are in the blue. And what you see is that, first of all, you know, if those margins had been negative, I would have been worried about my model.

Second, if they were well below the post-conspiracy

margins, I would have reconsidered my results and whether they are reasonable.

What I found is that they were above the post-conspiracy period margins but below the conspiracy period margins, which is what they should be.  I mean, I may have underestimated the overcharges or the damages because I didn't get margins that were equal to the post-conspiracy competitive margins.  They are still above.  But, you know, the prices were higher, too, in that period.

So I view this as a reasonable sanity check on the results of my model, and I think it shows that the results are reasonable and they are consistent with economic principles.

Q.   Did you do this same profit or margin analysis for all of the products that were the subject of your study?

A.   I did.  And I think you are flipping through them here.  They all show the same pattern.  That the estimated but-for margins are in between the conspiracy actual margins and the post-conspiracy actual margins for each product type that I analyzed.

Q.   All right.  And finally, I think, Dr. Aron, tell the jury what you concluded and what your expert opinion is as a result of the study that you have done in this case.

A.   I conclude that the overcharges overall during the

alleged conspiracy period and the damages suffered by HP as a result of that conspiracy are $176.3 million for optical disc drive DVD drives that were either sold directly into the United States or incorporated in computers that were sold in the United States.

Q.    All right.  And if the -- if Judge Hittner instructs this jury that each participant in a conspiracy is jointly and severally liable for all damages resulting from the conspiracy, does your damage model give us that number?

A.    Yes, it does.

Q.    At least --

A.    The $176.3 million is that number.

Q.    At least for the DVD products that were sold in the United States?

A.    That's right.

        MR. DAWSON:  Your Honor, at this time, I have no further questions.

        THE COURT:  Okay.  Counsel, we're going to wait on the cross or do you want to?  It just depends how much time you have.  We are in no rush whatsoever.  What is your call?

        MR. CARMAN:  After lunch.

        THE COURT:  After lunch.  Yeah.  All right.

    The time I have here is about ten minutes after 1:00. We will take a break; and we will be back in, ready to

resume, at 2:15.  All right.  So we'll see you at that time.  Let me get the lights back on.  We will see you at 2:15.

THE CLERK:  All rise.

(Jury exited courtroom at 1:11 p.m.)

(Recess from 1:11 p.m. to 2:18 p.m.)

THE COURT:  All right.  Bring in the jury, please.

CASE MANAGER:  All rise for the jury.

(Jury entered courtroom at 2:24 p.m.)

THE COURT:  You may be seated.  We are going to proceed here.  Let me turn the clock on.  Go right ahead, Counsel.

MR. CARMAN:  Thank you, Your Honor.

THE COURT:  Hang on one second, Counsel.  I'll stop the clock.

(Discussion off the record.)

THE COURT:  Yes, sir.  Go right ahead.

MR. CARMAN:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. CARMAN:

Q.  Good afternoon, Dr. Aron.

A.  Good afternoon.

Q.  Dr. Aron, all of the information that you received regarding the purchases of ODDs by Hewlett-Packard

Case 4:18-cv-00762 Document 307 Filed 11/07/19 in TXSD Page 109 of 231

Cross-Examination of Debra J. Aron, Ph.D   Day 5 - 489

Company, that came from Hewlett-Packard Company; is that right?

**A.** The purchase data that I analyzed came from Hewlett-Packard or HP, Inc.

**Q.** And did that data show the company that purchased the ODDs?

**A.** The company that purchased the ODDs was represented to me as being HP, Inc., formerly known as Hewlett-Packard Company. That's what the company produced to Quanta and to me.

**Q.** And --

THE COURT: Pull that microphone in there, Counsel.

MR. CARMAN: Yes, Your Honor.

BY MR. CARMAN:

**Q.** If some of the ODD purchases that you used in calculating your damages numbers were not ODDs purchased by Hewlett-Packard Company but rather by some subsidiary of Hewlett-Packard, that would affect your calculations, wouldn't it?

**A.** Well, I'm not --

THE COURT: Do you understand the question? Restate it, Counsel. Restate it.

THE WITNESS: Okay.

BY MR. CARMAN:

**Q.**  Dr. Aron, in calculating your damages amounts you have assumed that all of the purchases for ODDs were by Hewlett-Packard Company, right?

**A.**  Well, that's what the data were represented to me as being, and that's what the company produced as the purchases that are relevant to this litigation.  So that's the data that were produced to you and to me.

**Q.**  And if there has been testimony that in procuring the ODDs it was sometimes subsidiaries of Hewlett-Packard Company rather than Hewlett-Packard Company itself, that would impact your damages calculations, correct?

**A.**  If it was subsidiaries that what?  I just wasn't sure about that part of your question.

**Q.**  That purchased the ODDs.

**A.**  I just want to remind --

THE COURT:  Hold it a second.  I don't hear any objection on the other side.  That sounds like it's getting close to a legal conclusion.

MR. DAWSON:  Maybe I should object, Your Honor.

THE COURT:  Absolutely.  And I'll sustain it. Rephrase the question.

BY MR. CARMAN:

**Q.**  In determining the amount that Hewlett-Packard Company was damaged from the purchase of ODDs, you need to know exactly how many ODDs it purchased, correct?

**A.** Well, that is my understanding of the data that I received and that I analyzed. So that's what I believe I have.

**Q.** And you need to distinguish ODDs purchased by Hewlett-Packard Company from ODDs purchased from another company, perhaps a subsidiary, correct?

**A.** Well, I don't know the answer to that. I think that's a legal question. My understanding is that the plaintiff in the case is HP, Inc. and that HP, Inc. produced the purchase data relevant to the case.

As I also mentioned in my testimony earlier, where the data identified the supplier as being another HP entity, like an HP subsidiary, I removed those transactions from the data so that I didn't have double counting of purchases.

**Q.** So you are aware that Hewlett-Packard Company has a number of subsidiaries, correct?

**A.** I'm aware that there are other HP entities. I'm not giving testimony on whether they are technically subsidiaries or affiliated companies or whatever.

**Q.** In the data that you saw, you saw transactions from different geographic areas. Is that worldwide, essentially?

**A.** Yes. There were transactions that were identified as being associated with Europe and being associated with

Asia and so forth and North America.

Q.   And I believe you saw in the data that there were computers manufactured outside of the United States; is that right?

A.   There were drives that were shipped directly to the United States.

And then there were drives that were incorporated into computers outside of the United States, and the computers were shipped to the United States.

And then there were drives that never made it to the United States in either of those forms.  And in that third category, I didn't include those in the damages.

Q.   And the ODDs that were shipped to foreign countries and then put into computers that were sold in the United States, do you know who manufactured -- who put together those computers?

A.   If you are asking me something about the HP entities, like related to your earlier question, my answer is the same.  My understanding is that the ODDs that were in my transactions data, my purchase data, were purchased by HP, Inc., regardless of what path they took to ultimately get into the United States or not, depending on which category they fall in.

Q.   You indicated that you saw during the period of 2004 through 2007, I believe you testified, that Quanta

Storage, Incorporated supplied ODDs through Philips.  What did you mean by "through Philips"?

**A.**   Well, this is information that was provided by Quanta in its discovery responses.  And what is described there and also described by Philips in its discovery responses is that the -- those two companies, you could say, collaborated on the sale of those ODDs to HP.

And so in a procurement event it would be Philips or the Philips entity that was identified as the participant in the procurement event, but Philips would confer with Quanta as to the devices that would be provided and the prices that would be charged.

So Quanta would contribute to the determination with Philips of the price that would be bid in the procurement events.

**Q.**   But the seller was Philips, not Quanta, correct?

**A.**   In my data, I believe that the seller named is Philips.  As a legal matter, who the seller is and what the relationship was between Philips and Quanta, I don't know the answer to that; and I don't believe that Quanta provided or Philips provided that information in the case.

**Q.**   And for the period 2006 through 2010, based upon what you saw, the seller at Quanta was working with Sony but the seller was actually Sony, based upon what you have seen; is that right?

*Laura Wells, CRR, RDR*

**A.**   Well, I give the same answer, which is the way that I believe those transactions appear in my data is under the name Sony or a Sony entity.

What the testimony and the discovery responses in the case say is that Sony and Quanta had a relationship whereby the devices would be manufactured and procured from Quanta or QSI.

And in the case of Sony, the testimony was that Quanta would actually provide the prices to Sony, and Sony would transmit those into the procurement event, the e-auction or the RFQ.

As to the legal entity that actually performed the sale, that's not information that was provided or that I have; and I don't think Quanta has given that information.

**Q.**   So you don't know if it was Sony or Quanta who was actually selling those ODDs to Hewlett-Packard Company or if it was some Hewlett-Packard Company entity?

**A.**   I don't know beyond what I just described to you. Quanta said that it supplied those devices to HP through or with Sony or Philips, depending on the time period, and described the pricing process associated with that.  But I think you are asking me a legal question, and I don't know the answer to it.

MR. CARMAN:  Your Honor, I don't have anything further at this time.

*Laura Wells, CRR, RDR*

THE COURT:  Okay.  Thank you.

MR. DAWSON:  Nothing further, Your Honor.

THE COURT:  Okay.  Thank you, ma'am.  You may step down.  You are excused.  You are free to leave.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Call your next witness.

MR. DAWSON:  Your Honor, before we rest, we have a matter we need to take up with the Court that shouldn't take very long.  I don't know if you want us to come up there and do it.

THE COURT:  No.  No.  We're going to take a break.  I figure maybe ten minutes.  Okay.  So if you would, jury, stand and go into the jury room.  We'll see you shortly.

CASE MANAGER:  All rise for the jury.

(Jury exited courtroom at 2:37 p.m.)

THE COURT:  All right.  Yes.  Go right ahead.

MR. DAWSON:  Your Honor, HP moves for judgment as a matter of law on the issue that the DVDs that are the subject of this lawsuit that were purchased by HP that the conspiracy that's alleged affects interstate commerce.  That's one of the elements that we have to prove and I think it should be stipulated, frankly, and if it is not and if the Court doesn't enter judgment as a matter of law on this issue, we have to ask the jury that question.  So

we need to redo the charge.

But I think the testimony is undisputed that the DVDs arrived in the United States and were distributed in the United States and therefore they affect --

THE COURT:  Rather than me rule on it, have you visited with opposing counsel?

MR. DAWSON:  I have not, Your Honor.

THE COURT:  All right.  Let's do that off the record.

(Discussion off the record.)

MR. DAWSON:  We have an agreement, Your Honor.

THE COURT:  All right.  Then it's by agreement it is interstate commerce.

MR. DAWSON:  And after that, we're prepared to rest, Your Honor.

THE COURT:  All right.  Do you have anything further?

MR. CARMAN:  I do have a couple of matters, Your Honor.  I would like to -- and I indicated this to Mr. Dawson by e-mail.  I would like to ask the Court to take judicial notice of the subsidiaries of Hewlett-Packard Company, and I have the 10K statements from the relevant time period and, of course, they are available to Mr. Dawson.

But I show that it had over 100 subsidiaries in 2003,

over 123 subsidiaries in 2004, and I am lacking the information from 2005, 97 subsidiaries in 2006, 105 in 2007, 104 in 2008, 126 in 2009, and 127 in 2010 from the 10K statements.

THE COURT:  Response.

MR. DAWSON:  Your Honor, first of all, the exhibits or the documents to which he refers are not exhibits in this case.  He is asking you to take judicial notice of something that's not even in evidence and wasn't presented in evidence.

Secondly, there has been no evidence in the case presented that any of the subsidiaries actually purchased the DVDs.

THE COURT:  Is that a proper subject for judicial notice, in any event?

MR. DAWSON:  In fairness, Your Honor, there is -- we looked at that.  There is case law that says that the Court can take judicial notice of 10K filings.

However, here, the 10K filings don't indicate that the subsidiaries purchased any DVDs.  All they do is list them out.  There is no tie to the names on the entities and whether they purchased DVDs or not.

And I'll remind you that one of the limine motions that you granted is anything that goes to the size of HP, and I think introducing evidence that they have 100 and

whatever subsidiaries is contrary to the limine motion.
It's not relevant.

There is no assertion or any evidence in the case that any of the subsidiaries purchased DVDs.

They don't have a defense that somehow HP lacks standing to bring these claims.  They haven't asserted that defense.

It's simply not relevant to any issue that the jury is going to be asked to decide.

THE COURT:  All right.  Do you want to respond?

MR. CARMAN:  Yes, Your Honor.  When Dr. Hudson testified on cross-examination about procurement events, he testified that it was sometimes HP subsidiaries that were procuring these ODDs, that he didn't know in each instance for each procurement event what the entity was that was purchasing the ODDs.

And that's the reason why it's relevant, and that's also the reason why we would ask for a motion for judgment as a matter of law in that the jury does not have sufficient evidentiary basis to determine with reasonable certainty the amount of damages Hewlett-Packard Company has suffered because --

THE COURT:  We've got two things here.  He is making a motion first.  Are you changing it, or are you asking for judgment as a matter of law on this subject

now?  Because I am hearing two different things.

MR. DAWSON:  It's your motion.

MR. CARMAN:  I am asking the Court to take judicial notice, and I'm also asking the Court for a motion for judgment as a matter of law.

THE COURT:  All right.  For some of the reasons but not all of the reasons stated by counsel, okay, by Mr. Dawson, it's overruled.

All right.  Anything further?

MR. CARMAN:  Nothing further, Your Honor.

MR. DAWSON:  With that, we're prepared to rest. If you want us to do it in front of the jury, we will and then you can --

THE COURT:  All right.  Now, I want to mention something to you.  We have got people on that jury because, don't forget, you had estimated about a total of six hours today.  All right.  Some, some have real problems financially with their employer.  All right.

I'm going to throw out something to you.  You have got the jury charge.  We can run the copies, and we can argue it today.

MR. DAWSON:  If that's what the Court wants, that's what we'll do.

THE COURT:  Any problem?

MR. CARMAN:  No problem, Your Honor.

THE COURT:  All right.  Because we do.  We have got a juror or more that he or she is in a real bind.  Boy, that would help them and ease up -- let's put it this way.  That would ease up the angst, and that way they can get in tomorrow morning -- there wouldn't be time today -- to start deliberating, and I get in as early as 11:30.  I hate to slip that on you.  But we can run the copies, if we have to.

How long would it take, Ellen, to run the copies, about?

CASE MANAGER:  Maybe 20 minutes, Judge.

THE COURT:  No.  It will be longer than that.  All right.  I'll tell you what.  We're going to do it that way.  I'm going to have you rest and then ask if you have anything further so we can do it in front of the jury.  Then I'll tell them exactly what we have got planned.

It was their understanding, right, Ellen, they said they could do it because of the bind.  That at least one of the jurors is in with his or her employment.  And they have bent over backwards.  I mean, we had one lady who was, you know, in an automobile accident and came in, in any event, because they feel motivated.  If we can do that, they will take a break, and we'll work on all of that.

All right.  Thank you for being flexible.  I know it

-- let's do it that way.

Let's get the jury back in, Ellen.

CASE MANAGER:  All rise for the jury.

(Jury entered courtroom at 2:44 p.m.)

THE COURT:  Be seated.  Ladies and gentlemen, we have the -- what is it.  The plaintiff had some additional matters we discussed.

At this time, plaintiff, call your next witness.

MR. DAWSON:  At this time, Your Honor, HP rests.

THE COURT:  HP rests its entire case.  It's done.  I now ask the defense.  Counsel, you have had some questions and so forth.  Do you desire to call any additional witnesses, if any, at this time, sir?

MR. CARMAN:  No, Your Honor.  The defense rests.

THE COURT:  The defense rests.  The whole case is over.  I'm stopping the clock.

All right.  We know that you are making some sacrifices being here.  I have an option that I think we can fly on.  Okay.  We're not going to get underway tomorrow.  Remember I said every Tuesday we begin at 11:30.

The jury charge, we worked on it that afternoon -- was it Friday afternoon?  We worked on it for a while.  And how many pages is it about?  30, is it?

MR. DAWSON:  It is 20 pages, Your Honor.

*Laura Wells, CRR, RDR*

THE COURT: All right. It will take me about 20 minutes to read it. If it's all right with you, we're going to argue it this afternoon, not tomorrow. We're going to sum up today. So that way you can get in early tomorrow morning, even though all of us won't be here until 11:30, and you are on your own because you are deliberating and you are scheduling your own schedule.

I will tell everybody that no matter where we are, I am not going to be able to take a verdict, if it comes in. Now, you are in no rush at all. This is not to rush the jury. It's to accommodate your schedule.

But tomorrow from about -- I'm thinking about 3:45 to 4:30, I'm not going to be available. I don't know if you know that the Senate has confirmed the new judge to our district. The president has signed the commission, and he is being sworn in in a private ceremony in the judge's conference room tomorrow at 4:00. And the judges, at least, are required to be there. In fact, the judges in the rest of the district from The Valley, we have judges throughout this part of Texas, are going to be there, if they can, in person but, basically, even by video.

So I need to be there at that time. It's by the order of the Chief Judge, and I don't -- we are first of unequals but I don't want to mess around with the Chief Judge. Okay.

*Laura Wells, CRR, RDR*

But remember I come back and visit with every jury and visit with you about it.  So it's not to affect your ability to determine and reach a verdict.  It may as to when we're going to take it.  But with that, the attorneys said they can do that.  We're going to work on it.

Has Ellen -- she stepped out for a moment, right?

THE CLERK:  Yes, sir.

THE COURT:  Hang on one second because we're dealing with timing.  Okay.  Don't forget, the lawyers have been working on their summation arguments over the weekend.  They said they could do it if it would accommodate and help the jurors, and I know it would, based upon what I have talked to Ellen about.

We're going to go off the record.  Just sit right here for a second.

(Discussion off the record.)

THE COURT:  All right.  Here is the jury charge.  While you are sitting here, give me a second.  I'm going to flip through it because we were working on it.  It's a lot easier to flip through than read it.  Let me get through this way.  Here it is.  All right.  We're going to start making all the copies right now instead of doing it overnight.

All right.  Ladies and gentlemen, we're going to take a break at this time.  We're going to be doing that.  The

attorneys also have to get their summations in order.  So ride with us a little bit.  We're going to be here working or at least they are.  Okay.

But it's now -- I have about 2:49, almost 2:50.  We're going to get underway and give this case to you.  We're going to start.  I will read the instructions to you, and then the attorneys will sum up.

Actually, I still have -- I have their times all down.  Each side has a maximum of one hour.  They may not take it all.  And plus my reading it.  So we're looking at we've got -- it's 3:30.  We ought to be out of here right at our regular time.  You can go in there and visit with one another shortly or whatever and then adjourn and be back in.

I will tell you this, for you to think about it, we're not going to be able to even take questions.  Maybe a question, if it's a simple one, because I'll be available by phone.  Okay.  I really will.  I have done this before.

Tomorrow you deliberate up to 6:00, okay, tomorrow.  Usually I go to 5:00, but I want to work with your schedule.  But again, no rush.  I know you won't.  But we're trying -- the attorneys, too -- to work with your schedule.  If you want to get in earlier, you can get in as early as 9:00 but not later than 10:00 and deliberate up to 6:00.

Because even then, I'll come back and visit with you maybe for a shorter period of time.  But I know you won't rush.  You will not, because that's the nature of the jury system not to do it.  But we're trying to work with your schedule as well as ours.

So now it's 2:50.  We will see you back ready to wrap it up at 3:30.  All right.  Thank you.  And we'll see you later.

THE CLERK:  All rise.

(Jury exited courtroom at 2:52 p.m.)

THE COURT:  All right.  See you back here at the time.  I'm going to sit here a minute or two and work on this timing sheet.  I'll get you all the time eventually.

(Recess from 2:52 p.m. to 3:32 p.m.)

THE COURT:  All right.  Let's call the jury in, please.

(Jury entered courtroom at 3:32 p.m.)

THE COURT:  All right.  Have a seat, please.  All right.  Ladies and gentlemen, we're going to -- I'm going to -- it's a relatively short jury charge.  It's 20 minutes.  This is 20 pages, plus the last page.  So it ought to go pretty quickly.

Also, the original is in the blue back.  Okay.  So when you reach your verdict, this is what you'll sign.  Okay.  The presiding juror will sign this.  I will read it

to you.  You may mark up the copy you have, and each side has been granted a, what is it, a maximum of one hour.  They may not take it all.  And after that, it will be your decision to make in this case.  Okay.

So we'll -- we're going to start.  I'll start reading.  You follow along.  It's an antitrust case.  So it's a bit complex to what you might ordinarily think of that we have done, but the attorneys have done a fine job working together as best they could.  I made the rulings.  We were here Friday afternoon doing that.  So the jury charge is ready to go.  So we're going to start.  If you would, follow along.

By the way, during the trial you heard me sometimes say to witnesses or lawyers to slow down.  I may pick it up a little bit because everybody has got a copy of it, including the court reporter.  Okay.  But I'll try not to speed up too much.

And I'll turn on the special jury reading light.  I had that put in for a number of reasons.  All right.  We're ready to go.

It's my duty and responsibility to instruct you on the law you are to apply in this case.  The law contained in these instructions is the only law you may follow.  It is your duty to follow what I instruct you the law is, regardless of any opinion that you might have as to what

the law ought to be.

If I have given you the impression during the trial that I favor either party, you must disregard that impression.  If I have given you the impression during the trial that I have an opinion about the facts of this case, you must disregard that impression.

You -- as I mentioned before, remember, there are two judges.  I'm one of the judges.  You are the other.  Here it is in the jury charge.

You are the sole judges of the facts of this case.  Other than my instructions to you on the law, you should disregard anything I may have said or done during the trial in arriving at your verdict.

You should consider all of the instructions about the law as a whole and regard each instruction in light of the others without isolating a particular statement or paragraph.

The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence.  The statements of counsel are not evidence; they are only arguments.  It is important for you to distinguish between the arguments of counsel and the evidence on which those arguments rest.  What the lawyers say or do is not evidence.  You may, however, consider their arguments in light of the evidence that has been admitted and determine

whether the evidence admitted in this trial supports the arguments.  You must determine the facts from all the testimony that you have heard and the other evidence submitted.  You are the judges of the facts, but in finding those facts, you must apply the law as I instruct you.

You are required by the law to decide the case in a fair and impartial and unbiased manner, based entirely on the law and on the evidence presented to you in the courtroom.  You may not be influenced by passion, prejudice, or sympathy you might have for the plaintiff or for the defendants in arriving at your verdict.

Plaintiff Hewlett-Packard Company has the burden of proving its case by a preponderance of the evidence.  To establish by a preponderance of the evidence means to prove something is more likely so than not so.  If you find that plaintiff has failed to prove any element of its claim by a preponderance of the evidence, then it may not recover on that claim.

The fact that a company brought a lawsuit and is in a court seeking damages creates no inference that the company is entitled to a judgment.  Anyone may make a claim and file a lawsuit.  The act of making a claim in a lawsuit by itself does not in any way tend to establish that claim and is not evidence.

Case 4:18-cv-00762   Document 307   Filed 11/07/19 in TXSD   Page 129 of 231

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.

Generally speaking, there are two types of evidence. One is direct evidence, such as testimony of an eyewitness.  The other is indirect or circumstantial evidence.  Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists.  As a general rule, the law makes no distinction between direct and circumstantial evidence but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

In weighing the credibility of a witness, you may consider the fact that he or she has previously been convicted of a felony.  Such a conviction does not necessarily destroy the witness's credibility, but it is one of the circumstances you may take into account in determining the weight to give to his or her testimony.

You alone are to determine the questions of credibility or truthfulness of the witnesses.  In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias

about the case that he or she may have and the consistency or inconsistency of his or her testimony considered in light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed. Witnesses are not counted. The test is not the relative number of witnesses but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence you believe that witness.

You have heard and/or shall consider the testimony from Shang Hao -- the names I'm going to go with are the last names as you remember that they went by here in court, if that's satisfactory. Make sure I do it right. Okay.

You have heard and/or shall consider the testimony from the witnesses Chen, Tzeng, and Huang refusing to answer certain questions about his or her work for Quanta

Storage, Inc. or Quanta Storage America, Inc.  Mr. Chen and Ms. Tzeng were employees of Quanta Storage, Inc. during the relative times.

Now, hold it.  Is that Ms. or should that be Mr.?  The first one.  Mr. Chen and Mr. Tzeng?

MR. DAWSON:  Ms.

THE COURT:  Is it Ms.?  All right.  And there were two of the women testifying, correct?  I want to get that straight.

MR. DAWSON:  Mr. Chen and Ms. Tzeng and Ms. Huang.

THE COURT:  So it is correct?

MR. DAWSON:  Yes, Your Honor.

THE COURT:  Okay.  I'm going to go back and read it.

You have heard and will consider the testimony from Chen, Tzeng, and Huang refusing to answer certain questions about his or her work for Quanta Storage or Quanta Storage America.  Mr. Chen and Ms. Tzeng were employees of Quanta Storage, Inc. during the relative time.  Ms. Huang was an employee of Quanta Storage America, Inc. while she lived in the United States and was employed by Quanta Storage, Inc. while she lived outside the United States.  They each refused to answer certain questions on the grounds that his or her answers might be

incriminating.  A witness has a constitutional right to decline to answer on the grounds that their answer may incriminate them.

Now, you may but are not required to infer by the witness's refusal to answer that -- I'm going to get that one again.

You may -- and we worked on this paragraph for a while.  So I want to say it in certain sequence.

You may but are not required to infer by the witness's refusal to answer that the answers to the questions posed would have been adverse to Quanta Storage, Inc. and/or Quanta Storage America's interests.  You may not base your verdict solely on that adverse inference.

Certain testimony has been presented to you through a deposition.  A deposition is the sworn, recorded answers to questions a witness was asked in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness's testimony may be presented under oath in the form of a deposition.  Some time before this trial, attorneys representing the parties in this case questioned this witness under oath.  A court reporter was present and recorded the testimony.  The questions and answers have been shown to you during trial.  This deposition testimony is entitled to the same consideration and weighed and

otherwise considered by you in the same way as if the witness had been present and had testified from the witness stand in court.

A typewritten transcript of an oral conversation, which can be heard on recording -- on a recording received in evidence as Exhibits 340 through 357 was admitted. The transcripts also purport to identify the speakers engaged in such conversation. I have admitted the transcripts as Exhibits 340 through 357 for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the recording and also to aid you in identifying the speakers.

You are specifically instructed that whether the transcripts correctly or incorrectly reflect the contents of the conversation or the identity of the speakers is entirely for you to determine, based upon your evaluation of the testimony you have heard about the preparation of the transcripts and on your own examination of the transcripts in relation to your hearing of the recordings themselves as the primary evidence of their own content. If you should determine that the transcripts are in any respect incorrect or unreliable, you should disregard them to that extent.

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or

experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it's up to you to decide whether to rely upon it.

Certain parties are no longer involved in this litigation. As jurors it is your duty to consider the issues among the remaining parties. Do not concern yourself with the fact that companies which were discussed during the trial are not parties to this lawsuit.

In these instructions, these instructions coming up now and prior, I will refer to the plaintiff Hewlett-Packard Company as plaintiff. I will refer to the defendants Quanta Storage, Inc. and Quanta Storage America as defendants.

Although there are two defendants in this action, it does not follow from that fact alone that if one defendant is liable to the plaintiff, both defendants are liable. Each defendant is entitled to a fair consideration of the evidence. Neither defendant is to be prejudiced should you find against the other. All instructions I give you govern the case as to each defendant. In considering a claim against a defendant, you must not consider evidence admitted only against the other defendant.

In this case, plaintiff alleges that the defendants

violated the federal antitrust laws by entering into a conspiracy that unreasonably restrained trade and by engaging in price-fixing.

The defendants deny that they engaged in any unlawful conduct or in any way violated the federal antitrust laws.

This case involves alleged violations of a federal antitrust law called the Sherman Act.  The purpose of this antitrust law is to preserve free and unfettered competition in the marketplace.  The law rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

The Sherman Act prohibits contracts, combinations, or conspiracies that unreasonably restrain trade in interstate commerce.  Any agreement between or among competitors to fix, raise, or stabilize prices constitutes an unreasonable and illegal restraint of trade under The Sherman Act.

Plaintiff claims that it was injured because the defendants participated in an agreement to fix or stabilize prices of optical disc drives.  To prevail against the defendants on this price-fixing claim under The Sherman Act, a plaintiff must move, as to the defendants, each of the following elements.

We're now on Page 10.  That an agreement or agreements

to fix or stabilize the prices of optical disc drives existed among the competing sellers of those drives; that the defendants knowingly participated in such an agreement to fix or stabilize prices; that such an agreement occurred in or affected interstate commerce; and that the agreement in which defendants participated caused plaintiff to suffer an injury to its business or property.

Now, on that one point, as we discussed during the break as to interstate commerce, I think that an instruction now is applicable. Everybody agree, a short instruction?

MR. DAWSON: Yes, Your Honor.

MR. CARMAN: Yes, Your Honor.

THE COURT: Okay. The parties agree that for the purposes of this case and these instructions it did involve interstate commerce. So that element is agreed to.

Now, let's turn now to the existence of a conspiracy. An agreement between two or more competitors exists when they share a commitment to a common scheme. To establish the existence of an agreement, the evidence need not show that the competitors entered into any formal or written agreement. The agreement itself may have been entirely unspoken. A person can participate in a price-fixing agreement without full knowledge of all the details of the

overall agreement, the identity of the participants, or the parts each participant played in the agreement. Participants in a price-fixing -- hang on.

"In the agreement," should a period be there?

MR. DAWSON: Yes, Your Honor.

THE COURT: All right. I am just going to note that. I'll fix the original and add the period in the blue back during -- while you are summing up.

Participants in a price-fixing agreement need not necessarily have met together, directly stated what their object or purpose was to one another or stated the details or the means by which they would accomplish their purpose. To prove an agreement existed, the evidence must show that the participants in the agreement came to an understanding among themselves to accomplish a common purpose.

An agreement may be formed without all participants coming to an agreement at the same time. Similarly, it's not essential that all participants acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by the plaintiff are agreed upon to carry out the agreement nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all alleged participants were actually participants. It is

the agreement to fix or stabilize optical disc drive -- we are talking ODD -- prices that constitutes the pertinent agreement. You may find an agreement existed even if it did not succeed in all particulars.

Plaintiff may prove the existence of the agreement through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the agreement.

Direct evidence of an agreement may not be available and, therefore, an agreement may also be shown through circumstantial evidence. You may infer the existence of an agreement from the circumstances, including what you find the participants actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together does not, by itself, establish the existence of the claimed agreement. If they acted similarly but independently of one another without any agreement among them, then the claimed agreement would not exist.

In determining whether an agreement between one or more competitors has been proved, you must view the evidence as a whole and not piecemeal. In particular, you should consider all of the evidence as a whole in determining whether any similarity or identity of prices

resulted from the competitors' independent judgment freely competing in the ODD market or whether it resulted from an agreement among them.

Similarly, the fact that ODD sellers exchanged price information does not necessarily establish an agreement to fix or stabilize prices. There may be other legitimate reasons why competitors might exchange price information. On the other hand, if you find that price information was exchanged and defendants offer no reasonable explanation as to why prices were exchanged, you may consider that in determining whether the prices were being exchanged as part of a price-fixing agreement together with all the other evidence relevant to the existence or nonexistence of such an agreement.

Before you can find that the defendants participated in an agreement among sellers to fix or stabilize ODD prices, the evidence must show that the defendants knowingly joined in the price-fixing agreement at its inception or at some later time with the intent to further the purpose of the price-fixing agreement.

To act knowingly means to participate deliberately and not because of mistake, accident, or other innocent reason. A person may participate in an agreement without full knowledge of all the details of the entire agreement among the competitors, the identities of all participants,

or the parts they played.  Knowledge of the essential nature of the plan is enough.  On the other hand, a person who has no knowledge of a price-fixing agreement but happens to act in some way to help the agreement succeed does not therefore become a participant.

A competitor who knowingly joins an existing price-fixing agreement or who participates in only a part of the agreement with knowledge of the overall agreement is just as responsible as if it had been one of those competitors who formed or began the agreement and participated in every part of it.

In determining whether defendants participated in an ODD price-fixing agreement, you should consider only the evidence about defendant's statements and conduct, including any evidence of defendant's knowledge and participation in the events involved and any other evidence of the defendant's participation in an agreement.

You may not find the defendants participated in a price-fixing agreement based only on their association with or knowledge of price-fixing but that is a factor you may consider in determining whether defendants participated.

If you find that a price-fixing agreement existed, then the acts and the statements of the participants in the price-fixing agreement are binding on all those who

you find were participants.

If you find that defendants participated in a price-fixing agreement, it is not a defense that the defendants acted with good motives, that they thought their conduct was legal, or that their conduct may have had some good results.

Nor does it matter that agreed-upon prices were reasonable.  If you find that a price-fixing agreement existed, it does not matter whether the prices agreed upon were high or low, or reasonable or unreasonable.

Likewise, it does not matter that ODD sellers competed in some respects or failed to eliminate price competition among all of them.  Nor does it matter that price-fixing agreements did not extend to all products sold by the participant competitors or did not affect all ODD customers or transactions.  And it does not matter whether the participants stuck to their price-fixing agreement on every occasion.

If you have determined that the defendants participated in a price-fixing agreement among the competing ODD sellers that caused some injury to the plaintiff, then you must determine the amount of damages to award to the plaintiff.  The proper way to calculate those damages is to determine the difference between the amounts actually paid by plaintiff for the ODDs at the

fixed or stabilized price and the amounts plaintiff would have paid for the same volume of ODDs had there been no agreement among competing competitors to fix or stabilize the ODD prices.  This is referred to as the overcharge.

Each participant in a conspiracy that violates the antitrust laws is jointly and severally liable for all of the damages resulting from the conspiracy.  This means that each conspirator is fully liable for all the damages caused by the conspiracy and not solely for the damages caused by an individual conspirator.  One who knowingly joins an ongoing conspiracy is liable for the previous acts of the other conspirators in furtherance of the conspiracy.

If you find that the plaintiff has proved the existence of the alleged conspiracy, that one or both of the defendants participated in the conspiracy, and that plaintiff is entitled to recover damages based on the other instructions in this case, then defendants would be liable for all damages caused by the conspiracy.

It will soon be your duty -- now, these are the wrap-up instructions before I get to the questions, the jury questions.

It will soon be your duty to deliberate and consult with one another in an effort to reach a verdict.  Each of you must decide the case for yourself but only after an

impartial consideration of the evidence with your fellow jurors. During your deliberations do not hesitate to re-examine your own opinions and change your mind if you are convinced that you were wrong. But do not give up on your honest beliefs just because the other jurors think differently or just to finish the case.

Remember at all times you are the judges of the facts. You have been allowed to take notes during the trial. Any notes that you took during this trial are only aids to memory. If your memory differs from your notes, you should rely on your memory and not on the notes. The notes are not evidence. If you did not take notes, rely on your independent recollection of the evidence and do not be unduly influenced by the notes of other jurors. Notes are not entitled to greater weight than the recollection or impression of each juror about the testimony.

When you go into the jury room to deliberate, you may take this copy of the charge, the exhibits that I have admitted into evidence, and your notes. You must select a presiding juror to guide you in your deliberations and to speak for you here in the courtroom.

Your verdict must be unanimous. Some of you have sat on state court civil cases. In the federal court, all verdicts in all types of cases are unanimous. So your

*Laura Wells, CRR, RDR*

verdict here must be unanimous.

After you have reached a unanimous verdict, your presiding juror must fill out the answers to the written questions on the verdict form and sign and date it. After you have concluded your service and I have discharged the jury, you are not required to talk with anyone about the case.

If you need to communicate with me during your deliberations, the presiding juror should write out the inquiry and give it to the court security officer. After consulting with the attorneys, I will respond either in writing or by meeting with you in the courtroom. Keep in mind, however, you must never disclose to anyone, not even to me, your numerical division on any question.

When you begin your deliberations, you will have a Deputy U.S. Marshal assigned to you; and he or she will be in the hallway right outside the jury room.

All right. Now here are the questions that you need to answer. Keep in mind, you'll notice that they are broken down. The first one is as to Quanta Storage, Inc. That's one of the entities. The next one is as to Quanta Storage America, Inc. Then we get to a question and you'll see damages, if any.

Now, let me ask the attorneys. I just want to make sure, because we talked about this, the questions are the

same except for the difference in name; is that correct?

MR. DAWSON:  Yes, Your Honor.

THE COURT:  Both sets.  All right.  So we're not going to read all.  We will summarize the second set. They are exactly same as to both of the entities.

Let's look now beginning at Question Number 1.  Did the plaintiff prove by a preponderance of the evidence that Quanta Storage, Inc. participated in a conspiracy to fix, raise, maintain, and stabilize the prices of optical disc drives?  Answer yes or no.

If you have answered yes, go to Number 2.  If you have answered no, go forward to the section entitled conspiracy to fix prices by Quanta Storage America.

In other words, if by chance you reach no -- the attorneys correct me if I'm incorrect -- that page is done.  Remember, you are going from one question based upon another.  If you happen to answer no to this, then you immediately jump to Page 19.  That is the next page.

Let's assume you keep going on all of these.  Okay.

Now, if you have answered yes to Number 2 -- let's see.  If you have answered yes, go to Question Number 2. If you have answered no, go forward to the next page.

Question Number 2, did plaintiff prove by a preponderance of the evidence that Quanta Storage, Inc. knowingly, voluntarily, and intentionally participated in

the conspiracy?  Answer yes or no.

If you answer yes to question -- what is it?  Yes.  If you answer yes, you now proceed to Question Number 3.  If you answer no, once again, move to the next page.

Here is Question Number 3.  Did plaintiff prove by a preponderance of the evidence that it suffered an injury to its business or property as a result of the conspiracy?  Answer yes or no.

And now we're going to proceed to the next page.  Now the next page, the questions are basically the same, instead of skipping to the next page, where you'll find another corporation.

But again, you'll just look at Question Number 4.  Did they participate in a conspiracy?  But this is Quanta Storage America, Inc.  All right.

Question Number 5 is knowingly, voluntarily, and intentionally participated in the conspiracy as to Quanta Storage America, Inc.

Again, if you have answered that one yes, the last one is Number 6.  Did the plaintiff prove by a preponderance of the evidence that it suffered an injury to its business or property as a result of the conspiracy?

Okay.  Now, if your answer to either Question Number 3 or Question Number 6 was yes, answer Question Number 7.  Otherwise, stop and do not answer any further questions.

And assuming you reach Question Number 7, based upon one set or both sets or neither set or however it works, okay, of the prior questions, if you answer Number 7, let's look at it.

It states:  What is the amount of the overcharge that plaintiff paid as a result of the conspiracy to fix, raise, maintain, and stabilize the price of optical disc drives?  Answer in dollars and cents, if any.

Once you have reached a unanimous verdict, the presiding juror will sign the verdict form and date it and notify the marshal that you have reached a verdict and come back in.

Once again, when you come back in, I'll take the verdict.  And then, as in all cases, either civil or criminal or whatever -- and this is not a criminal case. I just want to impress upon you.  But any of the cases I try, I then come back, visit with the jury, and we can go over all the notes I have taken and answer any questions that you have that may have gone on while you were out and I was dealing with matters with the attorneys.

The attorneys have been allocated a maximum of one hour.  The burden of proof is on the plaintiff.  So they are going to go first.  Then they are going to -- then they will stop whenever they want to.  I'm going to give them a notice after 20 minutes have gone past.  All right.

*Laura Wells, CRR, RDR*

Any time after 30 minutes, because I need them to take at least half on the opening.  Whenever they stop, I'll note that time down.  Then we'll hear from the defense.  And then whatever time is left, since the burden is on the plaintiff, they can wrap up.

So that's the sequence.  Based upon the time allocations, I think we can go straight through.  If we run into a time crunch, let me know.  We'll see how long it goes and when the plaintiff takes its break.  Otherwise, we'll go straight through.

All right.  I'm going to start the clock.

MR. ROBERTS:  Your Honor, may I use the microphone?  Is this the one with the battery?

THE COURT:  Yes, please.  Is that the good battery?

MR. ROBERTS:  It should be.

THE COURT:  Well, try it and make sure it's a good battery.

MR. ROBERTS:  I'm getting green.  Green means good, right?  Can you hear me?

THE COURT:  Well, the sound sounds better to me.  It's just a green light.  Okay.

MR. ROBERTS:  Okay.  Can everybody hear me okay?

JURORS:  (Nodding head affirmatively.)

MR. ROBERTS:  Okay.  May it please the Court.

THE COURT:  Yes, sir.  Go right ahead.

MR. ROBERTS:  Ladies and gentlemen, thank you.
Thank you for being here.  You have spent a week away from
your jobs and your lives, and you have devoted your time
and attention to us.  And for that, we are profoundly
humbled and thankful.  On behalf of me and my colleagues
and Hewlett-Packard, we say thank you.  So we very much
appreciate the notes that you have taken, the diligence
that you have shown us, and the interest that you have
taken in the case.

Again, as Mr. Dawson said in opening, you know, right
behind military service, jury service is one of the best
things you can do for your country.  So we thank you for
that.

We have decided to split the closing a little bit.  So
what I'm going to do is recap some of the pertinent
evidence that you have heard.

THE COURT:  Counsel, let me ask you.  Do you want
me to turn the lights out?

MR. ROBERTS:  Please do, Your Honor.  Thank you.

THE COURT:  Okay.

MR. ROBERTS:  You have heard a lot of evidence
over the last week.  You have heard some live testimony
and some video testimony and some more video testimony.
And so what I want to do in the short period of time that

I have is to highlight for you some of the pertinent facts that you heard, some of the testimony that I think is important for you to remember as you go back and discuss amongst yourselves in about a couple of hours what you think the outcome should be in this case.

So jumping right in.  We started this trial with Mr. Hudson.  Mr. Russell Hudson testified here in the courtroom on behalf of HP.  Remember, he was the director of procurement, strategy and operations for the company. He talked about the procurement process.  He set the stage for you about what we were going to be listening to and hearing about for the next year.  He talked about the e-auctions and e-RFQs, what information was provided to the bidders, the suppliers for optical disc drives, and what information was not provided to the suppliers of optical disc drives as a result of their decisions as a strategy, as a procurement group, how to make it the most competitive process possible.

You will recall him talking about why it was important to provide the rank number after each round of an auction or of an RFQ because he thought the procurement team believed that that was going to incentivize people to bid a lower price if they wanted to get that higher market share.  So Mr. Hudson outlined those issues and why those were relevant to the case here before you.

*Laura Wells, CRR, RDR*

He testified that Hewlett-Packard purchased $7 billion worldwide of optical disc drives during the conspiracy period and that $2 billion of that was spent in the United States.  He testified that $385 million was spent on direct purchases from Quanta Storage, Incorporated, and $125 million, in addition to that, from Philips or Sony during their participation or collaborations with Quanta Storage for a total of $510 million.

He testified then, as well, about the different types of ODDs that were purchased from all of the conspirators but also from Quanta, in particular.  And those from Quanta were the DVD-ROM half-heights, the 12.7 DVD-ROM, the CD-ROM 12.7.  Again, y'all are now conversant in what these acronyms mean.  Mr. Hudson wrote up here on his flip chart what these different acronyms meant, and you all took copious notes.  But again, those were the different types of drives that were purchased by HP both from all the conspirators and from Quanta in particular.  There is a lot of overlap there, as you can see.

Mr. Hudson also testified that HP expects its suppliers to follow the rules and follow the laws, that they set up some of these protections in place during the course of the e-auctions and e-RFQs to try to protect against the types of conspiracy and collaboration that was happening between the suppliers.  But it was also on the

suppliers to follow the laws.  They believed that each of their suppliers were going to do that.  He said that HP was not aware of the type of information sharing and price-fixing that was going on during the time.

He also talked about how the price at the end of one procurement event sets the price for the next procurement event and how if it's artificially inflated or artificially raised because of conspiratorial behavior at the end of one event it has a cascading effect upon subsequent events.

And then he talked about, yes, in fact, we were overcharged during that time period.  And he admitted we couldn't do the calculations; but we, in fact, hired somebody to do that.  And you heard from Dr. Aron today, who was that person that was retained to do those calculations.

Then you heard some video testimony.  You heard testimony from, I believe it was, nine HLDS, PLDS, or Sony witnesses.  And they all testified to similar types of conduct.  And what we hope you heard was a theme, that there was a whole lot of information sharing going on during this six-year period.  That, you know, when one bidding event would occur, the phone would ring or the text messages would fly or the instant messages would be sent and the information sharing would begin.  And it

didn't stop until that auction was over.  And it picked right back up again when another auction or e-RFQ was to begin.

Mr. Park was the first of these witnesses to testify. He was from HLDS.  You'll recall that during his testimony he admitted that after his prison sentence he was promoted at HLDS.  He moved up to the C Suite, as they say, the president and CEO position.  He testified or, rather, he pled guilty to nine counts of bid rigging.

He testified that he engaged in price-fixing with PLDS, and he gave us a nice little quote in his deposition, as well, that he believed that freezing prices, when he was reading an e-mail that used the word "freezing prices," he said that meant keeping them from going down over time.  And that's exactly what price-fixing is.

S.H. Kim was also an HLDS executive who pled guilty to seven counts of bid rigging.  He also admitted to rigging bids with PLDS.  He admitted to rigging bids with TSST during an e-auction.  He admits -- and, in fact, if you will go back and read each of the plea agreements in this case for all these individual HLDS employees, they each admit that they conspired with five or more other suppliers.  That's a -- that's a point that's made in each of those plea agreements.  They each admit that there were

five or more other suppliers engaged in their conspiracy. He also admitted that he reached an agreement with TSST and Lite-On.

And, again, Mr. Kim was also promoted as a result of -- or after his prison sentence he was promoted to the head of sales.

Mr. Hur, another HLDS employee that we saw some video testimony from, pled guilty to six counts of bid rigging. He admitted that he rigged bids with PLDS. He admitted that he exchanged forecast information with TSST, that Lite-On actually contacted him during an auction, and that he was the one that instructed his colleagues, you know, y'all need to be careful when you are making these phone calls with your other suppliers, with your competition. Go out and buy these prepaid phones. You better go buy the burner phones in order to hide those phone calls.

And then Mr. Yang, the fourth HLDS employee to plead guilty and serve time in federal prison as a result of his conduct, he admitted to conspiring with Michael Chang and J.C. Lim of PLDS and with Kenny Lee of TSST.

He admits that the purpose of sharing information was to limit competition. That really is the bottom line to this entire discussion. He just put it out there. The purpose of all of this information sharing was to limit competition.

*Laura Wells, CRR, RDR*

He said that they shared sales volume and capacity shortage information with competitors, and you've heard testimony about why that is important. It allows the competitors, essentially, as Mr. Hudson said, to see what cards the other poker players are holding. And if you know what each other's cards are holding and you are in agreement with somebody else at the table, you all can bid in a way that is mutually beneficial.

He also admits that he met with Caroline Lin of QSI to discuss ODD prices.

And finally, during his testimony, he admitted that Quanta Storage was one of the participants in Counts 3 and 4 that he pled guilty to.

Bruce Jeong of HLDS indicated that two of his competitors in the ODD market were Sony Optiarc and Quanta Storage. He admits to speaking with PLDS and Quanta Storage about the ODD business. He talked about the meeting or meetings that he had with Evon Yu and Sally Huang at restaurants and that he met with Sally Huang in January of 2009 to discuss the ODD business.

And here is that e-mail in which Sally Huang writes in January of 2009 -- this is Plaintiff's Exhibit 214 -- where she says at the top, Dear All, some info from HLDS, Bruce. So we don't have it from Bruce Jeong. We actually have it from Sally Huang that they met and discussed

pertinent information set out here in Exhibit 214.

Michael Chang was one of the PLDS employees that we heard testimony from.  Mr. Chang agreed with HLDS to set prices for HP procurement events.  And again, why didn't we see plea agreements from or guilty pleas for PLDS?  Why didn't these people serve time?  You heard Mr. Hudson testify about his understanding of what happened with PLDS.  They turned state's evidence.  They became witnesses for the FBI, and that is the reason why you don't see guilty pleas from PLDS in the record.  They were all participating and trying to help the FBI once the conduct became apparent in 2009 and later.

Mr. Chang testified that one of the calls that he received during the procurement events was during the auction.  One call was during an e-RFQ.  And then he said, you know, I wouldn't disagree if the records show that I had 150 phone calls during this period with Daniel Hur of HLDS and another 68 calls with Eugene Yang.  So again, once the auctions began, the calls just started flying.

J.C. Lim from PLDS agreed or admitted to having multiple agreements to set prices with HLDS.  They agreed with TSST not to bid aggressively.  He talked about how the whole information sharing was a spy game, that they were checking on each other's information and bids to see where they were.  They treated it as a spy game.  And he

also admitted that one of his job duties was to get competitors' prices and exchange pricing information with his competitors.

And then he also testified that he talked with Caroline Lin once or twice a month.  So she was part of that vast network of communications.

And then we heard from Steve Van Vorst from Sony Optiarc.  He testified about how Quanta Storage and Sony worked together.  Quanta would submit the pricing information that they wanted Sony to then submit to HP during the process of a bidding event.  That QSI was the one that set the prices.  Sony just communicated them to the buyer.

He praised Ms. Huang when she came back and provided information about what the ranking order was after a couple of rounds of bids for the other suppliers.  She provided information that HLDS was first and PLDS was second and Optiarc was third.  He says, You are such a good spy.

And what we see in this drawing is a very rough overview of how the information flowed.  HLDS acted more or less as a conduit, as a hub.  But then communications were flying between PLDS and TSST and from PLDS to QSI and from PLDS to Sony Optiarc and from QSI to Sony Optiarc.

I don't think that this graphic really does it

justice, the 150 phone calls between just two of the parties. Multiple, multiple e-mails that we have seen. We can't adequately present it in a graphic to you. But the point that I want to drive home is these communications were frequent, fast, and furious.

What type of information were they sharing? They weren't just setting agreements on prices. They were exchanging a whole lot of information with each other, all of which was very useful, if you want to keep the prices high. Again, they exchanged the pricing information. They exchanged the pricing information during the auctions. They made agreements that they wouldn't go below a certain price.

They talked about levels of aggressiveness. And why was that important? Well, again, if you know that your competitor is not going to be aggressive in a certain round, that means you don't have to be aggressive and set a low price in that round.

They would talk about who would actually be participating in each event. And why was that important? That was important so you know I have got two competitors or six competitors. If I know that my competition is a certain number of people and I know that it's Party A and Party B, I might be able to be less aggressive having that information.

They talked about where they wanted to end up at the end of the bidding process, and they exchanged information about their sales volume, inventory levels, shortage information, their road maps, their future forecasts, and the pull rates, how quickly the inventory was flying off the shelf in the HP warehouse that they had.

So all of this information that was being exchanged is a part of this -- the phone calls, the e-mails, the text messages, all of this is very useful to help keep prices high.  And you have heard plenty of testimony about that and how it did that.

So I want to isolate one event for you, the October 2008 event, which is just one of many events that we've talked about and you have heard evidence about in this case.  But it's an interesting event because we can look at it sort of in isolation and help you to understand how the communications came out, what the significance of each of those communications was and easily extrapolate those communications to any or all of the other procurement events that you heard evidence on.

What we have in October of 2008 is every single defendant, HLDS defendant who pled guilty, pleading guilty to this particular bidding event.  These two events, actually.  Plaintiff's Exhibit Number 268 is the HLDS plea agreement.  362, 285, 180, and 396 are the individual HLDS

employee plea agreements.  And so you all can go back and consider those when you deliberate.  But what I have done in this slide is just show you that each of the HLDS individuals and the corporate entity pled guilty to the bidding events in October of 2008.

So what do we have?  In 2008, in October of 2008, HLDS learns that Quanta and Sony are going to participate jointly.  This is early October, October 10th, 2008.  The auction is just being announced.  And they immediately begin communicating and strategizing about the upcoming bidding event.

So Eugene Yang sends this e-mail internally and he says, Look, I have just learned this.  I have just learned that QSI and SNO are planning to jointly participate.  He goes on to say, down below, that when the auction commences, SNO, Sony Optiarc, and QSI, Quanta Storage, would very likely compete within the mutually agreed upon guideline.

So at this point, even in October 2008, the conspiracy has a mutually agreed upon guideline that they are all operating within.

The communications continue over the course of the next few weeks.  On October 17th, Quanta Storage has dinner with Mr. Yang from HLDS to, quote, get the consensus on the price protection.  I don't think you need

translation help to understand what that means.  Consensus is an agreement, obviously.

On the 23rd of October, Quanta Storage has lunch with PLDS, and I have provided the exhibit numbers there for y'all to consider.

And during the course of October of 2008, the beginning of the month to the end of the month, the records indicate that HLDS, PLDS talked with Quanta Storage 40 or more times during that month.  And that's Plaintiff's Exhibit Number 76.  You can go back and look at it.  Here is one page of those phone calls.  What the lawyers have done in this case is to take each of those phone calls, set out who the caller and the recipient is and the phone numbers and the duration, and the dates are over here.  But you can see for the period of the month of October of 2008 there were 40 or more phone calls that Quanta Storage has with one or more of its competitors.

So what happened?  Well, we know that on October 20th Caroline Lin indicates, Last week I met with HLDS guy.  I learned their best price.  I got HLDS's best price.  So we know what they are going to do.  Their best price is 24.65.  I also know that as a result of knowing HLDS's best price that we're going to submit a best quote of 24.50.

THE COURT:  All right.  20 minutes has gone past.

Move the microphone up a little bit.  You are cutting in and out.  Okay.  Go on.

MR. ROBERTS:  Mr. Dawson will have me later for taking some of his time, but this is an important point. I want to make sure we cover it.

Sally Huang sends an e-mail to Steve Van Vorst -- and you saw several of these types of e-mails -- telling them what they should submit.  Quanta wants you to submit, Sony, this price.  And so Quanta submits its best quote of 24.50, knowing what HLDS's best price is going to be.

She then follows up in an e-mail later on and talks about what all the information is that they learned.  One of the things that they learned is that in order to protect the price at a certain level, the suppliers have the consensus to keep the price no lower than 24.25.  The agreement is set out in writing and this is from Sally Huang with QSI that the agreement is we're not going to -- we're not going to go lower than 24.25.

And, of course, Mr. Hudson was asked, Did you go back and look at this event, what the results were of this event?

He said, Yes.  In fact, the results of that event were consistent with this agreement, including for QSI, who he said submitted a final bid somewhere above 24.35.

And that's the result of the October 2008 conspiracy

which, again, can be easily extrapolated to any of the other events at issue in this case.

I'm going to hand it over to Mr. Dawson.  Thank you.

MR. DAWSON:  Thank you.  Ladies and gentlemen, thank you.  You will remember when we started in voir dire -- it probably seems like a long time ago -- you all were sitting out there and Judge Hittner said to you -- talked to you about the preponderance of the evidence.  And he said the preponderance of the evidence is sort of just tipping the scale.  HP has to tip the scale in their favor.

So I went out after -- I didn't ever have a set of justice scales, scales of justice.  So I bought one on Amazon the other night.  And I thought, as we talked through some of the evidence, it's up to you to decide whether you give it credibility and, if so, how much weight you might give it.  We'll talk through some of the things that you might put on the scale for both HP and for Quanta and see how that helps you analyze the questions that you will get in this case.

As I told you in opening statement, there are really three issues for you to decide.  The first is was there a price-fixing conspiracy.  It's actually subsumed within the first question that you'll get asked.  The question is did Quanta participate in a price-fixing conspiracy.  So

in order for Quanta to participate, there must have been a price-fixing conspiracy to begin with.  So you have to make that determination yourself.

Did the -- the evidence on the scale, does it show that there was a price-fixing conspiracy.  And here is the -- the Court gives you a long definition of what "conspiracy" means.  This is what I -- this is part of it. It's not the whole thing.  It's just part of it.  You can read the whole definition yourself.  But I think it sort of sums it up.  To prove an agreement, a conspiracy, the evidence must show that the participants in the agreement came to an understanding among themselves to accomplish a common purpose.

So the question for you is:  Did all these companies did they have an understanding that they were trying to keep the prices higher than they would have otherwise? Were they trying to keep a price freeze in effect?  Did they have a common understanding that they were trying to not bid aggressively?  And if they did, that is a price-fixing conspiracy.

And you will remember in opening I told you I didn't really think it was disputed that there was a price-fixing conspiracy and, frankly, I don't think it has been disputed in this trial.  We know we have got five guilty pleas.  Five guilty pleas that there was a price-fixing

conspiracy. These people have all admitted that there was a price-fixing conspiracy, that they had an agreement to fix and stabilize prices to set them at a higher level than they would have been.

And they have also all admitted that five or more coconspirators were guilty with them. In other words, we conspired with five or more other companies, they have said.

So that is up to you to determine the weight of that and whether you give it credibility. But if you did, you might put some evidence on the scale.

What else do we know? These four went to jail. So that's maybe part of the same thing. It's kind of the same thing.

We also know that all of these witnesses, all of them -- Mr. Roberts has just testified about this -- they all came into this courtroom by video -- and again, I apologize for all the videos. If I could have gotten them here, trust me, I would have but I couldn't. So I did the best I could. But they all appeared on this screen. And in one way or another, they all said to you, yes, we agreed to fix the prices. Yes, we agreed to set prices. Yes, we agreed not to bid aggressively. Yes, we shared information on who was going to bid what and who was going to have what ranking. They all had a common purpose to

keep the price at an elevated level.

So again, it's up to you to determine whether you give that evidence any weight and, if so, how much and whether you find it credible but you might -- you might put another weight on the scale.

And then we have all the evidence that you saw. And, ladies and gentlemen, all those binders over there, that's all the evidence that was introduced. You are going to take that back into the jury room, and you are free to look through it all. And if you have written down exhibit numbers, you can pull them out, the exhibit numbers. They are all labeled with the numbers.

And you'll see -- this is just a part of it, but this is all the documentary evidence. And here you have, I have leaked information to P, one of the competitors, and they talk about their -- rather than engaging in ranking competition, they are going to agree for limited competition. It's part of their agreement to keep the prices higher than they would have been.

And here they are sharing information on what the prices are going to be for this event, who is going to get what. T company, TSST, is going to get 18.56; HLDS is going to get this; and PLDS is going to get that.

Here is another agreement or other evidence of their agreement. A price freeze will be in effect until next

June.  They've agreed amongst each other to have a prize freeze.  That is evidence of a price-fixing conspiracy.

T, referring to TSST, said that they quoted only 23.50.  They will not lower the price.  Because there was an agreement they would be ranked number one.  Again, a common purpose.  You saw all these.

Here they have agreed that they won't fight TSST to get number two.  We will keep our position at number three.  An agreement to keep the prices elevated.

And here is another document.  The participant said he will not insist on taking first place for all three months.  So they have an agreement on how they are going to divide up and who is going to have what price during this procurement event.

Here is another document.  Contact I had with Terry, TSST, Philips, and Sony to grasp the overall situation and the possibility to freeze prices.

I think you have got the picture.  I think you understood, hopefully, from the evidence that they were sharing information in order to keep the prices elevated.  We can go on.

So now -- so maybe the documentary evidence maybe that's gets another weight on the scale.  So we'll put that on there.

Now consider what evidence goes on this side.  What

evidence did you hear from Quanta that there wasn't a conspiracy? We didn't hear any, none. And so if you balance the evidence that you hear and you give any of the evidence that we have presented any credibility and any weight, because there is nothing on the other side of the scale, the answer to the question is, yes, there was a conspiracy. And I think that the evidence that we have presented supports that. That's the only reasonable conclusion from the evidence that we have presented.

So now we'll go back and we'll take this off -- and I have got to try to get them balanced again. Hopefully, that's balanced.

So if you find that there was this agreement among these competitors to artificially inflate prices, the question then becomes and what the real fight is in this lawsuit, I think, and I told you this in opening, is did Quanta participate in the conspiracy. That's the next question. That's Question Number 1 and Question Number 4. Quanta Storage, that is the name of the entities that -- the employees that are located overseas are QSI. The ones that were located here are Quanta Storage America.

You heard, by the way, the evidence that Sally Huang was a Quanta Storage America employee. She was located here. She was the one that was entering in -- and you'll see her name in some of the documents entering or

facilitating what we say is Quanta Storage America's participation in the conspiracy.  And then she was replaced later by Caroline Lin, who we saw evidence also participated in the conspiracy.

So the question is:  Did they participate?  And let's start with Mr. Yang.  Did I get that right?  Yang?  He is the one who pled guilty to conspiring with Quanta and others.  At the very end -- and we wanted to show you the video clip.  We intended to show you the video clip.  But when we changed closing from tomorrow to today, we weren't able to get all our ducks in a row.

So at the very end of his testimony he is asked this question -- and hopefully you remember it -- when you pled guilty to Counts 3 and 4, which includes the October 2008 event that you just heard about, who did you conspire with?  And his testimony was QSI, TSST, and PLDS.  He includes Quanta.

And I submit to you that since he has pled -- he could only have conspired with Quanta if they were a participant in the conspiracy.  And so that's, I think, some evidence -- uh-oh.  My scales got messed up.  I think that's some evidence that goes on the scale for Quanta's participation.

But there is more.  Here we have in Plaintiff's Exhibit Number 33 -- and you can take it and look at it.

This is sworn testimony from PLDS.  And they say, PLDS says prior to the auction Jerry Hsieh from PLDS phoned Haw Chen, a Quanta Storage employee, his counterpart at QSI. Mr. Hsieh placed the call from Taiwan.  The two reached an agreement whereby PLDS would bid a certain price and allow QSI to win the third place slot.

I submit to you, ladies and gentlemen, that that is some evidence -- and it's up to you to give it whatever weight you think is appropriate -- that Quanta participated in this conspiracy.  So you might consider putting that on the scale for HP.

But there is more.  You have got all this testimony that you heard in this case about Quanta's participation. Mr. Hur, he met with Caroline Lin to discuss pricing of ODD products.

Mr. Jeong met with Evon Yu from -- uh-oh.  What did I do?  Oh, here we go.  Mr. Jeong met with Evon Yu to discuss and Sally Huang to talk about ODD business.

Mr. Lim testified he agreed with Quanta to set prices. That was the meeting at the Olive Garden that you heard about.

Mr. Jerry Hsieh, we just talked about him.  He agreed with Haw Chen to discuss the desired rankings and auctions.

And then Mr. Yang, in addition to pleading guilty to

conspiring with Quanta, he testified he met with Caroline Lin to discuss prices.

So all of this testimony indicates that Quanta participated in the conspiracy.  So I think maybe another weight goes on the scale.

Then we have more evidence.  This is one I showed you in opening where Tango from TSST wants to have a tea talking meeting to talk about the future of ODD business and it is sent to Evon Yu at Quanta and she forwards it to Sally saying TSST wants to have tea talking time.

Why do you think they put it in quotes?  Why?  Because they knew what they were really going to talk about, and it wasn't about tea.  It was about ODD business.  And we know that Sally went to this meeting because she reports on it.

So if you look back, that document is dated -- I can't read it -- December 5th is that -- is the date of that document.  So here, December 15th, ten days later, she tells us or tells her colleagues at Quanta here is what she got from that meeting with Tango from TSST.  And they talk about inventory levels and they talk about their market funds and they share other competitively sensitive information.  So they went to the meeting to talk about the ODD business.

Here Sally tells Steve Van Vorst from Sony not to bid

aggressively because she has been told by TSST, presumably by TSST, that they are not willing to be aggressive.  So we don't want to be aggressive.  Their common purpose was to keep the prices up.  This is evidence that Sally participated in that by getting evidence that TSST was not going to be aggressive.  And so, therefore, QSI didn't want to be aggressive either.

And here, J.C. Lim is reporting on pricing information that he got from QSI for an upcoming procurement event.  How did he get that if they weren't participating in the conspiracy?  Because they were, I submit.

So there is more information and documents that talk about information that they had gotten from their competitors.  And here is Caroline talking about -- she is chatting with J.C., J.C. Lim, one of the competitors, once or twice a month.  They are meeting regularly, and they are meeting regularly to share information.

And you heard Dr. Aron.  She told you that competitors don't do that when they are competing with one another.  They don't share their competitively sensitive information.  They could only have been doing it as part of this overall plan to help each other elevate prices at HP's expense.

And here is the one that Mr. Roberts just went over with you where they share information with Eugene Yang at

HLDS about this upcoming auction that was the October one he has talked to you about.

We also know from the documents that have been produced by Quanta in this case that they had all this competitively sensitive information. They got the road maps. They had Sony's road map. Maybe they got that because -- oh, no. This is -- I'm sorry. This is HLDS has the road map from Sony and QSI, and they talk about these road maps are extremely helpful.

This is about their future production. This is about devices they have under development that they are going to introduce into the market at some point in the future. They are giving it to their competitors. Why would you do that? Unless it was part of some agreement to keep prices elevated.

And we know from Quanta's documents that they have all the other competitor's road maps. They had Pioneer's. They had Panasonic's. They had HLDS, PLDS, TSST. How did they get these documents, ladies and gentlemen, unless they were part of this conspiracy. And I submit that that's more evidence that they participated in this conspiracy.

And here a Quanta Storage employee is talking about collecting competitors' road maps so that they can use it as part of their conspiracy.

Here is the -- Mr. Roberts made reference to it.  This is Plaintiff's Exhibit Number 76.  These are the phone calls from Quanta to their competitors.  There is over 100 in a six-month timeframe.  Over 100 in just a six-month timeframe.  And I think, again, that shows that they were a participant.

Why do they need to call their competitors 100 times in six months?  They weren't talking about the weather, I promise you.  They were talking about competitively sensitive information that they were sharing to the detriment of HP.

Here they are talking about the ranking information.  Oh, other competitors.  That's right.  Other competitors, they knew what Quanta was doing because Quanta told them.  So here you have Lindsay Lu to J.C. Lim at PLDS.  And she is saying, Dear J.C., per the conversation with QSI yesterday, they put 26.30 for the SATA drive.  Their intention is to be the number five.  So they will not move their price in round two.

So here they have agreed on the rankings, and she could only get -- well, she says she got this information from Quanta.  Quanta shared it with them as part of the conspiracy, gave them that pricing information.

Here is another one from J.C. Lim, and he is saying, I also managed to talk to QSI and they did not make any

price move.  Again, they are sharing pricing information.  And you heard from Dr. Aron.  Competitors don't share pricing information unless they are trying to keep prices elevated.

So we took their depositions.  They had the opportunity to deny the charges that were being filed against them or the accusations that were being made.  We asked them all the questions.  Did you participate in a conspiracy?  Did you share information with your competitors?  Did you share ranking information?  We asked them all that question.  And you heard or you can read, from the one that we didn't play, that they invoked the Fifth Amendment on every question.

Now, they had the opportunity to deny the charges that are being brought by HP in this case, and they did not take advantage of that opportunity.  Instead, they pled the Fifth.  And as Judge Hittner has told you, you may infer, you are not required to, but you may infer that their refusals to answer all of those questions, that the reason that they did it, is because it would have been harmful to Quanta Storage, Inc. and harmful to Quanta Storage America.

And here are the topics -- some of the topics that were covered in those depositions from which you may infer that the answers would be negative or hurt Quanta Storage,

Inc. or Quanta Storage America.  Whether they participated in the conspiracy.  Whether they agreed to set prices. Whether they shared pricing information.  Whether they shared competitively sensitive information.  Whether they received from competitors their pricing.  And whether they met with employees of competitors.

And there is more and more.  We put on a whole bunch of that testimony for reasons that I think we have previously explained to you.  So I submit you could put another weight on the scale just by virtue of their refusal to answer questions about the charges that were being brought against them.

So I ask you again:  What evidence did you hear from Quanta in this trial?  None.  They provided you with no evidence whatsoever that they did not participate in this conspiracy.  None.  And so when you fill out the answer to the question, Questions 1 and 4, the answers are, yes, that we believe the evidence, if you weigh it out, the only evidence you heard supports the conclusion that they did participate.  And you didn't hear any other evidence to the contrary.

Two of the questions that you'll be asked are if you've found that they knowingly participated.  Did they do it knowingly and intentionally?  And here is the Court's -- I'm not sure this is the whole instruction but

certainly part of the Court's instruction on what "knowingly" and "intentionally" is.  It says to act knowingly means to participate deliberately and not because of mistake, accident, or other innocent reason.

And, ladies and gentlemen, I submit to you I don't think you can join a price-fixing conspiracy unless you intend to.  I think they knew what they were doing.  This was not -- and you certainly haven't heard any evidence that this was a mistake, that they didn't -- they were sharing pricing information and sharing competitive information and getting pricing information and getting this information that somehow it was a mistake.  You didn't hear any evidence.

I think the evidence is they knew what they were doing and that they did so intentionally in order to try and reap higher profits from HP.

So I submit to you, ladies and gentlemen, that the questions you are to answer are yes to one and four and yes to two and five because I believe that the only evidence that you heard supports that conclusion.

Now let's talk about damages.  And here is the Court's instruction.  I'm not going to read the whole thing.  You'll have a chance to read it yourself.  But, basically, the Court has instructed you that if you find that Quanta participated in the conspiracy, they are liable for the

damages during the entire conspiracy period, from 2003 to 2009.

It doesn't matter when they joined.  It doesn't matter that some of this conduct might have happened before they joined.  And it doesn't matter that they only sold 510 million, I think is the number, and that others may have sold more.  That doesn't matter.

The law says if you join a conspiracy you are liable for everything in the conspiracy.  And you know why?  We don't want people joining conspiracies.  It's not good. It's not good for the people in this country.  It's not good for companies like HP.  So we try and discourage people from joining conspiracies.  And that's why if you join one you are on the hook for the whole thing because, folks, we want to -- the law wants to send a strong disincentive to people to not participate in a conspiracy.

And you heard Dr. Aron today.  She went through in some detail the -- her work over four years and spent a bunch of money and a bunch of time and was very methodical to make sure she got it right.  And I think that -- I will say this.  It's clear that HP was damaged by this.  It's clear that prices were higher than they would have been. And the only number that you heard about what the damages were during the conspiracy period was that of Dr. Aron's.

And so if you determine that HP was harmed -- and you

heard Russell Hudson.  He said that they were harmed, that they were overcharged, that they paid a higher price than they should have, they have suffered some injury.  That's the only evidence you heard on that topic -- then I respectfully submit to you the only number that you can put, because the only number that you have any evidence to support, is the $176 million in damages that HP is seeking in this case.

And so, I respectfully submit to you that you should answer Questions 3 and 6 in the affirmative and that you should answer Question 7 with $176 million.

I am going to reserve -- I don't know how much time I have left.  I'm going to reserve the rest of my time.  I'm going to let Mr. Carman speak.  And then, I will have the opportunity to speak to you briefly before we conclude for the day.  Thank you.

THE COURT:  You have used 45 minutes.

Mr. Carman, I think we're okay for you, do you think, to start in?

MR. CARMAN:  Yes, sir.

THE COURT:  Okay.  Then we'll go straight through.  Mr. Carman may not take the amount of time, but he may take it all.  And then we'll wrap up.  Okay.

MR. DAWSON:  Do you want this?  I'm sorry.  Take that and turn that.

THE COURT: Mr. Carman, if you prefer the podium, you may use that. Whatever you are most comfortable with. Okay. It needs to be high up on the knot. Move it up close, a little higher on the knot.

MR. CARMAN: How is that, Your Honor?

THE COURT: Yes, sir.

MR. CARMAN: Could I have the lights, Your Honor?

THE COURT: Okay.

MR. CARMAN: Good afternoon, ladies and gentlemen. Thank you for listening carefully to this case. I know at times it probably hasn't been the most exciting case, probably wasn't what you expected when you were called for jury duty.

The first thing I want to do is I want to make it clear that while my company, Quanta Storage, Incorporated, is not admitting any involvement in this conspiracy, they are aware now of the evidence that's been presented against them and they are aware that a jury might reasonably find that they participated in the conspiracy. So I'm not going to spend any time arguing about the existence of the conspiracy or whether Quanta participated in it.

I want to talk to you about the issue of damages. And I want to remind you about the testimony of Dr. Hudson on cross-examination. If you will recall on

cross-examination, Dr. Hudson was asked:  Who is writing the checks?  I asked him about the procurement events.  Is it Hewlett-Packard Company who is buying these ODDs?  Is it a subsidiary, a different company?  He didn't know.  He couldn't tell us.

And Dr. Aron was here today.  She doesn't have any additional information.  The only information that she has about who purchased the ODDs is from Hewlett-Packard.  And who is the man at Hewlett-Packard?  Dr. Hudson.  And he doesn't know.

We know that there are subsidiaries.  We know that ODDs were purchased and put in computers overseas and shipped here.  So I submit to you that there is no evidence of the amount of ODDs that Hewlett-Packard Company purchased.

So even if you find that Quanta Storage, that my company was involved in this conspiracy, when it comes to the issue of damages, you can't determine what the damages are.  You haven't heard a specific number of here is the ODDs that Hewlett-Packard Company purchased versus some subsidiary of Hewlett-Packard.  There is no evidence of that.

Ladies and gentlemen, because of that, I submit that you cannot return a verdict for Hewlett-Packard Company. You have to know:  How many did they buy?  Dr. Aron told

you what the overcharge was. It doesn't matter what an overcharge is if you don't know which company purchased the devices. It's not a friends and family program where, you know, this subsidiary bought so many. This subsidiary bought so many, but Hewlett-Packard is going to collect for them.

So there is no evidence on which you can determine a reasonable amount of damages to award Hewlett-Packard Company because there is no evidence as to how many ODDs they purchased versus one of their subsidiaries.

Thank you.

THE COURT: Okay. You have 15 minutes left, Counsel.

MR. DAWSON: Thank you. Ladies and gentlemen, this will be the last time I get to talk to you. So in case I run out of time, I want to thank you for your service. And I know this has been, you know, not the most fun thing to do for the last five days, but it was incredibly important to HP for reasons that I will get to soon. So thank you so much for your dedication.

One of the reasons that we presented the case the way we did is we wanted to give you a good understanding of the scope and depth of this conspiracy because we thought that that was important to you.

Let me address what Mr. Carman just addressed, and

then I'll have a few final comments.  First of all, the Court will instruct you that what Mr. Carman and I say is not evidence.  It's not evidence.  It's not -- you are not really to consider it.  You can take it into consideration as you are looking through the evidence.

The evidence is what you heard from the witness box or the video box and what is in those binders.  And you didn't hear any evidence that any of the purchases that are the subject of our damage claim were purchased by any entity other than HP.  No one came in here and said, well, they were actually purchased by somebody else.  And you can look through all those documents, and you won't find one that indicates topside or bottom that anybody other than HP purchased these ODD products.

What did you hear?  You heard from Russell Hudson that what he was looking at was purchases by HP.  That's what he was looking at.  And he also, I think, said, yeah, there might have been some purchases by some of the subsidiaries but we're all part of the same family.  HP Korea, or whatever it is, it is part of HP.  He told you, in my memory -- and you'll have to remember it how you remember it.  My memory is he said, I look at this as purchases by HP.

What did Dr. Aron tell you?  She told you the data that she got she understood to be HP data; HP, Inc. data.

She also, importantly, told you that if there were any transactions involving foreign HP subsidiaries, she took that out of the model. So if there were any sales to HP Korea or any other entity, they were excluded from her model. And she told you that the $176 million that she calculated is damages to HP, Inc., and that's the only evidence that you heard on that topic.

So, ladies and gentlemen -- and so I submit that the answer to the question, the only evidence you have got is the $176 million number.

Let me switch gears and kind of conclude with you. I'm a really lucky guy. I get to do -- I love my job. I get to try cases like this. I get to work with great people like Brad Hartz from HP and all my colleagues at work. I have got a wonderful wife and four wonderful kids.

And as we were raising our kids -- we have two adult kids and two in high school -- we had rules in the house, things that you could or couldn't do. And there were -- we always told our kids there are consequences if you break the rules.

My now 15-year-old is a gamer. He likes playing video games. I'm not a fan, but he likes it. He started with Minecraft and now he is on to -- he went through Fortnite and now I think it's Destiny is the current game of

choice.

And it became apparent to me a couple of years ago that he was more interested in gaming than he was in doing his homework. And so we put in a new rule, and it said no gaming Thursday through -- I mean, Sunday through Thursday.

And one night I walked in his room, and he was gaming on a school night. And so the consequences, he lost his gaming rights for, whatever, three weeks or something. You would have thought the world was coming to an end. I mean, I was ruining his life. I didn't understand. He was going to lose the opportunity to do this and that and the next thing.

And, frankly, there was a side of me that was compassionate and maybe I should give in. Maybe I should let him have his gaming back. And the parent side of me said no. He has to understand that if you don't follow the rules, there are consequences.

And, ladies and gentlemen, that's what this case is all about. Russell Hudson told you that they -- HP expects their foreign suppliers to follow the rules, to follow the U.S. antitrust laws. And I told you that this was an important case for HP, and it's important for two reasons. One, the amount of money they lost.

But it's equally important because they still use the

e-auction process today.  They still use the e-RFQ process today.  And they want you to send a message, to send a message to Quanta and to the other suppliers that if you are going to sell us hundreds of millions of dollars worth of products, you have got to abide by the rules.  You have to abide by U.S. antitrust laws.

The future of all their purchases in the future depends on compliance with these rules and compliance with U.S. antitrust laws.  That is the reason that this is important to HP.  And it's not just HP, and it's not just these suppliers.  You saw evidence in this case.  This affected not just HP but Dell and Acer and Intel and Apple and others.

So on behalf of all American companies who buy from big suppliers, I'm asking you to send a message, and it's not just to Quanta.  This message is to Toshiba and Samsung and Hitachi and Panasonic and Pioneer and TEAC and Sony and NEC.  And I forget who I am missing.  It's a message to all of them if you are going to do business with American companies, if you are going to sell your products, then you need to abide by the rules and you need to abide by the U.S. antitrust laws.  And if you don't, there will be consequences.

And I submit to you, ladies and gentlemen, that these people, they need to hear your message.  Now this is only

a case against Quanta; but trust me, this is a message to the foreign suppliers for computer companies in the United States.  And I submit to you that they need to hear your message.

When you watched their testimony, did one of them come across as remorseful to you?  Did one of them -- I think one guy said he was sorry out of the nine.  Did one of them -- one guy said it was a pervasive business culture to go around and to have secret meetings and get on prepaid cell phones and have agreements with competitors and they do MSN or whatever texting or instant messaging through MSN to keep it quiet.  That was part of the business culture.

And it wasn't bad enough that the ones that went to jail got paid while they were in jail, got their salaries, they got promoted when they got back to the company, like it was a badge of honor.  They went to prison so the company could make more profits, and so you got promoted when you got back.

And so, ladies and gentlemen, I think it's really -- I told you at the beginning that this is a really important case and it's important because of the dollars but it's also important because we need to send a message to people if you are going to do business in this country, you have to abide by the rules.  You have to comply with U.S.

antitrust laws.  And if you don't, there will be consequences, and we will hold you accountable.

And so, ladies and gentlemen, I ask you to return a verdict for HP in this case.  Thank you.

THE COURT:  All right.  Ladies and gentlemen, that completes the trial.  In a moment I will hand the original jury charge to Ellen, and she will escort you into the jury room.

You now set your own schedule.  The first thing you are going to decide is if you want to do any deliberating tonight and until what time.  I will say this.  You don't have to -- it's now 5:07.  This is the way I always do it.  You may begin as early as 9:00 in the morning but not later than 10:00 and go deliberate up to 6:00 every day.  Okay.  And so that's strictly up to you.

The first thing you need to do when you go in there is just decide what your schedule is today.  Do you want us to hang around or are you just going to get organized and pick it up in the morning.  All right.  Either way is okay.  We just need to know.  So nobody is in any rush.

All of the exhibits -- have you gone through the exhibits?

MR. DAWSON:  No.  We have not yet, Your Honor. We can do that momentarily.

THE COURT:  In other words, shortly after you go

in, we'll have all the exhibits in, if you want to look at them. That's strictly up to you. But again, you set your own schedule. Like tomorrow, you set your own schedule. If you adjourn for the night, you are not to discuss this case with anyone unless all eight of you are in that jury room at the same time. When you have reached the unanimous verdict, you'll let us know.

Do we have a CSO?

CASE MANAGER: Yes, sir.

THE COURT: Okay. So we have a U.S. Marshal here in the hallway already. Okay. So we have a marshal out in the hallway.

I guess that's it. Am I right?

CASE MANAGER: Yes, sir.

THE COURT: You know the timeframe tomorrow. In other words, if you get underway, the earliest we will be able to answer a question or to take a verdict is 11:30. But if a question comes in, send it out. If they can get ahold of me on the phone, I may be able to answer it. Or if the attorneys agree, it can go right back in without finding me. But I'll be in at 11:30 and be around except not available for that 45-minute stretch I mentioned.

We appreciate your service. We can't do it -- the system would not work without the cooperation of everyone and all the citizens. And it's a major case. It moved

*Laura Wells, CRR, RDR*

quickly, relative to the complexity of this matter.  So we will have the, what is it, all the exhibits in to you momentarily.

But at this time, ladies and gentlemen, it's now in your ballpark.  Please stand and commence your deliberations.

CASE MANAGER:  All rise for the jury.

(Jury exited courtroom at 5:11 p.m. to begin deliberations.)

THE COURT:  Those of you that have tried cases in front of me know that I usually will not take a verdict after 5:00 because of the security and a number of things around the building.  But since we have a couple that are having financial situations, I said they can go right to 6:00 today and they can go right to 6:00 tomorrow.  If they have any questions coming out between 5:00 and 6:00, we'll be around here.

If they desire to come back tomorrow, Ellen will come back and mention it.  Tomorrow you need to be on call.  Okay.  There is no need -- there is no need for any of you to be here, but you need to let Ellen make sure she has your cell phone so you can get here within 10 minutes of a call.  Okay.  But you don't have to hang out down here if you don't want to or you can be in the coffee shop or whatever.

If they can -- I'll be available by phone.  If you can agree on the answer to a question, fine.  If not, more than likely she -- I didn't mention this -- she can get me on the phone, but I'll be in at 11:30, 11:30 or 11:35.  All right.  Get those in as quick as you can to them.

MR. DAWSON:  I think that's our set.  We will have a set that we will get to the court reporter.

THE COURT:  No.  No.  Give it to Ellen.  She will take it in.

MR. DAWSON:  We'll do that.

THE COURT:  Otherwise, I'll see you sometime tomorrow.  Just stick around today unless they go.  When they go, we are all out.

MR. ROBERTS:  Your Honor.

THE COURT:  Yes, sir.

MR. ROBERTS:  A housekeeping matter.  If a question comes up tomorrow morning and you are not here and we agree on an answer to send it back, it needs to be on the record, I assume, or not?

THE COURT:  It doesn't matter to me.  It doesn't matter to me.  As officers of the court, if you agree on it, that's fine.  You can agree on it.  And I can sign off on it when I get in.  If there is any problem, she knows where to catch me.  I'll be available probably by phone, yeah, tomorrow.

*Laura Wells, CRR, RDR*

MR. ROBERTS:  Thank you, Judge.

(Proceedings concluded at 5:14 p.m. and continued on Day 6.)

*Date: November 6, 2019*

### COURT REPORTER'S CERTIFICATE

*I, Laura Wells, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

_____/s/ Laura Wells_____

*Laura Wells, CRR, RMR*

### $

$1.26 [1] - 423:22
$1.79 [1] - 406:23
$1.793 [1] - 424:14
$125 [2] - 427:10, 531:6
$176 [6] - 479:13, 479:17, 559:7, 559:11, 564:5, 564:10
$3 [1] - 470:7
$385 [2] - 427:9, 531:4
$40 [2] - 469:24, 470:5
$43 [2] - 470:1, 470:6
$45 [1] - 469:23
$510 [1] - 531:8
$534 [1] - 423:20

### '

'04 [1] - 478:7

### /

/s [1] - 572:10

### 1

1 [3] - 525:6, 548:18, 556:17
10 [4] - 406:20, 482:7, 515:25, 570:22
100 [8] - 420:5, 420:8, 446:24, 496:25, 497:25, 554:3, 554:4, 554:7
104 [1] - 497:3
105 [1] - 497:2
10:00 [2] - 504:24, 568:14
10:09 [2] - 381:4, 383:11
10K [4] - 496:22, 497:4, 497:18, 497:19
10th [1] - 540:8
11:30 [9] - 435:24, 435:25, 500:6, 501:21, 502:6, 569:17, 569:21, 571:4
11:35 [1] - 571:4
11:51 [2] - 435:25, 436:4

### 12.5

12.5 [1] - 454:21
12.7 [9] - 464:17, 464:20, 466:14, 481:23, 485:19, 531:12, 531:13
12.7-millimeter [1] - 439:9
12.7s [5] - 465:12, 465:18, 465:19, 467:22, 468:22
1221 [1] - 381:12
123 [1] - 497:1
126 [1] - 497:3
127 [1] - 497:3
14 [1] - 412:21
15 [2] - 435:22, 562:12
15-minute [1] - 435:21
15-year-old [1] - 564:22
150 [2] - 536:17, 538:1
15th [1] - 551:18
176.3 [3] - 406:19, 487:2, 487:12
17th [1] - 540:23
18.56 [1] - 546:22
180 [1] - 539:25
19 [1] - 525:18
1:00 [2] - 435:21, 487:24
1:03 [1] - 483:20
1:05 [1] - 435:21
1:11 [2] - 488:5, 488:6
1:15 [1] - 483:21

### 2

2 [5] - 525:11, 525:20, 525:21, 525:23, 531:3
20 [10] - 387:4, 387:7, 389:18, 500:11, 501:25, 502:2, 505:21, 527:25, 541:25
2003 [9] - 402:23, 407:1, 418:3, 420:6, 467:16, 473:19, 478:7, 496:25, 558:1
2004 [3] - 427:23, 492:24, 497:1
2005 [1] - 497:2
2006 [3] - 427:24, 493:22, 497:2

### 2007

2007 [3] - 427:24, 492:25, 497:3
2008 [15] - 480:3, 480:12, 480:13, 497:3, 539:13, 539:21, 540:5, 540:6, 540:8, 540:19, 541:6, 541:16, 542:25, 549:14
2009 [11] - 402:23, 407:1, 419:4, 459:12, 459:19, 467:18, 497:3, 535:20, 535:22, 536:12, 558:2
2010 [5] - 418:4, 427:25, 470:25, 493:22, 497:3
2014 [2] - 420:6, 484:18
2015 [5] - 386:12, 395:16, 459:20, 473:20, 484:18
2019 [3] - 381:5, 382:2, 572:4
20th [1] - 541:18
21 [2] - 381:5, 382:2
214 [2] - 535:22, 536:1
23.50 [1] - 547:4
23rd [1] - 541:3
24.25 [2] - 542:15, 542:18
24.35 [1] - 542:24
24.50 [2] - 541:24, 542:10
24.65 [1] - 541:22
241-7499 [1] - 381:18
243 [1] - 425:19
245 [1] - 389:4
246 [1] - 405:11
248 [1] - 405:11
25 [1] - 446:1
250 [1] - 405:11
250,000 [1] - 396:13
252 [1] - 405:11
256 [1] - 435:11
26 [1] - 389:15
26.30 [1] - 554:17
268 [1] - 539:24
285 [1] - 539:25
293 [1] - 419:20
2:15 [2] - 488:1, 488:3
2:18 [1] - 488:6

### (continued)

2:24 [1] - 488:10
2:37 [1] - 495:16
2:44 [1] - 501:4
2:49 [1] - 504:4
2:50 [2] - 504:4, 505:6
2:52 [2] - 505:10, 505:14

### 3

3 [7] - 479:8, 526:3, 526:5, 526:23, 535:12, 549:14, 559:10
30 [6] - 384:23, 386:19, 386:21, 386:23, 501:24, 528:1
300 [1] - 381:17
304 [2] - 424:18, 482:10
33 [1] - 549:25
340 [2] - 513:6, 513:9
35 [1] - 427:2
357 [2] - 513:6, 513:9
362 [1] - 539:25
37 [1] - 467:3
383 [1] - 382:12
396 [1] - 539:25
3:30 [2] - 504:11, 505:7
3:32 [2] - 505:14, 505:17
3:45 [1] - 502:12

### 4

4 [6] - 392:20, 526:13, 535:13, 548:18, 549:14, 556:17
40 [3] - 427:2, 541:9, 541:16
400 [1] - 395:19
45 [3] - 400:9, 404:17, 559:17
45-minute [1] - 569:22
4500 [1] - 381:13
488 [1] - 382:12
495 [1] - 382:3
496 [1] - 382:4
4:00 [1] - 502:17
4:18-CV-00762 [1] - 381:3
4:30 [1] - 502:13

## 5

5 [3] - 381:8, 382:1, 526:16
5'7 [1] - 451:9
5'8 [1] - 451:8
501 [2] - 382:4, 382:5
505 [1] - 382:5
510 [1] - 558:5
515 [1] - 381:23
529 [1] - 382:6
535 [1] - 381:16
543 [1] - 382:6
560 [1] - 382:7
562 [1] - 382:7
570 [1] - 382:8
572 [1] - 382:8
5:00 [3] - 504:20, 570:12, 570:16
5:07 [1] - 568:12
5:11 [1] - 570:8
5:14 [2] - 381:4, 572:2
5th [1] - 551:17

## 6

6 [6] - 381:8, 526:20, 526:24, 559:10, 572:3, 572:4
6,000 [1] - 395:21
600,000 [4] - 395:21, 395:25, 458:9, 458:11
68 [1] - 536:18
6:00 [6] - 504:19, 504:25, 568:14, 570:15, 570:16

## 7

7 [5] - 526:24, 527:1, 527:3, 531:1, 559:11
700 [1] - 400:16
713 [1] - 381:14
76 [2] - 541:10, 554:2
77002 [1] - 381:23
77010 [1] - 381:13

## 8

8,000 [3] - 392:12,

395:14, 399:22
80 [1] - 390:6
8004 [1] - 381:23
818 [1] - 381:18

## 9

9.5 [3] - 454:22, 464:25, 466:15
9.5s [4] - 465:9, 465:18, 465:19, 466:23
90 [1] - 420:8
91203 [1] - 381:17
951-6225 [1] - 381:14
97 [1] - 497:2
9:00 [2] - 504:24, 568:13

## A

A-r-o-n [1] - 384:9
a.m [5] - 383:11, 435:24, 435:25, 436:4
A.M [1] - 381:4
abide [6] - 429:21, 566:5, 566:6, 566:21, 566:22, 567:25
ability [5] - 416:16, 421:3, 430:10, 433:6, 503:3
able [21] - 412:13, 419:5, 429:20, 431:13, 433:23, 444:17, 444:25, 450:16, 458:3, 470:1, 470:17, 475:15, 475:18, 478:18, 485:1, 502:9, 504:16, 538:24, 549:11, 569:17, 569:19
above-entitled [1] - 572:8
abrupt [1] - 470:24
absence [1] - 478:12
absolutely [2] - 460:7, 490:20
academic [4] - 386:25, 391:7, 391:13, 446:20
accept [1] - 514:3
accepted [1] - 446:25
access [4] - 422:15, 423:3, 423:4, 427:20
accessed [1] - 396:13

accident [3] - 500:21, 519:22, 557:4
accommodate [2] - 502:11, 503:12
accomplish [3] - 517:12, 517:15, 544:12
according [1] - 462:12
account [17] - 441:23, 449:7, 449:12, 451:24, 452:8, 452:21, 452:25, 453:7, 456:2, 456:3, 457:25, 462:17, 467:25, 470:9, 478:21, 480:15, 509:19
accountable [1] - 568:2
accounted [6] - 449:3, 462:11, 462:15, 470:22, 470:23, 470:25
accusations [1] - 555:7
Acer [1] - 566:12
achieve [1] - 415:17
acronyms [2] - 531:14, 531:15
Act [4] - 515:7, 515:13, 515:18, 515:23
act [4] - 508:23, 519:21, 520:4, 557:2
acted [4] - 517:18, 518:18, 521:4, 537:21
action [2] - 428:5, 514:16
activity [1] - 412:5
acts [4] - 394:21, 394:25, 520:24, 522:12
actual [25] - 403:20, 404:12, 428:20, 444:1, 445:8, 445:19, 445:20, 455:1, 467:11, 467:19, 468:16, 470:5, 477:21, 478:2, 478:6, 478:8, 479:23, 480:4, 480:7, 480:10, 485:13, 485:15, 486:19, 486:20
add [2] - 481:18, 517:7
added [2] - 398:23, 470:20
addition [4] - 388:19, 398:21, 531:6, 550:25

additional [10] - 398:19, 398:21, 427:10, 454:8, 454:10, 454:12, 484:5, 501:6, 501:13, 561:7
address [3] - 396:9, 459:22, 562:25
addressed [1] - 562:25
adequate [4] - 432:25, 460:18, 463:3, 463:19
adequately [1] - 538:3
adjourn [2] - 504:13, 569:4
adjust [2] - 441:25, 442:1
adjusted [1] - 463:7
adjustment [1] - 470:24
admit [2] - 533:23, 533:25
admits [4] - 533:20, 534:21, 535:9, 535:16
admitted [21] - 482:9, 507:25, 508:1, 509:3, 513:6, 513:8, 514:24, 523:20, 532:12, 533:6, 533:18, 533:19, 534:2, 534:9, 534:19, 535:11, 536:20, 537:1, 545:1, 545:5
admitting [1] - 560:16
adult [8] - 384:22, 450:8, 450:10, 450:22, 451:2, 453:13, 454:11, 564:17
adulthood [1] - 453:14
advance [1] - 512:16
advantage [1] - 555:16
adverse [2] - 512:11, 512:13
affect [15] - 401:24, 403:8, 431:2, 431:10, 441:12, 443:9, 444:9, 448:20, 448:22, 450:10, 471:7, 489:19, 496:4, 503:2, 521:15
affected [8] - 403:9, 403:10, 403:14, 403:15, 445:1, 459:15, 516:5, 566:12
affecting [2] - 398:2, 471:14
affects [1] - 495:21

affiliated[2] - 392:17, 491:20

affirmatively[1] - 528:24

afternoon[7] - 488:22, 488:23, 501:22, 501:23, 502:3, 506:10, 560:9

aggressive[9] - 414:9, 414:12, 538:16, 538:17, 538:24, 552:2, 552:3, 552:6, 552:7

aggressively[8] - 430:5, 430:9, 433:20, 433:23, 536:22, 544:19, 545:23, 552:1

aggressiveness[1] - 538:14

ago[4] - 388:14, 483:3, 543:6, 565:2

agree[20] - 411:9, 411:25, 412:2, 412:3, 412:10, 412:25, 414:16, 414:21, 414:24, 429:23, 440:25, 441:3, 516:10, 516:14, 546:17, 569:20, 571:2, 571:18, 571:21, 571:22

agreed[24] - 429:1, 429:2, 429:18, 429:22, 430:9, 516:16, 517:22, 517:23, 521:7, 521:9, 536:3, 536:20, 536:21, 540:17, 540:20, 545:22, 545:23, 547:1, 547:7, 550:19, 550:22, 554:20, 556:2

agreed-upon[1] - 521:7

agreeing[2] - 390:22, 411:8

agreement[89] - 411:6, 415:15, 416:16, 423:6, 430:4, 430:10, 432:1, 432:9, 432:17, 432:18, 496:11, 496:12, 515:15, 515:20, 515:25, 516:3, 516:4, 516:6, 516:19, 516:21, 516:23, 516:25, 517:1, 517:2, 517:4, 517:9, 517:13, 517:14, 517:16, 517:17, 517:20, 517:22, 518:1, 518:3,

518:5, 518:8, 518:9, 518:10, 518:12, 518:18, 518:19, 518:20, 518:21, 519:3, 519:5, 519:12, 519:14, 519:16, 519:18, 519:20, 519:23, 519:24, 520:3, 520:4, 520:7, 520:8, 520:10, 520:13, 520:17, 520:19, 520:23, 520:25, 521:3, 521:8, 521:17, 521:20, 522:3, 534:2, 535:7, 539:25, 541:2, 542:16, 542:17, 542:23, 544:10, 544:11, 545:2, 546:18, 546:24, 546:25, 547:5, 547:9, 547:12, 548:13, 550:5, 553:14

agreements[10] - 515:25, 521:14, 533:21, 533:25, 536:5, 536:21, 538:7, 538:12, 540:1, 567:10

ahead[9] - 406:13, 410:20, 429:18, 477:18, 480:4, 488:12, 488:18, 495:17, 529:1

ahold[1] - 569:19

aid[1] - 513:12

aiding[1] - 513:10

aids[1] - 523:9

AL[1] - 381:5

Alex[1] - 381:11

alike[1] - 517:18

Alistair[1] - 381:10

allegation[1] - 449:1

allegations[3] - 394:19, 394:20, 394:25

alleged[18] - 398:7, 400:6, 402:15, 402:22, 407:4, 416:18, 416:23, 417:20, 419:16, 419:25, 447:22, 459:9, 487:1, 495:21, 515:6, 517:25, 522:15

allegedly[1] - 398:9

alleges[1] - 514:25

allocated[1] - 527:21

allocates[1] - 385:11

allocation[1] - 515:11

allocations[1] - 528:7

allow[4] - 419:14, 455:1, 455:9, 550:5

allowed[6] - 412:9, 412:10, 415:5, 457:18, 472:3, 523:8

allows[5] - 403:17, 428:25, 429:11, 442:4, 535:3

alluded[1] - 456:10

almost[1] - 504:4

alone[2] - 509:21, 514:17

ALPHABETICAL[1] - 382:9

ALSO[1] - 381:19

alternative[3] - 401:15, 420:18, 433:7

Amazon[1] - 543:14

ambiguous[2] - 409:22, 410:13

Amendment[1] - 555:13

America[13] - 492:1, 511:1, 511:19, 511:22, 514:14, 524:22, 525:13, 526:15, 526:18, 548:21, 548:23, 555:22, 556:1

America's[2] - 512:12, 549:1

American[3] - 388:25, 566:14, 566:20

amount[19] - 392:21, 407:3, 427:3, 427:7, 478:4, 479:3, 479:4, 479:10, 479:16, 481:18, 482:22, 490:23, 498:21, 521:22, 527:5, 559:22, 561:14, 562:8, 565:24

amounted[1] - 406:19

amounts[3] - 490:1, 521:25, 522:1

analogy[1] - 459:24

analyses[4] - 401:17, 401:22, 471:4, 484:2

analysis[82] - 385:7, 393:20, 393:21, 394:1, 394:2, 394:3, 394:10, 394:17, 398:3, 400:4, 401:1, 404:13, 404:14, 404:23, 406:22, 407:7, 408:4, 411:3, 417:14,

419:7, 419:10, 419:13, 423:19, 441:18, 444:1, 446:15, 446:16, 446:18, 446:22, 447:1, 447:5, 447:16, 448:8, 448:9, 448:16, 448:18, 449:13, 449:16, 450:3, 450:5, 451:11, 452:13, 453:12, 455:5, 455:7, 455:8, 456:13, 456:25, 457:12, 457:13, 458:1, 458:7, 458:12, 458:22, 458:24, 460:1, 460:12, 460:19, 462:17, 462:24, 463:4, 463:16, 463:20, 464:1, 464:20, 465:24, 466:10, 467:7, 469:4, 470:9, 471:8, 471:16, 473:2, 473:4, 474:7, 475:1, 477:25, 480:14, 485:2, 486:15

analyst[1] - 396:25

analysts[1] - 398:5

analyze[6] - 395:17, 403:12, 419:10, 444:20, 479:19, 543:19

analyzed[14] - 395:10, 397:7, 401:9, 401:20, 403:7, 424:20, 443:14, 451:21, 457:7, 461:25, 467:5, 486:21, 489:3, 491:2

analyzing[2] - 446:21, 471:15

AND[1] - 381:7

Angeles[1] - 384:21

angle[2] - 436:15, 450:12

angst[1] - 500:4

Ankura[2] - 386:8, 386:9

announce[5] - 415:3, 425:8, 425:9, 425:11, 426:19

announced[3] - 425:13, 426:17, 540:9

announcement[2] - 425:25, 426:5

answer[38] - 491:7, 492:18, 493:20, 494:1, 494:23, 510:25, 511:17, 511:24, 512:2, 512:5, 512:10, 524:19, 525:10, 525:17, 526:1, 526:2, 526:3, 526:4,

526:8, 526:23, 526:24, 526:25, 527:3, 527:8, 527:18, 548:6, 555:19, 556:11, 556:16, 557:18, 559:10, 559:11, 564:9, 569:17, 569:19, 571:2, 571:18

answered[6] - 525:11, 525:12, 525:20, 525:21, 525:22, 526:19

answers[7] - 511:25, 512:10, 512:15, 512:23, 524:3, 555:25, 556:17

Antitrust[1] - 389:2

antitrust[18] - 386:3, 390:14, 390:15, 390:16, 390:17, 390:18, 393:2, 506:6, 515:1, 515:5, 515:7, 515:8, 522:6, 565:22, 566:6, 566:9, 566:22, 568:1

apologize[1] - 545:18

apparent[2] - 536:12, 565:2

appear[1] - 494:2

APPEARANCES[1] - 381:9

appeared[2] - 411:2, 545:20

Apple[1] - 566:12

apples[2] - 449:8

apples-to-apples[1] - 449:8

applicable[1] - 516:10

applications[2] - 447:25, 448:15

apply[6] - 404:7, 419:10, 442:7, 444:9, 506:22, 508:5

applying[1] - 446:12

appreciate[2] - 529:8, 569:23

approach[3] - 394:6, 446:12, 453:6

approached[3] - 394:3, 403:2, 403:3

appropriate[2] - 435:18, 550:9

approved[1] - 431:23

area[5] - 386:22,

390:16, 390:25, 437:3, 465:7

areas[5] - 385:20, 385:21, 398:17, 400:12, 491:22

argue[2] - 499:20, 502:3

arguing[1] - 560:20

arguments[6] - 503:10, 507:21, 507:22, 507:23, 507:24, 508:2

arise[1] - 397:10

arithmetic[1] - 479:16

ARON[2] - 382:11, 383:22

Aron[29] - 383:16, 384:5, 384:11, 387:25, 390:8, 393:1, 393:8, 411:4, 413:23, 414:20, 419:23, 423:11, 425:21, 427:6, 437:8, 450:1, 456:8, 477:18, 486:22, 488:22, 488:24, 490:1, 532:14, 552:18, 555:2, 558:17, 561:6, 561:25, 563:24

Aron's[1] - 558:24

arrangements[2] - 422:22, 423:9

arrive[2] - 385:16, 385:17

arrived[1] - 496:3

arriving[2] - 507:13, 508:12

articles[2] - 388:24, 397:20

artificially[3] - 532:7, 532:8, 548:14

ascertain[1] - 475:15

Asia[1] - 492:1

aspects[1] - 404:6

assembled[2] - 399:15, 518:16

asserted[1] - 498:6

assertion[2] - 469:7, 498:3

assess[6] - 393:22, 401:10, 401:20, 448:13, 473:3, 485:5

assessment[5] - 407:12, 407:25,

459:23, 463:8, 465:23

assessments[1] - 401:17

assigned[1] - 524:16

assignment[1] - 393:8

assisted[1] - 381:25

associated[7] - 394:5, 394:9, 395:5, 491:25, 494:21, 518:15

Associates[5] - 385:3, 385:4, 385:24, 386:5, 392:5

association[1] - 520:19

Association's[1] - 389:1

assume[10] - 393:10, 394:13, 394:14, 394:20, 395:7, 395:9, 432:23, 482:11, 525:19, 571:19

assumed[2] - 395:4, 490:2

assuming[2] - 395:3, 527:1

assumption[3] - 394:24, 457:20, 484:12

attempted[2] - 412:16, 412:17

ATTENDANCE[1] - 381:19

attention[1] - 529:5

attorneys[12] - 503:4, 504:1, 504:7, 504:22, 506:8, 512:20, 524:11, 524:24, 525:15, 527:20, 527:21, 569:20

auction[21] - 415:9, 424:23, 425:8, 425:11, 428:2, 428:4, 428:20, 435:8, 435:10, 494:10, 530:20, 533:1, 533:2, 533:20, 534:11, 536:15, 540:9, 540:15, 550:2, 553:1, 566:1

auctions[13] - 414:22, 425:1, 425:2, 425:7, 426:23, 428:14, 434:24, 435:9, 530:13, 531:23, 536:19, 538:12, 550:24

authored[1] - 389:16

auto[1] - 448:2

automobile[1] - 500:21

automotive[2] - 448:1

available[13] - 401:20, 425:5, 425:17, 426:25, 458:21, 459:19, 496:24, 502:13, 504:17, 518:9, 569:22, 571:1, 571:24

average[1] - 453:16

award[4] - 391:11, 427:4, 521:23, 562:8

awarded[2] - 391:13, 427:1

awards[6] - 391:5, 391:9, 432:2, 432:3, 432:5, 432:19

aware[6] - 427:11, 491:16, 491:18, 532:3, 560:17, 560:18

axis[7] - 418:15, 420:3, 420:4, 439:7, 439:10, 440:6, 467:14

## B

backgrounds[1] - 405:13

backup[1] - 476:13

backwards[1] - 500:20

bad[6] - 394:21, 394:25, 432:14, 455:10, 475:1, 567:14

badge[1] - 567:17

balance[1] - 548:3

balanced[3] - 391:23, 548:11, 548:12

ballpark[1] - 570:5

bank[1] - 483:21

Bar[1] - 389:1

bar[1] - 485:13

bargain[2] - 429:17, 430:1

barriers[1] - 422:5

base[1] - 512:12

based[17] - 394:1, 394:2, 409:6, 440:1, 451:14, 451:15, 452:7,

493:22, 493:24, 503:13, 508:8, 513:16, 520:19, 522:17, 525:16, 527:1, 528:6

basis [2] - 457:7, 498:20

basket [1] - 433:2

battery [6] - 476:7, 476:12, 476:17, 528:13, 528:15, 528:18

bearing [1] - 392:22

beat [1] - 413:18

beauties [1] - 455:7

became [3] - 536:8, 536:12, 565:2

Beck [1] - 381:12

become [1] - 520:5

becomes [1] - 548:15

becoming [1] - 465:10

BEFORE [1] - 381:7

began [4] - 395:16, 459:18, 520:10, 536:19

begin [8] - 501:20, 524:15, 532:25, 533:3, 540:10, 544:2, 568:13, 570:8

beginning [6] - 467:16, 473:19, 479:7, 525:6, 541:7, 567:21

behalf [3] - 529:6, 530:8, 566:14

behavior [2] - 390:25, 532:8

behind [1] - 529:12

beliefs [1] - 523:5

below [8] - 429:1, 478:1, 478:2, 481:11, 485:25, 486:4, 538:13, 540:15

beneficial [1] - 535:8

benefit [4] - 411:16, 411:22, 424:17, 482:8

benefits [2] - 412:7, 413:2

Benjamin [1] - 381:11

BenQ [1] - 417:10

bent [1] - 500:20

best [17] - 438:4, 451:13, 451:15, 451:16, 452:15, 452:16, 506:9, 515:10, 529:12,

541:20, 541:21, 541:23, 542:9, 542:10, 545:20

better [9] - 438:6, 438:7, 449:16, 452:18, 452:20, 456:5, 477:3, 528:21, 534:15

between [37] - 391:24, 409:16, 409:20, 411:16, 417:7, 417:15, 417:18, 420:6, 427:11, 427:23, 427:24, 442:5, 443:22, 444:19, 445:6, 471:2, 471:20, 478:5, 478:9, 478:10, 478:16, 478:20, 479:2, 483:9, 486:19, 493:19, 507:21, 509:12, 515:15, 516:19, 518:21, 521:24, 531:25, 537:23, 538:1, 570:16

beyond [4] - 427:25, 431:15, 483:21, 494:18

bias [1] - 509:25

bid [22] - 413:15, 413:18, 413:19, 414:6, 414:13, 415:16, 433:19, 433:21, 493:14, 530:22, 533:9, 533:18, 534:8, 535:7, 536:22, 542:24, 544:19, 545:23, 545:24, 550:5, 551:25

bidder [5] - 429:4, 429:10, 429:11, 429:22, 434:1

bidder's [2] - 414:7, 431:9

bidders [9] - 414:5, 415:11, 426:12, 426:17, 427:5, 428:16, 434:5, 434:13, 530:14

bidding [22] - 411:10, 414:9, 414:10, 414:11, 414:15, 429:1, 429:4, 429:7, 429:8, 430:5, 430:8, 431:7, 433:24, 434:6, 434:7, 434:15, 532:23, 537:11, 539:2, 539:23, 540:5, 540:11

bids [16] - 390:22, 411:9, 425:4, 426:8, 426:11, 426:14, 428:18, 428:19, 428:24, 434:19, 533:19, 534:9,

536:24, 537:16

big [7] - 421:4, 452:21, 478:8, 480:11, 484:5, 566:15

biggest [1] - 415:6

billings [1] - 392:19

billion [5] - 406:23, 423:22, 424:14, 531:1, 531:3

bills [1] - 392:7

bind [2] - 500:2, 500:18

binders [2] - 546:7, 563:7

binding [1] - 520:25

biology [1] - 450:9

bit [14] - 383:9, 392:11, 397:8, 419:5, 421:2, 423:12, 433:21, 450:13, 476:6, 504:2, 506:6, 506:15, 529:15, 542:1

black [1] - 418:12

Blu [3] - 418:15, 460:15, 460:17

Blu-ray [1] - 460:15

Blu-rays [2] - 418:15, 460:17

blue [6] - 418:9, 477:25, 478:16, 485:22, 505:23, 517:8

board [2] - 447:7, 450:2

boards [4] - 436:7, 438:20, 438:21, 449:15

book [1] - 388:24

born [1] - 384:20

bother [2] - 383:8

bottom [3] - 418:14, 534:22, 563:13

bought [5] - 386:8, 402:8, 543:13, 562:4, 562:5

Boulevard [1] - 381:16

box [2] - 563:6, 563:7

boy [6] - 451:5, 453:19, 454:10, 454:20, 456:4, 500:3

boys [5] - 452:3, 452:5, 452:14, 452:16, 459:25

boys' [1] - 452:15

Brad [2] - 381:19, 564:14

Brand [1] - 381:16

Brawley [1] - 381:11

break [12] - 435:18, 435:20, 435:21, 483:13, 483:16, 487:25, 495:12, 500:23, 503:25, 516:9, 528:9, 564:21

breaks [1] - 423:17

briefly [3] - 389:7, 439:3, 559:15

bring [6] - 383:9, 387:12, 389:4, 425:19, 488:7, 498:6

broad [1] - 448:15

broken [1] - 524:20

Brooklyn [1] - 384:24

brought [3] - 508:20, 555:15, 556:12

Bruce [3] - 535:14, 535:24

bucket [2] - 423:25, 424:1

buckets [1] - 424:16

building [3] - 470:13, 470:16, 570:13

built [1] - 462:21

bunch [3] - 556:7, 558:19

burden [3] - 508:13, 527:22, 528:4

burner [1] - 534:16

business [21] - 385:8, 385:13, 386:3, 411:21, 411:22, 427:11, 432:21, 432:25, 516:7, 526:7, 526:21, 535:17, 535:20, 550:18, 551:8, 551:13, 551:24, 566:19, 567:8, 567:13, 567:24

but-for [24] - 402:24, 445:15, 445:18, 446:11, 447:2, 447:20, 448:5, 455:4, 457:4, 457:14, 457:16, 458:5, 463:20, 475:15, 477:24, 478:6, 479:20, 480:3, 480:6, 480:16, 480:17, 485:3, 485:11, 486:19

button [4] - 437:17, 463:10, 476:4, 476:5
buy [9] - 385:15, 439:21, 439:22, 440:1, 534:15, 561:25, 566:14
buyer [1] - 537:13
buying [2] - 443:19, 561:3
BY [37] - 383:25, 384:16, 387:24, 389:5, 390:4, 390:12, 393:6, 405:21, 406:14, 408:8, 409:9, 410:9, 410:15, 410:19, 413:22, 416:22, 424:12, 425:20, 437:7, 438:10, 440:7, 446:7, 449:25, 451:20, 460:9, 461:21, 463:24, 465:22, 466:9, 467:4, 476:20, 481:17, 483:23, 488:21, 489:15, 489:25, 490:22

## C

calculate [12] - 402:8, 403:17, 419:6, 444:8, 445:10, 448:13, 451:13, 452:15, 453:5, 455:17, 475:18, 521:23
calculated [14] - 392:11, 402:4, 419:15, 445:6, 457:4, 457:14, 457:16, 458:5, 462:2, 477:24, 482:5, 482:6, 564:6
calculates [1] - 451:16
calculating [3] - 448:5, 489:17, 490:1
calculations [5] - 409:21, 489:19, 490:11, 532:13, 532:16
California [2] - 381:17, 399:7
caller [1] - 541:13
cannot [2] - 512:17, 561:24
capacity [3] - 420:17, 433:10, 535:1
car [1] - 448:1
cards [2] - 535:5, 535:6
career [1] - 386:24

careful [1] - 534:13
carefully [1] - 560:10
Carman [8] - 381:15, 382:12, 559:14, 559:18, 559:22, 560:1, 562:25, 563:2
CARMAN [25] - 407:21, 408:13, 409:22, 410:13, 413:7, 487:22, 488:14, 488:19, 488:21, 489:14, 489:15, 489:25, 490:22, 494:24, 496:18, 498:11, 499:3, 499:10, 499:25, 501:14, 516:13, 559:20, 560:5, 560:7, 560:9
Carman............... [1] - 382:7
Caroline [7] - 535:9, 537:5, 541:19, 549:3, 550:14, 551:1, 552:14
carpets [2] - 447:24, 448:1
carry [1] - 517:22
cartel [4] - 412:23, 420:20, 440:18, 440:22
cascading [1] - 532:9
case [124] - 383:19, 386:11, 386:13, 386:14, 389:7, 390:21, 391:17, 391:21, 391:25, 392:3, 392:6, 392:12, 392:13, 392:18, 392:23, 393:7, 393:11, 393:16, 393:18, 394:16, 394:24, 395:13, 396:14, 396:17, 396:20, 396:23, 398:12, 398:20, 401:15, 404:5, 404:6, 405:10, 405:24, 408:19, 411:10, 413:23, 414:20, 415:19, 417:2, 417:14, 427:2, 427:3, 427:14, 427:22, 429:14, 433:5, 439:4, 439:17, 443:23, 446:20, 447:1, 447:8, 447:15, 447:16, 447:22, 448:5, 448:7, 448:17, 448:23, 454:18, 456:13, 466:18, 470:4, 472:13,

475:2, 484:12, 484:19, 486:24, 491:9, 491:10, 493:21, 494:5, 494:8, 497:8, 497:11, 497:17, 498:3, 501:10, 501:15, 504:5, 506:4, 506:6, 506:22, 507:5, 507:10, 508:7, 508:14, 509:25, 510:1, 510:9, 512:21, 514:22, 514:25, 515:6, 516:15, 522:18, 522:25, 523:6, 524:7, 527:15, 529:10, 530:5, 530:25, 533:22, 539:15, 541:12, 543:2, 543:20, 550:13, 553:4, 555:15, 559:8, 560:11, 560:12, 562:16, 562:21, 565:19, 565:23, 566:11, 567:1, 567:22, 568:4, 569:5, 569:25
CASE [9] - 383:10, 436:3, 488:9, 495:15, 500:11, 501:3, 569:9, 569:14, 570:7
cases [14] - 386:3, 392:8, 393:2, 409:25, 446:23, 447:6, 447:18, 448:14, 523:24, 523:25, 527:14, 527:16, 564:13, 570:10
catch [1] - 571:24
category [2] - 492:12, 492:22
caused [7] - 395:9, 445:22, 516:6, 521:21, 522:9, 522:10, 522:19
causing [1] - 395:8
CD [12] - 393:17, 393:19, 417:21, 417:23, 418:10, 418:12, 418:19, 458:13, 460:15, 531:13
CD-ROM [1] - 531:13
CD-ROMs [2] - 418:10
CDs [6] - 394:5, 419:2, 419:6, 419:12, 419:14, 460:17
cell [2] - 567:10, 570:22
center [1] - 438:2
central [3] - 437:17, 446:18, 515:10
cents [2] - 479:10, 527:8

CEO [1] - 533:8
ceremony [1] - 502:16
certain [13] - 413:25, 448:14, 510:25, 511:17, 511:24, 512:8, 512:14, 514:6, 538:13, 538:16, 538:23, 542:14, 550:5
certainly [3] - 468:19, 557:1, 557:8
certainty [1] - 498:21
CERTIFICATE [1] - 572:5
Certificate............ ............ [1] - 382:8
certify [1] - 572:6
chair [2] - 391:10, 391:11
challenge [1] - 441:18
chance [2] - 525:14, 557:23
Chang [4] - 534:19, 536:2, 536:3, 536:13
change [5] - 456:20, 482:25, 484:14, 523:3
changed [4] - 386:7, 467:8, 484:11, 549:10
changes [6] - 397:25, 444:9, 444:25, 471:6, 471:10, 483:2
changing [3] - 443:15, 498:24
chapter [1] - 388:25
chapters [1] - 388:24
characteristic [3] - 434:20, 440:14, 460:20
characteristics [8] - 425:10, 437:11, 437:12, 438:13, 459:22, 460:11, 460:13
charge [11] - 385:14, 412:4, 496:1, 499:20, 501:22, 503:17, 505:20, 506:10, 507:9, 523:19, 568:7
Charge................. ................ [1] - 382:5
charged [7] - 393:22, 400:5, 439:12, 467:8,

477:22, 485:21, 493:12

charges[3] - 555:6, 555:14, 556:11

charging[1] - 420:13

Charles[6] - 385:2, 385:4, 385:5, 385:24, 386:5, 392:5

chart[13] - 406:3, 418:1, 418:3, 428:9, 452:10, 475:20, 475:22, 476:22, 482:11, 483:3, 483:8, 485:18, 531:15

chatting[1] - 552:15

cheat[2] - 432:9, 432:16

cheating[2] - 415:14, 430:3

check[3] - 458:25, 484:25, 486:11

checked[1] - 484:25

checking[4] - 400:23, 405:3, 405:4, 536:24

checks[1] - 561:2

Chen[8] - 510:24, 511:1, 511:5, 511:10, 511:17, 511:19, 550:3, 550:23

Chicago[5] - 384:6, 384:15, 384:20, 384:21, 388:17

Chief[2] - 502:23, 502:24

child[7] - 450:23, 450:24, 452:8, 453:2, 453:17, 454:11, 454:13

child's[4] - 450:7, 450:22, 451:15, 453:12

childhood[1] - 451:5

children[3] - 384:24, 459:25, 474:6

chipset[3] - 470:15, 472:5, 477:20

choice[2] - 420:22, 565:1

choices[1] - 433:12

circumference[1] - 461:4

circumstances[5] - 509:5, 509:19, 510:3, 512:17, 518:12

circumstantial[6] - 509:8, 509:9, 509:12, 509:14, 518:6, 518:11

cited[1] - 435:4

citizens[1] - 569:25

city[1] - 388:18

civil[2] - 523:24, 527:14

claim[9] - 448:24, 508:18, 508:19, 508:23, 508:25, 514:23, 515:22, 563:9

claimed[3] - 517:21, 518:17, 518:20

claims[2] - 498:6, 515:19

class[1] - 439:1

clean[21] - 403:5, 403:6, 403:12, 419:8, 419:14, 437:13, 438:14, 442:2, 442:3, 442:7, 442:13, 444:17, 444:23, 459:5, 459:8, 459:9, 459:18, 468:25, 470:19, 473:24, 484:19

clear[4] - 470:25, 558:21, 558:22, 560:15

clearer[1] - 406:4

CLERK[5] - 406:7, 435:23, 488:4, 503:7, 505:9

client[1] - 391:22

clients[1] - 386:1

clip[2] - 549:9

clock[4] - 488:12, 488:16, 501:16, 528:11

close[5] - 419:3, 420:8, 438:4, 490:18, 560:4

Closing[4] - 382:6, 382:6, 382:7, 382:7

closing[2] - 529:15, 549:10

clothing[1] - 438:9

clusters[1] - 451:25

co[7] - 388:25, 416:19, 416:23, 420:7, 420:23, 421:1, 422:11

co-conspirators[6] - 416:19, 416:23, 420:7, 420:23, 421:1, 422:11

co-wrote[1] - 388:25

coconspirators[1] - 545:6

codes[1] - 400:17

coefficients[5] - 454:16, 454:25, 457:1, 474:13, 485:2

coffee[1] - 570:24

collaborated[1] - 493:7

collaboration[1] - 531:24

collaborations[1] - 531:7

collate[1] - 400:1

colleagues[4] - 529:6, 534:12, 551:19, 564:14

collect[1] - 562:5

collected[3] - 398:4, 444:22, 456:16

collecting[1] - 553:24

collective[1] - 412:5

collectively[2] - 412:4, 413:2

collude[1] - 401:17

colluding[2] - 411:19, 440:23

collusion[11] - 428:8, 434:22, 435:7, 435:9, 435:10, 445:14, 457:10, 457:23, 470:6, 478:25, 481:7

collusive[9] - 412:24, 415:13, 420:20, 421:11, 421:12, 431:17, 431:25, 432:18, 434:25

column[2] - 481:24, 482:4

combinations[2] - 421:19, 515:13

combine[2] - 444:8, 448:19

combined[2] - 470:19, 481:22

combo[3] - 418:20, 466:14, 481:22

combos[5] - 418:17, 462:13, 464:22, 468:22

comfortable[1] - 560:2

coming[8] - 429:24, 437:21, 437:24, 456:11, 514:11, 517:17, 565:10, 570:16

commence[1] - 570:5

commences[1] - 540:16

comments[1] - 563:1

commerce[6] - 495:21, 496:13, 515:15, 516:5, 516:9, 516:16

commission[1] - 502:15

commit[1] - 425:15

commitment[1] - 516:20

common[11] - 426:21, 446:13, 449:14, 461:11, 516:20, 517:15, 544:13, 544:18, 545:25, 547:6, 552:3

commonly[3] - 403:3, 446:22, 448:12

communicate[2] - 428:20, 524:8

communicated[1] - 537:12

communicating[1] - 540:10

communications[10] - 387:5, 388:13, 537:6, 537:22, 538:5, 539:17, 539:18, 539:19, 540:22

companies[51] - 385:18, 390:19, 392:17, 393:24, 410:12, 411:7, 411:16, 411:18, 412:10, 413:13, 413:20, 414:6, 416:6, 416:12, 417:5, 417:13, 417:17, 417:19, 421:15, 421:19, 421:23, 421:24, 422:16, 422:17, 422:22, 422:24, 423:6, 423:9, 423:10, 427:18, 427:19, 428:7, 430:2, 430:5, 432:22, 433:17,

448:3, 469:16, 469:18, 472:16, 472:17, 481:9, 491:20, 493:6, 514:9, 544:14, 545:7, 558:12, 566:14, 566:20, 567:2

Company[22] - 409:8, 489:1, 489:9, 489:18, 490:3, 490:10, 490:23, 491:5, 491:16, 494:16, 494:17, 496:22, 498:21, 508:13, 514:13, 561:3, 561:15, 561:20, 561:24, 562:9

company[36] - 386:8, 392:7, 392:16, 409:15, 410:2, 410:5, 410:22, 417:3, 417:8, 417:10, 417:11, 417:16, 422:7, 422:16, 427:17, 433:10, 448:25, 489:5, 489:7, 489:9, 490:5, 491:6, 508:20, 508:22, 530:9, 546:22, 560:15, 561:4, 561:17, 562:2, 567:16, 567:18

COMPANY[1] - 381:3

company's[1] - 423:1

comparable[2] - 403:16, 485:4

compare[2] - 403:20, 440:17

compared[2] - 402:2, 445:19

comparing[1] - 449:8

compassionate[1] - 565:15

compendium[1] - 435:3

compensated[2] - 392:5, 392:18

compete[5] - 390:19, 390:20, 412:1, 433:23, 540:17

competed[1] - 521:11

competing[15] - 393:24, 398:9, 411:18, 413:21, 414:7, 416:14, 433:18, 439:24, 439:25, 440:15, 516:2, 519:2, 521:21, 522:3, 552:19

competition[17] - 385:17, 388:12, 390:17, 390:24, 391:1, 411:15, 412:6, 438:19,

515:9, 515:10, 521:12, 534:14, 534:22, 534:25, 538:22, 546:17, 546:18

competitive[32] - 397:10, 403:19, 413:15, 421:24, 422:1, 423:4, 423:8, 437:12, 438:14, 438:18, 440:8, 440:10, 440:13, 440:24, 441:6, 442:19, 445:2, 445:11, 468:11, 469:15, 469:24, 470:2, 470:5, 471:20, 475:16, 479:19, 479:23, 481:11, 485:21, 486:8, 530:18, 557:10

competitively[7] - 391:14, 416:11, 551:22, 552:20, 553:5, 554:9, 556:4

competitor[2] - 520:6, 538:16

competitor's[1] - 553:17

competitors[34] - 413:4, 413:17, 432:17, 515:16, 516:19, 516:22, 518:22, 519:7, 519:25, 520:10, 521:15, 522:3, 535:2, 535:4, 535:15, 537:3, 538:21, 538:22, 541:17, 546:15, 548:14, 552:14, 552:15, 552:18, 553:13, 554:3, 554:7, 554:13, 555:2, 555:10, 556:5, 556:6, 567:10

competitors'[3] - 519:1, 537:2, 553:24

compiling[1] - 404:16

completely[1] - 468:24

completes[1] - 568:6

complex[2] - 400:10, 506:7

complexity[1] - 570:1

compliance[2] - 566:8

complicated[1] - 443:2

comply[1] - 567:25

component[5] - 453:7, 457:2, 471:25, 472:6, 478:21

components[3] - 453:8, 470:13, 472:21

compression[1] - 485:17

computer[16] - 381:25, 424:6, 425:4, 426:9, 428:16, 444:11, 455:15, 456:17, 460:22, 462:19, 462:21, 463:13, 464:12, 473:18, 474:1, 567:2

computer-assisted [1] - 381:25

computers[26] - 397:4, 399:9, 399:10, 399:14, 400:18, 407:11, 407:15, 421:6, 423:23, 433:2, 443:6, 443:19, 444:6, 464:18, 473:6, 473:8, 473:12, 482:2, 487:5, 492:3, 492:8, 492:14, 492:16, 561:12

concept[1] - 402:19

conceptual[1] - 446:12

conceptually[1] - 445:5

concern[1] - 514:8

conclude[5] - 406:17, 486:25, 509:10, 559:15, 564:11

concluded[4] - 475:12, 486:23, 524:5, 572:2

conclusion[7] - 405:15, 407:17, 409:10, 490:18, 548:9, 556:19, 557:20

conclusions[3] - 405:23, 485:6, 509:4

concrete[1] - 447:16

conditions[2] - 442:5, 444:12

conduct[13] - 394:10, 394:16, 397:3, 400:25, 515:5, 518:14, 520:14, 521:5, 532:20, 534:19, 536:12, 558:4

conducted[14] - 394:1, 394:3, 401:16, 401:18, 401:19, 404:9, 425:1, 425:2, 428:6,

428:14, 428:15, 441:19, 456:24, 471:4

conducting[3] - 391:15, 398:3, 405:5

conducts[2] - 401:6, 401:9

conduit[1] - 537:22

confer[1] - 493:10

conference[1] - 502:17

conferences[1] - 389:23

confirmed[3] - 398:22, 456:21, 502:14

confusion[1] - 472:14

connection[1] - 428:4

consensus[3] - 540:25, 541:1, 542:15

consequences[5] - 564:20, 565:8, 565:18, 566:23, 568:2

conservative[1] - 407:23

consider[21] - 454:23, 507:14, 507:24, 509:1, 509:16, 509:23, 510:18, 510:23, 511:16, 514:7, 514:23, 518:24, 519:10, 520:13, 520:21, 540:2, 541:5, 547:25, 550:10, 563:4

consideration[6] - 457:12, 463:7, 512:25, 514:19, 523:1, 563:4

considerations[1] - 397:12

considered[19] - 396:3, 401:6, 402:7, 440:8, 440:10, 460:11, 460:16, 462:25, 463:16, 464:13, 464:14, 464:20, 464:24, 465:2, 465:3, 465:24, 466:10, 510:2, 513:1

considering[2] - 510:16, 514:22

consistency[1] - 510:1

consistent[13] - 401:14, 417:24, 427:15, 433:24, 466:20, 466:25, 469:1,

472:21, 475:11, 478:12, 484:16, 486:13, 542:23

consists [1] - 509:1

conspiracies [4] - 412:15, 515:14, 558:10, 558:13

conspiracy [177] - 393:11, 393:13, 394:13, 395:4, 395:5, 395:6, 395:9, 398:7, 398:8, 400:6, 400:8, 401:14, 402:1, 402:6, 402:15, 402:23, 402:24, 402:25, 403:5, 403:6, 403:11, 403:16, 403:18, 403:20, 406:23, 406:25, 407:4, 407:5, 407:20, 411:5, 411:6, 412:13, 412:24, 417:20, 419:3, 419:9, 419:10, 419:11, 419:13, 419:17, 420:12, 421:21, 422:2, 423:20, 427:25, 429:21, 430:2, 431:13, 440:18, 442:8, 442:13, 444:10, 444:12, 444:17, 444:24, 445:9, 445:11, 445:13, 445:16, 445:23, 455:3, 455:4, 457:4, 457:15, 459:10, 459:15, 460:18, 465:11, 465:12, 465:17, 467:12, 467:18, 468:24, 469:6, 469:7, 469:8, 469:12, 469:21, 469:25, 470:1, 470:19, 473:24, 475:17, 477:22, 478:3, 478:12, 478:25, 480:21, 481:5, 481:14, 481:19, 482:5, 482:16, 483:2, 483:10, 484:11, 484:13, 484:22, 485:10, 485:11, 485:14, 485:15, 485:21, 485:25, 486:4, 486:8, 486:19, 486:20, 487:1, 487:2, 487:7, 487:9, 495:21, 515:2, 516:18, 522:5, 522:7, 522:9, 522:11, 522:13, 522:15, 522:16, 522:19, 525:8, 525:12, 526:1, 526:7, 526:14, 526:17, 526:22, 527:6, 531:2, 531:24, 534:1, 540:19, 542:25,

543:23, 543:25, 544:2, 544:5, 544:7, 544:10, 544:20, 544:23, 545:1, 545:2, 547:2, 548:2, 548:7, 548:17, 549:2, 549:4, 549:20, 550:10, 551:4, 552:11, 553:20, 553:22, 553:25, 554:23, 555:9, 556:2, 556:16, 557:6, 557:25, 558:1, 558:8, 558:9, 558:16, 558:24, 560:16, 560:19, 560:21, 561:17, 562:23

conspirator [2] - 522:8, 522:10

conspiratorial [1] - 532:8

conspirators [12] - 414:21, 416:19, 416:23, 420:1, 420:7, 420:23, 421:1, 422:11, 485:9, 522:12, 531:10, 531:18

conspirators' [1] - 421:9

conspire [3] - 428:7, 441:4, 549:15

conspired [3] - 533:23, 545:7, 549:19

conspiring [7] - 393:25, 398:9, 432:23, 433:17, 534:19, 549:7, 551:1

constitute [1] - 507:19

constitutes [2] - 515:16, 518:2

constitutional [1] - 512:1

constrain [1] - 470:1

constrains [1] - 430:12

consult [1] - 522:23

consulted [2] - 431:5, 431:6

consulting [6] - 385:2, 385:5, 386:7, 387:3, 388:9, 524:11

consumers [6] - 385:15, 391:1, 411:17, 412:7, 412:11, 439:20

contact [1] - 547:15

contacted [1] - 534:11

contained [1] - 506:22

content [2] - 513:10, 513:20

contents [1] - 513:14

context [3] - 400:21, 444:20, 475:5

continue [2] - 450:19, 540:22

continued [2] - 388:10, 572:2

continuously [1] - 400:23

contracts [1] - 515:13

contradicted [1] - 510:4

contrary [4] - 498:1, 510:5, 510:16, 556:21

contribute [2] - 416:16, 493:13

control [12] - 405:3, 405:5, 456:17, 456:18, 456:22, 459:24, 460:2, 468:1, 468:19, 480:19, 484:4

controlled [4] - 419:16, 456:19, 473:9, 473:10

controls [2] - 458:17, 472:4

converge [1] - 468:23

converged [1] - 481:22

convergent [1] - 468:24

conversant [1] - 531:13

conversation [5] - 513:4, 513:8, 513:11, 513:15, 554:16

convicted [1] - 509:17

conviction [1] - 509:17

convinced [1] - 523:4

convincing [1] - 510:13

cooperation [1] - 569:24

coordination [1] - 414:16

copies [4] - 499:20, 500:7, 500:9, 503:22

copious [1] - 531:16

copy [4] - 389:6, 506:1, 506:15, 523:19

Corbett [1] - 404:15

corporate [1] - 540:4

CORPORATION [1] - 381:5

corporation [1] - 526:12

correct [25] - 392:14, 402:17, 403:22, 407:10, 409:13, 410:6, 410:12, 424:14, 424:15, 441:9, 464:24, 465:25, 466:11, 472:12, 478:25, 490:11, 490:25, 491:6, 491:17, 493:16, 511:8, 511:12, 525:1, 525:15, 572:7

Correct [1] - 466:7

correctly [2] - 402:13, 513:14

cost [19] - 397:12, 422:24, 423:3, 441:8, 442:22, 444:11, 444:22, 445:7, 445:8, 468:17, 470:16, 470:20, 472:2, 472:7, 472:9, 478:9, 478:11, 478:12, 483:9

costs [40] - 397:7, 397:15, 397:17, 422:20, 422:23, 441:11, 441:24, 442:10, 442:14, 442:16, 443:15, 443:17, 444:5, 456:17, 457:3, 468:7, 468:9, 468:12, 468:15, 468:19, 469:13, 469:17, 469:22, 470:10, 470:17, 470:18, 470:22, 471:8, 471:23, 472:5, 472:18, 472:24, 474:20, 477:6, 477:7, 477:20, 478:20, 478:22, 485:17

Counsel [6] - 447:9, 488:13, 488:15, 489:13, 489:23, 562:13

counsel [8] - 383:15, 487:18, 496:6, 499:7, 501:11, 507:20, 507:22, 529:18

count [2] - 389:15, 424:4

counted [2] - 390:6, 510:11

counterpart [1] - 550:3

counting [6] - 404:19, 423:25, 424:7, 424:11, 491:14, 510:9

countries [5] - 412:21, 422:19, 422:22, 422:24, 492:13

Countries [1] - 412:20

country [4] - 399:11, 529:13, 558:11, 567:24

counts [3] - 533:9, 533:18, 534:8

Counts [2] - 535:12, 549:14

couple [10] - 390:3, 398:14, 407:6, 415:13, 430:24, 496:18, 530:4, 537:16, 565:2, 570:13

course [27] - 386:18, 386:23, 387:2, 388:6, 388:10, 388:12, 395:17, 395:22, 397:21, 400:22, 409:14, 415:8, 415:10, 415:23, 425:21, 428:20, 428:23, 434:5, 434:8, 434:17, 440:11, 479:18, 496:23, 531:23, 540:22, 541:6, 542:19

courses [1] - 388:4

court [11] - 383:14, 506:16, 508:21, 510:21, 512:22, 513:3, 523:24, 524:10, 571:7, 571:21

Court [14] - 381:22, 383:2, 393:1, 495:8, 495:24, 496:20, 497:18, 499:3, 499:4, 499:22, 528:25, 544:6, 557:24, 563:2

COURT [149] - 381:1, 383:3, 383:5, 383:9, 383:12, 383:17, 383:21, 384:7, 384:14, 387:14, 387:17, 387:19, 387:23, 393:3, 406:2, 406:8, 406:12, 407:22, 408:1, 408:15, 408:20, 408:23, 409:3, 409:23, 410:4, 410:8, 410:17, 413:9, 413:12, 424:2, 424:9, 435:15, 435:19, 436:1, 436:5,

436:9, 436:13, 436:19, 436:21, 436:24, 437:2, 437:6, 437:16, 437:19, 437:21, 438:1, 438:7, 438:24, 446:3, 447:9, 447:13, 449:22, 450:11, 450:15, 450:19, 460:7, 460:24, 461:3, 461:7, 461:13, 461:20, 464:5, 464:9, 465:4, 465:14, 466:2, 466:5, 475:25, 476:5, 476:9, 476:13, 476:16, 476:23, 477:1, 477:4, 477:8, 477:11, 477:13, 481:1, 481:3, 483:15, 483:18, 483:20, 487:18, 487:23, 488:7, 488:11, 488:15, 488:18, 489:12, 489:22, 490:16, 490:20, 495:1, 495:3, 495:6, 495:11, 495:17, 496:5, 496:8, 496:12, 496:16, 497:5, 497:14, 498:10, 498:23, 499:6, 499:14, 499:24, 500:1, 500:12, 501:5, 501:10, 501:15, 502:1, 503:8, 503:17, 505:11, 505:15, 505:18, 511:7, 511:12, 511:14, 516:14, 517:6, 525:3, 528:14, 528:17, 528:21, 529:1, 529:18, 529:21, 541:25, 559:17, 559:21, 560:1, 560:6, 560:8, 562:12, 568:5, 568:25, 569:10, 569:15, 570:10, 571:8, 571:11, 571:15, 571:20, 572:5

Court's [3] - 556:25, 557:1, 557:21

court-wise [1] - 383:14

courtroom [15] - 383:11, 435:24, 436:4, 488:5, 488:10, 495:16, 501:4, 505:10, 505:17, 508:10, 523:22, 524:12, 530:8, 545:17, 570:8

cover [1] - 542:5

covered [3] - 446:8, 458:12, 555:24

CRA [1] - 385:3

crank [1] - 383:3

creates [1] - 508:21

creating [2] - 405:2, 420:19

credibility [7] - 509:15, 509:18, 509:22, 510:7, 543:16, 545:10, 548:4

credible [2] - 510:4, 546:4

credit [2] - 480:21, 481:15

criminal [2] - 527:15

Cross [1] - 382:12

CROSS [1] - 488:20

cross [4] - 487:19, 498:12, 560:25, 561:1

cross-examination [3] - 498:12, 560:25, 561:1

Cross-Examination [1] - 382:12

CROSS-EXAMINATION [1] - 488:20

CRR [2] - 381:22, 572:11

crunch [1] - 528:8

CSO [1] - 569:8

culture [2] - 567:8, 567:13

curiosity [1] - 447:21

curious [1] - 391:10

currency [1] - 396:10

current [2] - 431:16, 564:25

curve [11] - 439:14, 439:19, 442:15, 442:18, 442:21, 443:11, 443:22, 443:23, 444:6, 444:7, 471:18

curves [1] - 444:3

customer [2] - 411:12, 421:4

customers [6] - 399:10, 399:18, 439:21, 439:24, 440:1, 521:16

cutting [1] - 542:1

cycle [1] - 484:20

## D

damage [15] - 407:7, 407:12, 407:18, 407:24, 410:23, 459:23, 462:17, 463:8, 464:1, 465:23, 466:10, 467:7, 487:9, 563:9

damaged [2] - 490:24, 558:21

damages [53] - 393:2, 393:12, 393:14, 393:22, 394:5, 394:9, 394:15, 394:17, 394:18, 394:22, 394:23, 395:1, 395:5, 406:1, 406:18, 406:25, 407:2, 407:25, 409:10, 409:11, 409:21, 448:13, 467:16, 480:22, 480:23, 481:16, 486:6, 487:1, 487:8, 489:17, 490:1, 490:11, 492:12, 498:21, 508:21, 521:22, 521:24, 522:7, 522:8, 522:9, 522:17, 522:19, 524:23, 557:21, 558:1, 558:23, 559:7, 560:23, 561:18, 562:8, 564:6

Daniel [1] - 536:17

data [128] - 394:1, 394:2, 394:4, 394:6, 395:10, 395:18, 395:19, 395:20, 395:22, 396:4, 396:5, 396:18, 397:1, 397:7, 397:14, 398:2, 399:17, 400:10, 400:17, 400:20, 401:20, 402:14, 402:15, 403:12, 404:8, 404:16, 404:17, 404:18, 404:20, 404:24, 405:4, 408:10, 408:17, 408:25, 409:5, 409:6, 409:24, 410:24, 420:7, 443:14, 444:2, 444:4, 444:8, 444:16, 444:18, 451:1, 451:6, 451:10, 451:12, 451:25, 452:15, 452:16, 452:17, 453:17, 454:1, 454:4, 454:15, 455:12, 455:15, 455:16, 455:21, 456:1, 456:12, 456:15, 456:16, 456:19, 456:20, 457:3,

457:18, 457:20, 458:2, 458:8, 458:9, 458:11, 458:15, 458:16, 458:18, 458:20, 459:4, 459:19, 460:18, 461:24, 461:25, 462:3, 462:23, 463:2, 463:3, 463:19, 465:9, 465:17, 465:21, 466:20, 467:1, 467:20, 470:10, 470:17, 470:18, 470:25, 472:2, 473:16, 473:17, 474:23, 475:8, 475:14, 484:18, 485:1, 489:3, 489:5, 490:4, 490:7, 491:1, 491:10, 491:12, 491:14, 491:21, 492:2, 492:20, 493:17, 494:2, 563:24, 563:25

*Date* [1] - 572:4

*date* [5] - 396:8, 484:11, 524:4, 527:10, 551:17

*dated* [1] - 551:16

*dates* [1] - 541:14

*DAVID* [1] - 381:7

*David* [1] - 381:15

*DAWSON* [112] - 383:4, 383:7, 383:16, 383:25, 384:10, 384:16, 387:12, 387:15, 387:18, 387:22, 387:24, 389:3, 389:5, 390:2, 390:4, 390:10, 390:12, 392:25, 393:5, 393:6, 405:20, 405:21, 406:10, 406:14, 407:23, 408:8, 408:16, 408:22, 409:9, 410:9, 410:15, 410:19, 413:8, 413:10, 413:22, 416:20, 416:22, 424:12, 425:18, 425:20, 435:13, 435:17, 436:6, 436:12, 436:18, 437:4, 437:7, 438:10, 440:7, 446:1, 446:5, 446:7, 447:12, 449:19, 449:23, 449:25, 451:20, 460:5, 460:8, 460:9, 461:21, 463:22, 463:24, 465:22, 466:4, 466:7, 466:9, 467:2, 467:4, 476:1, 476:3, 476:11, 476:15, 476:18, 476:20, 476:25, 477:2,

477:9, 477:12, 477:18, 481:17, 483:11, 483:19, 483:22, 483:23, 487:16, 490:19, 495:2, 495:7, 495:18, 496:7, 496:11, 496:14, 497:6, 497:16, 499:2, 499:11, 499:22, 501:9, 501:25, 511:6, 511:10, 511:13, 516:12, 517:5, 525:2, 543:4, 559:24, 562:14, 568:23, 571:6, 571:10

*Dawson* [8] - 381:10, 382:12, 496:20, 496:24, 499:8, 529:11, 542:3, 543:3

*Dawson.......* [1] - 382:7

*Dawson...............* [1] - 382:6

*DAY* [1] - 382:1

*days* [3] - 465:4, 551:18, 562:18

*Days* [1] - 381:8

*dealing* [3] - 404:24, 503:9, 527:20

*Dear* [2] - 535:23, 554:16

*DEBRA* [2] - 382:11, 383:22

*Debra* [3] - 383:16, 384:5, 384:11

*December* [2] - 551:17, 551:18

*decide* [10] - 426:15, 498:9, 508:7, 510:9, 514:4, 522:25, 543:15, 543:22, 568:10, 568:17

*decided* [1] - 529:15

*decision* [1] - 506:4

*decisions* [5] - 385:13, 385:15, 385:16, 440:1, 530:16

*decline* [4] - 418:22, 468:10, 472:20, 512:2

*declined* [1] - 483:5

*declines* [2] - 468:17

*declining* [9] - 418:9, 418:10, 465:18, 468:3, 468:5, 468:6, 468:7, 468:10, 468:13

*dedication* [1] - 562:20

*defendant* [9] - 394:24, 514:17, 514:19, 514:20, 514:22, 514:23, 514:24, 539:22

*DEFENDANT* [1] - 381:15

*Defendant* [1] - 382:5

*defendant's* [3] - 520:14, 520:15, 520:17

*Defendant's* [1] - 382:4

*defendants* [27] - 391:19, 391:21, 391:23, 417:2, 508:12, 514:14, 514:15, 514:16, 514:18, 514:25, 515:4, 515:20, 515:22, 515:24, 516:3, 516:6, 519:9, 519:15, 519:17, 520:12, 520:18, 520:21, 521:2, 521:4, 521:19, 522:16, 522:18

*defense* [7] - 498:5, 498:7, 501:11, 501:14, 501:15, 521:3, 528:3

*definition* [2] - 544:6, 544:9

*degree* [1] - 465:15

*deliberate* [6] - 504:19, 504:24, 522:23, 523:18, 540:2, 568:14

*deliberately* [2] - 519:21, 557:3

*deliberating* [3] - 500:6, 502:7, 568:10

*deliberations* [6] - 523:2, 523:21, 524:9, 524:15, 570:6, 570:9

*Deliberations........ ...................* [1] - 382:8

*delivered* [1] - 396:9

*Dell* [1] - 566:12

*demand* [63] - 397:11, 402:16, 403:7, 403:13, 420:18, 437:11, 438:13, 439:5, 439:19, 439:23, 440:4, 440:12, 440:16, 441:24, 442:3, 442:5, 442:21, 442:24,

443:4, 443:6, 443:8, 443:10, 443:12, 443:14, 443:15, 443:18, 443:22, 444:6, 444:7, 444:11, 444:19, 444:23, 445:1, 445:7, 445:8, 454:24, 455:2, 456:18, 457:3, 458:4, 458:17, 471:3, 471:20, 473:2, 473:3, 473:5, 473:6, 473:9, 473:10, 473:11, 473:14, 473:19, 473:23, 474:9, 474:14, 474:17, 475:12, 475:14, 484:5

*demeanor* [1] - 509:24

*demonstrative* [5] - 391:9, 477:10, 477:11, 477:15, 477:17

*demonstratives* [1] - 438:25

*deny* [3] - 515:4, 555:6, 555:14

*depiction* [1] - 473:15

*deposition* [5] - 512:15, 512:20, 512:24, 533:12

*depositions* [3] - 398:20, 555:5, 555:24

*depth* [1] - 562:23

*Deputy* [1] - 524:16

*describe* [1] - 437:9

*described* [9] - 446:13, 456:14, 470:23, 475:19, 481:7, 493:4, 493:5, 494:18, 494:21

*deserves* [1] - 510:8

*designed* [1] - 401:19

*desire* [2] - 501:12, 570:18

*desired* [1] - 550:23

*desktop* [2] - 460:22, 464:12

*desktop-type* [1] - 460:22

*Destiny* [1] - 564:25

*destroy* [1] - 509:18

*detail* [4] - 384:17, 397:9, 403:25, 558:18

*details* [5] - 396:11, 398:6, 516:25, 517:11, 519:24

*detect* [1] - 430:3

determinants [1] - 450:22

determination [2] - 493:13, 544:3

determine [35] - 395:11, 403:19, 429:15, 429:20, 437:12, 438:14, 441:21, 442:4, 444:5, 445:7, 446:10, 446:19, 447:2, 447:20, 450:9, 455:10, 459:13, 459:21, 471:14, 474:10, 482:12, 498:20, 503:3, 507:25, 508:2, 509:21, 513:16, 513:21, 521:22, 521:24, 545:9, 546:2, 558:25, 561:18, 562:7

determined [7] - 401:25, 423:14, 443:5, 450:25, 458:19, 471:9, 521:19

determining [10] - 402:12, 438:17, 454:17, 490:23, 509:20, 518:21, 518:25, 519:11, 520:12, 520:21

detriment [1] - 554:11

develop [1] - 400:3

developed [1] - 422:18

development [1] - 553:11

deviate [2] - 430:12, 431:15

deviates [1] - 430:11

deviating [2] - 431:14, 432:17

device [5] - 424:8, 461:15, 462:18, 462:20, 465:3

devices [12] - 408:7, 431:6, 431:23, 462:24, 464:17, 472:18, 482:1, 493:11, 494:6, 494:19, 553:11, 562:3

devoted [1] - 529:4

diagnostic [2] - 455:9, 474:10

diameter [4] - 460:25, 461:6, 461:7

differ [1] - 397:23

difference [15] -

445:21, 461:1, 467:24, 467:25, 468:1, 478:4, 478:5, 478:10, 478:16, 479:2, 479:4, 521:24, 525:1

different [49] - 389:16, 390:7, 395:18, 400:9, 400:11, 400:12, 400:13, 400:14, 400:15, 400:16, 401:24, 402:3, 404:16, 404:17, 408:10, 417:24, 417:25, 418:1, 418:2, 418:22, 429:9, 439:16, 439:20, 441:22, 441:24, 441:25, 443:11, 443:12, 447:18, 448:10, 449:4, 458:6, 460:25, 461:17, 463:25, 465:24, 466:10, 472:4, 482:20, 484:3, 491:22, 499:1, 531:9, 531:15, 531:16, 561:4

differentiated [1] - 462:6

differentiates [1] - 460:20

differently [3] - 461:9, 462:3, 523:6

differs [1] - 523:10

digest [2] - 400:1, 400:2

diligence [1] - 529:8

dimensions [2] - 461:2, 461:16

dinner [1] - 540:24

dip [1] - 480:10

dire [1] - 543:5

DIRECT [1] - 383:24

Direct [1] - 382:12

direct [7] - 509:7, 509:12, 509:14, 518:6, 518:7, 518:9, 531:5

directly [9] - 399:4, 407:8, 417:4, 423:21, 424:4, 482:1, 487:4, 492:5, 517:10

director [1] - 530:8

disadvantage [1] - 423:8

disagree [1] - 536:16

disc [35] - 393:18, 394:13, 396:3, 397:13,

402:16, 417:4, 422:14, 433:3, 439:9, 442:11, 443:5, 444:7, 461:8, 461:10, 462:18, 464:4, 464:5, 464:8, 464:11, 464:21, 470:11, 470:13, 470:16, 470:21, 472:19, 473:14, 487:3, 515:21, 516:1, 518:1, 525:10, 527:7, 530:14, 530:16, 531:2

discern [2] - 444:18, 444:25

discharged [1] - 524:5

discipline [3] - 430:25, 431:9, 431:18

disclose [12] - 414:5, 415:8, 415:9, 429:7, 429:9, 433:16, 434:13, 434:15, 434:17, 434:19, 434:21, 524:13

disclosed [2] - 427:13, 429:4

disclosing [1] - 433:14

disclosure [1] - 434:22

disclosures [1] - 427:22

discourage [1] - 558:12

discover [1] - 434:9

discovery [3] - 493:4, 493:5, 494:4

discrimination [2] - 448:17, 448:23

discs [1] - 466:6

discuss [8] - 530:3, 535:10, 535:20, 550:14, 550:18, 550:23, 551:2, 569:4

discussed [5] - 484:3, 501:7, 514:9, 516:8, 535:25

discussing [1] - 404:6

Discussion [3] - 488:17, 496:10, 503:16

discussion [1] - 534:23

disincentive [1] - 558:16

disputed [2] - 544:22, 544:24

disputes [1] - 387:8

disregard [4] - 507:3, 507:6, 507:12, 513:22

disrupt [1] - 471:2

distinction [1] - 509:11

distinguish [3] - 418:15, 491:4, 507:21

distributed [1] - 496:3

district [2] - 502:15, 502:19

DISTRICT [2] - 381:1, 381:1

divide [1] - 547:13

DIVISION [1] - 381:2

division [1] - 524:14

doctors [1] - 404:10

document [10] - 419:19, 424:17, 425:22, 425:24, 435:11, 482:8, 547:10, 547:15, 551:16, 551:18

documentary [2] - 546:14, 547:22

documents [18] - 396:13, 396:15, 396:19, 396:20, 396:21, 396:22, 408:18, 433:8, 469:1, 497:7, 509:2, 548:25, 552:12, 553:3, 553:16, 553:19, 563:12

dollar [3] - 423:15, 423:17, 481:25

dollars [5] - 402:9, 439:11, 527:8, 566:4, 567:22

done [14] - 387:22, 388:20, 405:24, 406:9, 467:7, 486:24, 501:10, 504:18, 506:8, 507:12, 525:16, 540:2, 541:12

dots [1] - 477:25

dotted [4] - 418:7, 478:17, 478:23, 479:2

double [5] - 404:19, 423:24, 424:7, 424:10, 491:14

down [29] - 383:9, 411:16, 411:23, 412:4, 412:6, 435:19, 436:9, 436:10, 441:6, 442:11, 442:14, 442:15,

442:20, 443:8, 443:17, 443:18, 474:16, 481:11, 485:16, 495:4, 504:8, 506:14, 524:20, 528:3, 533:15, 540:15, 546:10, 570:23

downward [2] - 439:19, 439:21

dozen [1] - 404:25

Dr [37] - 383:16, 384:11, 387:25, 390:8, 393:1, 393:8, 404:5, 404:10, 404:12, 404:15, 411:4, 413:23, 414:20, 419:23, 423:11, 425:21, 427:6, 437:8, 450:1, 456:8, 477:18, 486:22, 488:22, 488:24, 490:1, 498:11, 532:14, 552:18, 555:2, 558:17, 558:24, 560:24, 561:1, 561:6, 561:9, 561:25, 563:24

draw [1] - 509:4

drawing [1] - 537:20

drive [31] - 412:4, 433:3, 441:5, 454:22, 461:11, 461:14, 463:5, 463:6, 463:10, 463:12, 464:4, 464:5, 464:8, 464:11, 465:13, 467:11, 469:23, 470:13, 470:16, 472:3, 472:7, 472:19, 477:24, 478:13, 479:17, 485:19, 487:3, 518:1, 538:4, 554:17

driven [2] - 473:6, 481:10

drivers [1] - 470:21

drives [66] - 393:16, 393:17, 393:18, 393:19, 393:20, 394:14, 396:3, 396:5, 396:6, 397:13, 399:1, 399:4, 402:16, 406:21, 411:16, 411:22, 417:4, 417:22, 417:23, 418:8, 418:13, 418:18, 418:19, 422:15, 439:9, 442:11, 443:5, 444:7, 462:18, 463:16, 463:17, 464:13, 464:21, 465:3, 466:3, 466:4, 466:5, 466:7, 466:11, 470:11, 470:21, 471:25, 472:4,

472:6, 473:6, 473:7, 473:14, 478:19, 479:18, 479:20, 487:3, 492:5, 492:7, 492:10, 515:21, 516:1, 516:2, 525:10, 527:8, 530:14, 530:16, 531:2, 531:17

driving [1] - 412:5

dropped [1] - 484:18

dropping [4] - 441:9, 472:9, 472:12, 484:25

ducks [1] - 549:11

duly [1] - 383:23

duration [1] - 541:14

during [77] - 395:22, 400:6, 402:1, 402:22, 403:8, 403:10, 403:12, 403:16, 406:23, 407:4, 407:19, 409:14, 415:8, 418:16, 419:12, 421:13, 421:16, 421:20, 421:23, 423:15, 423:20, 428:19, 429:4, 429:7, 434:15, 434:17, 441:7, 442:12, 455:2, 467:11, 469:5, 472:12, 472:22, 475:16, 479:24, 481:4, 481:13, 481:19, 485:10, 485:14, 486:25, 492:24, 506:13, 507:2, 507:4, 507:12, 511:3, 511:20, 512:24, 514:10, 516:8, 517:8, 523:2, 523:8, 523:9, 524:8, 531:2, 531:7, 531:22, 532:4, 532:12, 532:22, 533:5, 533:20, 534:11, 535:11, 536:14, 536:15, 536:17, 537:11, 538:11, 541:6, 541:9, 547:13, 558:1, 558:24

dutch [1] - 422:16

Dutch [1] - 417:9

duties [2] - 385:23, 537:1

duty [6] - 506:21, 506:24, 514:7, 522:20, 522:23, 560:13

DVD [43] - 393:15, 393:17, 393:20, 399:3, 417:22, 417:23, 418:8, 418:11, 418:18, 418:19, 424:4, 424:5,

439:8, 454:21, 454:22, 457:24, 458:12, 460:15, 460:21, 461:11, 462:3, 463:11, 463:14, 464:4, 464:13, 464:14, 465:2, 465:24, 466:2, 466:11, 468:22, 471:25, 472:6, 473:6, 475:22, 478:18, 481:22, 485:18, 487:3, 487:13, 531:12

DVD-ROM [6] - 462:3, 464:14, 475:22, 481:22, 531:12

DVD-ROMs [1] - 468:22

DVDs [30] - 406:21, 407:7, 407:11, 407:19, 408:3, 408:7, 408:11, 409:1, 419:25, 420:9, 423:15, 423:18, 423:21, 423:22, 423:25, 441:8, 441:12, 460:17, 462:8, 472:21, 472:22, 473:3, 473:5, 475:16, 495:19, 496:2, 497:13, 497:20, 497:22, 498:4

dynamic [1] - 481:7

## E

e-auction [6] - 424:23, 428:2, 428:4, 494:10, 533:20, 566:1

e-auctions [5] - 425:1, 425:7, 426:23, 530:13, 531:23

e-mail [6] - 496:20, 533:13, 535:21, 540:12, 542:6, 542:11

e-mails [4] - 396:20, 538:2, 539:8, 542:7

e-RFQ [5] - 426:6, 426:16, 533:2, 536:15, 566:1

e-RFQs [3] - 434:24, 530:13, 531:23

earliest [1] - 569:16

early [8] - 398:15, 483:4, 483:8, 500:6, 502:4, 504:24, 540:8, 568:13

earned [4] - 485:9, 485:10, 485:11, 485:20

ease [2] - 500:3, 500:4

easel [6] - 416:25, 436:7, 436:8, 438:21, 446:6, 449:20

easier [5] - 413:18, 420:19, 421:12, 431:25, 503:20

easily [2] - 539:18, 543:1

easy [1] - 467:13

eBay [4] - 433:24, 434:2, 434:5, 434:6

economic [19] - 385:7, 397:11, 401:10, 411:13, 411:15, 413:3, 413:10, 414:2, 414:23, 415:22, 416:1, 434:23, 435:1, 446:21, 475:5, 475:11, 481:9, 486:13, 515:11

economically [1] - 475:7

economics [18] - 384:13, 385:10, 385:11, 385:19, 385:20, 388:5, 388:6, 388:23, 388:25, 404:11, 413:11, 421:14, 439:1, 439:6, 446:14, 446:25, 471:13, 473:21

economist [7] - 384:5, 385:9, 385:10, 386:20, 391:6, 402:18, 448:12

economists [4] - 385:6, 401:11, 401:23, 446:19

economy [2] - 391:2, 412:11

educations [1] - 405:13

effect [16] - 431:7, 453:6, 457:2, 474:14, 474:21, 474:23, 474:24, 480:16, 480:25, 481:2, 484:6, 484:20, 484:24, 532:9, 544:17, 546:25

effective [6] - 395:8, 457:15, 469:11, 469:21, 469:25, 482:17

effectively [1] - 420:22

effectiveness [1] - 483:1

effects [10] - 454:7, 454:15, 454:16, 454:24, 455:17, 458:3, 474:8, 474:19, 475:4

effectuate [1] - 483:10

effort [1] - 522:24

eggs [1] - 433:1

eight [1] - 569:5

either [12] - 389:22, 407:8, 442:16, 482:1, 487:3, 492:11, 507:3, 524:11, 526:23, 527:14, 552:7, 568:19

El [1] - 399:8

electronic [1] - 425:2

electronically [3] - 426:8, 428:6, 428:15

element [2] - 508:17, 516:16

elements [2] - 495:22, 515:24

elevate [2] - 411:9, 552:22

elevated [5] - 546:1, 547:9, 547:20, 553:15, 555:4

eliminate [1] - 521:12

Ellen [11] - 387:20, 476:16, 500:9, 500:17, 501:2, 503:6, 503:13, 568:7, 570:18, 570:21, 571:8

elsewhere [1] - 420:14

emphasize [1] - 416:11

employed [3] - 385:1, 385:2, 511:23

employee [7] - 511:21, 534:7, 534:17, 540:1, 548:23, 550:3, 553:23

employees [6] - 511:2, 511:20, 533:22, 536:2, 548:20, 556:6

employer [1] - 499:18

employment [1] - 500:19

encourages [3] - 414:8, 431:17, 433:19

end [17] - 399:18, 419:3, 431:9, 436:9, 459:19, 467:18, 468:23, 479:9, 484:11, 532:5, 532:9,

539:1, 539:2, 541:7, 549:8, 549:12, 565:10

end-user [1] - 399:18

ended [1] - 484:13

engage [6] - 385:6, 388:21, 411:14, 428:3, 434:11, 469:19

engaged [6] - 392:8, 430:2, 513:7, 515:4, 533:10, 534:1

engaging [4] - 420:11, 422:21, 515:3, 546:16

enter [2] - 421:15, 495:24

entered [6] - 383:11, 436:4, 488:10, 501:4, 505:17, 516:22

entering [5] - 421:23, 515:1, 517:20, 548:24, 548:25

entire [10] - 426:25, 433:10, 465:10, 465:11, 470:18, 482:5, 501:10, 519:24, 534:23, 558:1

entirely [4] - 433:11, 508:8, 513:16, 516:23

entities [7] - 411:2, 491:18, 492:17, 497:21, 524:21, 525:5, 548:19

entitled [7] - 508:22, 512:25, 514:19, 522:17, 523:15, 525:12, 572:8

entity [11] - 410:1, 410:25, 491:12, 493:9, 494:3, 494:12, 494:17, 498:15, 540:4, 563:10, 564:4

entrant [1] - 423:2

entrants [2] - 421:15, 421:18

entry [1] - 422:5

environment [3] - 469:12, 469:22, 470:3

equal [1] - 486:7

equally [2] - 458:20, 565:25

equals [2] - 440:4, 440:16

equation [8] - 453:10, 453:13, 453:15, 454:5,

455:13, 455:18, 456:23, 474:5

equilibrium [5] - 438:18, 440:8, 440:11, 440:12, 441:2

error [1] - 453:24

errors [1] - 404:20

escort [1] - 568:7

especially [2] - 435:10, 469:17

essential [2] - 517:18, 520:1

essentially [4] - 386:6, 425:3, 491:23, 535:4

establish [6] - 508:15, 508:24, 516:20, 518:8, 518:17, 519:5

estimate [13] - 393:11, 425:16, 451:15, 452:19, 454:6, 454:24, 454:25, 457:1, 458:3, 463:21, 470:20, 485:1, 485:3

estimated [7] - 474:8, 474:23, 475:4, 480:7, 485:22, 486:18, 499:16

estimating [1] - 454:14

ET [1] - 381:5

Eugene [3] - 536:18, 540:12, 552:25

Europe [1] - 491:25

evaluation [1] - 513:16

event [40] - 414:19, 415:9, 426:6, 426:7, 426:10, 428:23, 430:17, 430:21, 431:7, 431:11, 431:16, 434:14, 434:15, 434:17, 457:11, 459:11, 493:8, 493:10, 494:10, 497:15, 498:15, 500:22, 532:6, 532:7, 532:9, 532:23, 537:11, 538:20, 539:12, 539:13, 539:15, 539:23, 540:11, 542:20, 542:21, 542:22, 546:21, 547:14, 549:15, 552:9

events [37] - 396:22, 401:7, 401:10, 401:12, 401:13, 401:16,

411:10, 414:1, 414:4, 414:22, 415:2, 415:10, 424:25, 430:16, 430:23, 431:2, 431:4, 431:8, 431:11, 432:7, 459:13, 459:15, 482:16, 493:15, 498:12, 520:16, 532:10, 536:4, 536:14, 539:13, 539:20, 539:23, 540:5, 543:2, 561:2

eventually [1] - 505:13

evidence [118] - 389:6, 428:21, 435:7, 477:16, 482:9, 497:9, 497:10, 497:11, 497:25, 498:3, 507:19, 507:20, 507:22, 507:24, 507:25, 508:1, 508:3, 508:9, 508:14, 508:15, 508:18, 508:25, 509:1, 509:3, 509:6, 509:7, 509:9, 509:12, 509:14, 510:4, 510:13, 510:16, 513:6, 513:20, 514:20, 514:23, 516:21, 517:13, 518:6, 518:7, 518:9, 518:11, 518:23, 518:24, 519:13, 519:17, 520:14, 520:15, 520:17, 523:1, 523:12, 523:13, 523:20, 525:7, 525:24, 526:6, 526:21, 529:17, 529:22, 536:8, 539:14, 539:20, 543:8, 543:9, 543:15, 544:4, 544:11, 545:11, 546:3, 546:6, 546:8, 546:14, 546:24, 547:2, 547:19, 547:22, 547:25, 548:1, 548:3, 548:4, 548:7, 548:9, 548:22, 549:3, 549:20, 549:22, 550:8, 551:6, 552:4, 552:5, 553:21, 556:13, 556:15, 556:18, 556:19, 556:20, 557:8, 557:13, 557:14, 557:20, 559:4, 559:6, 560:17, 561:14, 561:21, 562:7, 562:9, 563:3, 563:5, 563:6, 563:8, 564:7, 564:9, 566:11

evidentiary [1] - 498:20

Evon [4] - 535:18, 550:16, 550:17, 551:9

*exactly* [8] - 451:23, 456:14, 477:14, 490:25, 500:16, 517:18, 525:5, 533:15
*EXAMINATION* [2] - 383:24, 488:20
*examination* [4] - 498:12, 513:18, 560:25, 561:1
*Examination* [2] - 382:12, 382:12
*examine* [1] - 523:3
*example* [19] - 390:21, 410:25, 411:9, 412:12, 413:14, 416:8, 426:16, 429:18, 435:5, 439:8, 441:8, 448:23, 450:5, 450:6, 454:8, 456:3, 458:13, 475:21, 478:7
*examples* [1] - 435:8
*except* [2] - 525:1, 569:21
*excess* [1] - 407:3
*exchange* [2] - 519:7, 537:2
*exchanged* [9] - 519:4, 519:9, 519:10, 519:11, 534:10, 538:10, 538:11, 539:2, 539:7
*exchanging* [1] - 538:8
*exciting* [3] - 383:13, 383:14, 560:12
*exclude* [4] - 410:10, 410:22, 433:11, 463:1
*excluded* [8] - 408:5, 408:7, 410:1, 410:10, 410:16, 411:2, 462:24, 564:4
*excused* [1] - 495:4
*executive* [1] - 533:17
*exhibit* [5] - 477:8, 477:10, 541:4, 546:10, 546:11
*Exhibit* [13] - 389:4, 405:11, 419:20, 424:18, 425:19, 435:11, 482:9, 535:22, 536:1, 539:24, 541:10, 549:25, 554:2
*exhibits* [10] - 405:2, 497:7, 497:8, 507:18, 509:3, 523:19, 568:21,

568:22, 569:1, 570:2
*Exhibits* [2] - 513:6, 513:9
*exist* [3] - 394:6, 402:21, 518:20
*existed* [5] - 516:2, 517:13, 518:3, 520:23, 521:9
*existence* [9] - 516:18, 516:21, 518:5, 518:8, 518:11, 518:17, 519:13, 522:15, 560:21
*existing* [1] - 520:6
*exists* [2] - 509:11, 516:19
*exited* [5] - 435:24, 488:5, 495:16, 505:10, 570:8
*expect* [3] - 454:10, 454:12, 468:8
*expected* [3] - 390:19, 425:14, 560:12
*expecting* [1] - 429:13
*expects* [2] - 531:20, 565:21
*expenditures* [1] - 406:21
*expense* [2] - 411:11, 552:23
*experience* [7] - 386:23, 387:10, 400:25, 413:13, 416:5, 447:3, 514:1
*experienced* [1] - 434:5
*experiencing* [1] - 398:1
*expert* [7] - 387:20, 391:3, 393:1, 394:15, 394:23, 413:11, 486:23
*expertise* [4] - 385:21, 386:1, 398:17, 465:6
*explain* [8] - 417:12, 419:5, 439:3, 450:4, 451:19, 453:3, 463:6
*explained* [7] - 427:16, 453:25, 454:2, 454:3, 456:1, 458:14, 556:9
*explanation* [3] - 421:22, 453:9, 519:9
*explicit* [1] - 518:7

*Exporting* [1] - 412:20
*extend* [1] - 521:14
*extent* [2] - 412:16, 513:23
*external* [3] - 462:16, 462:19, 462:23
*externals* [1] - 463:1
*extrapolate* [1] - 539:18
*extrapolated* [1] - 543:1
*extremely* [1] - 553:9
*eyewitness* [1] - 509:8

## F

*face* [1] - 421:10
*facilitate* [3] - 401:14, 428:7, 434:22
*facilitating* [3] - 414:14, 414:15, 549:1
*facing* [1] - 469:18
*fact* [26] - 395:6, 401:21, 416:13, 422:4, 422:10, 441:24, 442:12, 448:20, 457:21, 468:4, 469:5, 482:19, 502:18, 508:20, 509:10, 509:16, 510:14, 514:9, 514:17, 518:15, 519:4, 532:11, 532:13, 533:20, 542:22
*factor* [3] - 461:22, 462:5, 520:20
*factors* [21] - 398:1, 399:2, 401:24, 403:7, 403:9, 403:14, 444:4, 445:7, 445:9, 448:19, 448:21, 449:13, 451:24, 454:17, 454:19, 454:24, 455:2, 457:1, 471:14, 471:17, 474:13
*facts* [9] - 507:5, 507:10, 508:2, 508:4, 508:5, 509:4, 509:13, 523:7, 530:1
*faculty* [1] - 388:9
*failed* [2] - 508:17, 521:12
*failure* [1] - 476:18
*fair* [4] - 427:7, 508:8, 509:3, 514:19

*fairly* [1] - 398:15
*fairness* [1] - 497:16
*fall* [4] - 469:14, 469:20, 472:24, 492:23
*falling* [9] - 469:5, 469:9, 469:12, 469:13, 469:17, 469:22, 470:2, 472:22, 472:25
*familiar* [2] - 439:2, 463:9
*family* [2] - 562:3, 563:19
*fan* [1] - 564:23
*far* [1] - 465:12
*fast* [1] - 538:5
*father* [1] - 453:23
*father's* [6] - 451:8, 451:15, 452:4, 453:21, 454:9, 456:4
*favor* [2] - 507:3, 543:11
*FBI* [2] - 536:9, 536:11
*features* [2] - 425:8, 428:5
*federal* [5] - 515:1, 515:5, 515:6, 523:24, 534:18
*feed* [1] - 463:14
*feelings* [1] - 509:25
*fellow* [1] - 523:1
*fellowships* [1] - 391:8
*felony* [1] - 509:17
*felt* [1] - 460:1
*few* [6] - 400:15, 438:25, 465:2, 478:15, 540:23, 563:1
*fewer* [1] - 431:24
*field* [3] - 388:23, 446:25, 514:1
*Fifth* [2] - 555:13, 555:17
*fifth* [1] - 429:24
*fight* [2] - 547:7, 548:15
*figure* [14] - 395:1, 397:3, 397:9, 397:14, 400:4, 400:17, 401:24, 403:14, 444:13, 448:19, 450:7, 450:21, 471:12, 495:12
*figured* [1] - 441:14
*figuring* [1] - 402:20

file [1] - 508:23
filed [1] - 555:6
files [6] - 396:13, 396:15, 396:18, 400:10, 409:24
filings [3] - 427:13, 497:18, 497:19
fill [2] - 524:3, 556:16
final [3] - 464:23, 542:24, 563:1
finally [2] - 486:22, 535:11
financial [1] - 570:14
financially [1] - 499:18
fine [8] - 435:15, 437:1, 437:2, 437:3, 483:17, 506:8, 571:2, 571:22
finish [1] - 523:6
finished [1] - 388:1
firm [4] - 385:2, 385:5, 386:7, 392:2
firms [2] - 385:13, 390:17
first [34] - 383:23, 386:24, 388:16, 388:18, 423:14, 423:25, 424:15, 426:1, 428:13, 432:13, 433:1, 441:15, 459:11, 459:16, 462:15, 478:15, 479:7, 484:2, 485:23, 497:6, 498:24, 502:23, 511:5, 524:20, 527:23, 533:4, 537:17, 543:22, 543:24, 547:11, 560:14, 563:1, 568:9, 568:16
first-place [1] - 432:13
fit [11] - 455:10, 455:11, 455:19, 455:22, 456:5, 474:11, 474:12, 475:1, 475:2, 475:3, 475:6
five [11] - 466:18, 479:18, 533:23, 534:1, 544:24, 544:25, 545:5, 545:7, 554:18, 557:19, 562:18
fix [15] - 394:13, 515:16, 515:20, 516:1, 516:4, 517:7, 518:1, 519:6, 519:16, 522:3, 525:9, 525:13, 527:6, 545:3, 545:22

fixed [1] - 522:1
fixing [70] - 390:21, 393:2, 393:10, 393:13, 395:4, 395:6, 395:9, 401:1, 411:5, 411:6, 411:14, 412:12, 412:14, 412:23, 424:21, 428:3, 428:11, 429:6, 430:15, 431:20, 432:4, 432:19, 433:15, 434:11, 434:25, 446:19, 447:1, 447:6, 447:18, 447:21, 448:4, 448:7, 448:11, 469:7, 469:8, 469:11, 469:19, 515:3, 515:22, 516:24, 517:3, 517:9, 519:12, 519:18, 519:20, 520:3, 520:7, 520:13, 520:19, 520:20, 520:23, 520:25, 521:3, 521:8, 521:13, 521:17, 521:20, 532:4, 533:10, 533:16, 543:23, 543:25, 544:2, 544:5, 544:20, 544:22, 544:25, 545:2, 547:2, 557:6
flatter [1] - 464:17
flexible [1] - 500:25
flip [4] - 406:3, 503:19, 503:20, 531:14
flipping [1] - 486:17
flow [1] - 399:2
flowed [1] - 537:21
fly [2] - 501:19, 532:24
flying [3] - 536:19, 537:23, 539:5
foam [5] - 447:8, 447:15, 447:22, 447:23, 448:4
focus [1] - 393:20
folks [1] - 558:15
follow [11] - 506:6, 506:12, 506:23, 506:24, 514:17, 531:21, 532:1, 565:17, 565:21, 565:22
following [3] - 429:2, 513:10, 515:24
follows [2] - 383:23, 542:11
FOR [2] - 381:10, 381:15
force [1] - 510:13

forecast [1] - 534:10
forecasts [1] - 539:4
foregoing [1] - 572:6
foreign [4] - 492:13, 564:2, 565:21, 567:2
forget [3] - 499:16, 503:9, 566:18
form [5] - 411:8, 426:6, 512:19, 524:4, 527:10
formal [1] - 516:22
formed [2] - 517:16, 520:10
formerly [2] - 409:7, 489:8
forms [1] - 492:11
forth [3] - 400:18, 492:1, 501:12
Fortnite [1] - 564:24
forward [2] - 525:12, 525:22
forwards [1] - 551:9
foundation [2] - 408:14, 413:7
four [10] - 386:14, 392:13, 404:3, 405:8, 427:4, 427:5, 545:12, 557:18, 558:18, 564:15
fourth [3] - 429:24, 433:21, 534:17
frames [1] - 479:24
Francisco [1] - 384:25
frankly [3] - 495:23, 544:23, 565:14
free [3] - 495:4, 515:8, 546:9
freely [1] - 519:1
freeze [4] - 544:17, 546:25, 547:2, 547:17
freezing [2] - 533:12, 533:14
frequent [1] - 538:5
Friday [2] - 501:23, 506:10
friends [1] - 562:3
front [3] - 499:12, 500:15, 570:11
full [9] - 386:25, 388:9, 389:14, 391:7, 480:21, 481:15, 516:25,

519:24
full-time [3] - 386:25, 388:9, 391:7
fully [2] - 400:14, 522:8
fun [1] - 562:18
funds [1] - 551:22
furious [1] - 538:5
furtherance [1] - 522:12
furthest [1] - 467:15
future [10] - 415:21, 416:3, 416:8, 431:11, 539:4, 551:8, 553:10, 553:12, 566:7

## G

game [6] - 430:13, 430:14, 430:16, 536:23, 536:25, 564:25
gamer [1] - 564:22
games [1] - 564:23
gaming [5] - 565:3, 565:5, 565:7, 565:9, 565:16
Garden [1] - 550:20
Garrett [1] - 381:11
gather [2] - 397:14, 397:18
gathered [4] - 396:24, 397:6, 402:14, 402:15
gears [6] - 411:4, 423:11, 427:6, 428:1, 435:17, 564:11
General [1] - 448:6
general [1] - 509:11
generally [4] - 412:16, 441:17, 446:25, 509:6
gentlemen [21] - 384:4, 501:5, 503:24, 505:19, 529:2, 543:4, 546:7, 550:7, 553:19, 557:5, 557:17, 560:10, 561:23, 562:14, 564:8, 565:19, 566:24, 567:20, 568:3, 568:5, 570:4
geographic [2] - 400:12, 491:22
girl [6] - 451:5, 453:20, 454:11, 454:13,

454:21, 456:4

girls [4] - 452:3, 452:4, 452:14, 459:25

girls' [1] - 452:17

given [10] - 442:17, 443:7, 443:13, 444:16, 452:4, 457:19, 494:14, 507:2, 507:4

Glendale [1] - 381:17

govern [1] - 514:22

governs [2] - 390:16, 390:25

grade [2] - 459:1, 459:2

graders [2] - 388:16, 388:18

graduate [2] - 384:21, 388:1

Graduate [1] - 388:3

granted [2] - 497:24, 506:2

grants [1] - 391:8

graphic [2] - 537:25, 538:3

grasp [1] - 547:16

great [1] - 564:13

greater [3] - 400:6, 510:15, 523:15

greatest [1] - 515:12

green [4] - 485:14, 528:19, 528:22

grew [1] - 384:20

grounds [2] - 511:25, 512:2

group [2] - 411:24, 530:17

grow [1] - 384:18

growing [2] - 418:11, 465:18

grown [1] - 384:24

growth [1] - 418:21

guess [3] - 409:15, 452:2, 569:13

guessing [1] - 473:25

guide [1] - 523:21

Guide [1] - 389:1

guideline [2] - 540:18, 540:20

guilty [17] - 459:11, 533:9, 533:17, 534:8,

534:18, 535:13, 536:5, 536:10, 539:22, 540:4, 544:24, 544:25, 545:6, 549:7, 549:14, 550:25

guy [5] - 438:2, 541:19, 564:12, 567:7, 567:8

guys [2] - 420:13, 429:12

## H

half [15] - 404:25, 428:23, 460:21, 461:25, 462:3, 462:4, 464:4, 464:10, 464:13, 466:13, 467:23, 475:22, 528:2, 531:12

half-height [5] - 464:4, 464:10, 464:13, 466:13

half-heights [7] - 460:21, 461:25, 462:3, 462:4, 467:23, 475:22, 531:12

hallway [3] - 524:17, 569:11, 569:12

hand [5] - 383:17, 519:8, 520:2, 543:3, 568:6

Handbook [2] - 435:2, 435:6

handful [1] - 411:1

handsome [1] - 404:4

hang [8] - 387:19, 406:2, 476:13, 488:15, 503:8, 517:3, 568:18, 570:23

Hao [1] - 510:19

hardly [1] - 418:14

harm [4] - 391:1, 395:8, 395:10

harmed [2] - 558:25, 559:1

harmful [2] - 555:21

harms [2] - 412:11

Hartz [2] - 381:19, 564:14

hate [1] - 500:7

Haw [2] - 550:2, 550:23

head [2] - 528:24, 534:6

headquartered [3] - 417:3, 417:13, 427:17

hear [18] - 408:20, 437:18, 437:23,

437:24, 490:16, 528:3, 528:20, 528:23, 548:1, 548:2, 548:3, 556:13, 556:20, 557:13, 563:8, 563:15, 566:25, 567:3

heard [51] - 393:3, 393:16, 398:11, 401:7, 412:19, 415:1, 415:18, 417:21, 423:12, 427:7, 427:8, 506:13, 508:3, 510:18, 510:23, 511:16, 513:5, 513:17, 529:17, 529:22, 529:23, 530:2, 532:14, 532:17, 532:20, 535:2, 536:3, 536:6, 537:7, 539:10, 539:14, 539:20, 548:22, 549:15, 550:13, 550:20, 552:18, 555:2, 555:11, 556:19, 557:8, 557:20, 558:17, 558:23, 559:1, 559:4, 561:19, 563:6, 563:15, 564:7

Hearing [2] - 382:3, 382:4

hearing [3] - 499:1, 513:19, 530:12

hearsay [1] - 408:13

heart [1] - 412:6

height [34] - 439:11, 450:8, 450:10, 450:22, 450:23, 451:7, 451:8, 451:15, 451:16, 452:4, 452:20, 452:25, 453:1, 453:13, 453:14, 453:21, 453:22, 454:9, 454:18, 454:19, 456:4, 460:21, 461:2, 461:3, 461:16, 461:17, 461:22, 461:24, 464:4, 464:10, 464:13, 466:13, 472:3

heights [11] - 451:2, 452:7, 460:21, 461:25, 462:3, 462:4, 467:23, 472:4, 474:7, 475:22, 531:12

help [17] - 438:17, 440:20, 441:13, 449:15, 450:2, 453:2, 461:19, 469:10, 477:1, 500:3, 503:12, 520:4, 536:11, 539:9, 539:16, 541:1, 552:22

helped [3] - 404:15,

404:23, 405:1

helpful [2] - 513:25, 553:9

helps [3] - 415:12, 471:19, 543:19

hesitate [1] - 523:2

Hewlett [30] - 409:8, 488:25, 489:1, 489:4, 489:8, 489:18, 489:19, 490:3, 490:9, 490:10, 490:23, 491:5, 491:16, 494:16, 494:17, 496:22, 498:21, 508:13, 514:13, 529:7, 531:1, 561:3, 561:8, 561:9, 561:14, 561:20, 561:21, 561:24, 562:5, 562:8

HEWLETT [1] - 381:3

Hewlett-Packard [30] - 409:8, 488:25, 489:1, 489:4, 489:8, 489:18, 489:19, 490:3, 490:9, 490:10, 490:23, 491:5, 491:16, 494:16, 494:17, 496:22, 498:21, 508:13, 514:13, 529:7, 531:1, 561:3, 561:8, 561:9, 561:14, 561:20, 561:21, 561:24, 562:5, 562:8

HEWLETT-PACKARD [1] - 381:3

hide [1] - 534:16

high [14] - 418:8, 420:13, 420:14, 422:20, 431:2, 464:17, 464:25, 478:8, 483:4, 521:10, 538:10, 539:10, 560:3, 564:18

higher [18] - 402:5, 413:2, 439:17, 440:25, 445:20, 467:22, 467:24, 482:21, 482:23, 486:9, 530:23, 544:16, 545:3, 546:19, 557:16, 558:22, 559:2, 560:4

highest [4] - 433:25, 434:6, 483:6, 515:12

highlight [1] - 530:1

highly [1] - 413:20

hired [2] - 449:5, 532:13

Hitachi [2] - 417:7,

566:17
Hittner [4] - 384:3, 487:6, 543:7, 555:17
HITTNER [1] - 381:7
HLDS [27] - 417:7, 532:18, 533:5, 533:7, 533:17, 533:22, 534:7, 534:17, 535:14, 535:23, 536:3, 536:18, 536:21, 537:17, 537:21, 539:22, 539:24, 539:25, 540:3, 540:6, 540:24, 541:8, 541:19, 546:22, 553:1, 553:7, 553:18
HLDS's [3] - 541:20, 541:22, 542:10
hold [7] - 387:12, 426:18, 440:21, 476:6, 490:16, 511:4, 568:2
holding [2] - 535:5, 535:6
home [1] - 538:4
homework [1] - 565:4
honest [1] - 523:5
honor [1] - 567:17
Honor [57] - 383:16, 387:18, 387:22, 392:25, 407:21, 407:24, 408:16, 408:24, 410:14, 413:7, 413:8, 424:3, 435:13, 436:6, 437:4, 438:23, 446:6, 449:19, 450:18, 460:5, 464:2, 466:4, 483:11, 483:22, 487:16, 488:14, 488:19, 489:14, 490:19, 494:24, 495:2, 495:5, 495:7, 495:18, 496:7, 496:11, 496:15, 496:19, 497:6, 497:16, 498:11, 499:10, 499:25, 501:9, 501:14, 501:25, 511:13, 516:12, 516:13, 517:5, 525:2, 528:12, 529:20, 560:5, 560:7, 568:23, 571:14
HONORABLE [1] - 381:7
hook [1] - 558:14
hope [1] - 532:20
hopefully [3] - 547:19, 548:11, 549:13

horizontal [3] - 418:15, 439:7, 467:14
hour [5] - 428:23, 428:24, 504:9, 506:2, 527:22
hours [6] - 392:12, 395:14, 399:22, 400:25, 499:17, 530:4
house [1] - 564:18
housekeeping [1] - 571:16
housing [1] - 462:20
HOUSTON [1] - 381:2
Houston [2] - 381:13, 381:23
HP [141] - 383:16, 386:11, 391:17, 391:21, 391:25, 393:8, 393:12, 393:22, 395:8, 396:2, 397:16, 400:5, 400:12, 401:6, 401:9, 402:3, 404:18, 406:17, 406:21, 406:22, 407:3, 407:19, 408:12, 409:2, 409:7, 409:11, 409:16, 409:20, 410:1, 410:6, 410:7, 410:11, 410:22, 410:25, 411:1, 411:2, 413:25, 414:5, 415:3, 415:8, 417:4, 420:2, 420:21, 421:3, 421:4, 422:7, 423:15, 423:18, 424:19, 425:1, 425:8, 425:9, 426:11, 426:15, 427:3, 427:4, 427:9, 427:14, 427:15, 428:2, 428:10, 428:17, 429:3, 429:7, 429:24, 431:3, 432:20, 433:11, 433:16, 434:9, 434:12, 434:15, 434:17, 434:19, 434:21, 434:24, 444:21, 456:15, 458:15, 458:17, 459:10, 466:18, 467:8, 470:10, 472:16, 481:25, 487:1, 489:4, 489:8, 491:9, 491:12, 491:13, 491:18, 492:17, 492:20, 493:7, 494:19, 495:18, 495:20, 497:24, 498:5, 498:13, 501:9, 501:10, 530:8, 531:17, 531:20, 532:2, 536:4, 537:10, 539:6, 543:10, 543:18,

550:11, 554:11, 555:15, 557:16, 558:12, 558:21, 558:25, 559:7, 562:19, 563:10, 563:14, 563:16, 563:19, 563:20, 563:23, 563:25, 564:2, 564:3, 564:6, 564:14, 565:20, 565:23, 566:10, 566:12, 568:4
HP's [3] - 422:9, 423:12, 552:23
HP-related [1] - 411:2
Hsieh [3] - 550:2, 550:4, 550:22
Huang [13] - 510:24, 511:11, 511:17, 511:21, 535:19, 535:21, 535:25, 537:14, 542:6, 542:17, 548:22, 550:18
hub [1] - 537:22
Hudson [24] - 381:20, 398:11, 398:13, 399:3, 399:20, 401:8, 423:13, 427:8, 466:17, 498:11, 530:7, 530:24, 531:14, 531:20, 535:4, 536:6, 542:19, 559:1, 560:24, 561:1, 561:9, 563:15, 565:20
humbled [1] - 529:6
hundreds [1] - 566:4
Hur [3] - 534:7, 536:17, 550:14
hurt [5] - 430:8, 430:11, 431:11, 431:15, 555:25
hurts [1] - 430:6

## I

IBM [2] - 391:10
IDC [1] - 473:17
idea [4] - 439:23, 444:14, 453:8, 454:14
identified [6] - 409:25, 410:1, 410:25, 491:12, 491:24, 493:9
identify [2] - 459:5, 513:7
identifying [1] - 513:12
identities [1] - 519:25

identity [3] - 513:15, 517:1, 518:25
ignore [1] - 452:9
illegal [2] - 411:13, 515:17
imagine [1] - 413:17
immediately [2] - 525:18, 540:9
impact [2] - 452:22, 490:11
impartial [2] - 508:8, 523:1
impedes [1] - 390:25
importance [3] - 390:17, 421:9, 453:5
important [24] - 395:15, 397:21, 422:13, 426:22, 454:17, 460:2, 481:13, 507:21, 530:3, 530:19, 535:3, 538:15, 538:20, 538:21, 542:4, 562:19, 562:24, 565:23, 565:25, 566:10, 567:21, 567:22, 567:23
importantly [1] - 564:1
impossible [1] - 401:16
impress [1] - 527:16
impression [5] - 507:2, 507:4, 507:6, 523:16
IN [1] - 381:19
inappropriately [1] - 471:6
INC [1] - 381:15
Inc [31] - 408:12, 409:2, 409:7, 409:12, 409:16, 409:20, 410:7, 410:11, 489:4, 489:8, 491:9, 492:21, 511:1, 511:2, 511:20, 511:22, 511:23, 512:11, 514:14, 524:20, 524:22, 525:8, 525:24, 526:15, 526:18, 555:21, 556:1, 563:25, 564:6
incentive [7] - 411:19, 421:25, 422:3, 430:12, 432:16, 469:16, 469:19
incentives [1] - 441:5
incentivize [1] - 530:22

inception [1] - 519:19

inch [1] - 454:8

inches [2] - 454:10, 454:12

include [6] - 393:19, 407:7, 408:4, 460:17, 480:14, 492:12

included [11] - 396:18, 406:22, 407:9, 407:12, 407:16, 407:18, 407:24, 408:3, 452:13, 463:25, 471:8

includes [2] - 549:14, 549:17

including [8] - 392:9, 404:6, 465:11, 473:18, 506:16, 518:12, 520:15, 542:23

inconsistency [1] - 510:2

inconsistent [1] - 469:6

incorporate [1] - 400:3

Incorporated [3] - 493:1, 531:5, 560:15

incorporated [13] - 399:9, 407:15, 423:22, 424:6, 458:11, 462:19, 464:12, 464:18, 465:1, 473:7, 482:2, 487:4, 492:7

incorrect [2] - 513:22, 525:15

incorrectly [1] - 513:14

increase [3] - 411:11, 440:23, 473:13

increases [1] - 443:10

increasing [1] - 395:8

incredibly [1] - 562:19

incriminate [1] - 512:3

incriminating [1] - 512:1

independent [2] - 519:1, 523:13

independently [1] - 518:18

Indianapolis [1] - 399:8

indicate [2] - 497:19, 541:8

indicated [3] - 492:24, 496:19, 535:14

indicates [3] - 541:19, 551:3, 563:13

indirect [1] - 509:8

individual [4] - 453:7, 522:10, 533:22, 539:25

individuals [3] - 404:4, 405:8, 540:4

Industrial [2] - 435:3, 435:6

industries [2] - 387:9, 447:19

industry [21] - 386:17, 387:5, 396:25, 397:1, 397:19, 397:22, 397:23, 398:1, 398:5, 398:6, 400:21, 418:6, 444:22, 456:21, 458:18, 469:2, 469:15, 470:12, 470:18

ineffective [1] - 457:16

infer [6] - 512:4, 512:9, 518:11, 555:18, 555:24

inference [2] - 508:21, 512:13

inferences [2] - 509:3, 518:7

inflate [1] - 548:14

inflated [1] - 532:7

influenced [2] - 508:10, 523:14

info [1] - 535:23

information [96] - 388:7, 396:8, 397:16, 397:17, 398:22, 398:23, 405:4, 405:12, 408:17, 413:5, 413:14, 413:20, 413:24, 414:12, 414:14, 415:11, 415:19, 415:20, 416:2, 416:5, 416:6, 416:11, 416:12, 416:13, 416:15, 433:22, 444:21, 444:22, 444:23, 445:4, 445:5, 451:14, 459:2, 488:24, 493:3, 493:21, 494:13, 494:14, 497:2, 519:5, 519:7, 519:8, 530:13, 530:15, 532:3, 532:21, 532:25, 534:10, 534:21, 534:24, 535:2, 536:1, 536:23, 536:24, 537:2,

537:10, 537:15, 537:17, 537:21, 538:6, 538:8, 538:10, 538:11, 538:25, 539:2, 539:4, 539:7, 542:12, 545:24, 546:15, 546:20, 547:20, 551:23, 552:8, 552:12, 552:13, 552:17, 552:21, 552:25, 553:5, 554:10, 554:12, 554:21, 554:23, 555:1, 555:3, 555:9, 555:10, 556:3, 556:4, 557:10, 557:11, 557:12, 561:7

initial [1] - 431:4

injured [1] - 515:19

injury [5] - 516:7, 521:21, 526:6, 526:21, 559:3

inner [1] - 388:18

inner-city [1] - 388:18

innocent [2] - 519:22, 557:4

input [1] - 442:22

inputs [16] - 441:11, 442:10, 444:19, 445:1, 470:8, 470:9, 470:18, 471:10, 472:11, 473:22, 473:23, 475:13, 475:14, 484:8

inquiry [1] - 524:10

insist [1] - 547:11

instance [1] - 498:15

instant [2] - 532:24, 567:11

instead [6] - 393:24, 412:2, 427:1, 503:22, 526:11, 555:16

instruct [4] - 506:21, 506:24, 508:5, 563:2

instructed [3] - 513:13, 534:12, 557:24

instruction [7] - 471:13, 507:15, 516:10, 516:11, 556:25, 557:1, 557:22

instructions [10] - 504:6, 506:23, 507:11, 507:14, 514:11, 514:21, 516:15, 522:18, 522:21

instructs [1] - 487:6

Intel [1] - 566:12

intellectual [2] - 423:1, 427:20

intend [1] - 557:7

intended [1] - 549:9

intent [1] - 519:19

intention [1] - 554:18

intentionally [5] - 525:25, 526:17, 556:24, 557:2, 557:15

inter [1] - 409:15

inter-company [1] - 409:15

interact [1] - 385:16

interest [3] - 453:5, 509:25, 529:9

interested [3] - 419:20, 435:12, 565:3

interesting [1] - 539:15

interests [1] - 512:12

internal [4] - 396:21, 462:16, 462:18, 462:25

internally [2] - 473:7, 540:12

internet [1] - 425:2

interrupt [3] - 395:23, 418:25, 460:4

interrupts [1] - 433:6

intersection [3] - 442:20, 443:12, 443:22

interstate [6] - 495:21, 496:13, 515:15, 516:5, 516:9, 516:16

interviewed [3] - 398:10, 398:15, 398:18

interviewing [1] - 398:12

intra [4] - 409:15, 410:2, 410:4, 410:22

intra-company [3] - 409:15, 410:2, 410:22

introduce [2] - 384:3, 553:12

introduced [3] - 384:11, 507:19, 546:8

introducing [1] - 497:25

inventory [10] - 397:25,

415:20, 416:2, 456:20, 470:24, 539:3, 539:5, 551:21

*invest* [1] - 416:9

*invited* [3] - 389:21, 414:6, 434:13

*invoked* [1] - 555:12

*involve* [2] - 385:19, 516:16

*involved* [4] - 388:17, 514:6, 520:16, 561:17

*involvement* [1] - 560:16

*involves* [1] - 515:6

*involving* [2] - 386:2, 564:2

*isolate* [1] - 539:12

*isolating* [1] - 507:16

*isolation* [1] - 539:16

*issue* [8] - 390:21, 417:14, 495:19, 495:25, 498:8, 543:2, 560:23, 561:18

*issues* [8] - 386:2, 386:3, 387:8, 396:23, 446:22, 514:8, 530:24, 543:22

*item* [1] - 429:3

*itself* [11] - 407:5, 430:10, 461:14, 462:19, 464:5, 464:6, 464:8, 490:10, 508:24, 516:23, 518:17

## J

*J.C* [8] - 534:20, 536:20, 552:8, 552:15, 554:15, 554:16, 554:24

*jail* [3] - 545:12, 567:15

*Jake* [1] - 381:21

*January* [2] - 535:20, 535:22

*Japan* [1] - 422:19

*Japanese* [5] - 417:8, 417:16, 417:19, 422:16, 423:1

*Jeong* [4] - 535:14, 535:24, 550:16, 550:17

*Jerry* [2] - 550:2, 550:22

*job* [9] - 388:9, 394:17,

406:6, 449:9, 449:10, 449:12, 506:8, 537:1, 564:12

*jobs* [2] - 449:4, 529:4

*join* [3] - 557:6, 558:8, 558:14

*joined* [3] - 519:18, 558:3, 558:5

*joining* [2] - 558:10, 558:13

*joins* [2] - 520:6, 522:11

*joint* [8] - 417:7, 417:9, 417:11, 417:15, 417:18, 422:21, 423:5, 427:16

*jointly* [4] - 487:7, 522:6, 540:8, 540:14

*journals* [1] - 388:23

*judge* [2] - 436:16, 502:14

*Judge* [10] - 384:3, 406:7, 406:11, 487:6, 500:11, 502:23, 502:25, 543:7, 555:17, 572:1

*judge's* [1] - 502:16

*judges* [8] - 502:17, 502:18, 502:19, 507:8, 507:10, 508:4, 523:7

*judgment* [7] - 495:18, 495:24, 498:18, 498:25, 499:5, 508:22, 519:1

*judicial* [5] - 496:21, 497:8, 497:14, 497:18, 499:4

*jump* [1] - 525:18

*jumping* [1] - 530:6

*June* [1] - 547:1

*junior* [1] - 405:1

*juror* [7] - 500:2, 505:25, 523:16, 523:21, 524:3, 524:9, 527:10

*JURORS* [7] - 436:20, 436:23, 437:1, 437:22, 437:24, 483:17, 528:24

*jurors* [6] - 500:19, 503:12, 514:7, 523:2, 523:5, 523:14

*Jury* [12] - 382:5, 382:8, 383:11, 435:24, 436:4, 488:5, 488:10, 495:16,

501:4, 505:10, 505:17, 570:8

*JURY* [1] - 381:7

*jury* [62] - 383:5, 383:10, 384:4, 387:15, 394:7, 396:19, 398:11, 401:7, 405:10, 412:19, 415:1, 416:24, 423:12, 427:7, 436:1, 436:3, 436:14, 436:16, 436:19, 463:9, 477:16, 483:15, 486:23, 487:7, 488:7, 488:9, 495:13, 495:15, 495:25, 498:8, 498:19, 499:12, 499:15, 499:20, 500:15, 501:2, 501:3, 501:22, 502:11, 503:1, 503:17, 505:3, 505:15, 505:20, 506:10, 506:18, 507:9, 513:25, 522:22, 523:18, 524:6, 524:17, 527:17, 529:12, 546:9, 560:13, 560:18, 568:7, 568:8, 569:5, 570:7

*jury's* [2] - 424:17, 482:8

*justice* [3] - 538:1, 543:13

## K

*keep* [20] - 431:18, 435:14, 483:12, 524:12, 524:19, 525:19, 538:9, 539:9, 542:15, 544:16, 544:17, 546:1, 546:18, 547:8, 547:9, 547:20, 552:4, 553:14, 555:3, 567:12

*keeping* [1] - 533:14

*Kellogg* [1] - 388:2

*Kenny* [1] - 534:20

*Khan* [1] - 404:22

*kids* [5] - 384:18, 564:16, 564:17, 564:18, 564:20

*Kim* [2] - 533:17, 534:4

*kind* [26] - 386:18, 395:25, 396:6, 396:15, 401:5, 402:10, 405:17, 418:12, 419:2, 426:10, 428:8, 433:24, 434:2, 434:4, 434:21, 444:18, 449:15, 451:25, 453:9, 454:20, 456:10,

480:10, 482:23, 484:19, 545:13, 564:11

*kinds* [6] - 400:18, 446:23, 447:18, 448:14, 449:4, 464:20

*knot* [3] - 438:4, 560:3, 560:4

*knowing* [4] - 428:2, 433:19, 541:22, 542:10

*knowingly* [11] - 516:3, 519:18, 519:21, 520:6, 522:10, 525:25, 526:16, 556:23, 556:24, 557:2, 557:3

*knowledge* [8] - 513:24, 516:25, 519:24, 520:1, 520:3, 520:8, 520:15, 520:20

*known* [2] - 409:7, 489:8

*knows* [2] - 476:16, 571:23

*Korea* [5] - 410:6, 411:1, 422:23, 563:20, 564:4

*Korean* [2] - 417:8, 417:16

## L

*labeled* [1] - 546:12

*labor* [4] - 422:20, 422:23, 422:24, 423:3

*lacking* [1] - 497:1

*lacks* [1] - 498:5

*ladies* [21] - 384:4, 501:5, 503:24, 505:19, 529:2, 543:4, 546:7, 550:7, 553:19, 557:5, 557:17, 560:9, 561:23, 562:14, 564:8, 565:19, 566:24, 567:20, 568:3, 568:5, 570:4

*lady* [1] - 500:20

*laptop* [3] - 460:23, 464:18, 464:19

*laptops* [3] - 465:1, 465:4, 473:18

*largely* [1] - 387:7

*laser* [1] - 476:24

*last* [17] - 384:7, 386:7,

387:4, 387:7, 426:21, 431:5, 459:10, 463:5, 467:17, 484:18, 484:20, 505:21, 510:20, 526:19, 529:23, 562:15, 562:18

Last [1] - 541:19

latter [1] - 485:1

Laura [4] - 381:22, 572:6, 572:10, 572:11

law [29] - 390:16, 390:18, 390:24, 390:25, 392:2, 412:9, 495:19, 495:24, 497:17, 498:19, 498:25, 499:5, 506:22, 506:23, 506:24, 507:1, 507:11, 507:15, 508:5, 508:7, 508:9, 509:11, 515:7, 515:8, 515:9, 558:8, 558:15

laws [10] - 515:1, 515:5, 522:6, 531:21, 532:1, 565:22, 566:6, 566:9, 566:22, 568:1

lawsuit [6] - 495:20, 508:20, 508:23, 508:24, 514:10, 548:16

lawsuits [1] - 448:10

lawyer [1] - 402:18

lawyers [4] - 503:9, 506:14, 507:23, 541:12

lead [4] - 430:14, 431:20, 434:1, 443:11

leaked [1] - 546:15

learn [2] - 399:3, 399:14

learned [8] - 398:25, 424:23, 470:12, 540:13, 541:20, 542:12, 542:13

learns [1] - 540:7

least [11] - 436:10, 436:17, 446:24, 473:23, 479:24, 487:11, 487:13, 500:18, 502:18, 504:3, 528:2

leave [3] - 419:19, 447:12, 495:4

Lee [1] - 534:20

left [6] - 388:8, 464:10, 467:15, 528:4, 559:13,

562:12

legal [7] - 412:15, 490:18, 491:8, 493:18, 494:12, 494:22, 521:5

legislatures [1] - 389:23

legitimate [1] - 519:6

length [1] - 461:16

Lenzo [2] - 404:10, 404:12

less [6] - 448:25, 449:5, 449:10, 463:18, 537:22, 538:24

lesson [1] - 473:21

level [5] - 400:11, 429:12, 542:14, 545:3, 546:1

levels [5] - 415:20, 416:3, 538:14, 539:3, 551:21

Levine [1] - 381:16

LG [1] - 417:8

liability [1] - 448:14

liable [9] - 487:8, 514:18, 522:6, 522:8, 522:11, 522:19, 557:25, 558:8

life [5] - 384:22, 454:2, 484:20, 484:21, 565:11

life-cycle [1] - 484:20

light [9] - 387:14, 450:11, 476:8, 476:9, 506:18, 507:15, 507:25, 510:3, 528:22

lights [6] - 446:3, 449:20, 460:6, 488:2, 529:19, 560:7

likelihood [1] - 448:13

likely [3] - 508:16, 540:17, 571:3

likewise [1] - 521:11

Lim [7] - 534:20, 536:20, 550:19, 552:8, 552:15, 554:15, 554:24

limine [2] - 497:23, 498:1

limit [4] - 433:12, 434:10, 534:22, 534:24

limited [3] - 421:2, 513:9, 546:17

limits [3] - 421:10,

431:23, 432:16

Lin [6] - 535:9, 537:5, 541:19, 549:3, 550:14, 551:2

Lindsay [1] - 554:15

line [15] - 418:7, 418:14, 439:15, 439:19, 451:13, 451:16, 451:19, 452:15, 452:16, 478:17, 478:24, 479:2, 479:3, 534:22

lineup [1] - 433:21

list [3] - 416:25, 429:3, 497:20

listed [4] - 389:24, 389:25, 390:1, 391:9

listen [1] - 513:11

listening [2] - 530:11, 560:10

Lite [4] - 417:10, 417:11, 534:3, 534:11

Lite-On [4] - 417:10, 417:11, 534:3, 534:11

literature [4] - 434:23, 435:1, 435:2, 450:8

litigation [5] - 385:8, 401:1, 446:23, 490:6, 514:7

live [2] - 384:20, 529:23

lived [3] - 384:22, 511:22, 511:23

lives [1] - 529:4

living [1] - 429:25

Liz [1] - 381:20

LLP [2] - 381:12, 381:16

located [4] - 399:19, 548:20, 548:21, 548:23

locations [1] - 399:6

logic [1] - 403:2

logically [2] - 394:20, 509:10

Look [1] - 540:13

look [35] - 403:4, 403:12, 403:13, 405:10, 418:9, 419:22, 426:11, 436:11, 443:22, 450:8, 452:12, 452:25, 453:13, 456:6, 463:22, 463:25, 464:3, 465:9, 465:20, 467:2, 471:13,

476:11, 479:10, 525:6, 526:13, 527:4, 539:16, 541:10, 542:20, 546:10, 549:25, 551:16, 563:12, 563:22, 569:1

looked [18] - 395:10, 408:10, 408:18, 408:25, 419:7, 437:11, 438:12, 442:23, 444:1, 455:21, 467:5, 467:20, 473:19, 483:3, 485:7, 485:8, 497:17

looking [7] - 441:19, 461:5, 477:14, 504:10, 563:5, 563:16, 563:17

looks [10] - 443:2, 451:8, 453:15, 455:24, 456:2, 464:11, 474:5, 479:7, 480:3, 482:7

Los [1] - 384:21

lose [3] - 431:9, 432:11, 565:12

lost [2] - 565:8, 565:24

love [1] - 564:12

low [4] - 423:3, 431:10, 521:10, 538:18

low-cost [1] - 423:3

lower [21] - 415:16, 422:22, 422:24, 426:20, 433:21, 439:22, 442:16, 442:22, 445:20, 449:4, 468:15, 469:16, 469:18, 479:23, 482:24, 485:16, 530:23, 542:15, 542:18, 547:4

lowest [6] - 415:5, 426:25, 427:1, 427:5, 434:7, 515:11

lowest-priced [1] - 427:5

LSI [3] - 470:15, 472:5, 477:20

Lu [1] - 554:15

lucky [1] - 564:12

lunch [4] - 483:13, 487:22, 487:23, 541:3

## M

ma'am [1] - 495:3

mail [6] - 496:20, 533:13,

535:21, 540:12, 542:6, 542:11

*mails* [4] - 396:20, 538:2, 539:8, 542:7

*main* [4] - 404:3, 450:9, 450:21, 470:13

*maintain* [7] - 411:7, 421:12, 430:25, 431:17, 431:25, 525:9, 527:7

*maintains* [1] - 430:10

*major* [4] - 388:22, 389:22, 456:20, 569:25

*makers* [1] - 448:3

*man* [2] - 384:23, 561:9

*managed* [1] - 554:25

*Management* [1] - 388:3

*MANAGER* [9] - 383:10, 436:3, 488:9, 495:15, 500:11, 501:3, 569:9, 569:14, 570:7

*manager* [2] - 383:19, 404:5

*managerial* [1] - 388:5

*managers* [1] - 398:21

*manner* [2] - 508:8, 509:24

*manufacture* [1] - 441:8

*manufactured* [4] - 417:3, 492:3, 492:15, 494:6

*manufacturers* [2] - 448:2, 472:19

*manufacturing* [1] - 472:19

*map* [3] - 416:8, 553:6, 553:8

*maps* [8] - 415:21, 415:23, 416:3, 539:4, 553:6, 553:9, 553:17, 553:24

*margin* [5] - 478:9, 478:20, 483:4, 483:6, 486:15

*margins* [13] - 485:9, 485:14, 485:15, 485:20, 485:23, 486:1, 486:4, 486:5, 486:7, 486:8, 486:19, 486:20

*mark* [1] - 506:1

*market* [36] - 385:17, 397:10, 419:15, 421:15, 421:20, 421:23, 423:2, 425:5, 425:17, 426:25, 432:11, 432:14, 439:12, 439:16, 439:18, 439:24, 440:2, 440:13, 440:15, 440:17, 440:24, 441:1, 441:20, 442:6, 442:19, 442:24, 445:10, 468:8, 468:11, 469:2, 469:24, 519:2, 530:23, 535:15, 551:22, 553:12

*marketplace* [4] - 385:18, 465:13, 484:22, 515:9

*markets* [3] - 388:13, 435:8, 435:10

*married* [2] - 384:18, 384:23

*Marshal* [2] - 524:16, 569:10

*marshal* [2] - 527:11, 569:11

*mask* [1] - 471:2

*material* [4] - 421:1, 421:8, 477:6, 515:12

*materially* [2] - 471:7, 484:14

*materials* [3] - 396:17, 400:1, 400:3

*math* [1] - 399:23

*matter* [28] - 386:17, 401:11, 420:10, 479:9, 493:18, 495:8, 495:19, 495:24, 498:19, 498:25, 499:5, 502:8, 513:24, 521:7, 521:9, 521:11, 521:13, 521:16, 558:3, 558:5, 558:7, 562:1, 570:1, 571:16, 571:20, 571:21, 572:8

*matters* [6] - 417:13, 420:11, 496:18, 501:7, 514:2, 527:20

*mattress* [1] - 448:3

*maximizing* [1] - 468:14

*maximum* [3] - 504:9, 506:2, 527:21

*MBA* [1] - 404:22

*McKinney* [1] - 381:12

*mean* [25] - 395:7, 397:15, 412:14, 418:25, 420:21, 420:24, 421:24, 424:2, 424:3, 430:16, 437:24, 439:25, 442:8, 452:2, 458:2, 461:3, 466:2, 469:8, 478:21, 486:5, 493:2, 500:20, 531:14, 565:5, 565:11

*meaning* [6] - 402:4, 402:22, 410:4, 427:5, 467:24, 484:20

*means* [26] - 385:12, 397:11, 407:2, 428:16, 430:20, 431:8, 442:18, 442:19, 455:14, 459:14, 469:21, 469:25, 473:13, 474:20, 477:15, 508:15, 517:12, 517:21, 517:23, 519:21, 522:7, 528:19, 538:17, 541:1, 544:7, 557:3

*meant* [2] - 531:15, 533:14

*measure* [2] - 457:1, 474:14

*measured* [1] - 461:8

*measuring* [1] - 473:11

*mechanical* [1] - 381:24

*mechanism* [1] - 463:14

*medium* [1] - 465:5

*meeting* [9] - 524:12, 535:18, 550:20, 551:8, 551:14, 551:20, 551:23, 552:16, 552:17

*meetings* [2] - 535:18, 567:9

*member* [1] - 429:2

*members* [2] - 404:3, 405:1

*memory* [5] - 523:10, 523:11, 563:21, 563:22

*men* [3] - 448:25, 449:6, 449:10

*mention* [3] - 499:14,

570:19, 571:3

*mentioned* [17] - 387:11, 390:13, 390:14, 404:1, 404:17, 409:4, 432:5, 433:14, 458:8, 470:8, 471:12, 473:5, 481:21, 484:1, 491:11, 507:7, 569:22

*mere* [1] - 518:14

*mergers* [1] - 386:3

*mess* [1] - 502:24

*message* [9] - 566:2, 566:3, 566:15, 566:16, 566:19, 566:25, 567:1, 567:4, 567:23

*messages* [3] - 532:24, 539:9

*messaging* [1] - 567:11

*messed* [1] - 549:21

*met* [12] - 422:9, 517:10, 518:16, 535:9, 535:19, 535:25, 541:19, 550:14, 550:16, 550:17, 551:1, 556:6

*methodical* [1] - 558:19

*methodology* [3] - 404:7, 446:13, 446:14

*methods* [3] - 454:5, 517:21, 517:23

*mic* [2] - 447:9, 447:10

*Michael* [2] - 534:19, 536:2

*microphone* [4] - 437:25, 489:12, 528:13, 542:1

*might* [34] - 383:8, 398:2, 412:13, 426:13, 430:20, 439:1, 448:16, 448:24, 449:4, 449:5, 451:9, 453:1, 453:2, 456:2, 461:18, 462:21, 471:11, 477:1, 480:24, 506:7, 506:25, 508:11, 511:25, 519:7, 538:24, 543:17, 543:18, 545:11, 546:4, 550:10, 558:4, 560:18, 563:18

*military* [1] - 529:12

*millimeter* [1] - 454:21

*millimeters* [2] - 464:17, 464:25

**million**[18] - 392:20, 395:19, 406:19, 423:20, 427:9, 427:10, 479:13, 479:17, 487:2, 487:12, 531:4, 531:6, 531:8, 558:6, 559:7, 559:11, 564:5, 564:10

**millions**[2] - 479:16, 566:4

**mind**[4] - 408:9, 523:3, 524:13, 524:19

**Minecraft**[1] - 564:24

**miniaturization**[2] - 465:15

**minute**[5] - 417:12, 445:25, 446:5, 461:18, 505:12

**minutes**[14] - 435:22, 483:12, 483:17, 487:24, 495:12, 500:11, 502:2, 505:21, 527:25, 528:1, 541:25, 559:17, 562:12, 570:22

**missing**[1] - 566:18

**mistake**[4] - 519:22, 557:4, 557:9, 557:12

**model**[28] - 407:24, 410:23, 455:23, 456:1, 456:7, 457:25, 471:5, 471:6, 471:7, 471:9, 474:1, 474:11, 474:12, 475:4, 475:9, 475:12, 480:15, 483:25, 484:2, 484:4, 484:7, 484:15, 484:17, 485:24, 486:12, 487:9, 564:3, 564:5

**modifications**[1] - 484:8

**moment**[4] - 446:6, 483:3, 503:6, 568:6

**momentarily**[2] - 568:24, 570:3

**money**[2] - 558:19, 565:24

**monopolist**[3] - 468:12, 469:14

**month**[9] - 443:19, 537:5, 541:7, 541:9, 541:15, 552:16, 554:4

**months**[4] - 430:19, 430:21, 547:12, 554:8

**morning**[8] - 383:3, 384:1, 384:2, 500:5, 502:5, 568:13, 568:19, 571:17

**most**[12] - 387:4, 388:10, 435:3, 453:5, 465:5, 465:12, 470:15, 478:22, 530:17, 560:2, 560:11, 562:17

**mostly**[1] - 438:15

**mother**[1] - 453:22

**mother's**[1] - 453:1

**motion**[5] - 498:1, 498:18, 498:24, 499:2, 499:5

**Motion.................**[2] - 382:3, 382:4

**motions**[1] - 497:23

**motivated**[1] - 500:22

**motive**[1] - 517:20

**motives**[1] - 521:4

**Motors**[1] - 448:6

**move**[14] - 406:2, 436:15, 438:2, 438:3, 441:14, 446:5, 449:20, 456:9, 515:23, 526:4, 542:1, 554:18, 555:1, 560:3

**moved**[4] - 436:22, 436:24, 533:7, 569:25

**moves**[1] - 495:18

**MR**[149] - 383:4, 383:7, 383:16, 383:25, 384:10, 384:16, 387:12, 387:15, 387:18, 387:22, 387:24, 389:3, 389:5, 390:2, 390:4, 390:10, 390:12, 392:25, 393:5, 393:6, 405:20, 405:21, 406:10, 406:14, 407:21, 407:23, 408:8, 408:13, 408:16, 408:22, 409:9, 409:22, 410:9, 410:13, 410:15, 410:19, 413:7, 413:8, 413:10, 413:22, 416:20, 416:22, 424:12, 425:18, 425:20, 435:13, 435:17, 436:6, 436:12, 436:18, 437:4, 437:7, 438:10, 440:7, 446:1, 446:5, 446:7, 447:12, 449:19, 449:23, 449:25, 451:20, 460:5,

460:8, 460:9, 461:21, 463:22, 463:24, 465:22, 466:4, 466:7, 466:9, 467:2, 467:4, 476:1, 476:3, 476:11, 476:15, 476:18, 476:20, 476:25, 477:2, 477:9, 477:12, 477:18, 481:17, 483:11, 483:19, 483:22, 483:23, 487:16, 487:22, 488:14, 488:19, 488:21, 489:14, 489:15, 489:25, 490:19, 490:22, 494:24, 495:2, 495:7, 495:18, 496:7, 496:11, 496:14, 496:18, 497:6, 497:16, 498:11, 499:2, 499:3, 499:10, 499:11, 499:22, 499:25, 501:9, 501:14, 501:25, 511:6, 511:10, 511:13, 516:12, 516:13, 517:5, 525:2, 528:12, 528:16, 528:19, 528:23, 528:25, 529:2, 529:20, 529:22, 542:3, 543:4, 559:20, 559:24, 560:5, 560:7, 560:9, 562:14, 568:23, 571:6, 571:10, 571:14, 571:16, 572:1

**MSN**[2] - 567:11, 567:12

**multiple**[26] - 401:22, 446:15, 446:16, 446:18, 446:22, 447:1, 447:15, 448:7, 448:9, 448:18, 448:20, 448:21, 449:13, 449:16, 451:23, 452:11, 453:6, 453:8, 453:12, 454:6, 456:13, 462:10, 536:21, 538:2

**multiply**[2] - 479:5, 479:15

**must**[19] - 507:3, 507:6, 508:2, 508:5, 510:6, 514:23, 515:23, 517:13, 518:22, 519:17, 521:22, 522:25, 523:20, 523:23, 524:1, 524:3, 524:13, 544:1, 544:11

**mutually**[3] - 535:8, 540:17, 540:20

## N

**name**[7] - 384:5, 384:7, 386:8, 494:3, 525:1, 548:19, 548:25

**named**[3] - 422:17, 434:12, 493:17

**names**[4] - 417:1, 497:21, 510:19, 510:20

**nature**[4] - 384:19, 407:23, 505:3, 520:2

**Navigant**[3] - 386:7, 386:10, 386:13

**near**[1] - 479:9

**NEC**[3] - 417:18, 417:19, 566:18

**necessarily**[5] - 395:4, 395:7, 509:18, 517:10, 519:5

**necessary**[4] - 473:22, 473:23, 517:19, 517:21

**need**[34] - 433:3, 442:1, 446:3, 450:12, 450:15, 450:16, 476:7, 476:16, 476:23, 477:13, 490:24, 491:4, 495:8, 496:1, 502:22, 516:21, 517:9, 524:8, 524:18, 528:1, 534:13, 540:25, 554:7, 566:21, 566:25, 567:3, 567:23, 568:16, 568:20, 570:19, 570:20, 570:21

**needed**[6] - 421:4, 421:5, 459:22, 460:1, 468:18, 468:19

**needs**[4] - 420:18, 433:11, 560:3, 571:18

**negative**[4] - 445:21, 481:15, 485:24, 555:25

**negotiation**[1] - 426:12

**Netherlands**[1] - 422:20

**network**[1] - 537:6

**never**[4] - 408:9, 454:3, 492:10, 524:13

**nevertheless**[1] - 407:19

**new**[10] - 421:14, 421:18, 442:20,

443:22, 443:23, 476:7, 502:14, 565:4

next [31] - 383:15, 389:13, 389:19, 390:2, 396:12, 405:20, 414:17, 416:20, 430:19, 431:2, 456:12, 459:14, 462:5, 463:23, 467:3, 469:23, 495:6, 501:8, 524:21, 525:18, 525:22, 526:4, 526:9, 526:10, 526:11, 530:12, 532:6, 540:23, 546:25, 548:17, 565:13

nice [1] - 533:11

night [4] - 543:14, 565:7, 565:8, 569:4

nine [3] - 532:18, 533:9, 567:7

nobody [1] - 568:20

none [3] - 548:2, 556:14, 556:16

nonexistence [1] - 519:13

normal [1] - 390:24

normally [5] - 391:18, 413:4, 413:13, 413:20, 416:12

North [2] - 381:16, 492:1

Northwestern [5] - 386:25, 388:2, 388:8, 388:11, 391:13

note [2] - 517:6, 528:2

notes [12] - 523:8, 523:9, 523:10, 523:11, 523:12, 523:14, 523:15, 523:20, 527:18, 529:8, 531:16

nothing [3] - 495:2, 499:10, 548:5

notice [10] - 426:22, 442:2, 468:21, 496:21, 497:9, 497:15, 497:18, 499:4, 524:19, 527:25

notify [1] - 527:11

November [1] - 572:4

nowhere [1] - 420:15

number [27] - 391:8, 428:5, 431:24, 435:8, 448:2, 479:6, 484:1, 487:9, 487:12, 491:17, 506:19, 510:9, 510:12, 510:15, 530:20,

538:23, 547:5, 547:8, 554:18, 558:6, 558:23, 559:5, 559:6, 561:19, 564:10, 570:12

Number [27] - 389:4, 419:20, 424:18, 425:19, 435:11, 482:10, 525:6, 525:11, 525:20, 525:21, 525:23, 526:3, 526:5, 526:13, 526:16, 526:20, 526:23, 526:24, 527:1, 527:3, 539:24, 541:10, 548:18, 549:25, 554:2

numbers [9] - 407:16, 408:4, 408:5, 489:17, 541:4, 541:14, 546:11, 546:12

Numbers [1] - 405:11

numerical [1] - 524:14

nutrition [3] - 450:24, 451:4, 454:20

nutritional [2] - 453:2, 453:17

## O

oath [2] - 512:19, 512:22

object [2] - 490:19, 517:11

objection [13] - 393:3, 407:21, 408:2, 408:13, 409:3, 409:22, 410:13, 413:7, 413:12, 436:10, 436:11, 450:16, 490:17

objective [1] - 440:22

observation [1] - 453:19

observations [2] - 451:2, 451:3

observed [2] - 456:19, 459:10

observers [1] - 398:5

obtain [1] - 470:17

obtained [4] - 398:23, 458:19, 472:2, 473:16

obviously [1] - 541:2

occasion [1] - 521:18

occur [2] - 430:18, 532:23

occurred [11] - 394:14,

395:7, 400:8, 402:25, 417:25, 444:12, 445:9, 445:16, 455:2, 478:11, 516:5

OCTOBER [2] - 381:5, 382:2

October [15] - 539:13, 539:21, 540:5, 540:6, 540:8, 540:19, 540:23, 541:3, 541:6, 541:16, 541:18, 542:25, 549:14, 553:1

ODD [33] - 413:24, 414:24, 415:19, 416:2, 427:9, 429:18, 430:18, 430:20, 443:18, 454:20, 460:15, 472:18, 478:18, 489:16, 518:2, 519:2, 519:4, 519:16, 520:13, 521:11, 521:15, 521:21, 522:4, 535:10, 535:15, 535:17, 535:20, 550:15, 550:18, 551:8, 551:13, 551:24, 563:14

odd [1] - 469:9

ODDs [33] - 395:20, 397:7, 417:21, 418:2, 421:16, 430:22, 488:25, 489:6, 489:7, 489:17, 490:2, 490:9, 490:14, 490:24, 490:25, 491:4, 491:5, 492:13, 492:19, 493:1, 493:7, 494:16, 498:14, 498:16, 521:25, 522:2, 531:10, 561:3, 561:8, 561:12, 561:14, 561:20, 562:9

OF [1] - 381:1

offer [3] - 412:2, 422:1, 519:9

offering [1] - 421:16

office [1] - 428:17

officer [1] - 524:10

officers [1] - 571:21

often [3] - 389:21, 391:23, 465:5

oil [3] - 412:22, 412:25, 413:1

Olive [1] - 550:20

once [11] - 400:2, 430:18, 453:4, 526:4, 527:9, 527:13, 536:11,

536:19, 537:5, 552:15

one [160] - 384:24, 384:25, 385:20, 385:21, 386:4, 387:13, 387:19, 388:10, 390:6, 390:18, 391:15, 392:9, 397:12, 398:14, 398:17, 399:7, 401:5, 401:17, 408:20, 412:19, 414:21, 415:14, 416:20, 417:2, 418:9, 418:12, 419:1, 419:19, 420:22, 422:6, 422:12, 422:13, 423:6, 424:20, 425:1, 425:13, 426:13, 426:17, 426:18, 426:22, 428:13, 430:24, 432:21, 433:2, 433:4, 433:5, 437:10, 438:11, 440:3, 441:14, 441:15, 441:20, 442:18, 447:11, 447:16, 447:25, 451:7, 451:21, 452:1, 452:25, 455:7, 457:11, 457:24, 459:13, 460:14, 467:17, 467:22, 471:24, 474:6, 475:21, 479:17, 480:2, 480:8, 480:9, 481:12, 483:1, 484:11, 485:8, 485:14, 488:15, 495:22, 497:23, 500:18, 500:20, 503:8, 504:9, 504:12, 504:17, 506:2, 507:8, 509:7, 509:19, 511:5, 512:6, 514:17, 516:8, 517:11, 518:16, 518:19, 518:21, 520:9, 522:10, 522:15, 522:24, 524:20, 524:21, 525:16, 526:19, 527:2, 527:21, 528:13, 529:12, 532:5, 532:9, 532:22, 534:12, 535:12, 536:2, 536:13, 536:15, 537:1, 537:12, 539:12, 539:13, 541:11, 541:17, 542:12, 543:13, 545:21, 546:15, 547:5, 548:24, 549:7, 551:6, 552:15, 552:19, 552:24, 553:1, 554:24, 555:12, 557:18, 558:14, 562:10, 562:21, 563:10, 563:13, 565:7, 565:24, 567:5, 567:6, 567:7,

567:8

one's [1] - 391:14

ones [5] - 421:20, 424:1, 465:5, 548:20, 567:14

ongoing [1] - 522:11

Ontario [1] - 399:7

OPEC [2] - 412:19, 412:22

opening [6] - 528:2, 529:11, 543:21, 544:21, 548:16, 551:7

operating [2] - 422:19, 540:21

operation [1] - 517:24

operations [1] - 530:9

opinion [5] - 486:23, 506:25, 507:5, 514:2, 514:3

opinions [3] - 405:23, 406:15, 523:3

opportunity [8] - 430:4, 432:12, 434:10, 555:6, 555:14, 555:16, 559:15, 565:12

opposed [1] - 484:22

opposing [2] - 496:6, 510:10

Optiarc [7] - 417:17, 535:15, 537:8, 537:18, 537:24, 540:16

optical [35] - 393:18, 394:13, 396:3, 397:13, 402:16, 417:4, 422:14, 433:3, 439:9, 442:11, 443:5, 444:7, 462:18, 464:4, 464:11, 464:21, 470:11, 470:13, 470:14, 470:16, 470:21, 471:24, 472:8, 472:19, 473:14, 477:19, 487:3, 515:21, 516:1, 518:1, 525:9, 527:7, 530:14, 530:16, 531:2

option [1] - 501:18

OPU [1] - 470:14

OPUs [1] - 472:3

oral [1] - 513:4

orange [3] - 477:21, 478:17, 479:3

order [23] - 383:2, 397:3, 397:9, 411:8, 414:13, 414:18, 415:16,

416:15, 422:6, 422:14, 423:2, 423:3, 431:13, 433:20, 438:13, 502:22, 504:1, 534:16, 537:15, 542:13, 544:1, 547:20, 557:15

ordinarily [1] - 506:7

Organization [3] - 412:20, 435:3, 435:6

organization [4] - 412:21, 412:22, 412:24, 449:3

organize [1] - 400:1

organized [1] - 568:18

organizing [1] - 404:16

original [3] - 505:23, 517:7, 568:7

originally [2] - 386:11, 386:12

otherwise [6] - 477:13, 513:1, 526:25, 528:10, 544:16, 571:11

ought [3] - 504:11, 505:22, 507:1

outcome [10] - 401:24, 415:13, 426:24, 432:6, 440:14, 448:20, 448:22, 452:22, 454:17, 530:5

outcomes [1] - 431:7

outlined [1] - 530:24

output [3] - 390:23, 411:8, 455:24

outputs [1] - 416:17

outside [5] - 407:11, 492:3, 492:8, 511:23, 524:17

overall [7] - 407:3, 472:22, 486:25, 517:1, 520:8, 547:16, 552:22

overcharge [18] - 402:7, 445:22, 457:17, 457:19, 470:4, 470:7, 478:4, 478:14, 479:3, 479:5, 479:8, 482:23, 483:7, 483:10, 522:4, 527:5, 562:1, 562:2

overcharged [3] - 407:19, 532:12, 559:2

overcharges [27] - 394:8, 401:21, 402:4, 402:9, 402:13, 403:21, 405:25, 406:19, 408:6,

419:6, 448:6, 457:21, 478:10, 479:13, 479:22, 480:20, 481:15, 481:18, 481:21, 482:4, 482:12, 482:21, 482:24, 486:6, 486:25

overlap [1] - 531:19

overnight [1] - 503:23

overrule [3] - 408:2, 409:3, 413:12

overruled [2] - 409:23, 499:8

overseas [3] - 399:15, 548:20, 561:12

oversimplify [1] - 474:4

overstating [1] - 480:17

overtaken [1] - 465:19

overview [2] - 395:13, 537:21

own [14] - 396:24, 429:10, 429:15, 429:20, 430:22, 441:5, 502:6, 502:7, 513:18, 513:20, 523:3, 568:9, 569:3

owned [1] - 422:17

owning [2] - 423:6, 423:10

## P

P.M [1] - 381:4

p.m [12] - 488:5, 488:6, 488:10, 495:16, 501:4, 505:10, 505:14, 505:17, 570:8, 572:2

P2 [1] - 443:24

P3 [1] - 443:24

Packard [30] - 409:8, 488:25, 489:1, 489:4, 489:8, 489:18, 489:19, 490:3, 490:9, 490:10, 490:23, 491:5, 491:16, 494:16, 494:17, 496:22, 498:21, 508:13, 514:13, 529:7, 531:1, 561:3, 561:8, 561:9, 561:14, 561:20, 561:21, 561:24, 562:5, 562:8

PACKARD [1] - 381:3

padding [2] - 447:24, 447:25

page [17] - 389:13, 389:14, 389:15, 389:25, 390:5, 426:1, 505:21, 525:15, 525:18, 525:22, 526:4, 526:9, 526:10, 526:11, 541:11

Page [4] - 382:2, 382:10, 515:25, 525:18

pages [4] - 390:3, 501:24, 501:25, 505:21

paid [19] - 392:22, 393:23, 400:7, 402:2, 402:5, 402:6, 407:3, 407:4, 426:21, 431:5, 431:6, 448:25, 449:4, 449:10, 521:25, 522:2, 527:6, 559:2, 567:15

Panasonic [3] - 417:6, 417:18, 566:17

Panasonic's [1] - 553:18

papers [4] - 446:21, 459:1, 459:2, 459:3

paragraph [2] - 507:17, 512:7

parent [1] - 565:16

parental [2] - 453:21, 454:19

parents [2] - 450:23, 451:4

Park [1] - 533:4

part [32] - 385:19, 388:21, 389:21, 390:23, 405:5, 417:20, 429:16, 429:25, 430:9, 459:6, 469:19, 490:13, 502:20, 519:12, 520:7, 520:11, 537:5, 539:8, 544:7, 544:8, 545:13, 546:13, 546:18, 552:21, 553:14, 553:20, 553:25, 554:22, 557:1, 563:19, 563:20, 567:12

partial [1] - 389:15

partially [1] - 482:18

participant [11] - 430:7, 432:16, 487:7, 493:9, 517:2, 520:5,

521:15, 522:5, 547:10, 549:19, 554:6

participants[18] - 419:16, 431:12, 481:6, 517:1, 517:3, 517:9, 517:14, 517:16, 517:18, 517:25, 518:13, 519:25, 520:24, 521:1, 521:17, 535:12, 544:11

participate[18] - 413:25, 422:2, 434:14, 516:24, 519:21, 519:23, 526:14, 540:7, 540:14, 543:25, 544:1, 548:17, 549:5, 555:8, 556:15, 556:20, 557:3, 558:16

participated[24] - 515:20, 516:3, 516:6, 519:15, 520:11, 520:12, 520:18, 520:22, 521:2, 521:20, 522:16, 525:8, 525:25, 526:17, 549:4, 550:10, 551:4, 552:5, 553:21, 556:1, 556:23, 557:25, 560:19, 560:21

participates[1] - 520:7

participating[3] - 536:11, 538:20, 552:10

participation[6] - 520:16, 520:17, 531:7, 549:2, 549:23, 550:13

particular[14] - 417:5, 426:17, 430:18, 448:25, 457:15, 457:24, 461:23, 462:2, 478:13, 507:16, 518:23, 531:11, 531:18, 539:23

particularly[1] - 414:22

particulars[1] - 518:4

parties[11] - 396:17, 398:8, 429:8, 434:18, 507:19, 512:21, 514:6, 514:8, 514:10, 516:14, 538:2

parts[4] - 400:11, 471:25, 517:2, 520:1

party[4] - 397:18, 429:8, 473:16, 507:3

Party[2] - 538:23,

538:24

Paso[1] - 399:8

pass[1] - 422:7

passed[1] - 422:12

passion[1] - 508:10

past[2] - 527:25, 541:25

Pat[1] - 406:6

patent[4] - 423:6, 423:10, 427:18, 427:21

patent-owning[2] - 423:6, 423:10

patented[2] - 422:18, 423:7

patents[3] - 422:15, 422:17, 423:5

path[1] - 492:21

pattern[1] - 486:18

patterns[1] - 418:22

pay[3] - 423:7, 472:16, 472:17

PC[1] - 460:22

PCs[1] - 407:9

peer[1] - 388:22

peer-reviewed[1] - 388:22

people[15] - 439:22, 443:19, 451:3, 499:15, 530:22, 536:6, 538:23, 545:1, 558:10, 558:11, 558:13, 558:16, 564:14, 566:25, 567:23

people's[2] - 451:2, 452:6

per[2] - 479:5, 554:16

percent[7] - 406:20, 420:5, 420:8, 427:2, 482:6, 482:7

perfect[1] - 452:24

perfectly[1] - 440:13

performed[1] - 494:12

performing[1] - 405:2

perhaps[3] - 449:3, 449:12, 491:6

period[108] - 395:22, 398:7, 398:8, 400:6, 402:14, 402:22, 403:4, 403:6, 403:8, 403:12, 403:16, 403:18,

403:20, 406:24, 406:25, 407:20, 418:16, 419:3, 419:8, 419:11, 419:13, 419:14, 421:21, 423:20, 427:25, 437:13, 438:15, 441:20, 441:22, 441:23, 442:2, 442:4, 442:7, 442:8, 442:13, 444:10, 444:12, 444:17, 444:24, 445:9, 445:11, 445:13, 455:3, 455:4, 456:16, 457:4, 459:5, 459:8, 459:9, 459:18, 465:11, 465:12, 465:17, 467:12, 467:17, 467:18, 468:24, 468:25, 469:6, 469:23, 470:19, 472:10, 472:12, 472:23, 473:24, 475:17, 477:22, 478:3, 480:3, 480:9, 480:13, 481:5, 481:19, 482:5, 483:4, 484:19, 484:22, 485:10, 485:11, 485:14, 485:15, 485:21, 486:4, 486:5, 486:10, 487:1, 492:24, 493:22, 494:20, 496:23, 505:2, 517:4, 517:7, 529:25, 531:3, 532:12, 532:22, 536:17, 541:15, 558:1, 558:24

periods[7] - 400:13, 467:15, 482:20, 482:21, 483:5, 483:8

permitted[1] - 514:1

person[8] - 451:7, 453:19, 502:21, 513:25, 516:24, 519:23, 520:2, 532:15

person's[1] - 450:10

personal[3] - 473:12, 473:18

persons[1] - 518:14

perspective[11] - 411:13, 411:15, 413:4, 413:11, 414:2, 414:7, 414:23, 415:22, 416:1, 431:1, 431:9

pertaining[4] - 396:21, 396:25, 397:1, 397:2

pertinent[4] - 518:2,

529:16, 530:1, 536:1

pervasive[1] - 567:8

Petroleum[1] - 412:20

Ph.D[5] - 382:11, 383:22, 384:12, 384:13, 388:6

Ph.D's[1] - 404:11

phenomenon[2] - 434:3, 434:4

Philippines[1] - 471:9

Philips[22] - 417:5, 417:9, 422:15, 427:10, 427:12, 427:14, 427:18, 427:23, 493:1, 493:2, 493:5, 493:8, 493:9, 493:10, 493:14, 493:16, 493:18, 493:19, 493:21, 494:20, 531:6, 547:16

Phoenix[1] - 384:25

phone[17] - 504:18, 532:23, 534:13, 534:16, 536:17, 538:1, 539:8, 541:11, 541:13, 541:14, 541:16, 554:2, 569:19, 570:22, 571:1, 571:4, 571:24

phoned[1] - 550:2

phones[4] - 428:22, 534:15, 534:16, 567:10

pl[1] - 456:19

pick[2] - 506:14, 568:19

picked[1] - 533:1

pickup[5] - 470:14, 471:24, 472:8, 472:14, 477:20

picture[3] - 440:22, 473:10, 547:18

pictures[1] - 461:18

pie[1] - 415:6

piecemeal[1] - 518:23

pieces[1] - 458:9

pink[1] - 418:14

Pioneer[2] - 417:18, 566:17

Pioneer's[1] - 553:17

place[6] - 432:13, 434:9, 436:7, 531:22, 547:11, 550:6

placed[1] - 550:4

places [1] - 510:5
plaintiff [37] - 391:22,
394:23, 408:12, 409:2,
409:7, 409:11, 448:6,
491:8, 501:6, 501:8,
508:11, 508:13,
508:17, 514:12,
514:13, 514:18,
514:25, 515:19,
515:23, 516:7, 517:22,
518:5, 521:22, 521:23,
521:25, 522:1, 522:14,
522:17, 525:7, 525:23,
526:5, 526:20, 527:6,
527:22, 528:5, 528:9
PLAINTIFF [1] -
381:10
Plaintiff [1] - 382:4
plaintiff's [1] - 394:19
Plaintiff's [13] - 382:3,
389:4, 405:11, 419:20,
424:18, 425:19,
435:11, 482:9, 535:22,
539:24, 541:10,
549:24, 554:2
plaintiffs [3] - 391:18,
391:19, 391:20
plan [2] - 520:2, 552:22
planned [1] - 500:16
planning [1] - 540:14
plans [1] - 416:7
platform [1] - 425:3
plausible [2] - 401:13,
485:8
play [1] - 555:12
played [2] - 517:2,
520:1
players [1] - 535:5
playing [1] - 564:22
PLDS [26] - 417:9,
532:18, 533:11,
533:19, 534:9, 534:20,
535:16, 536:2, 536:5,
536:8, 536:10, 536:20,
537:17, 537:23,
537:24, 541:4, 541:8,
546:23, 549:16, 550:1,
550:2, 550:5, 553:18,
554:15
plea [6] - 459:11,
533:21, 533:25, 536:5,
539:24, 540:1
plead [1] - 534:17

pleading [2] - 539:22,
550:25
pleas [4] - 536:5,
536:10, 544:25
pleasure [1] - 483:14
pled [10] - 533:9, 533:17,
534:8, 535:13, 539:22,
540:4, 549:7, 549:13,
549:18, 555:16
plenty [1] - 539:10
plot [2] - 467:10, 472:1
plotting [1] - 467:20
plug [2] - 455:1, 462:21
plugged [2] - 445:8,
457:3
plus [2] - 504:10, 505:21
podium [1] - 560:1
point [13] - 397:24,
417:6, 435:20, 443:25,
446:4, 463:5, 477:2,
516:8, 533:24, 538:4,
540:19, 542:4, 553:12
pointer [1] - 476:24
points [4] - 451:6,
451:10, 451:13,
452:16
Poirrier [9] - 381:20,
387:13, 389:3, 390:3,
390:11, 416:21,
425:18, 446:2, 463:23
poker [1] - 535:5
policy [3] - 385:7, 386:2,
387:8
polyurethane [5] -
447:8, 447:15, 447:22,
447:23, 448:4
posed [1] - 512:10
position [2] - 533:8,
547:8
positions [1] - 387:25
positive [1] - 445:21
possessed [1] -
517:19
possibility [2] - 430:7,
547:17
possible [4] - 428:3,
480:16, 481:4, 530:18
post [10] - 444:17,
460:18, 465:12,
465:17, 485:10,
485:15, 485:25, 486:4,

486:8, 486:20
post-conspiracy [10]
- 444:17, 460:18,
465:12, 465:17,
485:10, 485:15,
485:25, 486:4, 486:8,
486:20
potential [1] - 431:24
power [1] - 476:6
Practice [1] - 389:1
praised [1] - 537:14
pre [2] - 415:3, 431:22
pre-announce [1] -
415:3
pre-qualify [1] - 431:22
predict [6] - 452:6,
452:19, 453:11,
453:12, 454:3, 455:3
predicted [1] - 453:14
prediction [1] - 452:20
predictor [1] - 451:18
prefer [1] - 560:1
preferable [1] - 387:16
prefers [1] - 387:15
prejudice [2] - 508:11,
509:25
prejudiced [1] - 514:20
premise [2] - 419:7,
515:10
prepaid [2] - 534:15,
567:10
preparation [1] -
513:17
prepare [1] - 418:1
prepared [6] - 419:23,
428:9, 438:20, 449:15,
496:14, 499:11
preponderance [10] -
508:14, 508:15,
508:18, 509:13, 525:7,
525:24, 526:6, 526:20,
543:8, 543:9
prequalification [1] -
431:19
present [5] - 392:25,
512:17, 512:22, 513:2,
538:3
presentation [1] -
390:5
presentations [3] -
389:20, 390:7

presented [10] -
497:10, 497:12, 508:9,
512:14, 512:19, 548:4,
548:8, 548:9, 560:17,
562:21
preserve [1] - 515:8
president [4] - 385:24,
385:25, 502:15, 533:8
presiding [5] - 505:25,
523:21, 524:3, 524:9,
527:10
pressure [1] - 481:9
presumably [2] -
424:23, 552:1
pretty [6] - 384:22,
391:23, 419:3, 422:20,
456:1, 505:22
prevail [1] - 515:21
prevalent [3] - 463:18,
465:10, 465:13
prevent [1] - 434:10
previous [2] - 431:3,
522:11
previously [3] -
417:10, 509:16, 556:9
price [189] - 393:2,
393:10, 393:13, 395:4,
395:6, 395:9, 401:1,
411:5, 411:6, 411:7,
411:9, 411:14, 411:23,
412:3, 412:4, 412:5,
412:12, 412:14,
412:23, 413:1, 415:6,
420:20, 421:11,
421:12, 422:1, 424:21,
425:11, 426:20,
426:21, 426:25, 427:1,
428:3, 428:11, 429:1,
429:6, 430:15, 431:2,
431:4, 431:5, 431:10,
431:20, 432:4, 432:19,
433:15, 434:6, 434:7,
434:11, 434:25,
438:19, 439:12, 440:2,
440:3, 440:5, 440:9,
440:10, 440:11,
440:15, 440:16,
440:23, 440:24,
440:25, 441:1, 441:4,
441:6, 441:12, 442:10,
442:17, 442:19, 443:9,
443:12, 443:21,
443:24, 444:21, 445:2,
445:7, 446:19, 447:1,
447:6, 447:18, 447:21,
448:4, 448:7, 448:11,

454:18, 454:25, 457:2, 458:4, 458:16, 463:20, 468:10, 468:13, 468:14, 468:16, 469:7, 469:8, 469:11, 469:16, 469:19, 469:23, 469:24, 469:25, 470:1, 470:5, 471:15, 472:9, 472:20, 474:9, 474:16, 478:6, 478:9, 478:10, 478:20, 479:23, 479:24, 481:5, 481:11, 483:9, 485:17, 493:14, 515:3, 515:22, 516:24, 517:3, 517:9, 519:4, 519:7, 519:8, 519:12, 519:18, 519:20, 520:3, 520:7, 520:13, 520:19, 520:20, 520:23, 520:25, 521:3, 521:8, 521:12, 521:13, 521:17, 521:20, 522:1, 527:7, 530:23, 532:4, 532:5, 532:6, 533:10, 533:16, 538:13, 538:18, 540:25, 541:20, 541:21, 541:23, 542:9, 542:10, 542:14, 542:15, 543:23, 543:25, 544:2, 544:5, 544:17, 544:20, 544:22, 544:25, 545:2, 546:1, 546:25, 547:2, 547:4, 547:13, 550:5, 554:19, 555:1, 557:6, 559:2

price-fixing [68] - 393:2, 393:10, 393:13, 395:4, 395:6, 395:9, 401:1, 411:5, 411:6, 411:14, 412:12, 412:14, 412:23, 428:3, 428:11, 429:6, 430:15, 431:20, 432:4, 432:19, 433:15, 434:11, 434:25, 446:19, 447:1, 447:6, 447:18, 447:21, 448:4, 448:7, 448:11, 469:7, 469:8, 469:11, 469:19, 515:3, 515:22, 516:24, 517:3, 517:9, 519:12, 519:18, 519:20, 520:3, 520:7, 520:13, 520:19, 520:20, 520:23, 520:25, 521:3, 521:8, 521:13, 521:17, 521:20, 532:4, 533:10, 533:16, 543:23, 543:25, 544:2, 544:5,

544:20, 544:22, 544:25, 545:2, 547:2, 557:6

price-war [1] - 481:5

priced [1] - 427:5

prices [163] - 385:14, 385:17, 385:19, 385:20, 390:21, 390:22, 394:13, 395:8, 396:7, 397:9, 400:5, 400:7, 401:11, 401:25, 402:2, 402:5, 402:6, 402:20, 403:4, 403:8, 403:9, 403:10, 403:13, 403:14, 403:17, 411:16, 412:3, 416:17, 419:8, 420:13, 431:6, 431:18, 439:16, 439:17, 439:20, 439:22, 441:19, 441:21, 442:6, 444:1, 444:2, 444:3, 444:9, 444:10, 444:13, 444:20, 445:10, 445:13, 445:15, 445:16, 445:18, 445:19, 445:20, 446:11, 446:19, 447:20, 448:5, 455:3, 455:4, 456:15, 457:5, 457:14, 457:16, 458:5, 459:14, 459:17, 467:8, 467:11, 467:20, 467:22, 467:23, 468:18, 468:23, 469:5, 469:9, 469:12, 469:13, 469:18, 469:20, 472:11, 472:14, 472:15, 472:17, 472:22, 472:24, 473:23, 474:15, 474:16, 474:17, 474:24, 475:15, 475:16, 477:21, 477:24, 478:2, 478:8, 478:11, 478:24, 480:3, 480:4, 480:6, 480:7, 480:10, 480:17, 481:11, 481:22, 485:4, 485:12, 485:16, 485:21, 486:9, 493:12, 494:9, 515:11, 515:16, 515:21, 516:1, 516:4, 518:2, 518:25, 519:6, 519:10, 519:11, 519:17, 521:7, 521:9, 522:4, 525:9, 525:13, 533:13, 533:14, 535:10, 536:4, 536:21, 537:2, 537:12, 538:7,

538:9, 539:9, 544:16, 545:3, 545:22, 546:19, 546:21, 547:9, 547:17, 547:20, 548:14, 550:19, 551:2, 552:4, 552:22, 553:14, 555:3, 556:2, 558:22

pricing [27] - 388:5, 403:19, 403:20, 413:4, 421:25, 437:12, 438:14, 438:18, 447:2, 467:5, 471:21, 479:19, 494:21, 537:2, 537:9, 538:10, 538:11, 550:14, 552:8, 554:23, 555:1, 555:3, 556:3, 556:5, 557:10, 557:11

primarily [1] - 385:5

primary [2] - 484:17, 513:20

principle [2] - 412:8, 412:9

principles [2] - 475:11, 486:14

prison [4] - 533:6, 534:5, 534:18, 567:17

private [1] - 502:16

prize [1] - 547:1

problem [6] - 394:3, 433:5, 441:17, 499:24, 499:25, 571:23

problems [2] - 404:21, 499:18

proceed [5] - 393:4, 437:5, 488:12, 526:3, 526:9

PROCEEDINGS [1] - 383:1

proceedings [1] - 572:7

Proceedings [2] - 381:24, 572:2

process [18] - 398:15, 398:16, 402:12, 405:6, 423:12, 424:19, 424:24, 428:2, 428:4, 428:10, 434:21, 494:21, 530:10, 530:18, 537:11, 539:2, 566:1

procure [2] - 425:10, 433:12

procured [1] - 494:6

procurement [44] -

396:22, 398:16, 398:20, 401:7, 401:10, 401:12, 401:13, 401:16, 402:12, 411:10, 414:1, 414:4, 414:18, 414:22, 415:2, 423:12, 424:19, 424:25, 426:6, 426:7, 428:10, 430:21, 430:22, 459:10, 459:13, 459:15, 493:8, 493:10, 493:14, 494:10, 498:12, 498:15, 530:9, 530:10, 530:17, 530:21, 532:6, 536:4, 536:14, 539:20, 547:14, 552:9, 561:2

procuring [2] - 490:8, 498:14

produce [8] - 385:14, 385:18, 412:22, 421:5, 422:14, 422:25, 439:16

produced [9] - 381:25, 396:17, 458:23, 458:24, 489:9, 490:5, 490:7, 491:9, 553:4

produces [1] - 515:10

producing [1] - 443:18

product [42] - 400:13, 400:14, 400:15, 400:16, 418:17, 422:8, 422:11, 425:9, 425:10, 439:7, 439:8, 439:13, 447:23, 454:23, 455:2, 456:15, 457:22, 457:24, 458:3, 458:4, 458:7, 459:21, 460:2, 460:11, 464:1, 464:7, 464:23, 468:10, 468:18, 468:20, 475:21, 481:21, 481:23, 481:25, 482:13, 482:14, 482:15, 485:19, 486:21

product-type [1] - 455:2

production [6] - 413:1, 415:21, 416:4, 422:10, 433:5, 553:10

products [46] - 385:18, 393:23, 394:9, 394:11, 397:2, 397:4, 397:22, 399:2, 406:23, 416:9, 416:10, 417:24, 418:5, 418:22, 422:14,

422:25, 423:18, 427:9, 427:14, 427:23, 427:24, 447:18, 458:6, 460:13, 460:21, 461:23, 462:6, 462:12, 463:25, 464:15, 465:24, 466:2, 466:19, 467:6, 469:3, 479:25, 482:19, 484:21, 486:16, 487:13, 521:14, 550:15, 563:14, 566:5, 566:21

professional [2] - 386:20, 388:23

professionals [1] - 385:6

profit [2] - 468:13, 486:15

profits [4] - 411:11, 478:17, 557:16, 567:18

profoundly [1] - 529:5

program [2] - 455:17, 562:3

programming [4] - 404:13, 404:23, 405:3, 405:4

programs [1] - 459:3

progress [1] - 515:12

prohibits [1] - 515:13

project [1] - 388:17

projects [1] - 386:1

prominent [1] - 457:11

promise [2] - 406:10, 554:9

promoted [5] - 533:6, 534:4, 534:5, 567:16, 567:18

proof [1] - 527:22

proper [2] - 497:14, 521:23

property [5] - 423:1, 427:20, 516:7, 526:7, 526:22

prospect [1] - 469:18

protect [2] - 531:23, 542:14

protection [1] - 540:25

protections [1] - 531:22

protective [1] - 413:14

prove [11] - 495:22,

508:16, 508:17, 510:14, 517:13, 518:5, 525:7, 525:23, 526:5, 526:20, 544:10

proved [2] - 518:22, 522:14

proven [1] - 509:5

proves [1] - 509:9

provide [3] - 386:1, 494:9, 530:20

provided [15] - 458:15, 458:17, 458:18, 466:21, 493:3, 493:11, 493:21, 494:13, 530:13, 530:15, 537:14, 537:17, 541:4, 556:14

provides [2] - 455:8, 473:17

proving [1] - 508:14

public [1] - 386:2

publications [3] - 389:8, 389:16

published [3] - 388:22, 388:24, 446:21

pull [5] - 447:9, 447:10, 489:12, 539:5, 546:11

pulls [1] - 463:14

punish [2] - 430:4, 431:13

punishing [1] - 481:6

purchase [11] - 396:3, 396:8, 417:23, 420:22, 425:14, 425:16, 427:3, 489:3, 490:24, 491:10, 492:20

purchased [33] - 393:23, 395:20, 396:2, 396:6, 396:7, 398:25, 423:15, 467:6, 489:5, 489:7, 489:17, 490:14, 490:25, 491:4, 491:5, 492:20, 495:20, 497:12, 497:20, 497:22, 498:4, 531:1, 531:10, 531:17, 561:8, 561:12, 561:15, 561:20, 562:2, 562:10, 563:9, 563:11, 563:14

purchasers [1] - 420:12

purchases [22] - 408:11, 409:1, 409:7, 418:2, 423:18, 423:20,

456:18, 473:11, 473:12, 481:24, 481:25, 488:25, 489:16, 490:2, 490:6, 491:15, 531:5, 563:8, 563:16, 563:18, 563:23, 566:7

purchasing [1] - 498:16

purport [1] - 513:7

purpose [16] - 397:20, 398:12, 408:1, 447:4, 513:10, 515:7, 517:11, 517:12, 517:15, 519:20, 534:21, 534:24, 544:13, 545:25, 547:6, 552:3

purposes [4] - 385:7, 398:14, 477:15, 516:15

push [3] - 437:17, 463:10, 476:5

put [30] - 423:8, 433:1, 434:9, 437:15, 449:20, 453:2, 453:4, 453:16, 453:21, 455:15, 461:10, 463:11, 484:3, 492:14, 492:15, 500:3, 506:19, 517:24, 534:23, 543:18, 545:11, 546:4, 547:23, 551:11, 554:17, 556:7, 556:9, 559:6, 561:12, 565:4

putting [2] - 475:13, 550:11

**Q**

QSI [18] - 494:7, 535:9, 537:11, 537:23, 537:24, 540:14, 540:16, 542:17, 542:23, 548:20, 549:16, 550:3, 550:6, 552:6, 552:9, 553:8, 554:16, 554:25

qualified [3] - 393:1, 420:16, 422:8

qualify [1] - 431:22

quality [4] - 391:14, 405:5, 453:17, 515:12

QUANTA [1] - 381:15

Quanta [106] - 417:2, 417:3, 427:7, 427:8, 427:9, 427:12, 427:13,

427:17, 427:19, 427:22, 458:21, 458:23, 458:25, 466:18, 472:17, 489:9, 492:25, 493:3, 493:11, 493:13, 493:16, 493:19, 493:20, 493:23, 494:5, 494:7, 494:8, 494:14, 494:15, 494:19, 510:25, 511:1, 511:2, 511:18, 511:19, 511:20, 511:21, 511:23, 512:11, 512:12, 514:14, 524:20, 524:21, 525:8, 525:13, 525:24, 526:14, 526:17, 531:5, 531:7, 531:11, 531:12, 531:18, 535:12, 535:15, 535:16, 537:8, 537:9, 540:7, 540:16, 540:23, 541:3, 541:8, 541:17, 542:8, 542:9, 543:19, 543:25, 544:1, 548:1, 548:17, 548:19, 548:21, 548:23, 549:1, 549:7, 549:17, 549:19, 550:3, 550:9, 550:19, 551:1, 551:3, 551:9, 551:19, 553:4, 553:23, 554:3, 554:14, 554:22, 555:21, 555:25, 556:1, 556:14, 557:24, 560:15, 560:21, 561:16, 566:3, 566:16, 567:1

Quanta's [3] - 549:22, 550:13, 553:16

quantified [1] - 406:18

quantify [4] - 393:11, 394:5, 394:18, 456:25

quantity [3] - 423:14, 439:7, 439:11

quarter [30] - 407:1, 430:18, 443:7, 443:13, 443:17, 443:20, 444:23, 457:7, 457:11, 457:13, 457:14, 457:16, 457:19, 459:12, 459:13, 459:14, 459:16, 459:17, 459:18, 459:20, 467:16, 467:17, 473:20, 478:6, 479:6, 484:12

quarter-by-quarter [1] - 457:7

quarterly [1] - 443:14

quarters [2] - 457:22, 467:14
QUESTION [1] - 408:25
questioned [1] - 512:21
Questions [2] - 556:17, 559:10
questions [27] - 478:15, 487:17, 501:12, 504:16, 509:21, 510:25, 511:18, 511:25, 512:10, 512:16, 512:23, 522:21, 522:22, 524:4, 524:18, 524:25, 526:10, 526:25, 527:3, 527:18, 543:19, 555:8, 555:19, 556:11, 556:22, 557:18, 570:16
quick [1] - 571:5
quickly [3] - 505:22, 539:5, 570:1
quiet [1] - 567:12
quite [4] - 387:3, 409:4, 484:7, 484:13
quotation [1] - 426:7
quote [7] - 416:8, 421:19, 423:2, 533:11, 540:24, 541:23, 542:9
quote-unquote [2] - 416:8, 421:19
quoted [1] - 547:3
quotes [1] - 551:11

**R**

race [2] - 448:17
raise [4] - 383:17, 515:16, 525:9, 527:7
raised [2] - 384:20, 532:8
raising [1] - 564:17
ran [7] - 456:24, 457:13, 458:1, 458:2, 458:22, 459:19, 484:1
random [1] - 474:22
rank [7] - 415:12, 429:4, 429:10, 429:16, 429:19, 429:20, 530:20
ranked [1] - 547:5

ranking [13] - 414:25, 415:7, 415:10, 415:16, 433:14, 433:15, 433:16, 433:19, 537:15, 545:25, 546:16, 554:12, 555:10
rankings [3] - 414:22, 550:23, 554:20
ranks [2] - 429:9, 434:18
rates [1] - 539:5
rather [6] - 416:15, 489:18, 490:10, 496:5, 533:8, 546:16
ray [1] - 460:15
rays [2] - 418:15, 460:17
re [1] - 523:3
re-examine [1] - 523:3
reach [6] - 416:16, 503:3, 505:24, 522:24, 525:14, 527:1
reached [8] - 405:16, 405:23, 524:2, 527:9, 527:11, 534:2, 550:4, 569:6
read [18] - 388:18, 408:23, 418:18, 440:5, 462:7, 502:2, 503:20, 504:6, 505:25, 511:14, 525:4, 533:21, 544:9, 551:17, 555:11, 557:22, 557:23
readable [1] - 418:18
reading [4] - 504:10, 506:5, 506:18, 533:13
ready [5] - 383:3, 487:25, 505:6, 506:11, 506:20
real [6] - 454:2, 480:24, 481:1, 499:17, 500:2, 548:15
really [20] - 418:8, 420:25, 421:7, 433:9, 433:11, 451:25, 478:8, 480:15, 480:17, 483:4, 504:18, 534:22, 537:25, 543:21, 544:22, 551:12, 563:4, 564:12, 567:20, 567:21
reap [1] - 557:16
reason [12] - 413:16, 463:17, 480:24, 481:14, 483:1, 498:17,

498:18, 519:23, 536:9, 555:20, 557:4, 566:9
reasonable [13] - 471:10, 475:4, 485:6, 486:2, 486:11, 486:13, 498:20, 509:4, 519:9, 521:8, 521:10, 548:8, 562:8
reasonably [2] - 432:22, 560:19
reasons [13] - 428:10, 431:21, 432:21, 460:16, 480:8, 499:6, 499:7, 506:19, 519:7, 556:8, 562:19, 562:21, 565:24
Rebuttal [1] - 382:7
recap [1] - 529:16
received [9] - 400:9, 408:17, 409:5, 409:24, 488:24, 491:2, 513:5, 536:14, 556:5
recently [1] - 449:5
Recess [3] - 435:25, 488:6, 505:14
recession [7] - 480:11, 480:14, 480:16, 480:18, 481:4, 481:10, 481:13
recipient [1] - 541:13
recognize [1] - 434:23
recollection [5] - 465:9, 465:17, 465:20, 523:13, 523:16
reconsidered [1] - 486:1
record [9] - 477:14, 488:17, 496:9, 496:10, 503:14, 503:16, 536:10, 571:19, 572:7
recorded [4] - 381:24, 396:10, 512:15, 512:23
recording [3] - 513:5, 513:11
recordings [1] - 513:19
records [2] - 536:16, 541:8
recover [2] - 508:19, 522:17
red [4] - 418:7, 442:18, 476:8, 476:9
Redden [1] - 381:12

redo [1] - 496:1
reduce [2] - 468:13, 468:14
refer [2] - 514:12, 514:13
reference [1] - 554:1
referenced [1] - 458:9
references [1] - 393:15
referred [1] - 522:4
referring [3] - 389:9, 415:23, 547:3
refers [2] - 448:20, 497:7
reflect [1] - 513:14
reflected [1] - 400:10
reflecting [2] - 442:22, 468:17
refusal [3] - 512:5, 512:10, 556:11
refusals [1] - 555:19
refused [1] - 511:24
refusing [2] - 510:24, 511:17
regard [1] - 507:15
regarding [1] - 488:25
regardless [2] - 492:21, 506:25
regression [47] - 401:22, 446:15, 446:16, 446:18, 446:22, 447:1, 447:5, 447:16, 448:7, 448:9, 448:16, 448:18, 449:13, 449:16, 450:3, 450:4, 451:11, 451:23, 452:12, 452:14, 453:6, 453:8, 453:12, 454:6, 455:5, 455:7, 455:12, 455:14, 455:18, 455:25, 456:13, 456:23, 456:25, 458:22, 458:24, 460:12, 460:19, 463:20, 470:9, 471:1, 473:3, 474:7, 475:1, 477:25, 480:13, 485:2
regular [1] - 504:12
regularly [2] - 552:16, 552:17
regulators [1] - 389:23
regulatory [3] - 385:7,

386:2, 387:8

reinforced[1] - 398:23

reiterate[1] - 407:2

relate[1] - 412:13

related[7] - 387:8, 396:23, 410:11, 411:2, 419:6, 482:18, 492:18

relates[1] - 409:20

relation[1] - 513:19

relationship[10] - 441:21, 442:5, 442:7, 444:18, 445:6, 451:16, 471:14, 471:20, 493:19, 494:5

relationships[2] - 427:11, 471:2

relative[6] - 421:1, 510:12, 510:13, 511:3, 511:20, 570:1

relatively[1] - 505:20

relevance[2] - 407:21, 407:22

relevant[10] - 423:16, 424:14, 490:6, 491:10, 496:23, 498:2, 498:8, 498:17, 519:13, 530:25

reliable[10] - 400:4, 422:9, 458:19, 460:19, 463:20, 473:17, 474:11, 474:13, 474:23, 475:3

relies[1] - 419:13

rely[4] - 408:16, 514:4, 523:11, 523:12

remaining[1] - 514:8

remember[15] - 473:7, 483:3, 501:20, 503:1, 507:7, 510:20, 523:7, 525:16, 530:3, 530:8, 543:5, 544:21, 549:13, 563:21, 563:22

remind[3] - 490:15, 497:23, 560:24

remorseful[1] - 567:6

removed[1] - 491:13

repeat[1] - 446:10

repeated[3] - 430:13, 430:14, 430:16

repeatedly[1] - 430:23

rephrase[2] - 410:17, 490:21

rephrasing[1] - 410:17

replaced[1] - 549:3

Reporter[1] - 381:22

REPORTER[1] - 408:24

reporter[3] - 506:16, 512:22, 571:7

Reporter's[1] - 382:8

REPORTER'S[1] - 572:5

reporting[1] - 552:8

reports[7] - 396:20, 396:25, 397:19, 398:5, 456:21, 458:18, 551:14

represented[4] - 450:2, 475:20, 489:7, 490:4

representing[1] - 512:21

request[1] - 426:6

required[7] - 502:18, 508:7, 512:4, 512:9, 514:3, 524:6, 555:18

requirement[1] - 431:19

requires[2] - 509:13, 518:7

rerun[1] - 458:25

research[19] - 388:15, 388:20, 388:21, 388:22, 388:24, 389:23, 391:5, 391:8, 391:12, 391:15, 396:25, 397:2, 397:20, 404:9, 405:2, 416:9, 435:4, 446:20

researched[1] - 404:21

reserve[2] - 559:12, 559:13

resources[2] - 385:12, 515:11

respect[4] - 394:10, 409:10, 460:10, 513:22

respectfully[2] - 559:5, 559:9

respective[1] - 405:13

respects[1] - 521:12

respond[2] - 498:10, 524:11

response[4] - 391:14, 408:15, 413:9, 497:5

responses[3] - 493:4, 493:5, 494:4

responsibility[1] - 506:21

responsible[1] - 520:9

responsive[1] - 471:6

rest[7] - 495:7, 496:15, 499:11, 500:14, 502:19, 507:23, 559:13

restate[2] - 489:23

restaurants[1] - 535:19

restrain[1] - 515:14

restrained[1] - 515:2

restraint[1] - 515:17

restrict[3] - 390:23, 411:8, 412:25

rests[5] - 501:9, 501:10, 501:14, 501:15, 515:9

Rests................... ............ [2] - 382:4, 382:5

result[20] - 393:13, 405:16, 405:23, 406:16, 407:5, 408:17, 445:22, 474:1, 474:7, 474:22, 486:24, 487:2, 526:7, 526:22, 527:6, 530:16, 534:4, 534:18, 541:22, 542:25

resulted[2] - 519:1, 519:2

resulting[2] - 487:8, 522:7

results[16] - 460:19, 475:7, 484:6, 484:10, 484:14, 484:16, 484:17, 484:24, 485:4, 485:7, 486:1, 486:12, 521:6, 542:20, 542:22

resume[4] - 389:6, 389:19, 390:1, 488:1

resumes[1] - 405:7

retained[5] - 386:11, 386:12, 391:17, 393:9, 532:15

rethink[1] - 475:8

retracts[1] - 463:12

return[2] - 561:24, 568:3

reviewed[3] - 388:22, 397:19, 398:4

rewritable[14] - 418:8, 418:13, 439:8, 454:22, 462:4, 462:9, 462:10, 462:13, 464:14, 466:13, 466:14, 466:15, 485:18

rewritables[3] - 418:11, 464:21, 465:2

RFQ[7] - 426:6, 426:16, 494:11, 530:21, 533:2, 536:15, 566:1

RFQs[3] - 434:24, 530:13, 531:23

ride[1] - 504:2

rigged[1] - 534:9

rigging[5] - 533:9, 533:18, 533:19, 534:8

rights[4] - 427:18, 427:21, 565:9

ring[1] - 532:23

rise[10] - 383:10, 401:13, 435:23, 436:3, 488:4, 488:9, 495:15, 501:3, 505:9, 570:7

River[6] - 385:2, 385:4, 385:5, 385:24, 386:5, 392:5

RMR[2] - 381:22, 572:11

road[11] - 415:20, 415:23, 416:3, 416:8, 539:4, 553:5, 553:6, 553:8, 553:9, 553:17, 553:24

Roberts[4] - 381:11, 545:16, 552:24, 554:1

ROBERTS[12] - 528:12, 528:16, 528:19, 528:23, 528:25, 529:2, 529:20, 529:22, 542:3, 571:14, 571:16, 572:1

Roberts.............. [1] - 382:6

robust[2] - 471:9, 484:8

role[2] - 386:1, 394:16

ROM[11] - 462:3, 462:13, 464:14, 465:3,

*466:13, 466:14, 475:22, 481:22, 531:12, 531:13*

*ROMs [4] - 418:10, 464:21, 468:22*

*room [11] - 428:17, 483:7, 483:9, 495:13, 502:17, 523:18, 524:17, 546:9, 565:7, 568:8, 569:6*

*rough [1] - 537:20*

*roughly [1] - 480:2*

*round [7] - 426:13, 426:14, 426:18, 530:20, 538:17, 538:18, 554:19*

*rounds [1] - 537:16*

*row [1] - 549:11*

*RPR [1] - 381:22*

*ruining [1] - 565:11*

*rule [3] - 496:5, 509:11, 565:4*

*rules [10] - 429:21, 531:21, 564:18, 564:21, 565:18, 565:21, 566:5, 566:8, 566:21, 567:25*

*rulings [1] - 506:9*

*run [12] - 453:12, 454:5, 456:13, 458:21, 460:18, 463:3, 463:19, 499:20, 500:7, 500:9, 528:8, 562:16*

*runs [1] - 455:17*

*rush [6] - 487:20, 502:10, 504:21, 505:3, 568:20*

*Rusk [1] - 381:23*

*Russell [6] - 381:20, 398:11, 530:7, 559:1, 563:15, 565:20*

## S

*S.H [1] - 533:17*

*sacrifices [1] - 501:18*

*safeguards [1] - 434:9*

*salaries [1] - 567:15*

*sale [3] - 417:22, 493:7, 494:13*

*sales [9] - 418:5, 419:9, 419:25, 420:1, 473:18,*

*534:6, 535:1, 539:3, 564:3*

*Sally [12] - 535:18, 535:19, 535:21, 535:25, 542:6, 542:16, 548:22, 550:18, 551:10, 551:14, 551:25, 552:4*

*sample [1] - 459:25*

*Samsung [2] - 417:16, 566:17*

*San [1] - 384:25*

*sanity [1] - 486:11*

*sat [1] - 523:23*

*SATA [1] - 554:17*

*satisfactory [1] - 510:21*

*satisfy [1] - 420:17*

*save [3] - 462:8, 462:9*

*saw [19] - 404:20, 416:25, 431:3, 466:20, 469:1, 482:22, 483:8, 485:16, 491:21, 492:2, 492:24, 493:23, 534:7, 542:7, 546:6, 547:6, 549:3, 566:11*

*scale [12] - 543:10, 543:18, 544:4, 545:11, 546:5, 547:23, 548:6, 549:22, 550:11, 551:5, 556:10*

*scales [3] - 543:13, 549:21*

*schedule [9] - 502:7, 502:11, 504:21, 504:23, 505:5, 568:9, 568:17, 569:3*

*scheduling [1] - 502:7*

*scheme [1] - 516:20*

*scholarly [1] - 388:19*

*School [1] - 388:3*

*school [4] - 384:21, 388:1, 564:18, 565:8*

*schools [1] - 388:18*

*sciences [1] - 446:14*

*scientists [1] - 401:23*

*scope [1] - 562:23*

*Scott [1] - 381:11*

*screen [3] - 387:17, 406:4, 545:20*

*searched [1] - 396:13*

*seat [4] - 383:21, 445:24, 456:8, 505:18*

*seated [4] - 383:12, 436:5, 488:11, 501:5*

*seats [1] - 448:1*

*second [22] - 387:12, 387:19, 395:23, 407:1, 415:15, 424:1, 429:3, 432:13, 445:24, 459:17, 460:4, 467:17, 476:11, 476:14, 485:25, 488:15, 490:16, 503:8, 503:15, 503:18, 525:4, 537:18*

*secondary [1] - 513:9*

*secondly [1] - 497:11*

*secret [2] - 412:17, 567:9*

*section [3] - 389:8, 389:19, 525:12*

*secure [1] - 415:13*

*security [2] - 524:10, 570:12*

*see [80] - 384:24, 387:20, 389:25, 391:9, 394:2, 394:4, 394:7, 399:17, 402:3, 402:10, 403:21, 405:19, 409:14, 416:13, 418:7, 418:10, 418:21, 420:5, 422:4, 431:14, 433:8, 435:22, 436:8, 436:11, 436:14, 436:17, 436:21, 436:23, 441:2, 444:2, 444:3, 444:4, 445:19, 450:16, 450:18, 451:17, 451:24, 452:18, 464:2, 464:10, 464:11, 464:16, 464:18, 467:13, 467:21, 468:2, 468:22, 471:23, 472:2, 472:5, 472:8, 476:21, 478:1, 480:10, 481:24, 482:6, 485:7, 485:13, 485:22, 488:1, 488:2, 495:13, 505:6, 505:7, 505:11, 524:23, 525:21, 528:8, 531:19, 535:4, 536:5, 536:10, 536:24, 537:20, 541:15, 543:19, 546:13, 548:25, 571:11*

*seeing [3] - 461:12, 468:16, 468:17*

*seeking [2] - 508:21, 559:7*

*seem [1] - 420:14*

*segregating [1] - 462:12*

*select [1] - 523:20*

*sell [4] - 433:3, 468:14, 566:4, 566:20*

*seller [5] - 493:16, 493:17, 493:18, 493:23, 493:24*

*sellers [7] - 420:16, 516:2, 519:4, 519:16, 521:11, 521:21*

*selling [3] - 420:25, 478:18, 494:16*

*Senate [1] - 502:14*

*send [7] - 558:15, 566:2, 566:15, 567:23, 569:18, 571:18*

*sends [2] - 540:12, 542:6*

*sense [3] - 427:19, 475:3, 475:7*

*sensitive [8] - 413:21, 416:6, 416:11, 551:22, 552:20, 553:5, 554:10, 556:4*

*sensitivity [2] - 471:4, 471:8*

*sent [2] - 532:25, 551:9*

*sentence [2] - 533:6, 534:5*

*separate [4] - 462:20, 463:3, 472:4*

*separated [2] - 461:24, 462:2*

*separately [3] - 458:2, 458:6, 464:14*

*separating [1] - 458:2*

*sequence [2] - 512:8, 528:6*

*serve [2] - 534:18, 536:6*

*service [5] - 524:5, 529:12, 562:17, 569:23*

*set [33] - 385:19, 385:21, 390:22, 401:12, 402:10, 411:7, 419:8, 426:14, 431:4, 456:11, 525:4, 527:2, 530:10, 531:22, 536:1, 536:3,*

Concordance

Day 5 - 605

536:21, 537:12, 538:17, 541:13, 542:16, 543:12, 545:3, 545:22, 550:19, 556:2, 568:9, 569:2, 569:3, 571:6, 571:7

*sets* [7] - 395:18, 404:17, 472:11, 525:3, 527:2, 532:6

*setting* [1] - 538:7

*seven* [1] - 533:18

*several* [2] - 416:24, 542:7

*severally* [2] - 487:8, 522:6

*sex* [5] - 448:16, 448:23, 450:10, 450:23, 451:5

*shall* [2] - 510:18, 510:23

*Shang* [1] - 510:19

*share* [19] - 413:4, 413:24, 415:4, 415:6, 416:7, 416:12, 419:15, 419:24, 420:4, 432:14, 516:20, 530:24, 551:22, 552:17, 552:20, 552:25, 555:2, 555:9, 555:10

*shared* [5] - 535:1, 545:23, 554:22, 556:3, 556:4

*sharing* [19] - 414:14, 415:11, 415:19, 416:2, 416:13, 416:15, 532:3, 532:21, 532:25, 534:21, 534:24, 536:23, 538:6, 546:20, 547:20, 554:10, 555:1, 557:10

*sheet* [1] - 505:13

*shelf* [1] - 539:6

*Sherman* [4] - 515:7, 515:13, 515:18, 515:23

*shift* [4] - 441:11, 442:24, 443:10, 471:18

*shifted* [1] - 442:21

*shifting* [3] - 442:3, 442:16, 443:15

*shifts* [8] - 442:15, 443:4, 443:17, 444:5, 444:7, 473:9, 473:11

*shipped* [21] - 399:4, 399:5, 399:6, 399:10, 399:15, 399:16,

399:18, 407:8, 407:9, 407:14, 407:15, 423:21, 423:23, 424:5, 424:6, 482:1, 482:3, 492:5, 492:9, 492:13, 561:13

*shock* [1] - 470:24

*shop* [1] - 570:24

*short* [4] - 435:18, 505:20, 516:10, 529:25

*shortage* [3] - 415:20, 535:2, 539:3

*shortages* [1] - 416:3

*shorter* [2] - 452:5, 505:2

*shortly* [3] - 495:14, 504:13, 568:25

*show* [19] - 390:2, 396:5, 424:13, 438:25, 443:3, 457:17, 461:18, 486:18, 489:5, 496:25, 516:21, 517:13, 519:17, 536:16, 540:3, 544:4, 544:11, 549:8, 549:9

*showed* [4] - 456:24, 474:6, 484:10, 551:6

*showing* [9] - 435:5, 439:6, 442:9, 443:16, 467:10, 467:19, 473:15, 475:23, 477:5

*shown* [6] - 396:4, 404:4, 440:21, 512:24, 518:10, 529:9

*shows* [7] - 407:23, 418:1, 418:3, 419:24, 421:6, 486:12, 554:5

*shut* [1] - 435:19

*side* [11] - 464:19, 471:16, 471:22, 473:2, 490:17, 504:9, 506:1, 547:25, 548:5, 565:14, 565:16

*sides* [1] - 510:10

*sign* [6] - 474:15, 505:24, 505:25, 524:4, 527:10, 571:22

*signed* [1] - 502:15

*significance* [8] - 414:2, 414:23, 416:1, 418:24, 425:6, 432:3, 468:4, 539:17

*significant* [2] - 419:2,

474:20

*significantly* [1] - 484:15

*similar* [1] - 532:19

*similarity* [2] - 518:14, 518:25

*similarly* [3] - 517:17, 518:18, 519:4

*simple* [2] - 450:5, 504:17

*simply* [3] - 467:10, 498:8, 509:12

*single* [3] - 478:21, 510:14, 539:21

*sit* [2] - 503:14, 505:12

*sitting* [2] - 503:18, 543:7

*situation* [3] - 413:15, 432:15, 547:16

*situations* [1] - 570:14

*six* [11] - 458:6, 465:24, 466:10, 466:18, 499:17, 532:22, 534:8, 538:22, 554:4, 554:8

*six-month* [2] - 554:4

*six-year* [1] - 532:22

*size* [2] - 460:24, 497:24

*skipping* [1] - 526:11

*Slide* [2] - 446:1, 467:3

*slide* [14] - 387:13, 390:11, 393:15, 396:12, 404:4, 405:20, 419:18, 419:22, 431:3, 463:23, 467:3, 477:9, 540:3

*slides* [1] - 463:11

*sliding* [1] - 464:19

*slight* [1] - 436:14

*slim* [3] - 460:22, 464:15, 464:21

*slimmer* [1] - 464:16

*slims* [1] - 461:25

*slip* [1] - 500:7

*slit* [1] - 463:13

*slope* [1] - 439:14

*sloping* [2] - 439:19, 439:22

*slot* [4] - 463:6, 463:13, 463:17, 550:6

*slow* [1] - 506:14

*small* [2] - 418:16, 420:17

*smaller* [1] - 461:8

*SNO* [2] - 540:14, 540:16

*society* [1] - 385:11

*sold* [21] - 407:11, 417:4, 418:5, 419:12, 419:25, 420:9, 427:9, 427:14, 427:23, 427:24, 460:3, 479:6, 479:15, 482:19, 487:3, 487:5, 487:13, 492:14, 521:14, 558:5, 558:7

*sole* [1] - 507:10

*solely* [2] - 512:13, 522:9

*someone* [2] - 421:25, 429:25

*sometime* [1] - 571:11

*sometimes* [14] - 391:20, 396:9, 406:4, 411:7, 443:3, 443:8, 443:13, 474:25, 475:1, 490:9, 498:13, 506:13

*somewhere* [2] - 428:17, 542:24

*Sony* [34] - 417:5, 417:17, 417:18, 427:10, 427:12, 427:15, 427:17, 427:24, 493:23, 493:24, 494:3, 494:5, 494:8, 494:9, 494:15, 494:20, 531:6, 532:18, 535:15, 537:7, 537:8, 537:10, 537:12, 537:24, 540:7, 540:16, 542:9, 547:16, 551:25, 553:8, 566:18

*Sony's* [1] - 553:6

*soon* [3] - 522:20, 522:23, 562:20

*sophisticated* [1] - 473:25

*sorry* [8] - 395:21, 418:24, 450:11, 472:16, 481:20, 553:7, 559:24, 567:7

*sort* [3] - 539:16, 543:9, 544:9

*sorts* [1] - 396:22

*sound* [8] - 389:17, 390:8, 475:10, 475:12,

Concordance

Day 5 - 606

484:15, 484:16, 485:3, 528:21

*sounds* [4] - 389:18, 390:9, 490:17, 528:21

*source* [1] - 473:17

*sources* [3] - 397:18, 444:22, 458:18

*SOUTHERN* [1] - 381:1

*speakers* [3] - 513:7, 513:12, 513:15

*speaking* [3] - 441:17, 509:6, 535:16

*special* [2] - 506:18, 513:25

*specialized* [1] - 386:18

*specialty* [2] - 385:21, 386:22

*specific* [2] - 466:8, 561:19

*specifically* [1] - 513:13

*specified* [1] - 456:23

*spectrum* [1] - 448:15

*speed* [1] - 506:17

*spell* [1] - 384:7

*spend* [1] - 560:20

*spent* [8] - 392:12, 395:14, 396:7, 406:22, 529:3, 531:3, 531:4, 558:18

*split* [5] - 432:2, 432:5, 432:19, 529:15

*spongy* [1] - 447:23

*sports* [1] - 383:13

*sports-wise* [1] - 383:13

*spotty* [1] - 463:2

*spy* [3] - 536:23, 536:25, 537:19

*stabilize* [11] - 515:16, 515:21, 516:1, 516:4, 518:1, 519:6, 519:16, 522:3, 525:9, 527:7, 545:3

*stabilized* [1] - 522:1

*stable* [1] - 484:7

*staff* [3] - 392:8, 395:12, 405:1

*stage* [6] - 400:24, 402:10, 456:11, 484:21, 484:23, 530:10

*stand* [7] - 475:24, 495:13, 509:24, 510:6, 512:18, 513:3, 570:5

*standard* [3] - 394:15, 447:3, 447:19

*standards* [1] - 422:9

*standing* [1] - 498:6

*standpoint* [1] - 421:10

*start* [12] - 421:15, 426:19, 444:16, 500:6, 503:22, 504:6, 506:5, 506:11, 528:11, 549:6, 559:19

*started* [5] - 400:2, 530:6, 536:19, 543:5, 564:23

*starting* [4] - 425:11, 426:19, 426:20, 431:4

*starts* [1] - 482:23

*state* [3] - 477:14, 514:1, 523:24

*state's* [1] - 536:8

*statement* [2] - 507:16, 543:21

*Statement* [4] - 382:6, 382:6, 382:7, 382:7

*statements* [6] - 496:22, 497:4, 507:20, 510:5, 520:14, 520:24

*STATES* [1] - 381:1

*States* [35] - 399:1, 399:4, 399:7, 399:12, 399:13, 399:16, 399:19, 407:8, 407:9, 407:12, 407:14, 407:16, 412:15, 423:21, 423:23, 424:5, 424:7, 482:2, 482:3, 487:4, 487:5, 487:14, 492:3, 492:6, 492:8, 492:9, 492:11, 492:15, 492:22, 496:3, 496:4, 511:22, 511:24, 531:4, 567:3

*states* [1] - 527:5

*statistical* [5] - 401:23, 404:13, 404:14, 454:5, 455:8

*statistically* [1] -

474:20

*statistics* [11] - 455:9, 455:13, 455:20, 455:25, 456:6, 474:8, 474:10, 474:21, 475:6, 475:10, 485:3

*stayed* [1] - 388:9

*stenography* [1] - 381:24

*step* [1] - 495:4

*stepped* [2] - 388:14, 503:6

*Steve* [3] - 537:7, 542:6, 551:25

*stick* [1] - 571:12

*still* [11] - 388:11, 452:23, 459:16, 484:15, 485:1, 485:2, 485:3, 486:8, 504:8, 565:25, 566:1

*stipulated* [1] - 495:23

*stop* [5] - 488:16, 526:25, 527:24, 528:2, 533:1

*stopped* [1] - 416:21

*stopping* [1] - 501:16

*Storage* [43] - 493:1, 511:1, 511:2, 511:18, 511:19, 511:20, 511:21, 511:23, 512:11, 512:12, 514:14, 524:20, 524:22, 525:8, 525:13, 525:24, 526:15, 526:18, 531:5, 531:8, 535:12, 535:16, 535:17, 537:8, 540:16, 540:23, 541:3, 541:9, 541:17, 548:19, 548:21, 548:23, 549:1, 550:3, 553:23, 555:21, 555:22, 555:25, 556:1, 560:15, 561:16

*STORAGE* [1] - 381:15

*straight* [4] - 511:9, 528:7, 528:10, 559:21

*strategizing* [1] - 540:10

*strategy* [7] - 385:8, 386:3, 388:12, 396:21, 429:2, 530:9, 530:17

*Street* [1] - 381:23

*stretch* [1] - 569:22

*strictly* [2] - 568:15, 569:2

*strike* [1] - 433:5

*strong* [3] - 412:9, 422:3, 558:15

*structured* [2] - 414:5, 415:2

*stuck* [1] - 521:17

*studied* [4] - 471:25, 472:12, 472:23, 479:25

*study* [8] - 385:10, 385:11, 385:12, 407:18, 467:7, 470:12, 486:16, 486:24

*subject* [9] - 386:17, 393:18, 467:7, 486:16, 495:20, 497:14, 498:25, 513:24, 563:9

*subjects* [1] - 435:14

*submit* [20] - 426:11, 537:9, 537:10, 541:23, 542:8, 549:18, 550:7, 552:11, 553:20, 556:9, 557:5, 557:17, 559:5, 559:9, 561:13, 561:23, 564:8, 566:24, 567:3

*submits* [1] - 542:9

*submitted* [3] - 426:9, 508:4, 542:24

*submitting* [3] - 425:4, 428:18, 428:19

*subsequent* [4] - 426:13, 426:14, 431:8, 532:10

*subsidiaries* [19] - 409:17, 409:20, 490:9, 490:12, 491:17, 491:20, 496:21, 496:25, 497:1, 497:2, 497:12, 497:20, 498:1, 498:4, 498:13, 561:11, 562:10, 563:19, 564:2

*subsidiary* [8] - 410:11, 489:18, 491:6, 491:13, 561:4, 561:21, 562:4

*subsumed* [1] - 543:23

*subtracted* [2] - 480:22, 481:15

*succeed* [3] - 420:19, 518:4, 520:4

*successful* [2] -

457:10, 457:23

suffer [1] - 516:7

suffered [8] - 393:12, 406:17, 409:11, 487:1, 498:22, 526:6, 526:21, 559:3

sufficient [3] - 394:5, 498:20, 510:14

sufficiently [1] - 422:9

suggest [1] - 420:21

suggests [1] - 416:14

suing [1] - 448:3

Suite [4] - 381:13, 381:17, 381:23, 533:7

sum [4] - 424:15, 481:20, 502:4, 504:7

summarize [1] - 525:4

summarized [3] - 401:5, 428:12, 435:2

summarizes [2] - 428:9, 439:15

summary [2] - 405:22, 406:15

summation [1] - 503:10

summations [1] - 504:1

summing [1] - 517:8

sums [1] - 544:10

Sunday [1] - 565:5

supervising [1] - 404:8

supervision [1] - 405:3

supplied [5] - 405:7, 420:7, 466:18, 493:1, 494:19

supplier [7] - 409:25, 410:1, 410:24, 422:6, 432:13, 433:4, 491:12

supplier's [3] - 397:17, 411:11, 431:1

suppliers [51] - 397:13, 397:25, 411:24, 413:24, 414:24, 415:19, 416:2, 420:25, 421:4, 422:7, 425:3, 426:5, 426:11, 428:3, 429:18, 430:24, 431:22, 431:24, 432:9, 432:10, 432:23, 433:9, 434:10, 439:16, 439:18, 439:25, 440:15, 440:23,

442:11, 442:16, 442:22, 470:11, 478:18, 530:14, 530:15, 531:21, 531:25, 532:1, 532:2, 533:24, 534:1, 534:14, 537:16, 542:14, 565:21, 566:3, 566:11, 566:15, 567:2

supply [61] - 397:11, 397:16, 402:15, 403:7, 403:13, 415:5, 421:5, 427:1, 427:19, 430:18, 432:25, 433:6, 433:10, 434:7, 437:11, 438:12, 439:5, 439:14, 439:18, 439:23, 440:4, 440:11, 440:16, 442:3, 442:5, 442:15, 442:17, 442:18, 442:21, 443:3, 443:12, 443:14, 443:17, 443:23, 444:5, 444:11, 444:19, 445:1, 454:24, 455:1, 456:17, 458:3, 458:17, 470:8, 470:9, 471:2, 471:14, 471:16, 471:18, 471:20, 471:22, 473:1, 473:10, 473:22, 474:9, 474:14, 475:11, 475:13, 481:9, 484:4

supply-and-demand [1] - 403:7

supplying [1] - 442:10

support [3] - 391:12, 416:15, 559:7

supports [4] - 508:1, 548:8, 556:19, 557:20

suppose [3] - 441:7, 441:11, 450:7

susceptibility [3] - 430:15, 431:20, 432:4

susceptible [6] - 424:21, 428:11, 429:5, 432:19, 433:15, 434:25

sustain [1] - 490:20

switch [7] - 411:4, 423:11, 427:6, 428:1, 435:13, 435:17, 564:11

sworn [6] - 383:17, 383:19, 383:23, 502:16, 512:15, 550:1

sympathy [1] - 508:11

system [2] - 505:4,

569:24

systematic [1] - 467:23

systematically [1] - 448:24

**T**

table [1] - 535:7

Taiwan [5] - 417:3, 417:12, 422:23, 427:17, 550:4

talks [3] - 389:19, 390:18, 542:11

tall [1] - 451:3

Tango [2] - 551:7, 551:20

taught [5] - 388:2, 388:4, 388:5, 388:6, 388:15

tea [3] - 551:7, 551:10, 551:13

TEAC [2] - 417:19, 566:17

teach [2] - 388:10, 388:18

teaching [7] - 386:25, 387:10, 387:25, 388:10, 388:12, 388:14, 388:19

team [10] - 392:8, 396:24, 398:4, 400:22, 401:19, 404:1, 404:3, 405:1, 530:21

technical [4] - 476:18, 513:24, 514:1, 514:2

technically [1] - 491:19

technique [1] - 401:23

technology [4] - 387:6, 387:9, 422:18, 423:7

Telecommunications [1] - 389:1

telecommunications [3] - 387:6, 387:9, 390:14

tempers [1] - 432:15

tempting [1] - 432:9

ten [7] - 386:24, 388:3, 483:12, 483:17, 487:24, 495:12, 551:18

tend [3] - 412:16, 452:4,

508:24

tenure [4] - 449:6, 449:9, 449:11, 449:12

term [2] - 420:3, 453:24

terms [4] - 397:11, 399:23, 402:11, 402:12

Terry [1] - 547:15

test [6] - 400:1, 401:20, 455:9, 483:24, 484:2, 510:12

testable [1] - 400:4

tested [3] - 422:8, 422:11, 431:23

testified [22] - 383:23, 391:3, 492:25, 498:12, 498:13, 510:10, 510:15, 513:2, 530:7, 531:1, 531:4, 531:9, 531:20, 532:19, 533:8, 533:10, 536:13, 537:4, 537:8, 545:16, 550:19, 551:1

testify [3] - 512:18, 533:4, 536:7

testifying [1] - 511:8

testimony [57] - 385:23, 390:13, 392:23, 393:16, 413:23, 414:20, 415:18, 437:8, 437:14, 458:10, 466:17, 466:22, 490:8, 491:11, 491:19, 494:4, 494:8, 496:2, 507:18, 508:3, 509:2, 509:7, 509:20, 509:23, 510:2, 510:7, 510:11, 510:13, 510:18, 510:23, 511:16, 512:14, 512:19, 512:23, 512:24, 513:17, 523:17, 529:23, 529:24, 530:2, 532:17, 532:18, 533:5, 534:8, 535:3, 535:11, 536:3, 539:10, 549:12, 549:16, 550:1, 550:12, 551:3, 556:8, 560:24, 567:5

testing [1] - 400:23

tests [2] - 422:7, 422:12

TEXAS [1] - 381:1

Texas [4] - 381:13, 381:23, 399:8, 502:20

text [2] - 532:24, 539:8
texting [1] - 567:11
thankful [1] - 529:6
THE [191] - 381:7, 381:10, 381:15, 383:3, 383:5, 383:9, 383:12, 383:17, 383:20, 383:21, 384:7, 384:9, 384:14, 384:15, 387:14, 387:17, 387:19, 387:23, 393:3, 406:2, 406:7, 406:8, 406:12, 407:22, 408:1, 408:15, 408:20, 408:23, 408:24, 409:3, 409:23, 410:4, 410:6, 410:8, 410:17, 413:9, 413:12, 424:2, 424:3, 424:9, 424:10, 435:15, 435:19, 435:23, 436:1, 436:5, 436:9, 436:13, 436:19, 436:21, 436:24, 437:2, 437:6, 437:16, 437:18, 437:19, 437:20, 437:21, 437:23, 438:1, 438:6, 438:7, 438:8, 438:22, 438:24, 446:3, 447:9, 447:11, 447:13, 447:14, 449:22, 450:11, 450:14, 450:15, 450:18, 450:19, 450:20, 460:7, 460:24, 461:1, 461:3, 461:6, 461:7, 461:10, 461:13, 461:14, 461:20, 464:5, 464:7, 464:9, 465:4, 465:8, 465:14, 465:16, 466:2, 466:5, 475:24, 475:25, 476:2, 476:5, 476:8, 476:9, 476:10, 476:13, 476:16, 476:19, 476:23, 477:1, 477:3, 477:4, 477:5, 477:8, 477:11, 477:13, 477:19, 481:1, 481:2, 481:3, 483:15, 483:18, 483:20, 487:18, 487:23, 488:4, 488:7, 488:11, 488:15, 488:18, 489:12, 489:22, 489:24, 490:16, 490:20, 495:1, 495:3, 495:5, 495:6, 495:11, 495:17, 496:5, 496:8, 496:12, 496:16, 497:5, 497:14, 498:10, 498:23, 499:6, 499:14,

499:24, 500:1, 500:12, 501:5, 501:10, 501:15, 502:1, 503:7, 503:8, 503:17, 505:9, 505:11, 505:15, 505:18, 511:7, 511:12, 511:14, 516:14, 517:6, 525:3, 528:14, 528:17, 528:21, 529:1, 529:18, 529:21, 541:25, 559:17, 559:21, 560:1, 560:6, 560:8, 562:12, 568:5, 568:25, 569:10, 569:15, 570:10, 571:8, 571:11, 571:15, 571:20
theme [1] - 532:20
themselves [3] - 513:20, 517:15, 544:12
theory [2] - 388:5, 475:5
therefore [5] - 449:5, 496:4, 518:10, 520:5, 552:6
they've [1] - 547:1
thicknesses [1] - 460:25
thinking [3] - 397:24, 435:4, 502:12
third [13] - 397:18, 399:8, 406:25, 429:23, 433:22, 459:18, 459:20, 467:15, 473:16, 473:20, 492:11, 537:18, 550:6
third-party [2] - 397:18, 473:16
threat [3] - 421:10, 430:7, 430:8
three [13] - 384:24, 388:13, 399:6, 404:10, 424:25, 430:19, 430:21, 461:15, 464:20, 543:22, 547:9, 547:11, 565:9
throughout [4] - 398:6, 399:19, 472:9, 502:20
throw [1] - 499:19
Thursday [2] - 565:5, 565:6
tie [3] - 438:3, 438:4, 497:21
timeframe [9] - 421:13, 421:16, 421:23, 423:16, 424:14, 441:7,

554:4, 554:5, 569:15
timing [2] - 503:9, 505:13
tip [1] - 543:10
tipping [1] - 543:10
title [2] - 385:25, 472:14
today [13] - 499:17, 499:21, 500:5, 502:4, 532:14, 549:10, 558:17, 561:6, 566:1, 566:2, 568:17, 570:15, 571:12
together [9] - 422:23, 470:15, 470:20, 492:15, 506:9, 517:10, 518:16, 519:12, 537:9
Tomlin [1] - 404:5
tomorrow [17] - 500:5, 501:20, 502:3, 502:5, 502:12, 502:17, 504:19, 549:10, 569:3, 569:15, 570:15, 570:18, 570:19, 571:12, 571:17, 571:25
tonight [1] - 568:11
took [14] - 388:9, 394:6, 399:22, 399:24, 401:2, 439:1, 445:6, 463:7, 480:20, 492:21, 523:9, 531:16, 555:5, 564:2
tool [4] - 446:18, 446:23, 447:3, 447:19
top [4] - 427:4, 476:4, 476:5, 535:23
topic [3] - 435:4, 559:4, 564:7
topics [3] - 397:3, 555:23
topside [1] - 563:13
TOSHIBA [1] - 381:5
Toshiba [2] - 417:16, 566:16
total [14] - 392:19, 402:8, 406:20, 419:24, 424:13, 425:5, 425:14, 425:16, 425:17, 426:25, 480:23, 481:18, 499:16, 531:8
towards [1] - 468:23
trade [4] - 441:16, 515:2, 515:14, 515:17
training [1] - 513:25

transacted [1] - 397:5
transaction [3] - 396:2, 396:4, 396:10
transactions [26] - 395:21, 395:25, 396:1, 400:10, 400:11, 404:18, 409:16, 409:19, 409:24, 410:3, 410:22, 410:24, 456:15, 458:12, 458:13, 458:16, 467:11, 491:13, 491:21, 491:24, 492:20, 494:2, 521:16, 564:2
transcript [2] - 513:4, 572:7
Transcript [1] - 381:25
transcription [1] - 381:25
transcripts [6] - 513:7, 513:8, 513:14, 513:18, 513:19, 513:21
transitioned [1] - 387:3
translation [1] - 541:1
transmit [1] - 494:10
tray [5] - 463:5, 463:10, 463:11, 463:12, 463:16
treat [1] - 413:20
treated [3] - 469:2, 469:3, 536:25
trial [16] - 427:8, 506:13, 507:2, 507:5, 507:13, 508:1, 512:16, 512:20, 512:24, 514:10, 523:8, 523:9, 530:6, 544:24, 556:14, 568:6
Trial [1] - 382:1
TRIAL [1] - 381:6
tried [1] - 570:10
true [8] - 394:19, 394:21, 394:25, 426:23, 433:9, 468:11, 471:2, 483:2
trust [2] - 545:19, 567:1
truth [1] - 429:15
truthfulness [1] - 509:22
try [14] - 395:1, 411:20, 434:10, 437:17, 450:4, 452:6, 506:16, 527:17, 528:17, 531:23,

548:11, 557:15, 558:12, 564:13

*trying* [11] - 425:10, 443:3, 450:7, 471:11, 504:22, 505:4, 536:11, 544:15, 544:17, 544:18, 555:3

*TSST* [19] - 417:15, 533:19, 534:2, 534:10, 534:20, 536:22, 537:23, 546:22, 547:3, 547:7, 547:16, 549:16, 551:7, 551:10, 551:20, 552:1, 552:2, 552:5, 553:18

*Tuesday* [1] - 501:20

*turn* [11] - 389:13, 447:11, 460:5, 476:3, 476:6, 488:12, 506:18, 516:18, 529:19, 559:25

*turned* [6] - 395:19, 398:19, 406:20, 457:21, 470:6, 536:8

*turns* [2] - 394:18, 468:6

*twice* [2] - 537:5, 552:16

*two* [33] - 391:24, 424:15, 451:25, 453:22, 456:11, 467:21, 469:3, 470:12, 470:15, 480:8, 484:3, 484:18, 493:6, 498:23, 499:1, 505:12, 507:7, 509:6, 511:8, 514:16, 516:19, 535:14, 538:1, 538:21, 539:23, 547:8, 550:4, 554:19, 556:22, 557:19, 564:17, 564:18, 565:23

*type* [15] - 454:23, 455:2, 456:15, 460:2, 460:14, 460:22, 467:11, 468:18, 468:20, 472:8, 481:21, 481:25, 486:21, 532:3, 538:6

*types* [17] - 400:13, 400:15, 400:16, 418:2, 418:4, 418:16, 424:25, 435:8, 448:10, 458:7, 509:6, 523:25, 531:9, 531:17, 531:24, 532:19, 542:7

*typewritten* [1] - 513:4

*typically* [10] - 415:2, 415:5, 416:6, 430:17, 432:6, 433:4, 443:13,

460:21, 460:23, 465:1

*Tzeng* [6] - 510:24, 511:2, 511:5, 511:10, 511:17, 511:19

## U

*U.S* [7] - 524:16, 565:22, 566:6, 566:9, 566:22, 567:25, 569:10

*uh-oh* [2] - 549:21, 550:16

*ultimately* [3] - 405:16, 443:5, 492:21

*ultraslim* [5] - 460:23, 464:24, 465:2, 465:6, 466:19

*ultraslims* [1] - 462:1

*unanimous* [6] - 523:23, 523:25, 524:1, 524:2, 527:9, 569:7

*unbiased* [1] - 508:8

*under* [12] - 405:2, 406:20, 444:11, 482:7, 485:11, 494:2, 512:17, 512:19, 512:22, 515:17, 515:22, 553:11

*undercharge* [1] - 445:22

*undercharges* [1] - 480:21

*undercut* [5] - 411:20, 421:11, 432:10, 432:12, 441:5

*undercutting* [3] - 411:21, 429:12, 432:17

*underestimated* [1] - 486:6

*underlies* [1] - 412:8

*underlying* [1] - 459:3

*underneath* [2] - 447:24, 448:1

*understood* [3] - 410:2, 547:19, 563:25

*underway* [3] - 501:19, 504:5, 569:16

*undisputed* [1] - 496:2

*unduly* [1] - 523:14

*unequals* [1] - 502:24

*unfettered* [1] - 515:8

*unique* [1] - 480:15

*unit* [3] - 470:14, 477:20, 479:5

*United* [35] - 399:1, 399:4, 399:6, 399:12, 399:13, 399:16, 399:19, 407:8, 407:9, 407:12, 407:14, 407:16, 412:15, 423:21, 423:23, 424:5, 424:7, 482:2, 482:3, 487:4, 487:5, 487:14, 492:3, 492:6, 492:8, 492:9, 492:11, 492:14, 492:22, 496:3, 496:4, 511:22, 511:24, 531:3, 567:2

*UNITED* [1] - 381:1

*units* [7] - 402:8, 471:24, 472:8, 472:14, 479:6, 479:15, 479:16

*universities* [2] - 389:22

*University* [4] - 384:15, 387:1, 388:2, 391:13

*unlawful* [1] - 515:4

*unless* [6] - 553:14, 553:19, 555:3, 557:6, 569:5, 571:12

*unpack* [1] - 405:17

*unquote* [2] - 416:8, 421:19

*unreasonable* [2] - 515:17, 521:10

*unreasonably* [2] - 515:2, 515:14

*unreliable* [1] - 513:22

*unspoken* [1] - 516:24

*unusual* [1] - 400:24

*up* [67] - 383:3, 384:18, 384:20, 387:12, 389:4, 393:15, 393:17, 406:3, 406:4, 425:19, 429:25, 431:9, 431:18, 438:20, 443:8, 443:10, 443:18, 445:25, 453:10, 470:15, 471:24, 473:13, 474:17, 475:24, 481:18, 495:8, 495:9, 500:3, 500:4, 502:4, 504:7, 504:19, 504:25, 505:7, 506:1, 506:15, 506:17, 514:4, 514:11, 517:8, 522:21,

523:4, 528:5, 531:14, 531:22, 533:2, 533:7, 539:1, 542:1, 542:11, 543:15, 544:10, 545:9, 546:2, 547:13, 549:21, 550:8, 552:4, 559:23, 560:3, 568:14, 568:15, 568:19, 569:2, 571:17

*upcoming* [3] - 540:10, 552:9, 553:1

*upholding* [1] - 429:16

*upsetting* [1] - 484:6

*upward* [1] - 439:14

*useful* [2] - 538:9, 539:9

*user* [1] - 399:18

*uses* [2] - 447:25, 452:10

## V

*vague* [2] - 409:22, 410:13

*validity* [2] - 483:24, 484:2

*Valley* [1] - 502:19

*valuable* [1] - 433:22

*value* [2] - 453:2, 481:25

*Van* [3] - 537:7, 542:6, 551:25

*variability* [6] - 451:18, 452:23, 453:3, 453:25, 454:1, 454:2

*variable* [5] - 451:12, 451:22, 452:13, 452:21, 474:24

*variables* [10] - 448:21, 452:11, 452:24, 453:4, 453:22, 455:16, 474:9, 474:14, 484:3

*variation* [1] - 474:22

*varies* [2] - 472:3, 482:13

*variety* [6] - 397:2, 446:21, 447:17, 447:25, 448:2, 448:19

*various* [3] - 434:9, 460:10, 518:14

*vary* [3] - 468:18, 472:7, 482:15

*vast* [1] - 537:6

*venture* [6] - 417:7, 417:9, 417:11, 417:15,

417:18, 423:5

*ventures* [2] - 422:21, 427:16

*verdict* [20] - 502:9, 503:3, 505:24, 507:13, 508:12, 512:13, 522:24, 523:23, 524:1, 524:2, 524:4, 527:9, 527:10, 527:11, 527:14, 561:24, 568:4, 569:7, 569:17, 570:11

*verdicts* [1] - 523:25

*verify* [1] - 397:18

*verifying* [1] - 405:4

*versus* [8] - 457:11, 457:24, 461:25, 462:1, 462:16, 463:6, 561:20, 562:10

*vertical* [5] - 420:4, 439:10, 440:6, 478:5, 479:4

*vet* [1] - 400:1

*vice* [2] - 385:23, 385:25

*video* [10] - 502:21, 529:24, 532:17, 534:7, 545:17, 549:9, 563:7, 564:22

*videos* [1] - 545:18

*view* [2] - 486:11, 518:22

*violated* [2] - 515:1, 515:5

*violates* [1] - 522:5

*violations* [1] - 515:6

*virtue* [1] - 556:10

*visit* [5] - 503:1, 503:2, 504:12, 505:1, 527:17

*visited* [1] - 496:6

*voir* [1] - 543:5

*volume* [14] - 415:4, 421:1, 421:5, 421:8, 423:15, 423:17, 425:14, 425:15, 425:16, 427:4, 433:10, 522:2, 535:1, 539:3

*volumes* [1] - 417:25

*voluminous* [1] - 395:18

*voluntarily* [2] - 525:25, 526:16

*Vorst* [3] - 537:7, 542:6, 551:25

*vulnerable* [1] - 435:10

## W

*wage* [1] - 471:8

*wait* [1] - 487:18

*walk* [1] - 476:21

*walked* [1] - 565:7

*Wang* [1] - 381:21

*wants* [6] - 405:10, 499:22, 542:8, 551:7, 551:10, 558:15

*war* [1] - 481:5

*warehouse* [1] - 539:6

*warm* [2] - 383:5, 383:7

*watched* [1] - 567:5

*ways* [4] - 391:1, 415:13, 484:5, 484:15

*weather* [1] - 554:8

*week* [4] - 383:14, 529:3, 529:23, 541:19

*weekend* [2] - 383:13, 503:11

*weeks* [2] - 540:23, 565:9

*weigh* [1] - 556:18

*weighed* [2] - 510:11, 512:25

*weighing* [2] - 509:15, 509:22

*weight* [11] - 509:20, 523:15, 543:17, 545:9, 546:3, 546:5, 547:23, 548:5, 550:9, 551:5, 556:10

*Wells* [4] - 381:22, 572:6, 572:10, 572:11

*whatsoever* [3] - 392:22, 487:20, 556:15

*whereas* [2] - 455:24, 460:22

*whereby* [2] - 494:6, 550:5

*whole* [19] - 384:22, 411:3, 418:6, 432:10, 432:11, 442:12, 501:15, 507:15, 518:23, 518:24, 532:21, 536:23, 538:8, 544:8, 544:9, 556:7, 556:25, 557:22, 558:14

*wide* [1] - 460:24

*widely* [1] - 435:4

*widely-cited* [1] - 435:4

*width* [1] - 461:16

*wife* [1] - 564:15

*willing* [3] - 439:18, 442:17, 552:2

*win* [12] - 411:20, 411:22, 413:19, 414:13, 414:17, 432:10, 432:11, 433:20, 433:23, 434:6, 550:6

*win/lose* [1] - 432:15

*winner* [5] - 415:3, 426:24, 432:6, 432:8, 434:1

*winner-take-all* [1] - 432:6

*winners* [2] - 415:4, 426:15

*wise* [2] - 383:13, 383:14

*Witness* [1] - 383:19

*witness* [22] - 383:15, 391:3, 436:16, 495:6, 501:8, 509:15, 509:24, 510:3, 510:6, 510:7, 510:11, 510:14, 510:17, 512:1, 512:16, 512:17, 512:18, 512:22, 513:2, 513:3, 514:4, 563:6

*WITNESS* [35] - 383:20, 384:9, 384:15, 410:6, 424:3, 424:10, 437:18, 437:20, 437:23, 438:6, 438:8, 438:22, 447:11, 447:14, 450:14, 450:18, 450:20, 461:1, 461:6, 461:10, 461:14, 464:7, 465:8, 465:16, 475:24, 476:2, 476:8, 476:10, 476:19, 477:3, 477:5, 477:19, 481:2, 489:24, 495:5

*witness's* [5] - 509:18, 509:24, 512:5, 512:9, 512:18

*WITNESSES* [1] - 382:10

*witnesses* [15] - 501:13, 506:14, 507:18, 509:2, 509:22,

509:23, 510:10, 510:11, 510:12, 510:15, 510:24, 532:19, 533:4, 536:9, 545:15

*Wolk* [1] - 381:16

*women* [4] - 448:24, 449:3, 449:9, 511:8

*women's* [1] - 438:9

*won* [2] - 391:5, 391:7

*wonderful* [2] - 564:15

*word* [2] - 461:4, 533:13

*words* [10] - 426:8, 436:13, 479:23, 480:22, 481:6, 518:13, 525:14, 545:6, 568:25, 569:16

*works* [4] - 392:8, 398:17, 405:19, 527:2

*world* [9] - 402:21, 402:22, 402:24, 413:1, 420:9, 421:6, 479:20, 565:10

*worldwide* [6] - 418:5, 419:25, 420:1, 491:22, 531:2

*Worldwide* [1] - 473:17

*worried* [1] - 485:24

*worry* [1] - 432:24

*worth* [1] - 566:4

*wrap* [4] - 505:6, 522:21, 528:5, 559:23

*wrap-up* [1] - 522:21

*writability* [2] - 462:4, 462:11

*write* [3] - 418:19, 462:8, 524:9

*writes* [1] - 535:21

*writing* [3] - 524:12, 542:16, 561:1

*written* [3] - 516:22, 524:3, 546:10

*wrote* [3] - 388:25, 531:14

## Y

*y'all* [3] - 531:13, 534:13, 541:5

*Yang* [8] - 534:17, 536:18, 540:12, 540:24, 549:6, 550:25,

*552:25*

*year [6] - 386:7, 388:10, 420:6, 443:7, 530:12, 532:22*

*years [20] - 384:23, 386:15, 386:19, 386:21, 386:23, 386:24, 387:4, 387:7, 388:4, 388:11, 388:14, 392:13, 399:23, 420:6, 420:8, 446:24, 484:19, 484:20, 558:18, 565:2*

*yellow [1] - 485:13*

*yesterday [1] - 554:17*

*yourself [7] - 384:3, 384:18, 514:9, 522:25, 544:3, 544:9, 557:23*

*yourselves [1] - 530:4*

*Yu [4] - 535:18, 550:16, 550:17, 551:9*

## Z

*zero [2] - 419:3, 420:5*